RECEIVED
JAN 28 2026
KL 7u03
U.S.C.A. 3rd CIRCUIT

**No. 25-1805**

**UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

Jessica Brink

Plaintiff-Appellant,

v.

John Bormann, et al.

Defendants-Appellees.

On Appeal from the United States District Court of New Jersey

---

INFORMAL BRIEF FOR APPELLANT JESSICA BRINK

---

Jessica Brink (*Pro Se*)
8 Gordon Court
Port Monmouth, NJ 07758
Tel.: (732) 492-4690

January 24, 2026

**List of Documents**


| Document | No. of Pages |
|---|---|
| Appellant Brief | 31 |
| Certificate of Service | 1 |
| District Court Docket | 7 |
| Second Amended Complaint | 59 |
| Dismissal Order | 1 |
| Dismissal Opinion | 17 |
| Notice of Appeal | 1 |
| Denial of Reconsideration | 2 |
| **Exhibits** | |
| ESS Contract and Addendum | 21 |
| Nurse Montanez Authorized, NOT Approved | 2 |
| Get you on the List for the Vaccine | 2 |
| Nurse Montanez Vaccine Experience | 4 |
| Resource for Informed Consent | 1 |
| Nurse Montanez - Political Topic | 1 |
| Bormann Response to Resource for Informed Consent | 1 |
| Start Smoking | 2 |
| Requesting Clarity on Quarantine Decision | 2 |
| Flow Chart Decision Tool | 3 |
| Dismissal from Rumson - emails | 5 |

**No. 25-1805**

# UNITED STATES COURT OF APPEALS
# FOR THE THIRD CIRCUIT

Jessica Brink

Plaintiff-Appellant,

v.

John Bormann, et al.

Defendants-Appellees.

On Appeal from the United States District Court of New Jersey

---

INFORMAL BRIEF FOR APPELLANT JESSICA BRINK

---

Jessica Brink (*Pro Se*)
8 Gordon Court
Port Monmouth, NJ 07758
Tel.: (732) 492-4690

January 24, 2026

## JURISDICTION

The District Court entered a final order dismissing with prejudice, the Second Amended Complaint on March 24, 2025. Plaintiff-Appellant filed a timely notice of appeal on April 23, 2025. A Motion for Reconsideration was denied on November 24, 2025. Appellant appeals the final order to dismiss.

## INTRODUCTION

This is a First Amendment case that was dismissed for failure to state a claim upon which relief can be granted. On one side is Appellant Jessica Brink, a nurse since 2006, whose passion is patient advocacy. On the other side are Appellees Rumson School District a small, affluent district in central New Jersey and its Superintendent John Bormann.

In the summer of 2020 the Rumson School District needed "extra hands" in its nursing department. Superintendent Bormann learned that the school custodian's daughter (Appellant Jessica Brink) was a nurse. He contacted Ms. Brink and directed her to a third-party employment agency for hiring. Ms. Brink began work as a supplemental nurse in the Fall of 2020, during the COVID pandemic.

As a certified patient advocate Ms. Brink is always focused on the rights of those needing care and protection. After two months of employment it became apparent that the State and Federal COVID guidelines were not being properly

implemented or followed. Ms. Brink noticed unsafe clinical practices, unequal treatment, and potential violations of law. Ms. Brink spoke up.

None of this speech was part of her job duty and none of it was ordinary. Ms. Brink was an agency nurse. She was designated a substitute. She was not a certified school nurse. She had no formal training in public health or school law. Her role was purely ministerial. In fact, she was never given a job description for her role. She had no contract. Each day, her job was to do as the certified nurses instructed.

On the first day of February Ms. Brink tried one last time to explain the discrepancies and dangers she observed. She expressed genuine concern for the staff, students, and families. Bormann terminated her position during that conversation and told her she was not welcome back at the school. In an email to the Board regarding Ms. Brink's termination he stated that Ms. Brink was not an employee. She was questioning protocols, making staff uncomfortable, and requesting to send anti-vaccination information. The day after Ms. Brink was terminated Bormann updated Rumson School's COVID protocols. In doing so, he addressed some of the very concerns Ms. Brink was fired over.

We know the devastation caused by COVID and we pray that nothing like that ever happens again. But should another pandemic strike, or should another nurse find herself in similar situation, the District Court's ruling in this case may leave that speech unprotected. If allowed to stand, this ruling has the potential to

silence the few outsiders who are brave enough to speak up. Those agency employees with firsthand knowledge but no collective bargaining agreement, no union or civil service protection, no tenure. Temporary employees who likely can't afford a lawyer, but are willing to take the risk of speaking up because "just following orders" is not on course with their ethical compass.

Appellees admit that Ms. Brink was not an employee of the School District. They acknowledge that her speech was advocacy. They do not claim that her concerns were unwarranted or disingenuous. They do not claim that her speech or conduct was disruptive. Their argument is that she should be treated as a contractor or subcontractor and that <u>all</u> of her speech is unprotected because it is part of what nurses do. This argument fails for four reasons.

First, the contract between the Rumson School District and the third-party agency specifically states that employees of the agency are not to be treated as employees of the district for any reason.

Second, as a matter of law, Ms. Brink cannot be a contractor or a subcontractor because she does not meet the policy or statutory requirements.

Third, as a matter of law and common sense, a substitute, non-certified agency nurse is not responsible for guideline interpretation and compliance, policy assessment, clinical safety, staff training, and advocacy.

Finally, its not practical that an agency nurse with less than four months experience would be expected to take on such a role at any point, and especially in the midst of a world-wide pandemic.

**STATEMENT OF THE CASE**

This record in this case is surely not a shining example of clarity or efficiency. Three iterations of a verbose complaint; briefs bursting with block quotes; and voluminous exhibits. As a pro se, Ms. Brink's legal theory has evolved as her knowledge of contracts, statutes, and case law has grown. Because of this, her understanding of how the law applies to the facts has changed, but the facts remain the same.

ORIGINAL COMPLAINT

The original complaint was filed on January 26, 2023 and dismissed on September 25, 2023. It contained three defendants, eight federal claims, and four state law claims including claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and U.S. Const. amends. I and XIV, and a *Monell* claim, as well as state law claims. In this first version of the Complaint, Ms. Brink incorrectly identifies herself as an Independent Contractor. Ms. Brink also incorrectly identifies the Board of Education's Appointment Letter as a contract. Both misconceptions led to several claims which were inappropriate, like due process and breach of contract. The Court did not take supplemental jurisdiction of State law claims. When Defendants did not respond timely, Ms. Brink filed a Request for Entry of Default,

which was entered by the Clerk, and a Motion for Judgment of Default. In an Opinion dated September 25, 2023 the lower Court court vacated the default and dismissed the Motion for Default Judgment. Ms. Brink's original Complaint was dismissed without prejudice with 30 days leave to amend.

AMENDED COMPLAINT

Ms. Brink filed an Amended Complaint on October 24, 2023 asserting two counts against Defendants Bormann and the Board of Education: (1) First Amendment retaliation in violation of 42 U.S.C. § 1983; and (2) First Amendment viewpoint discrimination, in violation of 42 U.S.C. § 1983. 18 days later, when Defendants' failed to file a response, Ms. Brink requested an Entry of Default from the Clerk and it was entered.

In an Opinion dated June 25, 2024 the Court vacated the default and dismissed the Amended Complaint for failure to assert that she was deprived of any right protected by the First Amendment.

SECOND AMENDED COMPLAINT

Ms. Brink filed a Second Amended Complaint on July 30, 2024 asserting the same two counts as the previous Complaint. Additionally Ms. Brink filed a Motion for Judicial Notice to evidence the contract between the School District and the third-party agency, ESS, for substitute staffing services. Defendants opposed the Motion for Judicial Notice.

In an Opinion dated March 24, 2025 the Court granted Ms. Brink's Motion for Judicial Notice and dismissed the Second Amended Complaint with prejudice. The Court summarized the Second Amended Complaint thusly, "In sum the SAC alleges that Defendants violated the First Amendment by refusing to allow Plaintiff to disseminate vaccine information to staff and parents in the School District and by dismissing her for voicing opposition to the School District's COVID-19 policies."

MOTION FOR RECONSIDERATION

On April 8, 2025 Ms. Brink filed a Motion for Reconsideration followed by a Notice of Appeal on April 23, 2025. On November 24, 2025 the Court denied Ms. Brink's Motion for Reconsideration stating that it was not persuaded that its *legal* conclusions were erroneous, and that Ms. Brink has not met her high burden to merit the extraordinary remedy of reconsideration.

**STATEMENT OF FACTS**

Appellant Brink:

> "I am simply asking for consistency, sound clinical judgment and genuine concern for the wellbeing of our children, teachers, and communities be brought to the forefront....I want what is best for the children, their families and the staff of every school...At some point, we must acknowledge the harm this stress, fear and uncertainty is causing for our children...I'm not asking for anyone to decide if what occurred during my employment was right, wrong, or indifferent. I am asking that you evaluate the appropriateness and consistency of the policies, procedures, guidelines, rules, ideas that are impacting the health and wellbeing of your children and community."

Appellee Bormann:

> "This sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS"

These are some of the words written by Ms. Brink and Bormann after Bormann fired Ms. Brink nearly five years ago. She wasn't arguing about wrongful termination. She didn't want her job back. She just wanted what was right for the children - consistency, common sense polices, and procedures that were clinically sound. She wasn't alone in her concerns. Parents were confused and frustrated too. But Bormann could not fire the parents. Contractually, he could not fire Ms. Brink either.

This story starts in 2001 when Ms. Brink's Mother began working as a custodian in the Rumson School District. Appellant Brink wasn't just another substitute. She had a relationship with the Rumson School District through her Mom. So, when Bormann asked Ms. Brink for help in the Nursing Department, it was not seen as just a job. It was an opportunity to help a community she has been part of for nearly 20 years.

In September 2020 Bormann directed Ms. Brink to ESS, a third-party agency that manages the substitute staffing needs of the School District. Ms. Brink went through the hiring process with ESS and began work in late September. Ms. Brink received no COVID-related training from ESS or from the School District.

Ms. Brink was not certified as a school nurse and was not permitted to work without supervision. Her role was purely ministerial. Each day, Ms. Brink followed the direction of a certified school nurse.

For students, each day started with a health screening in the vestibule as they entered the school building. Students were required to have their temperature assessed by an automated thermal scanner or by a non-contact thermometer operated by a staff member. Students often waited outside the building for 15 minutes or more before they were screened. On some winter days outside temperatures were in the teens and single digits. The vestibule was cold and windy. Forehead temperatures often registered in the 80's and low 90's °F.

Ms. Brink pointed out that health screenings like this were not recommended by the CDC. She asked if it made sense to take the temperatures of kids who just came inside from freezing temperatures. Ms. Brink instructed staff on proper use of a non-contact thermometer that included a controlled environment and an acclimated patient. On several occasions between December 2020 and February 2021 Ms. Brink had conversations with five different staff members on the topic of proper health screenings.

Health screenings were not part of Ms. Brink's duties. Knowing CDC recommendations regarding COVID-19 was not part of Ms. Brink duties. Teaching untrained staff to use non-contact thermometers was not part of Ms. Brink's duties.

Assessing the clinical soundness of taking temperatures of cold foreheads was not part of Ms. Brink's duties. SAC ¶140-168

Students who failed the health screening or had not completed the COVID Screening Form were sent to the "Quarantine Room." This is typically where Ms. Brink's day started. The Quarantine Room was the cafeteria modified with shower curtain dividers and plastic chairs. Ms. Brink would get a list of all the students whose screening forms were positive or incomplete. She would check to make sure they were in the Quarantine Room, if not, she would send a runner to retrieve them from their classroom. Once in the Quarantine Room Ms. Brink would attempt to contact a parent or guardian and ask them to complete the COVID Screening Form. Healthy students were confined to the Quarantine Room until their form was complete. In some instances it took hours to reach a parent. Students that were actually experiencing symptoms were also brought to the same Quarantine Room.

Sometimes parents could not be reached. Some parents would yell at Ms. Brink over the phone stating that the COVID Screening Form was unnecessary and that their children were missing important classroom time. At times language barriers prevented communication. The staff made "Naughty List" for students whose parents routinely forgot to complete the form. Ms. Brink discussed her concerns with staff members. She asked if it made sense to put healthy kids in the same quarantine room with symptomatic kids. She asked if it was lawful to keep healthy kids out of the classroom for extended periods of time just because a parent

forgot to fill out a form. Ms. Brink had these conversations with multiple staff members between November 2020 and February 2021.

The only role Ms. Brink was officially tasked with was monitoring the "Quarantine Room" and contacting parents who did not complete the Screening form. Students go in, phone calls are made, students come out. Questioning the process, advocating for students and families, and researching the law, was not part of Ms. Brink's ordinary job duties. SAC ¶169 - 195

Monitoring student face masks was not part of Ms. Brink's ordinary job duties. But when she noticed that the policy was unclear and students were being reprimanded for wearing masks incorrectly, she researched, asked questions, and advocated for proper implementation. In December 2020 Ms. Brink had conversations with Nurse Montanez and Bormann regarding face masks. ¶ 98-139

In mid-December 2020 Bormann began sending weekly emails to the District with information and links to websites regarding the COVID-19 vaccine. Much of the information in the emails came from Hackensack Meridian Health, a local hospital system. Ms. Brink learned that a parent of a student was a doctor in the HMH system and was providing much of the information to Bormann. They were working together to organize a COVID-19 vaccine clinic for the staff and their families. Nurse Montanez regularly shared COVID-19 vaccine-related information with the staff. Bormann expressed his personal encouragement for the vaccine in statements like "I would be happy to be the first in line as a model to

our staff!" Those who were not registered for the vaccine were described by the HMH representative as a "problem." Bormann even suggested he and another staff member start smoking so they can have priority in getting the vaccine. SAC ¶ 280-312

In late December 2020, Bormann notified Ms. Brink that he had provided her name, and the names of the other nurses, to the DOH to get them "on the list" to receive the COVID-19 vaccine. Ms. Brink did not intend on getting the vaccine and viewed Bormann's email to the DOH as inappropriate and intrusive. Ms. Brink responded to Bormann and copied the other nurses, explaining that she would not be getting the vaccine and the reasons for her decision. From this point, Bormann and the nurses were aware that Ms. Brink was opposed to receiving the COVID-19 vaccine. ¶196-210

In early January Ms. Brink felt compelled to email Bormann and advocate for herself, her Mother and other staff regarding informed consent for the COVID-19 vaccine. Ms. Brink sent the email in her off hours, from her personal phone, and provided her personal email address. She identified herself as "technically not an employee of Rumson" and stated "I feel tied to the team for many reasons…I am a Nurse Patient Advocate first and foremost." Ms. Brink requested to email the staff factual, balanced information from official sources regarding the COVID-19 vaccine. Upon receiving Ms. Brink's email Bormann forwarded it to Nurse Montanez asking for her opinion. Nurse Montanez replied

that she was disappointed at Jess' response to Bormann signing them up for the vaccine. She felt Ms. Brink explaining her decision not to vaccinate was an "overshare." Nurse Montanez said that working in a school has a political component and one must be mindful when and how to share. Nurse Montanez said that she was not comfortable having a substitute nurse discussing such topics because she wasn't sure what information will be relayed. After receiving Nurse Montanez's response, Bormann emailed Ms. Brink stating in part "it would not be appropriate to provide advocacy…I would not want anyone involved with the school to serve in that capacity…" Ms. Brink understood 'anyone involved with the school' to mean staff, students, and parents in their personal capacity This chilled Ms. Brink's speech, even as a citizen. This is despite the fact that no controls were in place to govern who could email school staff from private email accounts and the District had every staff members' email address posted on their public website.

In mid-January an issue arose regarding the quarantine period for two students in the District. Nurse Zajak advised Ms. Brink that the quarantine period should be 14 days. Ms. Brink contacted the parent and relayed this information. Later when Ms. Brink reviewed the "Quarantine Spreadsheet" she noticed that Bormann entered a 10-day quarantine. After speaking with several staff members there was still no clarity regarding the discrepancy in Bormann's prescribed quarantine period and the State recommended period. The next day Ms. Brink

addressed Bormann and two other staff members in the hallway in an attempt to understand the discrepancy. Bormann was also insisting the young child take a PCR test instead of an antigen test which was not in-line with DOH guidance. Ms. Brink left that conversation with no clear understanding of the clinical soundness or lawfulness of Bormann's decisions. That day Ms. Brink composed an email expressing confusion from a medical safety standpoint and from a professional liability standpoint. She also wanted consistency for students, families, and staff. Of her own volition, Ms. Brink advised that she was working on a flow chart. Once complete, Ms. Brink emailed the flow chart to select staff and asked for answers to specific questions and feedback generally.

By the first day of February Ms. Brink had not yet received answers to her questions. She met with Bormann by phone, on her day off, to discuss the discrepancies in Bormann's actions, school policies, and official guidance. She expressed the same concern parents were having. She expressed concern for her professional license. She expressed concern that what the school was doing could be against the law.

Bormann dismissed Ms. Brink from her assignement during that conversation. He stated that Ms. Brink was not an employee and that he would email ESS about her termination. That evening Ms. Brink emailed every member of the Board of Education, including Bormann, from her personal email address and explained what had transpired earlier. Bormann responded, to the Board only,

and gave the following reasons for Ms. Brink's termination: (1) she was questioning and indicating she would not follow district protocols (2) she is not an employee of the district (3) her request to send anti-vaccination guidance to our staff (4) conversations that have made both our school nurses uncomfortable.

**APPLICATION OF FACTS**

As mentioned previously, the theory of this case has changed, but the facts have not. The Court has, however, interpreted the facts differently across opinions. Initially the Court found that Ms. Brink was an independent contractor, but now concludes she is a subcontractor. Speech that was opinion and purely personal, is now matter of public concern.

The Court misunderstands the foundation of Ms. Brink's claims. Ms. Brink describes seven distinct instances of protected speech or conduct. The Court summarizes her allegations as "the Defendants violated the First Amendment by refusing to allow Plaintiff to disseminate vaccine information to staff and parents in the School District and by dismissing her for voicing opposition to the School District's COVID-19 policies." These are not the complete facts.

Ms. Brink maintains the vaccine-related emails were the cause of viewpoint discrimination. Those emails, plus the other episodes of speech or conduct were the cause of the retaliation. The Court frames the claim as "refusing to allow Plaintiff to disseminate…", but it doesn't end there. Ms. Brink also claims that she was fired just for making the request. Like the case *Marsden v. Kishwaukee Community*

*College*, 572 F. Supp. 3d 512 (N.D. Ill. 2021) where a faculty counselor alleges she was fired, in part, for making a FOIA request. Here, the District Court said, Marsden is "stating that her speech in requesting the information was itself protected and the motivating fact for the College's actions." So, while Ms. Brink does claim that her viewpoint was silenced unconstitutionally, she also claims that she was retaliated against for the act of requesting to share her viewpoint. As a matter of fact, there is no allegation or evidence that Ms. Brink intended to disseminate vaccine information to <u>parents</u>.

On two occasions (pg. 2 & 13) in the Opinion, the Court seemingly lumps together discrete allegations of protected speech by labeling them "among other things." These other things are factual allegations of protected speech and relevant details. In *Marsden* the Court said the "complaint alleges much more that the FOIA request." In the instant case, Ms. Brink alleges seven discrete episodes of speech or conduct and other facts that require an assumption of truth and inferences in her favor like: (1) Bormann's email to the DOH to get Ms. Brink on the list to get the vaccine could be viewed as encouragement; (2) Nurse Montanez's email containing incorrect information about the COVID vaccine; (3) potential impropriety in contracting related to a vaccine clinic and a private business' financial interest in promoting the vaccine; (4) potential violations of Family Educational Rights and Privacy Act; (5) Ms. Brink's recognition that she was not an employee of the RSD; (6) Bormann's recognition that Ms. Brink was not an

employee of the RSD; (7) the contract between the RSD and ESS that states that Ms. Brink should not be treated as an employee. (8) Bormann and Nurse Montanez's statements that advocacy is not part of Ms. Brink's job.

On Page 3 the Court examines the communications between Bormann and Ms. Brink on the day she was terminated. Facts that are relevant but not mentioned in the Opinion include: (1) The conversation occurred on Ms. Brink's day off. She was not getting paid. (2) In Bormann's email response to the Board, Bormann acknowledges the significance of a contract between the RSD and ESS and states that Ms. Brink is not an employee. (3) Bormann misstates the intention of Ms. Brink's vaccine-related email and labels it "anti-vaccination."

On Page 4 the Court concluded that COVID-19's wide-ranging impact on school operations justified the viewpoint neutral controls…as well as associated disciplinary measures for failure to abide by such controls. There is nothing in the record that indicates that Ms. Brink failed to abide by such controls.

On Page 7 the Court concludes that the ESS Contract is only relevant to Ms. Brink's allegations that she was an employee of ESS, not the Rumson School District and that the term of the contract predates Ms. Brink's employment. These facts are true however, the contract is relevant in more ways including: (1) In § 2 the contract specifically states that employees of ESS should not be treated as employees of the LEA (local education association). (2) In §§ 3&4 the contract defines the relationship between the LEA and the ESS employee. (3) In § 7 the

contract states that it automatically renews on a yearly basis. Additionally, the Court finds that Ms. Brink changed her allegations from independent contractor to private employee "in an effort to avoid *Pickering*" - this is not true. Ms. Brink's understanding of employment relationships changed as she continued to research this case. Upon receiving a copy of an ESS contract, her understanding was clarified. Ms. Brink is not trying to avoid anything that is factually based and legally appropriate.

On Page 11 the Court describes one of Ms. Brink's job duties as "communicating on quarantine issues with school members." The complaint states at ¶ 93(f) "Communicating with fellow nurses, Defendants Bormann, principals and secretarial staff regarding children being quarantined from the school building." The allegation does not reference "quarantine issues." This nuance is important. Ms. Brink's role was ministerial. She was charged with communicating regarding children being quarantined, not the quarantine itself. For example, Ms. Brink would communicate with staff regarding the condition of the child, his location, and the parent's plan for pick-up.

On Page 13 the Court found Ms. Brink's allegation that she attempted to "bring to light potential wrongdoing or breach of public trust…" contrary to her allegations. But, Ms. Brink factually alleged that she was concerned about her nursing license because she was being told to do things not permitted by her license or the law. SAC ¶ 370. Also, the Court found on page 13, Ms. Brink's

"conduct concerning the importance of "consistency" of, among other things, the School District's guidance on its quarantine policy that Plaintiff "gave [the District's] students, families, and staff" was part of the role [she] was paid to perform on an ordinary basis." It is accurate that Ms. Brink was paid to explain the school's decision on quarantine (10-day vs.14-day) to families of quarantined children. But this instance of speech, as alleged in the SAC, refers to Ms. Brink questioning the authority and consistency of Bormann's decision to quarantine a student for 10 days instead of the State recommended 14 days, and to require a PCR test, when the DOH stated an antigen test was acceptable ¶353-359.

On Page 14 the Court finds that there is no relevant analogue to speech by citizens. Yet, Ms. Brink factually alleges at ¶¶358, 362, 363, 401 that she expressed the confusion and concerns of parents.

On Page 16 the Court concludes that Ms. Brink requested to send a listserv-wide email to School District staff. This is contrary to the allegations of the complaint at ¶268. Nor did Ms. Brink intend to use the District's listserv. In the email Ms. Brink stated that she was not an employee of the School District, she was speaking in her capacity as a nurse advocate out of concern for the community and she included her personal email address as contact. It is important to note that this was during a time when email was the primary form of communication because in-person meetings were discouraged. The Court states that it evaluated some emails sent by Nurse Montanez, but this ignores all the other emails and

conduct alleged at ¶¶280-307. The Court conclusively states that "no other School District member had sent a similar email on the server." This is not a fact alleged in the complaint, and at this stage of the litigation, before discovery, it is impossible to know.

At footnote 4 on Page 16, the Court states that "the allegation stemming from Bormann's email after Plaintiff's dismissal that she "requested to send anti-vaccination guidance" does not affect the Court's conclusion (regarding viewpoint discrimination.) Ms. Brink alleges that the reason initially given by Bormann (not appropriate) was merely pretext for the actual reason (anti-vaccination) which was given privately to the Board after Ms. Brink's dismissal. ¶236, 429, 442, 482

Finally, although the Court does not consider Bormann's email after Plaintiff's dismissal relevant to the viewpoint discrimination claim, it does not mention its impact on the retaliation claim. Ms. Brink was dismissed, in part, for "requesting to send anti-vaccination guidance." The Court has concluded that this is a matter of public concern. Both Bormann and Nurse Montanez state that this speech and conduct was not part of her job duties. These facts should be considered as they relate to the retaliation claim.

**APPLICATION OF LAW**

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) the Supreme Court stated, "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable and that a recovery is very remote

and unlikely." In *Fowler v. UPMC Shadyside,* 578 F .3d 203 (3d Cir. 2009) this Court gave context to the pleading standard at the 12(b)(6) Motion to Dismiss stage, explaining that the District Court should have focused on the appropriate threshold question - "namely whether Fowler pleaded she is an individual with a disability. The District Court and UPMC instead focused on what Fowler can "prove.""

In *Wilkerson v. New Media Technology Charter School Inc.,* 522 F .3d 315 (3d Cir. 2008) the Court stated, "In ruling on a motion to dismiss, the court is not free to question whether there was in fact ancestor worship at a public school…" At footnote 3 on Page 11 the Court incorrectly presumes "she already has that agreement or at the very least could reasonably have obtained a copy of it without the aid of discovery." As mentioned above, on Page 16 and 17 the Court made evidentiary inquiries and decisions related to pro-vaccine emails.

To determine that Ms. Brink was a subcontractor, the Court looked to Black's Law Dictionary. This is incorrect because the facts of the case do not support this definition and it is not in dispute that Ms. Brink did not have a contract with the Rumson School District. Instead, the court should have looked to NJSA 52:32-44 which defines a *contract* as a legally binding relationship enforceable by law; and *subcontractor* as a business organization with proof of a valid business registration, of which Ms. Brink had neither.

Next, the District Court uses *Board of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668 (1996) to stretch the application of the *Pickering* balance beyond independent contractors to subcontractors. But as noted above, this is incorrect, because Ms. Brink did not have a contract with the Rumson School District. Nothing in *Umbehr* indicates that it is meant to apply to subcontractors or employees of third-party private companies. In fact, the Supreme Court in *Umbehr* emphasizes its limited scope. *Umbehr* also emphasizes the importance of the contract, which makes sense, because it is the contract that gives the government the power to control. "The Board exercised contractual power, and its interest as a public service provider..." Finally, the District Court seems to state that because the School District is a contractor generally, it is entitled to deference. On page 10 of the Opinion, "...whatever Plaintiff's status, it cannot be reasonably disputed that the School District nevertheless remains a contractor based on allegations in the SAC and is therefore entitled to the deference *Umbehr* endorsed." There was no dispute that Mr. Umbehr had a contract to haul trash for the County. The opinion in *Umbehr* repeatedly emphasizes the importance of that contract. It was the contract with Mr. Umbehr that gave the Board power over him, not the Board's status as a contractor generally. A more in point case would be *Lipkin v. George,* Civ. No. 23-127, 2024 WL 1119958 (D. Conn. Mar. 14, 2024) (distinguishing *Umbehr* on the basis that "Plaintiff is not an independent contractor with the City of New Haven. Their employer is an independent contractor and this

is not a situation where the City of New Haven terminated its contract with CS-HHC.")

Next, the Court uses *Clairmont v. Sound Mental Health,*632 F .3d 1091 (9th Cir. 2011) as support for applying the *Pickering* balance to an employee of a municipal contractor. This case is distinguished because the Ninth Circuit made this decision "given the nature of the relationship between [contracting agency] the court and [contractor] SMH…" the Ninth Circuit looks to the details of the contract between SMH and the Municipal Court to determine that relationship. SMH provided specified services to the general public, the municipal court provided equipment and office space, SMH employees were required to submit reports, attend monthly meetings, and provide coverage 40 hours per week to the municipal court. SMH's work was subject to the City's general review and approval. Nothing in the record demonstrates this type of relationship. In fact, the School District/ESS contract is quite the opposite. To make the instant case fit the "analogous to that of an employer and employee" relationship mentioned in *Clairmont,* the District Court focuses on the relationship between Ms. Brink and the RSD, describing "the high degree of trust placed in Plaintiff by both ESS and the District." While the opinion in *Clairmont* does briefly mention "Clairmont's role in the provision of such services…" it focuses on the relationship between SMH and the court. It is important to note that Mr. Clairmont's role is distinguished. He was a Manager with high-level responsibility and a supervisory

role. The record in this appeal bears no resemblance to this situation. The record factually alleges that Ms. Brink's role was non-supervisory and purely ministerial. It can be inferred that the perceived trust placed in Ms. Brink was due to her existing 20 year relationship with the School District.

Additionally, *Clairmont* and *Lipkin* are both distinguished because the government exercised its contractual power over the contracted entity to cause the termination of the employee. Here, the government acted directly on Ms. Brink to cause her termination and notified the contracting agency after the fact.

In a footnote 2 on page 10, the District Court references *Hayes et al v. Buffalo Municipal Housing Authority,* No. 2012 cv 00578 (W.D.N.Y) to support its decision to apply *Pickering* to subcontractors. A close reading of *Hayes* indicates that Mr. Hayes and his company, MKH Construction, was actually a prime contractor to the Housing Authority, not an employee of a third party private company.

After deciding that the *Pickering* balance applies, the District Court addressed the first prong - Did the employee speak as a private citizen? The Court first looks to *Garcetti v. Ceballos*, 547 U.S. 410 (2006). *Garcetti* is distinguished on several fronts. It was undisputed that Mr. Ceballos was a public employee and that he prepared his memo pursuant to his duties as a prosecutor. It was part of what he was employed to do. Those are not the facts of this case. The Court also references *Javitz v. Cnty. of Luzerne,* 940 F.3d 858 (3d Cir. 2019) in which the job

duties of the Director of Human Resources were in dispute. This case is distinguished because Javitz was a management level, public employee with a significant amount of power and responsibility. Also, it was decided at summary judgment.

More in point with the instant case is *Flora v. County of Luzerne,* 776 F.3d 169 (3d Cir. 2015) In *Flora,* The Third Circuit found: (1) that the District Court failed to accept facts alleged in the complaint as true and erred when it made factual determinations as to the scope of Flora's duties. (2) the Court identified a distinction between obligations as an attorney versus those of a Chief Public Defender. As an attorney, Flora was compelled to make the statements at issue. (3) that the statute creating the Public Defender dictates ordinary job duties. On this last point, the relevant statues to be considered are those controlling the job duties of a non-certified nurse working in a school are N.J.A.C. 6A:16-2.3(c)

The Court also points to the Third Circuit case, *De Ritis v. McGarrigle,* 861 F.3d 444 (3d Cir. 2017). This case is distinguished for a number of reasons including (1) Mr. De Ritis' undisputed job duties included in-court obligations to build rapport with the Court. (2) The speech for which he sought protection was primarily "rumormongering." From *De Ritis,* what should be relevant to the instant case, is that the appeals court found that discussions about the rumor that occurred outside the courtroom "are arguably citizen speech because they were not part of the work [De Ritis] was paid to perform on an ordinary basis." Also, in *De Ritis* the

appeals court carefully reviewed each statement and divided those statements into categories for the purpose of analysis. Without completing such an analysis, the Court uses *Dennison v. Indiana University of Pennsylvania,* No. 22-2649 (3d Cir. Dec. 12, 2023) to conclude that all of Plaintiff's speech was made pursuant to her official job duties, reasoning that the Plaintiff's conduct "while related to a matter of public concern, were not just adjacent to her official duties; they were at the heart of her duties." *Dennison* was decided at summary judgment and is distinguished because Ms.Dennison was the Director of Residence Life at a University. Ms. Dennison supervised staff and had decision making power. The appeals Court found that Dennison's decision could *only* have been made by a University employee in her position, not by a private citizen exercising her constitutional rights to speak out about the pandemic. Ms. Brink alleges that other staff, parents, and community members voiced similar concerns.

More in point with the case at hand is *Decotiis v. Whittemore,* 635 F.3d 22 (1st Cir. 2011). Here, Ms. Decotiis argues that her speech was "analogous to the speech of other citizens; she says the parents of children, advocacy groups, therapists…were all discussing the issues about which she spoke." The First Circuit Court of Appeals found that such "speech appears to have been sufficiently analogous to the speech of other citizens in the community troubled by the new regulation and policy."

One additional case from outside this circuit, but in point is *Struckel v. Macomb County,* Civ. No. 2:2020cv12995 (E.D. Michigan) (probationary Morgue Specialist terminated for voicing COVID-related health and safety concerns). This case, when compared to the cases cited by the District Court, demonstrates the difference between the ministerial job duties of a probationary employee as compared to career pubic employees with supervisory control and decision making power. It emphasizes the practical reality of a new employee with minimal experience. In this vein, it is important to recognize that in accordance with State Law N.J.S.A. 18A:40-3.2 school nursing is recognized as a specialty because certified school nurses are trained in, and responsible for public health and school law. N.J.A.C. 6A:16-2.3(b) As a matter of law, and practicality, non-certified, substitute, non-certified nurses with four month's experience, are not. N.J.A.C. 6A:16-2.3(c)

In regard to Ms. Brink's claim for viewpoint discrimination, the Court cites *Pomicter v. Luzerne City. Convention Center Authority,* 939 F.3d 534 (3d Cir. 2019) and *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee,* 505 U.S. 672 (1992) These cases are distinguished because they involve physical places (the concourse of a public arena, and an airport terminal, respectively) whose primary function is facilitate movement of pedestrians. Nonetheless, some relevant points are made, for example, in *Pomciter*, the Court cautioned that a public arena and its entranceway may not always be treated this way (as a nonpublic fora). If there was

evidence showing, for example, that the concourse was "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," our analysis would be different." Ms. Brink alleges similar facts in the SAC.

*Page v. Lexington Cnty Sch. Dist. One,* 531 F.3d 275 (4th Cir. 2008) from the Fourth Circuit, is distinguished because Mr. Page sought access to the entire "district information distribution system" including website, email server, and newsletter. The Court found that the School District's campaign was largely government speech and that the forum was non-public. The Court found that the government established the message; maintained control of its content; and controlled its dissemination to the public. Ms. Brink's SAC alleges and demonstrates that the Rumson School District did not maintain control of the email server at ¶ 264-266. *Page* is similar in some respects, for example, Mr. Page and Ms. Brink sought to send emails as citizens. Mr. Page requested access to the server. Ms. Brink intended to send emails from her personal email address. In *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819 (1995) the Supreme Court concluded that the university engaged in viewpoint discrimination. The university did not prohibit religion as a subject matter, but instead disfavored student journals with a religious editorial viewpoint. Likewise, the Rumson School District did not prohibit vaccine-related discussions by email, it only prohibited Ms. Brink from sending a vaccine-related email that they interpreted as "anti-

vaccine". More in point is *Sprague v. Spokane Valley Fire Dep't,* 409 P.3d 160,189 Wash. 2d 858 (Wash 2018) where the Washington Supreme Court found that the fire department engaged in viewpoint discrimination when it opened its email system for discussion of the topics in the EAP newsletters, but restricted Mr. Sprague's emails that touched on the same topics as the EAP newsletters forwarded by the fire department. The SAC alleges that the email Ms. Brink intended to send contained essentially the same information others, including third parties, were sharing regarding the COVID-19 vaccine. The District Court decided that the School District's restriction was viewpoint neutral, but fails to cite any case supporting this finding. Ms. Brink offers *Pittsburgh League of Young Voters Education Fund v. Port Authority of Allegheny,* 653 F.3d 290 (3d. Cir. 2011). Here, the Court did not reach the issue of forum-selection because it decided that Appellees established viewpoint discrimination. The Third Circuit goes on to consider the Appellants stated rationale for rejecting an ad as compared to the evidence of pretext, and found that the "comparator evidence more compellingly favored a finding of viewpoint discrimination. As between evidence that a decisionmaker acted at odds with a nondiscriminatory rationale and evidence that the decisionmaker acted consistently with the rationale, the former is often stronger proof of discrimination than the latter is of nondiscrimination." In the instant case, it is not in dispute that Ms. Brink was terminated, in part, for "requesting to send anti-vaccination guidance." The proposed email in the record is demonstrably not

“anti-vaccination guidance” yet the reason given for her termination indicates that it was viewed as such. Ms. Brink alleges a pro-vaccine atmosphere and supports it with evidence. Finally, this Court should consider *El-Haggan et al v. Board of Education for Montgomery County,* No. 8:2024cv00442 (D. Md. 2025). In this case the Court found that a teacher’s email signature containing a slogan supportive of Palestine was speech as a private citizen. And because the email was not used to communicate with students or parents it would not be regarded as supported by the school. This case is distinguished because Ms. Brink did not intend to use the school email server, but in point because she did not seek to communicate with students or their parents.

**ADDITIONAL REASONS**

Based on the foregoing, it appears that the standards of liberally construing a pro se complaint, accepting all facts as true, and making all inferences in favor of the non-moving party were not upheld. Was Ms. Brink held to a higher pleading standard? It is the Defendants’ responsibility to shoulder the burden at this stage, but no attempt was made to provide documentation or affidavits. It seems the Court shouldered this burden and supplied some facts and the compelling state interest to justify reasonable restraints and dismiss this complaint. Considering Ms. Brink’s Pro Se status and the complaint’s reliance on the ESS contract, should the Court have considered it a Motion for Incorporation by Reference? Did the Court

err in dismissing this case with prejudice? Did any of the above cause prejudice to Ms. Brink?

**CONCLUSION**

During the COVID pandemic many students, staff, and families were scared, frustrated, or confused. No visitors, including parents, were permitted to enter the Rumson School District. Ms. Brink, as a member of the community and a nurse advocate, was well positioned to identify and discuss the issues. She was compelled to speak and did so independently because she felt the fear, frustration, and confusion of students, staff, and families. This is speech and conduct at the core of the First Amendment. Any finding to the contrary threatens the very idea of self-governance and the importance of transparency and accountability in public service.

For all the reasons described above, this Court should reverse the order of the district court dismissing this case and remand for further proceedings.

Respectfully submitted,

Jessica Brink (*Pro Se*)
8 Gordon Court
Port Monmouth, NJ 07758
Tel.: (732) 492-4690

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of January 2026, I sent for filing by mail the foregoing to the Clerk of the Court of the United States Court of Appeals for the Third Circuit at 21400 United States Courthouse, 601 Market Street, Philadelphia, PA 19106-1790 and a copy was sent by electronic mail to Patrick Carrigg, Esq. at **pcarrigg@lenoxlaw.com** and by mail to 136 Franklin Corner Road, St. 2B Lawrenceville, NJ 08648.

Jessica Brink (*Pro Se)*
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690

Query Reports Utilities Help Log Out

APPEAL,CLOSED,PROSE

# U.S. District Court
# District of New Jersey [LIVE] (Trenton)
# CIVIL DOCKET FOR CASE #: 3:23-cv-00497-ZNQ-JTQ

BRINK v. BORMANN et al
Assigned to: Judge Zahid N. Quraishi
Referred to: Magistrate Judge Justin T. Quinn
Case in other court: Third Circuit, 25-01805
Cause: 42:1983 Civil Rights Act

Date Filed: 01/26/2023
Date Terminated: 11/24/2025
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**JESSICA M. BRINK**

represented by **JESSICA M. BRINK**
8 GORDON COURT
PORT MONMOUTH, NJ 07758
Email: jessb11@me.com
PRO SE

V.

**Defendant**

**JOHN BORMANN**
*individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District*

represented by **MICHAEL A. PATTANITE, JR.**
LENOX, SOCEY, FORMIDONI, GIORDANO, COOLEY, LANG & CASEY LLC
136 FRANKLIN CORNER ROAD
UNIT B2
LAWRENCEVILLE, NJ 08648
(609) 896-2000
Email: mpattanite@lenoxlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK F. CARRIGG**
LENOX SOCEY LAW FIRM
136 Franklin Corner Rd
Bldg B2
Lawrenceville, NJ 08648
609-896-2000
Fax: 609-895-1693
Email: Pcarrigg@lenoxlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MARIA MONTANEZ**
*individually and in her official capacity as*

represented by **MICHAEL A. PATTANITE, JR.**
(See above for address)

*School Nurse in Rumson School District*
*TERMINATED: 10/25/2023*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH**
*a body politic and corporate*

represented by **MICHAEL A. PATTANITE, JR.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK F. CARRIGG**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2023 | 1 | Complaint Received. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 EXhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21)(kht) (Main Document 1 replaced on 1/27/2023) (kht, ). (Entered: 01/27/2023) |
| 01/26/2023 | 2 | Consent & Registration Form to Receive Documents Electronically by JESSICA M. BRINK (kht) (Entered: 01/27/2023) |
| 01/27/2023 | 3 | Notice of Guidelines for Appearing Pro Se (kht) (Entered: 01/27/2023) |
| 01/27/2023 | 4 | Clerk's Letter: Complaint not accompanied by the filing fee or application to proceed in forma pauperis. (kht) (Entered: 01/27/2023) |
| 01/31/2023 | | Filing fee: $ 402, receipt number TRE130759. (mlh) (Entered: 01/31/2023) |
| 01/31/2023 | | COMPLAINT filed. See docket entry 1 for the complaint. (mlh) Modified on 1/31/2023 (km). (Entered: 01/31/2023) |
| 01/31/2023 | 5 | SUMMONS ISSUED as to BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN and MARIA MONTANEZ. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (mlh) (Entered: 01/31/2023) |
| 03/20/2023 | 6 | CERTIFICATE OF SERVICE as to BOARD OF EDUCATION OF RUMSON by JESSICA M. BRINK. (Filed via Ecf Held Desk) (jdg) (Entered: 03/21/2023) |
| 03/20/2023 | 7 | CERTIFICATE OF SERVICE as to JOHN BORMANN by JESSICA M. BRINK. (Filed via ECF Help Desk) (jdg) (Entered: 03/21/2023) |
| 03/31/2023 | 8 | SUMMONS Returned Executed by JESSICA M. BRINK. MARIA MONTANEZ served on 3/23/2023, answer due 4/13/2023. (Received via Help Desk) (mlh) (Entered: 04/03/2023) |
| 05/12/2023 | 9 | NOTICE of Appearance by MICHAEL A. PATTANITE, JR. on behalf of All Defendants (PATTANITE, JR., MICHAEL) (Entered: 05/12/2023) |
| 05/15/2023 | 10 | VACATED Request for Default by JESSICA M. BRINK against JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF |

| | | |
|---|---|---|
| | | MONMOUTH. (Received via ECF Help) (Attachments: # 1 Entry of Default, # 2 Affidavit in Support)(jdg) Modified on 9/25/2023 (kht). (Entered: 05/15/2023) |
| 05/15/2023 | | Clerk's ENTRY OF DEFAULT as to JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH for failure to plead or otherwise defend. (jdg) (Entered: 05/15/2023) |
| 05/15/2023 | 11 | MOTION for Default Judgment as to JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH by JESSICA M. BRINK. (Filed via ECF Help Desk) (jdg) (Entered: 05/15/2023) |
| 05/15/2023 | | Set Deadlines as to 11 MOTION for Default Judgment as to. Motion set for 6/20/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 05/15/2023) |
| 05/18/2023 | 12 | MOTION to Dismiss by All Defendants. (Attachments: # 1 Brief Brief, # 2 Certification Certification of Counsel, # 3 Exhibit Exhibit A, # 4 Certificate of Service Proof of Service, # 5 Text of Proposed Order Order)(PATTANITE, JR., MICHAEL) (Entered: 05/18/2023) |
| 05/18/2023 | 13 | MOTION to Vacate 10 Request for Default by All Defendants. (Attachments: # 1 Brief Brief, # 2 Certification Certification of Counsel, # 3 Text of Proposed Order Order, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A, # 6 Exhibit Exhibit B, # 7 Exhibit Exhibit C, # 8 Exhibit Exhibit D, # 9 Exhibit Exhibit E)(PATTANITE, JR., MICHAEL) (Entered: 05/18/2023) |
| 05/22/2023 | | Set Deadlines as to 13 MOTION to Vacate 10 Request for Default . Motion set for 6/20/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 05/22/2023) |
| 06/01/2023 | 14 | MOTION for Extension of Time to File by JESSICA M. BRINK. (Filed via ECF Help Desk) (jdg) (Entered: 06/01/2023) |
| 06/01/2023 | | Set Deadlines as to 14 MOTION for Extension of Time to File. Motion set for 7/3/2023 before Magistrate Judge Douglas E. Arpert. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 06/01/2023) |
| 06/12/2023 | 15 | BRIEF in Opposition filed by JESSICA M. BRINK re 12 MOTION to Dismiss (Filed via ECF Help Desk) (jdg) (Entered: 06/13/2023) |
| 06/20/2023 | | Set Deadlines as to 12 MOTION to Dismiss . Motion set for 7/17/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 06/20/2023) |
| 06/20/2023 | 16 | ORDER granting 14 Plaintiff's Motion for Extension of Time to File nunc pro tunc. The Court notes that Plaintiff filed a Motion for Extension of Time to oppose Defendant's Motion to Dismiss and thereafter filed her Opposition on 6/12/2023 15 . Signed by Judge Zahid N. Quraishi on 6/20/2023. (kht) (Entered: 06/20/2023) |
| 09/25/2023 | 17 | OPINION filed. Signed by Judge Zahid N. Quraishi on 9/25/2023. (kht) (Entered: 09/25/2023) |

| | | |
|---|---|---|
| 09/25/2023 | 18 | ORDER that Plaintiff's 11 Motion for Default judgment is DENIED. Defendants' 13 Motion to Vacate Default is GRANTED. Defendants' 12 Motion to Dismiss is GRANTED; the Complaint is DISMISSED WITHOUT PREJUDICE. The Plaintiff may file an amended complaint consistent with the Court's Memorandum Opinion within thirty (30) days of this Order's filing. The Clerk's Office is hereby instructed to ADMINISTRATIVELY TERMINATE this matter pending the submission of an Amended Complaint. Signed by Judge Zahid N. Quraishi on 9/25/2023. (kht) (Entered: 09/25/2023) |
| 10/24/2023 | 19 | AMENDED COMPLAINT against BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN, filed by JESSICA M. BRINK. (Filed via ECF Help Desk) (jal, ) Modified on 10/25/2023 (jal, ). Modified on 6/20/2024 (jal, ). (Entered: 10/25/2023) |
| 10/24/2023 | 20 | Exhibit to 19 Amended Complaint by JESSICA M. BRINK. (Filed via ECF Help Desk) (jal, ) (Entered: 10/25/2023) |
| 11/11/2023 | 21 | Request for Clerk's Entry of Default by JESSICA M. BRINK against John Bormann & Board of Education of Rumson. (Filed via ECF Help Desk) (Attachments: # 1 Affidavit) (jal, ) (Main Document 21 replaced on 11/16/2023) (jjc, ). (Attachment 1 replaced on 11/16/2023) (jjc, ). (Entered: 11/13/2023) |
| 11/13/2023 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised that the Request for Default submitted by Jessica M. Brink on11/11/2023 cannot be granted as requested because Defendants still have time to answer. This submission will remain on the docket unless otherwise ordered by the Court. This message is for informational purposes only. (jal, ) (Entered: 11/13/2023) |
| 11/14/2023 | | CLERK'S QUALITY CONTROL MESSAGE - Please note the quality control message filed by the Clerk's office on 11/13/2023 was docketed in error. Please disregard. (jal, ) (Entered: 11/14/2023) |
| 11/14/2023 | | Clerk's ENTRY OF DEFAULT as to John Bormann & Board of Education of Rumson for failure to plead or otherwise defend. (jal, ) (Entered: 11/14/2023) |
| 11/15/2023 | 22 | MOTION to Vacate *Default* by All Defendants. (Attachments: # 1 Text of Proposed Order Order, # 2 Certification Certification of Counsel, # 3 Brief Brief, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A)(PATTANITE, JR., MICHAEL) (Entered: 11/15/2023) |
| 11/15/2023 | 23 | MOTION to Dismiss by All Defendants. Responses due by 11/14/2023. (Attachments: # 1 Text of Proposed Order Order, # 2 Certification Certification of Counsel, # 3 Brief Brief, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A, # 6 Exhibit Exhibit B, # 7 Exhibit Exhibit C, # 8 Exhibit Exhibit D)(PATTANITE, JR., MICHAEL) (Entered: 11/15/2023) |
| 11/16/2023 | | Set Deadlines as to 22 MOTION to Vacate *Default*, 23 MOTION to Dismiss . Motions set for 12/18/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, these motions will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 11/16/2023) |
| 11/28/2023 | 24 | BRIEF in Opposition filed by JESSICA M. BRINK re 22 MOTION to Vacate *Default*. (Received via ECF Help Desk) (mlh) (Entered: 11/28/2023) |
| 11/28/2023 | 25 | Application and Proposed Order for Clerk's Order to extend time to answer as to JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 11/28/2023) |
| 11/28/2023 | | Clerk`s Text Order - The document 25 Application for Clerk's Order to Ext Answer/Proposed Order submitted by JESSICA M. BRINK has been DENIED as it is |

| | | |
|---|---|---|
| | | beyond the scope of what the Clerk can grant. This submission has been forwarded to Chambers. (mlh) (Entered: 11/28/2023) |
| 12/04/2023 | 26 | BRIEF in Opposition filed by JESSICA M. BRINK re 23 MOTION to Dismiss (Attachments: # 1 Exhibits)(Received via Help Desk)(kht) (Entered: 12/04/2023) |
| 06/04/2024 | | Magistrate Judge Justin T. Quinn added. Magistrate Judge Douglas E. Arpert no longer assigned to case. (gxh) (Entered: 06/04/2024) |
| 06/06/2024 | 27 | NOTICE of Appearance by PATRICK F. CARRIGG on behalf of All Defendants (CARRIGG, PATRICK) (Entered: 06/06/2024) |
| 06/25/2024 | 28 | OPINION filed. Signed by Judge Zahid N. Quraishi on 6/25/2024. (jal, ) (Entered: 06/25/2024) |
| 06/25/2024 | 29 | ORDER granting 22 Motion to Vacate 22 23 MOTION to Dismiss with prejudice; The Clerks Office is instructed to Administratively terminate this matter. Signed by Judge Zahid N. Quraishi on 6/25/2024. (jal, ) (Entered: 06/25/2024) |
| 07/26/2024 | 30 | SECOND AMENDED COMPLAINT filed by JESSICA M. BRINK. (Attachments: # 1 Exhibits)(Received via Help Desk)(kht) (Main Document 30 replaced on 7/30/2024) (jdg, ). (Entered: 07/29/2024) |
| 07/30/2024 | 31 | VERIFIED SECOND AMENDED COMPLAINT against BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN, filed by JESSICA M. BRINK. (Filed via ECF Help Desk)(amv) (Additional attachment(s) added on 7/31/2024: # 1 Exhibits) (jdg, ). (Main Document 31 replaced on 3/17/2025) (amv). (Entered: 07/31/2024) |
| 07/31/2024 | | Please disregard 30 SECOND AMENDED COMPLAINT as it was filed inadvertently. Please see 31 VERIFIED SECOND AMENDED COMPLAINT. (jdg) (Entered: 07/31/2024) |
| 08/01/2024 | 32 | TEXT ORDER: In light of the Plaintiff filing an amended complaint 30 , this case is hereby REOPENED. So Ordered by Judge Zahid N. Quraishi on 8/1/2024. (kas, ) (Entered: 08/01/2024) |
| 08/16/2024 | 33 | Third MOTION to Dismiss *Second Amended Complaint* by All Defendants. Responses due by 9/3/2024. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F)(CARRIGG, PATRICK) (Entered: 08/16/2024) |
| 08/16/2024 | | Set Deadlines as to 33 Third MOTION to Dismiss *Second Amended Complaint*. Motion set for 9/16/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 08/16/2024) |
| 08/29/2024 | 34 | MOTION for Extension of Time to Oppose 33 Third MOTION to Dismiss *Second Amended Complaint* by JESSICA M. BRINK. (Filed via ECF Help Desk) (amv) (Entered: 08/29/2024) |
| 08/29/2024 | | Set Deadlines as to 34 MOTION for Extension of Time to File Response/Reply as to 33 Third MOTION to Dismiss *Second Amended Complaint*. Motion set for 10/7/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 08/29/2024) |

| | | |
|---|---|---|
| 09/07/2024 | 35 | MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) by JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 09/09/2024) |
| 09/07/2024 | 36 | PLAINTIFF'S BRIEF in Opposition to Defendants' 33 Third MOTION to Dismiss Second Amended Complaint filed by JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 09/09/2024) |
| 09/09/2024 | | Set Deadlines as to 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2). Motion set for 10/7/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 09/09/2024) |
| 09/23/2024 | 37 | BRIEF in Opposition filed by All Defendants re 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) (CARRIGG, PATRICK) (Entered: 09/23/2024) |
| 09/23/2024 | 38 | REPLY BRIEF to Opposition to Motion filed by All Defendants re 33 Third MOTION to Dismiss *Second Amended Complaint* (CARRIGG, PATRICK) (Entered: 09/23/2024) |
| 09/24/2024 | | CLERK'S QUALITY CONTROL MESSAGE - The 37 Brief and 38 Reply Brief submitted by Patrick Carrigg on 9/23/2024 did not contain a proper electronic signature (s/). PLEASE RESUBMIT THE DOCUMENT WITH THE PROPER ELECTRONIC SIGNATURE (s/ Attorney's Name.) This submission will remain on the docket unless otherwise ordered by the court. (kht) (Entered: 09/24/2024) |
| 09/30/2024 | 39 | REPLY BRIEF to Opposition to Motion filed by JESSICA M. BRINK re 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) (Filed via ECF Help Desk) (jdg) (Entered: 09/30/2024) |
| 10/07/2024 | 40 | NOTICE of Objection by JESSICA M. BRINK re 38 Reply Brief to Opposition to Motion, 33 Third MOTION to Dismiss *Second Amended Complaint* (Filed via ECF Help Desk) (jdg) (Entered: 10/08/2024) |
| 03/24/2025 | 41 | OPINION filed. Signed by Judge Zahid N. Quraishi on 3/24/2025. (mlh) (Entered: 03/24/2025) |
| 03/24/2025 | 42 | ORDER granting 33 Third MOTION to Dismiss Second Amended Complaint and granting 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2). It is ORDERED that the Second Amended Complaint is hereby DISMISSED WITH PREJUDICE; and it is further ORDERED that the Clerk's Office is herby instructed to mark this matter CLOSED. ***CIVIL CASE TERMINATED. Signed by Judge Zahid N. Quraishi on 3/24/2025. (mlh) (Entered: 03/24/2025) |
| 04/08/2025 | 43 | MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss, by JESSICA M. BRINK. (Filed via ADS) (amv) (Entered: 04/08/2025) |
| 04/08/2025 | | Set Deadlines as to 43 MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss,, Order on Motion for Miscellaneous Relief,. Motion set for 5/5/2025 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 04/08/2025) |
| 04/21/2025 | 44 | BRIEF in Opposition filed by All Defendants re 43 MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss,, Order on Motion for Miscellaneous Relief, (CARRIGG, PATRICK) (Entered: 04/21/2025) |
| 04/22/2025 | | CLERK'S QUALITY CONTROL MESSAGE - The Brief in Opposition 44 submitted by |

| | | |
|---|---|---|
| | | Patrick Carrigg on 4/21/2025 contains an improper signature. Only the filing user is permitted to sign electronically filed documents with an s/. PLEASE RESUBMIT THE DOCUMENT WITH A PROPER ELECTRONIC SIGNATURE. This submission will remain on the docket unless otherwise ordered by the court. (jal, ) (Entered: 04/22/2025) |
| 04/23/2025 | 45 | REPLY BRIEF to 44 Opposition to Motion filed by JESSICA M. BRINK (Received via ADS) (Attachments: # 1 Cover Letter)(mlh) (Entered: 04/24/2025) |
| 04/23/2025 | 46 | NOTICE OF APPEAL as to 42 Order on Motion to Dismiss by JESSICA M. BRINK. (Received via ADS) No Filing Fee or IFP Application received. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mlh) (Entered: 04/24/2025) |
| 04/24/2025 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised, the Notice of Appeal 46 filed on 4/23/2025 was filed without a filing fee. PLEASESUBMIT THE FEE OF $605 to our Office Immediately. Your check should be made payable toClerk, U.S. District Court. In the alternative, an application for In Forma Pauperis can be filed. Please refer to the Courts website at www.njd.uscourts.gov for information and forms. (mlh) (Entered: 04/24/2025) |
| 04/25/2025 | 47 | USCA Case Number 25-1805 for 46 Notice of Appeal (USCA), filed by JESSICA M. BRINK. USCA Case Manager Stephanie (Document Restricted - Court Only) (ca3sb, ) (Entered: 04/25/2025) |
| 04/30/2025 | 48 | USCA Appeal Fees received $ 605 receipt number TRE143762 re 46 Notice of Appeal (USCA), filed by JESSICA M. BRINK. (amv) (Entered: 04/30/2025) |
| 11/24/2025 | 49 | LETTER ORDER directing the Clerk's Office to RE-OPEN this matter; DENYING Plaintiff's 43 Motion for Reconsideration; directing the Clerk's Office to RE-CLOSE this matter. Signed by Judge Zahid N. Quraishi on 11/24/2025. (sms2) (Entered: 11/24/2025) |
| 11/24/2025 | | ***Civil Case Terminated. (sms2) (Entered: 11/24/2025) |

---

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/23/2026 10:50:01 | | | |
| **PACER Login:** | jessb117 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00497-ZNQ-JTQ Start date: 1/1/1980 End date: 1/23/2026 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JESSICA M. BRINK,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Office of the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.**<br><br>Defendants. | Civil Action No. 3:23-cv-00497 (ZNQ)(JTQ)<br><br>**VERIFIED SECOND AMENDED COMPLAINT** |

COMES NOW, Plaintiff, Jessica Brink ("Brink") in *pro se*, and for this Second Amended Complaint alleges the following:

## INTRODUCTION

1. It has been four years since the worst pandemic in recent history.

2. That pandemic, and our reaction to it, caused death, illness, isolation, learning loss, business failure, financial loss, mental health crises, increases in hunger, abuse, and hate that has persisted long beyond COVID-19.

3. In the years since the pandemic we have learned important lessons about what we could have

done better, what we could have done differently, and what we should never do again.

4. School closures, student quarantines, and remote learning had disastrous effects on children and families.

5. Social distancing, mandated use of face masks, and isolation of children from their friends and grandparents, disrupted the normal growth and development of children.

6. Plaintiff Brink and many others – citizens, parents, nurses, physicians, psychologists, teachers - recognized the dangers of these interventions in the early days of the pandemic.

7. Plaintiff Brink and many others spoke out about their concerns in an attempt to bring attention to the children and elderly that were suffering, and warn those in positions of power, about the dangers they were creating.

8. Parents were told to talk to school administrators, school administrators said their hands were tied. Sick patients were told to talk to their doctors, but many doctors weren't willing to see sick patients.

9. Students were relegated to a lonely, sterile classroom or an even more lonely computer screen. Sick patients were relegated to a hospital bed where many of them died scared and alone.

10. Children and the elderly suffered tremendously, and in some cases, needlessly during the COVID-19 pandemic.

11. People across the world were screaming from the rooftops "Danger! Danger!" but they were ignored, many were silenced, some had their licenses revoked, and their livelihoods destroyed.

12. Plaintiff Jessica Brink was one of those people who was silenced for attempting to sound the alarm.

13. She was a substitute nurse employed by a third-party, working in an affluent school district,

with no obligations as a government employee and no political influence from a teachers' Union.

14. Plaintiff Brink was a trained medical professional, an advocate, an objective third-party permitted inside the walls of school buildings during a time when no outsiders could enter.

15. Plaintiff Brink, as a medical professional and member of the community, was most likely to have informed and definite opinions about the health and safety of children in the school setting during a pandemic.

16. Plaintiff Brink was terminated from her assignment because she, in good conscience, brought to light serious clinical and societal issues in the Rumson School District (RSD).

17. Plaintiff Brink was terminated from her assignment because her views and opinions were "found not to be a good fit for the district."

18. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

19. Plaintiff Brink brings this case as a *pro se* litigant because, despite many attempts to secure counsel after the event, and in the months following – no attorney was willing to engage.

20. As the pandemic raged on and practically all COVID-related cases were dismissed, it became less likely that anyone would champion Plaintiff Brink's cause.

21. In a desperate act of ultimate Patriotism (in the traditional sense) and self-governance, Plaintiff Brink is learning to fight for herself, and for the millions of children and seniors that suffered needlessly during the COVID-19 pandemic.

22. Plaintiff Brink moves this Court to recognize that needless suffering, the efforts of so many who attempted to sound the alarm, the harshness with which they were silenced, and the opportunity this Court has, to prevent it from ever happening again.

## JURISDICTION

23. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff Brink's causes of action arising under the Constitution of the United States and 42 U.S.C. 1983.

## VENUE

24. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b) in that the alleged unlawful practices were committed in Monmouth County, New Jersey while Plaintiff Brink was assigned to work in the Defendants' school district.

## PARTIES

25. Plaintiff, Jessica M. Brink ("Brink") is an individual who at all times relevant, resided in Monmouth County, State of New Jersey.

26. Defendant, John Bormann ("Bormann"), is an individual and in his official capacity acts as Superintendent and Chief Administrative Officer employed by the Rumson School District ("RSD") in Monmouth County, State of New Jersey.

27. Defendant, Board of Education of Rumson in the County of Monmouth ("Rumson BOE"), is a Board of Education in the Rumson School District, created pursuant to New Jersey law.

## GENERAL STATEMENT OF FACTS RELEVANT TO THE CASE

28. Boards of Education are created by statute to perform a state function at a local level, their powers are derived from the Legislature.

29. The Board of Education is responsible for the development of policy and for the employment of a Superintendent who shall carry out its policies through the development and implementation of regulations.

30. The Board of Education shall be responsible for the operation of the school but shall delegate

the administration to the Superintendent.

31. It is the responsibility of the Superintendent to implement policies in accordance with law.

32. Boards of Education can perform only those acts for which express or implied authority exists in law or in the rules and regulations of the State Board of Education.

33. Implied powers of the Board of Education are limited and must be consistent with law and the rule of the state board, and must be necessary for the lawful and proper conduct of the public schools of the district.

34. The Board of Education is the final policymaker for all existing policies.

35. The Superintendent shall be delegated the authority to take necessary action in circumstances not governed by Board policy and shall report any such action to the Board at the first Board meeting following the action.

36. The Superintendent is the final policymaker in circumstances not governed by Board policy.

37. Appointing, transferring, removing or renewing the employment contract of a certificated or non-certificated officer or employee requires a recorded roll call vote and must pass by an affirmative vote of the majority of the full board.

38. Removing an ESS employee assigned to work in the district does not require a recorded roll call vote and affirmative vote of the majority of the full board.

39. Professional services must be provided through contract, in writing, and a brief notice stating the nature, duration, service and amount of the contract must be printed in an official newspaper.

40. Contracts for professional services shall be limited to non-recurring or specialized work for which the district does not possess adequate in-house resources or in-house expertise to conduct.

41. Boards of Education must follow Public School Contracts Laws.

42. Policies, procedures and practices that impact the rights, benefits and privileges of students, must serve a legitimate government interest.

43. Students must be afforded minimal due process when their rights are deprived.

44. Students have a right to be free of arbitrary and capricious invasions of privacy and deprivations of rights.

45. Students have a right to know what defines acceptable behavior.

46. It is well established that remote learning is not equivalent or as effective as in-person learning in the regular educational environment.

47. It is the responsibility of every citizen, employee, volunteer, and contractor who interacts with children in the school setting, to be concerned with their health safety and well-being.

48. Silencing a citizen or public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making.

49. Non-certified Nurses have limited job duties.

50. Substitutes are defined by N.J.S.A. 18A:16-1.1 as one who acts in place of any officer or employee during absence, disability or disqualification.

51. The School Ethics Act recognizes that school board members and administrators must "hold the respect and confidence of the people," and is thus designed to prevent school officials from engaging in "conduct which is in violation of their public trust, or which creates a justifiable impression among the public that such trust is being violated."

## FACTS OF THE CASE

Work history

52. Plaintiff Brink began work as a third-party contracted, non-certified nurse assigned to the RSD on September 25, 2020.

53. Plaintiff Brink's assignment in the RSD was terminated by Defendant Bormann on February 1, 2021.

54. The three reasons given for Plaintiff Brink's termination were:

a. "She was questioning and indicating she would not follow district protocols"

b. "Her request to send anti-vaccination guidance to our staff"

c. "Conversations that have made both our school nurses uncomfortable"

55. Plaintiff Brink's work-related relationship with the RSD began when Defendant Bormann recruited Plaintiff Brink for a nursing position.

56. Defendant Bormann was aware of Plaintiff Brink and her status as a nurse because Plaintiff's Mother has worked as a custodian in the RSD since 2001.

57. In September of 2020 Defendant Bormann contacted Plaintiff Brink by phone to offer her a nursing position in the RSD.

58. Defendant Bormann explained that the job would involve assisting the two existing certified school nurses with their daily tasks and occasionally filling in if one of the nurses needed time off.

59. Plaintiff Brink explained that she did not have a school nurse endorsement or a state-issued substitute certificate and has never worked as a school nurse.

60. Defendant Bormann assured her that this would not be an issue.

61. Plaintiff Brink agreed to a schedule of Tuesday thru Friday, 8 am to 1 pm, at a pay rate of $200/day.

62. Defendant Bormann directed Plaintiff Brink to contact ESS, a third-party employment contractor, to complete the hiring process.

63. Plaintiff Brink was hired and paid through ESS Northeast, LLC (ESS), a private company that provides education management and staffing solutions.

64. Plaintiff Brink was an employee of ESS.

65. ESS has a professional services contract with the RSD to provide substitute services.

66. Upon information and belief, the contract between the RSD and ESS clearly states "**Treatment of Substitute Staff as Employees of the Company** All Substitute Staff provided by the Company will be treated by the LEA (Local Education Agency) as employees of the Company, and not as employees of the LEA, for all purposes…"

67. Upon information and belief, the contract between the RSD and ESS contains an exclusivity clause to the affect that ESS shall be the exclusive contract provider of Substitute Staff to RSD.

68. Substitute Staff employed by ESS and assigned to public schools shall not be eligible for tenure with the LEA or be entitled to participate in any of the LEA's employee benefit plans, including pension, 403(b), profit sharing, retirement, deferred compensation, welfare, insurance, disability, bonus, vacation pay, severance pay and other similar plans, programs and agreements.

69. Plaintiff Brink did not have a contract with the RSD

70. Plaintiff Brink was not entitled to any of the benefits of public employment.

71. Plaintiff was not a public employee.

72. If Plaintiff Brink were an employee of the RSD she could not have been appointed, transferred, removed, or renewed without a recorded roll call majority vote of the full board.

73. Plaintiff Brink was not an Independent Contractor of the RSD.

74. If Plaintiff Brink were an Independent Contractor she would have had a contract with the RSD.

75. Plaintiff Brink was directed to ESS by Defendant Bormann for the sole purpose of providing nursing services to the RSD on a permanent basis.

76. Removing Plaintiff Brink from her permanent assignment to the RSD, was in all respects, the same as terminating her job with ESS.

77. Defendant Rumson BOE appointed Plaintiff Brink to the position of School Nurse Permanent Substitute. (Exhibit 1)

78. Substitutes are defined by N.J.S.A. 18A:16-1.1 as one who acts in place of any officer or employee during absence, disability or disqualification.

79. Plaintiff Brink was knowingly assigned as a daily, long-term worker and was not acting in place of any existing employee.

80. Defendant Rumson BOE leases employees from ESS, appoints them as substitutes and uses them as daily, long-term workers not acting in place of another.

81. Upon information and belief, Defendants Bormann and Rumson BOE knowingly use this leasing scheme to avoid hiring employees directly, thereby denying them the rights, benefits, and privileges afforded to public employees.

82. A School District should not knowingly use a third-party contractor to hire part-time employees and label them substitutes to avoid affording them rights, benefits, and privileges.

83. Misuse of a public contract and deceptive hiring practices by government officials demonstrates potential wrongdoing or breach of public trust.

84. At all times during Plaintiff Brink's assignment with the RSD she was never a public employee and could therefore, speak only as a citizen.

85. Despite this allegation, and considering some of the events referenced herein occurred during work hours, Plaintiff offers facts to support the allegation that her speech was citizen speech even if Plaintiff had been a public employee.

86. Beginning on September 25, 2020, Plaintiff Brink worked Tuesday thru Friday from 8 am to 1 pm.

87. Plaintiff Brink was not a school nurse.

88. Plaintiff Brink was a non-certified nurse, as she did not possess a certification or credential from the Department of Education.

89. Plaintiff Brink was provided no formal job orientation or training by ESS or the RSD.

90. No formal job description for Plaintiff's position exists on the RSD Website, nor was Plaintiff provided a job description.

91. Plaintiff Brink was never verbally or in written form counseled, disciplined, admonished, warned or criticized for her work performance.

92. Plaintiff Brink's duties as an ESS employee, non-certified nurse working in a public school were limited to tasks supervised by a Certified School Nurse and those which she is lawfully permitted to do under her nursing license issued by the State Board of Nursing.

93. Plaintiff Brink's assigned, ordinary job duties included:

a. Monitoring the "Quarantine Room" each morning.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

b. Contacting parents/guardians of the children who were confined to the "Quarantine Room."

c. Contacting parents/guardians of children to investigate absence, reported illness, travel, sick contacts.

d. Addressing emergent issues for example lost tooth, sprained ankle, symptomatic illness.

e. Arranging for the pickup of any child who reported COVID-like symptoms, as well as any of their siblings currently within the RSD.

f. Communicating with fellow nurses, Defendant Bormann, principals, and secretarial staff regarding children being quarantined from the school building.

g. Escorting school children out of school and into the custody of a parent/guardian and when necessary, explaining the RSD's policy on quarantine and testing.

h. Documenting student-related interactions in the student's health record.

94. Plaintiff Brink's assigned, ordinary job duties as an ESS employee, non-certified nurse did **not** include, nor was she expected to:

a. Be knowledgeable or proficient in school law, public health, COVID-19 guidance, protocols or vaccines.

b. Observe RSD staff and analyze the clinical soundness or legitimacy of their actions.

c. Initiate discussions on the clinical soundness or legitimacy of the actions of the staff of the RSD.

d. Research COVID-19 guidance, protocols, or vaccines.

e. Analyze the accuracy of the COVID-19 information provided by the RSD to the families and staff of the RSD.

f. Advocate for the distribution of factual information regarding COVID-19 to RSD Staff.

g. Advocate for the rights, health and safety of students, families, and staff of the RSD.

95. Plaintiff Brink was not trained by ESS or by the RSD regarding COVID-19 guidance, protocols, or vaccines.

96. Plaintiff Brink, in her capacity as a private citizen and advocate, and of her own volition, educated herself on School Law, Public Health Law, COVID-19 guidance, protocols, and vaccines.

97. While working in the RSD, Plaintiff observed several things that concerned her as a citizen, because it impacted the health and well-being of students and the community.

Face Masks

98. The Rumson BOE adopted a face mask policy that did not prescribe with sufficient detail the type of face mask to be worn, the material of which it should be made or the proper way in which to wear a face mask. (Exhibit 2, pg.3)

99. Students' face masks were of varying sizes, shapes, and materials, and rarely fit properly.

100. Many students frequently wore their face masks below their nose or chin.

101. Despite no policy describing proper use of a face mask, students were frequently reprimanded by RSD staff for not wearing their face masks appropriately.

102. Students were singled-out by RSD staff and directed in a loud voice to "put your mask on."

103. Parents and guardians often called and emailed the RSD to question the use of face masks and to request face mask accommodations for their children.

104. It was the directive of Defendant Bormann to "Minimize mask breaks and maskless snack times for students and staff as much as possible."

105. One day in December 2020 Defendant Bormann, Nurse Montanez and Plaintiff Brink were together in the Nurse's Office at Forrestdale School discussing face masks.

106. Plaintiff Brink stated that wearing a face mask properly was guidance, not law and that without parental consent she could not compel a student to wear a non-medical device securely over their nose and mouth.

107. Defendant Bormann stated that the Executive Orders (EO) and The Road Back Plan permit the Governor and Department of Education to make stronger laws, and parental consent is not needed.

108. Plaintiff Brink explained that the EO stated that a school must maintain a policy regarding face masks, however the EO did not prescribe how the student must wear a face mask, and compelling a child to securely cover their nose and mouth with cloth that is not intended for medical use, is a gray area in her opinion.

109. Defendant Bormann stated that a state can make stronger rules and offered the example of New Jersey legalizing same-sex marriage.

110. Plaintiff Brink responded by explaining that Defendant Bormann's example was an expansion of rights, not a deprivation.

111. Only properly fitted, medical-grade, respiratory protection prevents the transmission of COVID-19.

112. A cloth face mask of unknown quality and cleanliness, that is not properly fitted or worn, does not prevent the transmission of COVID-19, nor does it treat the disease.

113. The mandated wearing of a cloth face mask of unknown quality and cleanliness, whose effectiveness is completely unregulated, does not serve a legitimate public health interest.

114. Any policy that mandates the use of face masks to protect public health, but does not require the face mask to be effective or used in a legitimate way, to protect health, is arbitrary and capricious.

115. The policy adopted by the Rumson BOE did not prescribe in sufficient detail, the way in which a face mask must be worn by students.

116. The policy adopted by the Rumson BOE did not serve a legitimate public health interest.

117. Students have a right to know what defines acceptable behavior.

118. Students were intimidated, reprimanded and disciplined by staff of the RSD for improper use of face masks.

119. Students in the public school must submit to the authority of the teachers and others in authority over them.

120. Continued or willful disobedience of a student, as well as open defiance of the authority of any teacher or person, having authority over him can be cause for suspension or expulsion.

121. Students have a right to be secure in their person.

122. Parents or guardians of students have a right to object to medical treatments and no student shall be compelled to receive such treatment.

123. The rights of parents, guardians, and students were deprived when school staff compelled students, under threat of discipline, to wear face masks that did not treat or prevent the spread of

a communicable disease, nor did unregulated, cloth face masks serve a legitimate public health interest.

124. A student cannot be compelled, without due process of law, to use a device that does not serve a legitimate public health interest.

125. There were known risks associated with wearing face masks.

126. Executive Order 175, issued before students were back to in-person learning, recognized risks associated with masking such as masking in extreme heat, masking when unable to remove a face mask, masking when eating or drinking, masking when an Individual Education Program precludes the use of a face mask.

127. Parents, guardians, and citizens regularly communicated with Defendant Bormann, staff, and the Board of Education regarding concerns and risks related to the use of face masks.

128. Plaintiff Brink spoke as a citizen when she shared, with Defendant Bormann and Nurse Montanez, her opinion and concerns about the compelled use of face masks by students.

129. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

130. Plaintiff Brink, as a citizen, was concerned for the health and well-being of the students of the RSD.

131. Plaintiff Brink, as a citizen, sought to protect the rights of school children whom which, in most respects, were in the custody of the state because no parent, guardian or member of the general public could access the school building.

132. Plaintiff Brink felt that the face mask policy of the RSD, as applied to students, was unconstitutional.

133. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to Defendant Bormann and Nurse Montanez about compelling the use of face masks on school children.

134. Compelling students to wear face masks that do not serve a legitimate public health interest, and deprive students and parents of their constitutional rights, is a matter of public concern.

135. The Rumson BOE failed to establish a legitimate, enforceable face mask policy.

136. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law, and public health law.

137. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students.

138. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

139. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

Health Screenings

140. The Rumson BOE established a policy or custom of using a thermal scanner or non-contact thermometer used by untrained or poorly trained, non-medical personnel to conduct health screenings for symptoms of communicable disease on all students who entered the school building. (Exhibit 2, pg. 3)

141. School law states that student health screenings are to be performed by medical personnel or those properly trained to perform specific screenings and assessments.

142. In the RSD health screenings were being conducted by non-medical personnel to screen students for the presence of symptoms of a communicable disease.

143. Students' forehead temperatures were being assessed with thermal cameras or non-contact thermometers by non-medical personnel immediately upon entering the vestibule of the school building after waiting outside in near freezing conditions.

144. The vestibule of the school building was often cold and windy.

145. Students' skin temperatures were below normal because of prolonged exposure to the cold resulting in inaccurately low temperature readings.

146. This poses an obvious risk of potentially causing a feverish person to be incorrectly screened.

147. Instructions for using a thermal camera or non-contact thermometer state that the device and the subject being assessed must acclimate to the environment before an accurate reading can be taken.

148. Instructions for using a thermal camera or non-contact thermometer state that the environment around the subject should be stable and free from large air flows such as drafts, heating or cooling vents.

149. Subjecting a student to a health screening that will not result in an accurate assessment of health does not serve a legitimate public health interest and is arbitrary and capricious.

150. There were known risks associated with screening asymptomatic students for signs of illness.

151. Subjecting a student to a health screening that will not result in an accurate assessment of health puts students and staff at risk because it can result in unnecessary confinement, exclusion and quarantine, or potential exposure due to a communicable disease.

152. Parents or guardians of students have a right to object to medical exams that do not serve a legitimate public health interest and no student shall be compelled to receive such an exam.

153. Students have a right to be free of arbitrary and capricious invasions of their privacy and health status.

154. Plaintiff Brink spoke as a citizen when she questioned four members of the RSD staff regarding their use of non-contact thermometers.

155. Plaintiff Brink spoke as a citizen when she explained to staff members the limitations of non-contact thermometers and the need to use them in a controlled environment.

156. Plaintiff Brink, as a citizen, sought to protect the rights of school children who were, in most respects, in the custody of the state because no parent, guardian or member of the general public could access to the school building.

157. Plaintiff Brink felt that the health screening policy and practice of the RSD, as applied to students, was unconstitutional.

158. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

159. Plaintiff Brink, as a citizen, was concerned for the health and well-being of the students of the RSD.

160. The principals and support staff of the RSD with whom Plaintiff spoke regarding the use of non-contact thermometers were outside Plaintiff's chain-of-command.

161. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals or support staff of the RSD about the use of non-contact thermometers.

162. The improper use of thermal cameras and non-contact thermometers by non-medical personnel to screen students for symptoms of a communicable disease in a public school is a matter of public concern.

163. Using the results of an ineffective health screening to confine or exclude a student from the classroom or the school building is a matter of public concern.

164. Potential wrongdoing or breach of public trust on the part of government officials is a matter of public concern.

165. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law and public health law.

166. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students

167. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

168. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

<u>COVID-19 Screening Form / Quarantine Room</u>

169. It was the policy or procedure of the RSD to confine students to the "Quarantine Room" when their parent/guardian failed to complete the COVID-19 Screening Form. (Exhibit 2, pg. 5)

170. Each morning before school parents/guardians of students were required to complete a COVID-19 Screening Form.

171. Students whose forms were not complete were confined to the "Quarantine Room" until a parent/guardian could be reached and the form completed.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

172. The middle school "Quarantine Room" was routinely filled with twenty (20) or more students.

173. The "Quarantine Room" was designed to quarantine and isolate no more than (10) symptomatic or exposed people. (Exhibit 3, pg. 9)

174. Instead, the "Quarantine Room" was used to confine students whose parents/guardians did not complete the COVID-19 Screening Form.

175. Some students in the middle and elementary school were confined to the "Quarantine Room" for an hour or more, despite having no symptoms of illness.

176. Students whose parents/guardians frequently failed to complete the Screening Form were put on the "Naughty List."

177. In one example, a young child from the elementary school, whose Mother did not speak English and had difficulty completing the Screening Form, was frequently confined to the "Quarantine Room" for extended periods of time.

178. There were known risks associated with confining, quarantining, and isolating students unnecessarily.

179. Students have a right to be free of arbitrary and capricious deprivation of their liberty.

180. Confining a student to a "Quarantine Room" and depriving them of their liberty because their parent/guardian did not complete a screening form is arbitrary and capricious and serves no legitimate public health interest.

181. On several occasions Plaintiff Brink, as a citizen, initiated discussions with Principal Gibbons, and the Certified School Nurses regarding the clinical soundness of the COVID-19 Screening Form and the confinement of healthy students to the "Quarantine Room."

182. Plaintiff Brink, as a citizen, was concerned for the health, and well-being of the students of the RSD.

183. Plaintiff Brink spoke as a citizen when she questioned principals and support staff of the RSD staff regarding the use of COVID-19 Screening Form to confine healthy students to the "Quarantine Room."

184. The principals or support staff of the RSD with whom Plaintiff spoke regarding the use of the COVID-19 Screening Form, were outside Plaintiff's chain-of-command.

185. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals or support staff of the RSD about the use of the COVID-19 Screening Form to confine healthy students to the "Quarantine Room."

186. Confining healthy students in a "Quarantine Room" that is meant for those who are sick or have been exposed to a communicable disease is a matter of public concern.

187. Students being deprived of their liberty for arbitrary and capricious reasons, without due process of law is a matter of public concern.

188. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

189. Plaintiff Brink, as a citizen, sought to protect the rights of school children who were, in most respects, in the custody of the state because no parent, guardian or member of the general public could access to the school building.

190. Plaintiff Brink felt that the COVID-19 Screening policy as applied to the students of the RSD was unconstitutional because it caused the confinement of healthy students to a "Quarantine Room" for no legitimate public health reason.

191. Potential wrongdoing or breach of public trust on the part of government officials is a matter of public concern.

192. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law and public health law.

193. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students.

194. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

195. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

Plaintiff's Stance on the COVID-19 Vaccine

196. On December 28, 2020 Defendant Bormann emailed Plaintiff Brink advising Plaintiff that he (Bormann) had provided her name the New Jersey Department of Health to get Plaintiff "on the list" to receive the COVID-19 vaccine. (Exhibit 4)

197. Plaintiff Brink did not consent to receiving the COVID-19 vaccine, nor did she want Defendant Bormann sharing her name with the Department of Health for such a purpose.

198. Plaintiff Brink spoke as a citizen when she responded by email from her personal cell phone, on her day off, to Defendant Bormann and both certified school nurses, stating that she would not be getting the COVID-19 vaccine. (Exhibit 5)

199. Plaintiff Brink spoke as a citizen in that email when she advocated for informed consent and offered to share her reasoning for choosing not to get the COVID-19 vaccine.

200. Plaintiff Brink spoke as a citizen when she wrote "The patient advocate in me is compelled to share my reasons with you…I've spent 30 plus hours investigating Covid-19

vaccines…the information presented in the media is incomplete and one-sided….I'd be happy to share a balanced presentation of the details with anyone wishing to know."

201. Plaintiff Brink was speaking as a citizen which is why she provided her personal phone number and personal email address as contact information.

202. Informed consent, the media's presentation, and factual details regarding the COVID-19 vaccine were issues of public concern.

203. Discussions of this new, experimental, fast-tracked vaccine clearly related to a matter of social or political concern of the community, as it was a topic many commercials, news reports, and social media posts.

204. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the Superintendent or certified school nurses of the RSD regarding information related to the COVID-19 vaccine.

205. In response to Plaintiff Brink's email, Defendant Bormann wrote "Not a problem Jessica… At this time I do not foresee any associated requirements related to the vaccine." (Exhibit 6)

206. Defendant Bormann and both certified school nurses were now aware of Plaintiff Brink's personally-held viewpoint in opposition to receiving the COVID-19 vaccine.

207. The COVID-19 vaccine was never mandated for public school employees in New Jersey.

208. Plaintiff Brink's email was 'not a problem' and did not distract or disrupt the function or efficiency of the workplace.

209. Defendant Bormann invaded Plaintiff Brink's privacy when he sent her name to the NJ Department of Health, without her consent, to sign her up for the COVID-19 vaccine.

210. The Rumson BOE failed to train the Superintendent regarding the privacy of personal health decisions.

Restraint and Viewpoint Discrimination

211. There was a concerted effort on behalf of the RSD to get staff vaccinated with the COVID-19 vaccine.

212. Beginning in Mid-December of 2020, Defendant Bormann emailed the entire staff on a weekly basis regarding information and opportunities to receive the COVID-19 vaccine.

213. On December 17, 2020, Nurse Montanez sent an email sharing incorrect information with all middle school staff, stating that the COVID-19 vaccine was "approved", despite the fact that the vaccine was only authorized under emergency use as a medical countermeasure. (Exhibit 7)

214. On January 6, 2021, Nurse Montanez sent a detailed description of her vaccine experience along with pictures of her vaccine-site bandage and vaccination card. (Exhibit 8)

215. Defendant Bormann had taken the liberty of sending Plaintiff Brink's name to the NJDOH to sign her up to receive the COVID-19 vaccine, Bormann was sending regular vaccine-related emails to the staff, Nurse Montanez was sending inaccurate vaccine-related information to the staff, and Plaintiff's own Mother, a member of the staff, was feeling the pressure to get vaccinated.

216. On January 7, 2021 Plaintiff Brink emailed Defendant Bormann regarding her concern for the staff. (Exhibit 9)

217. Speaking as a citizen, Plaintiff Brink wrote:

> "I know I'm new in the district and technically not an employee of Rumson, but I feel tied to the team for many reasons…I am a Nurse Patient Advocate first and foremost. My goal is to ensure that everyone has as complete informed consent as possible. I have no reason to deter people from getting the vaccine. My only purpose is to ensure they have the information they need and understand the jargon in the

> documentation…Do I have your permission to email the staff and offer myself as a resource?"

218. Plaintiff Brink sent this email as a citizen, in her off hours, from her personal phone and provided her personal email address for any response.

219. Plaintiff Brink states clearly in the email "I know I'm…technically not an employee of Rumson…"

220. Plaintiff Brink spoke as a citizen in that email when she advocated for informed consent and education regarding the COVID-19 vaccine.

221. As a citizen and advocate, Plaintiff Brink was concerned that the staff of the RSD, including her own Mother, was not getting balanced and accurate information regarding the COVID-19 vaccine.

222. Plaintiff Brink, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to have concern over the lack of informed consent of the RSD staff.

223. Plaintiff Brink was not hired or paid to be an advocate, but she felt compelled to do so.

224. Informed consent, the media's presentation, and factual details regarding the COVID-19 vaccine were issues of public concern.

225. Discussions of this new, experimental, fast-tracked vaccine clearly related to a matter of social or political concern of the community, as it was a topic many commercials, news reports, and social media posts.

226. Upon receiving Plaintiff Brink's email referenced above, Defendant Bormann forwarded Plaintiff's email to Nurse Montanez asking, "In full confidentiality, what do you think about this?" (Exhibit 10)

227. Nurse Montanez responded in part that:



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

> "I [Montanez] was disappointed at Jess' [Plaintiff] response when you [Bormann] emailed the nursing staff on how to obtain the vaccine. That response was an overshare. Like it or not working in a school has a political component and you have to be mindful when and how you should share. I feel uncomfortable having a permanent sub nurse do this as I am not sure what information will be relayed." (Exhibit 10)

228. Nurse Montanez stated that Plaintiff Brink shared too much when she expressed her opinion in opposition to the COVID-19 vaccine, and for this, Nurse Montanez was disappointed in Plaintiff Brink.

229. Nurse Montanez implies that certain political viewpoints, like the viewpoint of Plaintiff Brink, may not be well received in the RSD and should only be shared in certain ways, at certain times.

230. However, Defendant Bormann and Nurse Montanez's advocacy for and support of the COVID-19 vaccine was acceptable to be shared during the work day, through the District email system.

231. Nurse Montanez perceived Plaintiff Brink's response as "anti-vaccine" and feared that Plaintiff would relay "anti-vaccine" information to others.

232. Nurse Montanez disagreed with Plaintiff Brink's viewpoint regarding the COVID-19 vaccine and for this reason she encouraged Defendant Bormann to chill Plaintiff Brink's speech.

233. After receiving Nurse Montanez's response, Defendant Bormann replied to Plaintiff Brink's email stating:

> "Thank you for reaching out and sharing this. Your willingness to support the staff is appreciated and we value having you as part of our team. After much thought, it would not be appropriate to provide advocacy one way or another…I would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact." (Exhibit 11)

234. Plaintiff Brink responded, further clarifying her position as a citizen concerned for the staff and community, "I just couldn't help but notice that in Maria's explanation of her vaccination experience, she didn't mention informed consent. In the rush to get people vaccinated, I believe people aren't truly getting complete information…" (Exhibit 11)

235. Defendant Bormann's proffered reason for restraining Plaintiff's speech was that advocacy one way or another would not be appropriate, yet his previous emails and those of Nurse Montanez demonstrate their own support of and advocacy for receiving the COVID-19 vaccine.

236. This purported neutral reasoning is pretext for viewpoint discrimination because Defendant Bormann and Nurse Montanez perceived Plaintiff's viewpoint to be "anti-vaccination."

237. One of the reasons given by Defendant Bormann when explaining Plaintiff's termination from the RSD was for "requesting to send anti-vaccination guidance to our staff."

238. Plaintiff Brink was singled-out and subjected to oppressive measures, when others similarly situated were free to share similar information and personal viewpoints.

239. Hatred, fear, and anger toward the unvaccinated was a widespread sentiment from many news outlets including MSNBC, CNN, FOX, and even President Biden, with comments like:

> "You're killing people", "The only people you can blame are the unvaccinated", "Idiots who do their own research", "Lunatics who won't take any of the COVID vaccines", "It is the unvaccinated who are the problem, period, end of story" "Those who are unvaccinated will end up paying the price."

240. Plaintiff Brink never requested to send anti-vaccination guidance to the staff of the RSD.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

241. Defendant Bormann states that advocacy is not appropriate, which indicates that it is not part of anyone's job duties, not Plaintiff Brink, not Defendant Bormann, and not Nurse Montanez.

242. Defendant Bormann did not offer Plaintiff Brink any alternatives to convey her message of informed consent and education.

243. Defendant Bormann's restriction did not include clear, narrow standards.

244. Plaintiff Brink understood this to mean that she was restrained from speaking about COVID-19 informed consent and education inside or outside the school.

245. Plaintiff Brink's speech, as a citizen, about informed consent and education regarding the COVID-19 vaccine was chilled for fear of losing her job if Plaintiff did not abide by Defendant Bormann's warning that no one involved with the school be involved with advocacy.

246. Plaintiff Brink's speech was also chilled out of fear for retaliation or discrimination against her Mother, who worked in the Rumson School District and interacted with Defendant Bormann regularly.

247. Plaintiff Brink made clear in her email that she was speaking as a citizen when she states, "I know I'm ....technically not an employee of Rumson..." (Exhibit 9)

248. Plaintiff Brink was speaking as a citizen who cares for her community when she states that she is speaking because "[she] feel[s] tied to the team for many reasons."

249. Plaintiff Brink's email was a response, as a daughter, to the coercion her own Mother experienced, as an employee of the RSD, who received the nearly daily emails from Defendant Bormann, encouraging her to complete surveys regarding vaccination status, and directives to sign up to receive the COVID-19 vaccine.

250. A staff member should not be coerced to divulge their personal medical information.

251. A staff member should not be coerced to accept a medical intervention that is still under clinical trial and is not proven to prevent any disease.

252. A school board should not act as the marketing arm for a private hospital system so that the hospital system can increase its revenue and number of potential patients.

253. There are known and unknown risks associated with receiving the COVID-19 vaccine.

254. Informed consent, clearly outlining those risks, was not required with the administration of the COVID-19 vaccine.

255. Those authorized under emergency circumstances to administer the COVID-19 vaccine were not equipped to answer questions about the effectiveness or risks associated with the COVID-19 vaccine.

256. Citizens have a First Amendment right to receive information and ideas.

257. The First Amendment exists to protect the free discussion of governmental affairs.

258. Plaintiff Brink was compelled, as a citizen, a daughter, and an advocate to ensure that people had as informed a consent as possible before receiving a new, experimental, fast-tracked vaccine.

259. Plaintiff Brink spoke as a citizen when she advocated for education and informed consent regarding the COVID-19 vaccine.

260. Plaintiff Brink, as a citizen, was concerned for the health and well-being of her Mother, her colleagues, and the community at large.

261. The COVID-19 vaccine was not mandatory for public school employees in New Jersey, it did not prevent transmission, and there were known and unknown risks for which the manufacturer nor the government had liability.

262. It was not rational or justified to restrain and chill Plaintiff Brink's protected, citizen speech on the topics of informed consent and education for the COVID-19 vaccine.

263. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak about advocacy for education regarding the COVID-19 vaccine.

264. Individual email addresses of staff and Board Members of the RSD are posted on the District's publicly available website.

265. The Rumson BOE intentionally opened the use of the RSD's email system to the public when it made staff and Board Member email addresses publically available and invited discourse through its website.

266. Any citizen with access to the internet and an email server can openly communicate their message by email with individual members or all members of the RSD and Board of Education.

267. Parents, guardians and members of the public had access to and used the RSD's email system without limitation.

268. Plaintiff Brink never requested to use the District's listserv.

269. Defendant Bormann freely shared information about the COVID-19 vaccine with the staff of the RSD that he received from the non-governmental, private hospital system representative.

270. Defendant Bormann should have known that it is unconstitutional to restrain the free speech rights of a citizen, especially on matters of public concern.

271. Defendant Bormann should have known that it is unconstitutional to discriminate against a citizen and deny their First Amendment right based on the viewpoint they seek to express.

272. The Rumson BOE failed to effectively train the Superintendent and Nurse Montanez in the constitutional rights of citizens and employees.

273. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to free speech on matters of public concern.

274. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was deprived of her First Amendment right.

275. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

276. Failure to effectively train staff resulted in injury to the staff of the RSD when they were deprived of their First Amendment right to receive information.

277. The Rumson BOE does not have a policy to govern the use of the RSD email system by citizens or third-party employees.

278. The Rumson BOE does not have a policy to govern the First Amendment rights of citizens or third-party employees.

279. Defendant Bormann was the final policymaker when he acted to restrain Plaintiff's protected speech.

Concerted Effort to Vaccinate the Staff

280. Despite Defendant Bormann's directive to Plaintiff Brink that advocacy for education about the COVID-19 vaccine was not appropriate, Bormann himself educated the staff and encouraged vaccination.

281. Defendant Bormann advocated for, and he himself signed, a contract with a private hospital system to provide COVID-19 vaccines to staff. (Exhibit 12)

282. The RSD was used as a pilot by this private hospital system to roll out a program for vaccinating teachers and staff. (Exhibit 13)

283. The representative for the hospital system, who is also the parent of a RSD student, provided a survey to the RSD to gauge the interest of the staff in receiving the COVID-19 vaccine.

284. Upon information and belief, the private hospital system had a financial interest in testing and vaccinating as many people as possible.

285. Upon information and belief, Defendant Bormann leveraged his personal relationship with this parent to obtain benefits for the Rumson School District and provide benefits to the private hospital system.

286. Upon information and belief, the contract between the Rumson Board of Education and the private hospital system is unlawful and potentially fraudulent.

287. Defendant Bormann stated in an email to the representative at the private hospital system "I know about 75% of staff has shared that they signed up to get in line for the vaccine using the state link! I would be happy to be the first in line as a model to our staff!" (Exhibit 14)

288. The representative at the private hospital system responded "Its great to hear that 75% pre registered, hopefully you don't have much of a problem then. Lets see what the survey says."

289. It can be inferred that the view of the hospital representative was that those who chose not to get the vaccine were a "problem."

290. Defendant Bormann shared regular emails with staff directing staff to "VOLUNTEER TO COMPLETE THIS ONCE YOU ARE FULLY VACCINATED"

291. In an email message to All District Staff, Defendant Bormann stated, "read the information attached on COVID vaccines and consider your participation in getting the vaccine."

292. Defendant Bormann reported to All District Staff on the number of staff members who were already vaccinated, as well as those who were scheduled to be vaccinated.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

293. In an email to All District Staff, Defendant Bormann referred to those already scheduled to receive the COVID-19 vaccine as "the lucky few."

294. In an email dated January 11, 2021, from Defendant Bormann to All District Staff, Bormann stated "Over the next few weeks our focus will be on vaccinations. Please take some time to familiarize yourself with the vaccination process."

295. In an email dated January 12, 2021, Defendant Bormann encouraged All District Staff to participate in a "COVID-19 Vaccine Community Forum" hosted by the private hospital system.

296. In an email dated January 15, 2021, Defendant Bormann stated to a colleague "LOL, Let's start smoking so we can get the vaccine!" (Exhibit 15)

297. In an email dated January 30, 2021 from Defendant Bormann to All District Staff, Bormann states, "WE NEED THIS SURVEY DATA BY SUNDAY EVENING, 1/31/21…Our goal is to facilitate the vaccination of all staff who meet this criteria as quickly as possible."

298. Later that same day Defendant Bormann once again emailed All District Staff stating "Please talk this up with colleagues to ensure they fill out the form as well! If everyone texts a colleagues [sic] I can get the info needed to move this forward." (Exhibit 16)

299. Upon information and belief, Defendant Bormann held a personal pro-vaccine viewpoint.

300. Defendant Bormann shared his viewpoint with the staff of the RSD.

301. Nurse Montanez freely shared personal, vaccine-related email messages with all middle school staff including pictures of her vaccination experience and her vaccine card.

302. Nurse Montanez's email was viewed as advocacy for the vaccine by members of the staff as evidenced by their responses to it.

303. Defendant Bormann responded "Sounds good but got notified that healthy educators will not be until late spring, if then! Uggh!"

304. Another staff member responded "Talk about staff support! The first one to brave the vaccine…." (Exhibit 17)

305. Advocacy for and support of the COVID-19 vaccine was discussed freely in the RSD.

306. Discussion of, and advocacy for COVID-19 vaccination was not reserved to certified school nurses or medical professionals.

307. Defendant Bormann and members of the staff of the RSD freely presented a pro-vaccine viewpoint through discussion and use of the email system.

308. The COVID-19 vaccine was never proven to prevent transmission of the SARS CoV-2 virus.

309. There were known and unknown risks associated with the COVID-19 vaccine.

310. The topic of COVID-19 vaccination was a matter of public concern.

311. Proper informed consent for an Emergency Use Authorized medical countermeasure is a matter of public concern.

312. Plaintiff Brink's protected speech, geared toward educating the staff, was restrained and Plaintiff was ultimately removed from her position, just for making a request to share similar information.

<u>11,000 Days of Exclusion from School</u>

313. It was the policy, procedure, or custom of the Rumson BOE, during the pandemic, to exclude students from school for symptoms of known conditions like chronic allergies.

314. It was the policy, procedure, or custom of the Rumson BOE to exclude healthy students from school because they traveled to restricted areas outside the state of New Jersey.

315. Rumson BOE policies and their implementation by Defendant Bormann had significant impact on the students of the community.

316. The RSD served on average approximately 915 students during the 2020-2021 school year.

317. In the four-month period between December 7, 2020 and April 25, 2021, three hundred seventy (370) student close-contact exclusions (quarantines) were ordered by the Rumson BOE.

318. The close-contact exclusion (quarantine) period was 14 days which results in 5,180 days of in-person learning missed by students.

319. During that same time, four hundred thirty-three (433) travel exclusions (quarantines) were ordered by the Rumson BOE.

320. On a 14-day exclusion, that amounts to 6,062 days of in-person learning missed by students.

321. Many of the same students were required to quarantine multiple times resulting in extended absence from the regular educational environment.

322. Exclusions from school for 10 days or more are equivalent to long-term suspensions.

323. Even short-term suspensions of one day require minimal due process of law.

324. Remote learning is not equivalent to learning in-person in the regular education environment.

325. Remote learning was authorized by EO in two scenarios – when schools were closed, and when parents/guardians chose a full-time remote option.

326. As early as August 13, 2020 Governor Murphy recognized the risks associated with remote learning when he stated in EO 175:

> "WHEREAS, the Department of Education has determined that in-person instruction provides students with academic, social, emotional, and mental health supports that cannot be provided with the same level of efficacy in a remote setting; and

> WHEREAS, the Department of Education has found that reopening schools for in-person instruction is critical in facilitating the social and emotional health of students and providing educators with the ability to actively participate in student learning, provide feedback, and promote active learning among students on a daily basis; and
>
> WHEREAS, the American Academy of Pediatrics has determined that in-person instruction is preferred over other forms of instructional delivery for reasons such as addressing and preventing learning loss, attending to students' social and emotional wellbeing, and minimizing educational inequities resulting from the remote learning model;"

327. Remote learning was not intended to be used as an ad hoc alternative to in-person education, making it more palatable to exclude students for extended periods of time.

328. No school law or Executive Order permits a Board of Education to exclude students from school without a departure from normal health, or without a known exposure to a communicable disease.

329. No school law or Executive Order permits a Board of Education to mandate quarantines for students or staff.

330. No Executive Order permits a Board of Education to prescribe remote learning except for school closure or as a full-time option when requested by a parent/guardian.

331. It is well established that the authority to quarantine citizens lies within the Department of Health, not the Department of Education.

332. Self-quarantine was recommended by the CDC and NJDOH; it was not mandatory.

333. Defendant Bormann and the Rumson BOE adopted policies and made it a custom to mandate quarantines for students, denying them access to in-person learning until their quarantine time expired.

334. Failure to abide by school exclusion policies could result in discipline for students and criminal disorderly conduct charges for parents and guardians.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

335. Students and parents / guardians were compelled under threat of punishment, to comply with the quarantine orders of the Rumson BOE.

336. It was the directive of the Rumson BOE to "report any student suspicions to the admin team. This includes travel, illnesses in the home, pending COVID test, group gatherings, etc…." (Exhibit 18)

337. It is irrational, discriminatory, and harmful to presume that students with known health conditions, like chronic allergies, are sick with a communicable disease.

338. It is irrational, discriminatory, and harmful to presume that every student who traveled to a "restricted area" outside the state of New Jersey during the pandemic was exposed to a communicable disease.

339. It is irrational to claim that COVID-19-like symptoms or travel to a "restricted area" are a significant threat to public health, yet under those conditions, quarantines were voluntary.

340. If COVID-19-like symptoms or travel to a restricted area were a significant threat to public health, quarantines would be mandatory, and such a deprivation of liberty requires due process of law.

341. The policies and procedures of the Rumson BOE, as applied to the students of the RSD, deprived them of their constitutional rights to liberty, privacy and a free, thorough and efficient public education.

342. A school board cannot act in an arbitrary fashion, especially when a child's right to an education is at stake.

343. There are known risks associated with excluding students from attending school in-person.

344. Defendant Bormann and the Rumson BOE acknowledged these risks when, in November of 2021, they eliminated mandatory COVID close-contact quarantine of students stating, "Risk assessments that determine the need for students to be in school for social, emotional, school readiness and academic purposes outweigh the risks associated with close-contact spread as demonstrated by district data."

345. This risk associated with remote learning was well established in EOs 175, 214, and 253, all effective months before the RSD changed their policy.

346. The risk associated with close-contact spread in the school setting was established months before the RSD changed their policy.

347. The Rumson BOE demonstrated deliberate indifference for the health, well-being, and rights of students when it arbitrarily excluded students from in-person learning and required students to quarantine for 10 to 14 days while receiving only remote learning, depriving them of their right to a free, public, thorough and effective education.

348. Upon information and belief there has not been, nor is there currently any investigation into the number of in-person school days missed because of exclusions and quarantines imposed by Boards of Education throughout the state.

Advocacy for Students and Families

349. It was the policy, procedure, or custom of the Rumson BOE to permit the Superintendent, Defendant Bormann, to exclude students from the school building and determine the period of time the student should be excluded away from school due to COVID-19.

350. It was the policy of the RSD to accept only results of the Emergency Use Authorized COVID-19 RT-PCR test as means to reenter and attend in-person learning.

351. The Rumson BOE denied the use of the NJDOH recommended COVID-19 rapid antigen test.

352. Defendant Bormann is not a trained medical professional.

353. On January 13, 2021 while gathered in the hallway, Plaintiff Brink initiated a discussion between Defendant Bormann, Principal Gibbons, and Nurse Montanez regarding confusion that arose the previous day regarding the quarantine period required for two siblings - a preschool student who developed a fever after receiving a routine vaccination and his sister, an asymptomatic, close-contact.

354. Defendant Bormann required a ten (10) day quarantine for the close-contact, but Nurse Zajac, Plaintiff Brink, and Principal Gibbons determined a fourteen (14) day self-quarantine was the proper recommended timeframe.

355. Defendant Bormann overrode the medical judgment of two licensed medical professionals and the principal, and insisted on a (10) day quarantine.

356. Only when a medical professional is absent from the school, should the principal make the decision to exclude a student from the school building.

357. Reasonableness, in the context of excluding a student from school for possible illness, clearly involves appropriate deference to medical expertise.

358. During the discussion in the hallway Plaintiff expressed the confusion and concern of the Mother whose two children were required to quarantine the day before.

359. Because of the young age of the child with the fever, the Mother chose not to subject him to the invasive and painful PCR test.

360. The Mother was frustrated and confused because her child's fever was clearly related to the vaccination just received and because of that, both her children were directed to quarantine for ten days.

361. The Mother was also frustrated because Defendant Bormann and the Board of Education would not accept an antigen test, but instead required a PCR test.

362. Plaintiff Brink spoke as a citizen and advocate for the Mother and her children because based on Plaintiff's medical training and experience, it was very likely that the child's fever was due to the immune response related to the recent vaccination.

363. Plaintiff Brink spoke as a citizen and advocate for the Mother and her children because she believed, based on guidance from the NJDOH, that an antigen test was acceptable and would be less invasive, less painful, less expensive, and provide faster results allowing the children to return to in-person learning.

364. Plaintiff Brink felt that this young child should have the opportunity to take an antigen test as recommended by the NJDOH.

365. Plaintiff Brink was also concerned because if the Mother refused to have the child PCR tested, he would be considered COVID-19 positive, meaning he would have to self-quarantine for at least 10 days, and his sibling for at least 14 days.

366. After that morning's discussion Plaintiff Brink was still unclear on Defendant Bormann's rationale and his implementation of the School District policies and procedures.

367. Plaintiff Brink, as a citizen and advocate, composed an email out of concern for the entire community. (Exhibit 19)

368. Plaintiff Brink addressed the email to Defendant Bormann, Principal Gibbons, Nurse Montanez, Nurse Zajac and Principal Feeney.

369. In her email, Plaintiff Brink outlined several areas in which the policies and procedures of the RSD did not align with CDC and NJDOH guidance.

370. Plaintiff Brink expressed concern for her professional license because she felt that Defendant Bormann and the Board of Education were telling her to do things that were not permitted by her nursing license or the law.

371. Plaintiff Brink was also expressing concern for the staff and students when she wrote "It's a very confusing thing for which consistency is paramount…If school policy dictates otherwise, can you direct me to where I can find this documented, so that I can be consistent in the guidance I give our students, families and staff."

372. Plaintiff Brink quoted directly from the NJDOH recommendations as quoted by the American Academy of Pediatrics, NJ Chapter "any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test **(molecular or antigen)** for SARS-CoV-2 or they have completed an isolation period of at least 10 days since symptom onset…"

373. This update was shared with Defendant Bormann by Nurse Zajac on January 6, 2021.

374. In an email to All District Staff on January 8, 2021, Defendant Bormann inaccurately quoted the above referenced recommendation by stating "any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test **[PCR]** or they have completed an isolation period of at least 10 days since symptom onset…"

375. Defendant Bormann knowingly changed the recommended guidance of the NJDOH which significantly affected the rights of students to receive an education in the regular learning environment.

376. When comparing PCR tests to antigen tests, they are more expensive, more invasive, more painful, require more time for results, and must be administered by a trained professional.

377. No school law or Executive Order permits the Rumson BOE to prescribe specific diagnostic tests to staff and students as a condition of attending school.

378. No school law or Executive Order permits the Superintendent to override the exclusion recommendation of a medically licensed professional.

379. Only students who demonstrate a departure from normal health or who have had a known exposure to a communicable disease can be excluded from the school building, and only the principal is authorized to exclude them.

380. Plaintiff Brink, as a citizen, was concerned for the health, and well-being of the students of the RSD.

381. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

382. Plaintiff Brink spoke as a citizen when she addressed Defendant Bormann, Nurse Montanez, Principal Gibbons and Principal Feeney regarding the use of quarantine periods and testing requirements of Defendant Bormann and the Rumson BOE.

383. The principals with whom Plaintiff communicated regarding quarantine periods and testing requirements were outside Plaintiff's chain-of-command.

384. Plaintiff Brink, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals regarding the use of quarantine periods and testing requirements.

385. Plaintiff Brink, as a non-certified nurse and third-party employee of ESS, had no obligation or duty to research or know the recommendations of the NJDOH as it relates to COVID-19 quarantine or testing.

386. Plaintiff Brink, as a non-certified nurse and third-party employee of ESS, had no obligation or duty to advocate for the Mother and her children affected by the policies and procedures of the Rumson BOE.

387. Plaintiff Brink's discussion and follow-up emails were well received by everyone and did not distract or disrupt the function or efficiency of the workplace.

388. Defendant Bormann responded, 'much appreciated" and Principal Feeney responded, "Thank you Jess for putting this together."

389. Plaintiff Brink, as a citizen and concerned member of the community, brought a complaint first verbally, then in writing, about several policies/procedures, to the Superintendent of the RSD.

390. Defendant Bormann had a duty to investigate Plaintiff's concerns and escalate them to the Board of Education if he could not resolve them.

391. Instead, Defendant Bormann terminated Plaintiff's assignment to prevent Plaintiff from exposing his potentially wrongful conduct.

392. The Superintendent is responsible for establishing procedures for the hearing of requests and complaints regarding the operation of the school district.

393. The Rumson BOE failed to effectively train the Superintendent in the school law regarding exclusion from the school building and the limits of authority regarding medical decisions that impact the rights of students.

394. The Rumson BOE failed to effectively train the Superintendent in the proper handling of concerns and complaints.

395. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

396. Failure to effectively train staff resulted in injury to the students of the RSD when they were deprived of their right to attend in-person learning in their regular learning environment.

Follow-up and Retaliation

397. When, after two weeks, Plaintiff Brink received no feedback regarding these concerns, Plaintiff requested a phone meeting with Defendant Bormann.

398. On Monday, February 1, 2021, Plaintiff's day off, she met by phone with Defendant Bormann.

399. Plaintiff Brink reviewed her concerns regarding quarantine timelines, PCR tests, the "Quarantine Room", and the sharing of staff, student, and family personal health information.

400. Plaintiff Brink was calm, courteous, and respectful while explaining her concerns for the health, safety, rights, and privacy of the staff, students, and parents/guardians.

401. Plaintiff Brink, as a citizen, echoed the frustration and confusion felt by the parents and guardians she interacted with regularly while working in the RSD.

402. Plaintiff Brink, as a citizen, advocated for lawful, consistent, clinically sound policies and procedures.

403. Defendant Bormann was not receptive to Plaintiff Brink's concerns and criticisms.

404. Defendant Bormann told Plaintiff Brink that she was no longer welcome in the RSD and he would email ESS about the termination.

405. Plaintiff Brink requested that Defendant Bormann copy her on the email to ESS.

406. Defendant Bormann refused to copy Plaintiff Brink on the termination email, stating that she wasn't an employee.

407. Immediately after their conversation Defendant Bormann emailed ESS stating "I wanted to inform you that Jessica Brink, substitute nurse for RSD will no longer be serving in the capacity for the district. Please ensure her placement with the district no longer occurs." (Exhibit 20)

408. Later that evening Plaintiff Brink, as a citizen with open access to the District email system, composed a letter to all members of the Rumson BOE, including Defendant Bormann, explaining what transpired earlier in the day. (Exhibit 21)

409. In her email, Plaintiff Brink stated:

> "I am simply asking for consistency, sound clinical judgment and genuine concern for the wellbeing of our children, teachers and communities be brought to the forefront…I want what is best for the children, their families and the staff of every school….At some point, we must acknowledge the harm this stress, fear, and uncertainty is causing for our children…I'm not asking for anyone to decide if what occurred during my employment was right, wrong, or indifferent. I am asking that you evaluate the appropriateness and consistency of the policies, procedures, guidelines, rules, ideas that are impacting the health and wellbeing of your children and community."

410. By way of an Open Public Records Act (OPRA) request, Plaintiff Brink obtained a copy of an email message from Defendant Bormann to the Rumson BOE. (Exhibit 22)

411. The email was Defendant Bormann's response to Plaintiff's February 1, 2021 email to the Board of Education regarding her termination.

412. Defendant Bormann stated:

> "…this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. They have been notified and confirmed as has been done with other subs in the past. Please

> know this is the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable."

413. Plaintiff Brink has been connected to the RSD community for nearly 20 years through her Mother's employment as a custodian. Over the years, she has come to know the staff and some students.

414. Plaintiff Brink, as a citizen and daughter of an employee, had a vested interest in the health and safety of the RSD.

415. Plaintiff Brink clearly stated that her concern was not for herself, but for the children when she states, "I'm not asking for anyone to decide if what occurred during my employment was right, wrong, or indifferent."

416. As clearly stated by Defendant Bormann, Plaintiff was "not an employee of the district", but she was nonetheless, very concerned.

417. Defendant Bormann should know that he cannot retaliate against a citizen or employee because of protected speech.

418. Plaintiff Brink's employment relationship with ESS would not have happened but for Defendant Bormann directing her there.

419. Plaintiff Brink was recruited by Defendant Bormann to have a permanent assignment in the RSD with a weekly schedule and on call duties.

420. Plaintiff Brink never intended to work other assignments for ESS nor did her Rumson schedule allow for other assignments.

421. Plaintiff Brink intended to work permanently in the RSD for as long as she possible could.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

422. Defendant Bormann, while acting in his role as Superintendent of the RSD, directed and caused ESS to remove Plaintiff Brink from her permanent assignment in the RSD, essentially ending her employment with ESS, in retaliation for her protected speech.

423. Weeks later, when pressed by staff at ESS, Defendant Bormann provided a reason for terminating Plaintiff's assignment stating, "Mrs. Brink was found not to be a good fit in the district." (Exhibit 23)

424. Upon information and belief, it is a requirement of the contract between the RSD and ESS, that Rumson notify ESS that a Substitute Staff has not performed satisfactorily, along with the clear reasons therefor.

425. Defendant Bormann stated clearly in his email message to the Rumson BOE on February 1, 2021, three reasons why Plaintiff was removed from her assignment, however he failed to provide those clear reasons to ESS over a month later.

426. Defendant Bormann possessed and was delegated final policymaking authority in regard to recruiting and removing third-party contracted ESS employees in the RSD.

427. Defendant Bormann had the final, unreviewable authority to request that an ESS employee be removed from their assignment with the RSD.

428. Defendant Bormann interfered directly with Plaintiff Brink's reasonable expectation of economic gain when he caused Plaintiff Brink's assignment through ESS to be terminated.

429. Defendant Bormann acted maliciously and intentionally when he retaliated against Plaintiff for her protected speech to hide his own wrongdoing, then fabricated lies to justify the termination of Plaintiff's assignment.

430. Plaintiff Brink suffered economically and emotionally when Defendant Rumson BOE failed to uphold its obligations under its contract with ESS Northeast, LLC.

431. Plaintiff Brink suffered economically and emotionally when she no longer had an income from her previously consistent work with ESS assigned to the RSD.

432. Considering Plaintiff's abrupt termination from the RSD, she would have considered future employment with ESS, however ESS had no other nursing positions available.

433. Defendant Bormann should have known to take no retaliatory or adverse action against Plaintiff Brink because she conscientiously objected to a policy, or practice of District that she reasonably believed to be in violation of law or rule, or incompatible with a clear mandate of public policy concerning public health or safety.

434. An employee who has reason to believe that the Board has engaged in an activity contrary to public policy must report that belief in writing to the Superintendent before notice is given to a supervisor or a public body.

435. The Superintendent shall promptly report the same to the Board and institute an investigation of the reported activity. The findings of the investigation will be reported in writing to the Board and to the employee.

436. The Rumson BOE should have known that the rights of citizens were at risk by permitting Defendant Bormann to terminate the assignments of ESS employees with no oversight from the Board of Education.

437. The harm inflicted on Plaintiff Brink was foreseeable as Defendant Bormann previously stated, "we have the right to request a sub not be assigned to our schools…They have been notified and confirmed as has been done with other subs in the past."

438. The Rumson BOE failed to establish a policy to protect the First Amendment rights of private citizen, third-party ESS employees assigned to the RSD.

439. There is no policy to protect private citizen, third-party ESS employees assigned to the RSD from retaliatory conduct.

440. The Rumson BOE was under an obligation to train its employees because for years, it has routinely used third-party ESS employees.

441. Plaintiff Brink was retaliated against by Defendant Bormann because she challenged his decision-making and threatened to expose his questionable actions.

442. Defendant Bormann fabricated lies to the Board of Education and to ESS in an attempt to justify his retaliation against Plaintiff Brink for her protected speech.

443. A Superintendent should not fabricate information in an attempt to justify the adverse action taken against an employee, citizen.

444. Defendant Bormann demonstrated deliberate indifference for the health, well-being and rights of citizens, students, and staff when he ignored Plaintiff Brink, a medical professional's, repeated, sincere concerns.

445. Defendant Bormann demonstrated deliberate indifference for the rights of citizens when he acknowledged Plaintiff was not an employee, then terminated her assignment because of her protected speech.

446. The Board of Education demonstrated deliberate indifference for Plaintiff Brink's rights when upon learning of Defendant Bormann's impermissible reasons for terminating her assignment, they acquiesced.

## COUNTS

### COUNT ONE: RETALIATION IN VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION

447. Plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through XX above.

448. Plaintiff brings this claim pursuant to 42 U.S.C. §1983.

449. Plaintiff's speech, made as a citizen, expressing her opinion of and objection to the COVID-19 vaccine, advocating for informed consent and education regarding the COVID-19 vaccine, questioning the clinical soundness and legitimacy of health screenings, questioning the clinical soundness and legitimacy of the COVID-19 Screening Form, advocating for the rights, health, and safety of students and families, questioning the implementation of policies regarding quarantine periods and mandatory PCR testing as applied to the students and staff of the RSD, was protected by the First Amendment to the U.S. Constitution.

450. Defendant Bormann, as Superintendent of the RSD, was an official of New Jersey, Monmouth County, Rumson at all times relevant to this complaint.

451. Defendant Rumson BOE, as a body politic, was an official entity of New Jersey, Monmouth County, Rumson at all times relevant to this complaint.

452. Defendants' actions against the Plaintiff, including restraining Plaintiff's protected speech, communicating false information, retaliating against Plaintiff for her protected speech, and interfering with Plaintiff's employment, were taken under color of law.

453. Defendant Bormann's actions against the Plaintiff were such that they would chill a reasonable person from engaging or continuing to engage in the protected speech and were intended to cause harm to the Plaintiff.

454. Plaintiff's protected speech was a substantial or motivating factor in Defendant Bormann's actions.

455. Defendant Bormann was motivated by ill-will and malice when he retaliated against Plaintiff for her protected speech.

456. As a result of Defendants' unlawful actions, the Plaintiff suffered economic, non-economic and compensatory damages.

457. While acting under color of state law, Defendant Bormann deprived Plaintiff Brink of a Federal and Statutory right.

458. Defendant Bormann's decisions to restrain Plaintiff's speech and to terminate her assignment with the RSD were final, and unreviewable.

459. Defendant Board of Education is liable for Defendant Bormann's conduct because Defendant Bormann was a policymaking official in regard to restraining the speech and terminating the assignments of third-party ESS employees assigned to the RSD.

460. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to establish and maintain a policy which could have prevented this conduct.

461. Defendant Board of Education should have adopted policies to protect the First Amendment rights of third-party ESS employees assigned to the RSD.

462. Deprivation of the rights of private citizen, third-party ESS employees assigned to the RSD was a highly predictable consequence of the failure to adopt a needed policy.

463. Failure to adopt a policy that protects the free speech of private citizen, third-party ESS employees assigned to the RSD, created an unreasonable risk of deprivation of constitutional and statutory rights.

464. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to train staff on the contours of the First Amendment, who it applies to and how to apply it to citizens,

citizens assigned to the District by third-party employers, and employees of the RSD speaking as citizens.

465. Defendant Rumson BOE was aware that these unreasonable risks existed.

466. Defendant Rumson BOE was deliberately indifferent to these risks.

467. Defendant Bormann's restraint and retaliation against Plaintiff's speech resulted from Defendant Board of Education's failure to establish a policy that explains the First Amendment rights of private citizen, third-party ESS employees, assigned to the RSD.

468. Defendant Bormann was a policymaking official in regard to terminating the assignments of third-party ESS employees assigned to the RSD.

469. Defendant Bormann made a deliberate decision to terminate Plaintiff's assignment in the RSD, essentially terminating her employment, a choice that represents an official policy.

470. Through such a policy, Defendant Bormann caused the violation of Plaintiff's federal right by directing the violation to occur.

471. There was no policy of the Rumson BOE that protected the free speech of private citizen, third-party ESS employees assigned to the RSD.

472. It was the policy of the Rumson BOE to delegate to the Superintendent, policymaking power in instances where a policy does not exist.

**COUNT TWO: VIEWPOINT DISCRIMINATION IN VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**

473. Plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through XX above.

474. Plaintiff brings this claim pursuant to 42 U.S.C. §1983.

475. Rumson BOE, by history and practice established a designated public forum of the RSD electronic mail system.

476. By the acts set forth above, the Rumson BOE has adopted, promoted, and endorsed certain messages regarding the COVID-19 vaccine, and permitted others to do the same.

477. While acting under color of state law, Defendant Bormann restrained Plaintiff Brink's speech on the topic of COVID-19 vaccination.

478. Defendant Bormann's restraint of Plaintiff's protected speech regarding education on the COVID-19 vaccine, which Bormann perceived as "anti-vaccination guidance" amounts to content-based discrimination.

479. Defendant Bormann was motivated by ill-will and malice when he restrained Plaintiff's protected speech because he disagreed with Plaintiff's viewpoint.

480. Content-based discrimination in a designated public forum triggers strict scrutiny, requiring the agency to prove that its decision is narrowly tailored to promote a compelling government interest.

481. Defendant's purported neutral reasoning is a pretext for viewpoint discrimination.

482. Since Defendant Bormann cannot meet this difficult burden, Defendant's decision to restrain Plaintiff's protected speech violates the First and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. §1983.

483. Alternatively, even if Rumson BOE history and practice has not established a designated public forum on the RSD electronic mail system, Defendant Bormann's restraint on Plaintiff's protected speech regarding the COVID-19 vaccine, while allowing other similar COVID-19 speech, amounts to viewpoint discrimination, which is *per se* a violation of the First and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. §1983.

484. Defendant Bormann's decisions to restrain Plaintiff's speech because of the viewpoint he perceived her to hold, and to terminate her assignment with the RSD, in part because of this perceived viewpoint, were final, and unreviewable.

485. Defendant Board of Education is liable for Defendant Bormann's conduct because Defendant Bormann was a policymaking official in regard to restraining the speech and terminating the assignments of third-party ESS employees assigned to the RSD.

486. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to establish and maintain a policy which could have prevented this conduct.

487. Defendant Board of Education should have adopted viewpoint neutral, narrowly-tailored policies to protect the First Amendment rights of citizens and third-party employees who use the electronic mail system to share ideas and information.

488. Deprivation of the rights of private citizen, third-party ESS employees assigned to the RSD was a highly predictable consequence of the failure to adopt a needed policy.

489. Failure to adopt a policy that protects the viewpoints and free speech of private citizen, third-party ESS employees assigned to the RSD, created an unreasonable risk of deprivation of constitutional and statutory rights.

490. Defendant Rumson BOE was aware that this unreasonable risk existed.

491. Defendant Rumson BOE was deliberately indifferent to that risk.

492. Restraint of Plaintiff's speech resulted from Defendant Board of Education's failure to train its staff on the importance of uninhibited, robust, and wide-open debate about matters of public importance that secures an informed citizenry.

493. Restraint of Plaintiff's speech resulted from Defendant Board of Education's failure to train its staff on the different types of public forums and the type of restrictions permitted in each

494. Defendant Bormann was a policymaking official in regard to the content-based restriction he placed on Plaintiff's speech when Bormann restricted Plaintiff's speech because he perceived her viewpoint as "anti-vaccination."

495. Defendant Bormann made a deliberate decision to restrain Plaintiff's speech and provided a pre-textual reason for doing so, a choice that represents an official policy.

496. Through such a policy, Defendant Bormann caused the violation of Plaintiff's federal right by directing the violation to occur.

497. There was no policy of the Rumson BOE that protected the free speech of private citizen, third-party ESS employees assigned to the RSD.

498. It was the policy of the Rumson BOE to delegate to the Superintendent, policymaking power in instances where a policy does not exist.

499. As a result of Defendants' unlawful actions, the Plaintiff suffered economic, non-economic and compensatory damages.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment against Defendants and grant the following relief:

a. Declaration that Defendants' retaliation against Plaintiff for her protected speech expressing her opinion of and objection to the COVID-19 vaccine, advocating for informed consent and education regarding the COVID-19 vaccine, questioning the clinical soundness and legitimacy of health screenings, questioning the clinical soundness and legitimacy of the COVID-19 Screening Form, advocating for the rights, health, and safety of students and families, questioning the

implementation of policies regarding quarantine periods and mandatory PCR testing as applied to the students and staff of the RSD, violates the First Amendment to the U.S. Constitution;

b. Declaration that Defendants' content-based restraint of Plaintiff's speech expressing her opinion of and objection to the COVID-19 vaccine and advocating for informed consent and education regarding the COVID-19 vaccine, violates the First Amendment to the U.S. Constitution;

c. Award damages for Defendants violation of her rights under the First Amendment to the U.S. Constitution, including for the Plaintiff's economic, non-economic, including emotional distress, and in an amount to be proven at trial;

d. Award punitive damages against Defendant Bormann in his individual capacity;

e. Award front pay in lieu of reinstatement;

f. Award pre- and post-judgment interest at the highest rate allowed by law;

g. Award Plaintiff's costs incurred to bring this action and attorney's fees pursuant to 42 U.S.C. §1988; and

h. Grant such other relief as this Court deems just and appropriate.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

## JURY TRIAL DEMAND

**Plaintiff Brink demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.**

Dated this 26th day of July 2024

Respectfully submitted,

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35

# VERIFICATION

BEFORE ME personally appeared Jessica M. Brink who, being by me first duly sworn and identified in accordance with law, deposes and says:

1. My name is Jessica M. Brink, Plaintiff herein.

2. I have read and understood the attached foregoing complaint, and each fact alleged therein is true and correct of my own personal knowledge.

FURTHER THE AFFIANT SAYETH NAUGHT.

_______________________

Jessica M. Brink, Affiant
State of Texas, County of Harris
SWORN TO and subscribed by me this 26th day of July 2024.

_______________________

NOTARY PUBLIC

NOTARY PUBLIC ★ STATE OF TEXAS ★
ANA LAURA SALAZAR URIBE
ELECTRONIC NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID: 131757026
COMISSION EXP: OCT 11, 2026

Document Notarized using a Live Audio-Video Connection

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of July 2024, I electronically filed the foregoing with the Clerk of Court by email to the NJD Help Desk at ecfhelp@njd.uscourts.gov, and a copy was provided to Michael A. Pattanite, Jr. Esq. by electronic mail at mpattanite@lennoxlaw.com, and to Patrick Carrigg, Esq. by electronic mail at pcarrigg@lenoxlaw.com and by regular U.S. mail at 136 Franklin Corner Road, St. 2B Lawrenceville, NJ 08648.

Jessica M Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

State of Texas, County of Harris

BEFORE ME personally appeared Jessica M. Brink who, being by me first duly sworn and identified in accordance with law, did execute the foregoing under penalties of perjury in my presence this 26th day of July 2024.

Ana Laura Salazar Uribe

NOTARY PUBLIC

NOTARY PUBLIC STATE OF TEXAS
ANA LAURA SALAZAR URIBE
ELECTRONIC NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID: 131757026
COMISSION EXP: OCT 11, 2026

Document Notarized using a Live Audio-Video Connection

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, *et al.*,**<br><br>Defendants. | Civil Action No. 23-497 (ZNQ) (JTQ)<br><br>**ORDER** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Defendants John Bormann and the Board of Education of Rumson's (collectively, "Defendants") Motion to Dismiss *pro se* Plaintiff Jessica M. Brink's ("Plaintiff") Second Amended Complaint. (the "Motion", ECF No. 33.) Plaintiff additionally filed a Motion for Judicial Notice ("Mot. For Jud. Not.", ECF No. 35). For the reasons set forth in the accompanying Opinion,

**IT IS** on this **24th** day of **March 2025,**

**ORDERED** that Plaintiff's Motion for Judicial Notice (ECF No. 35) is hereby **GRANTED**; and it is further

**ORDERED** that Defendants' Motion (ECF No. 33) is hereby **GRANTED**; and it is further

**ORDERED** that the Second Amended Complaint is hereby **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk's Office is hereby instructed to mark this matter **CLOSED**.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, *et al.***,<br><br>Defendants. | Civil Action No. 23-497 (ZNQ) (JTQ)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Defendants John Bormann ("Bormann") and the Board of Education of Rumson's ("BOE") (collectively, "Defendants") Motion to Dismiss *pro se* Plaintiff Jessica M. Brink's ("Plaintiff") Second Amended Complaint. (the "Motion", ECF No. 33.) Defendants filed a brief in support. ("Moving Br.", ECF No. 33.) Plaintiff filed a brief in opposition to the Motion ("Opp'n Br.", ECF No. 36) as well as a Motion for Judicial Notice ("Mot. For Jud. Not.", ECF No. 35). Defendants replied to Plaintiff's opposition brief ("Reply", ECF No. 38) and filed a letter in opposition to the Motion for Judicial Notice ("Opp'n to Mot. For Jud. Not.", ECF No. 37).

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Plaintiff's Motion for Judicial Notice and GRANT Defendants' Motion to Dismiss.

## I. BACKGROUND AND PROCEDURAL HISTORY

This is the third iteration of Plaintiff's Complaint before the Court. The Court thoroughly set forth the factual and procedural background in two prior opinions, *Brink v. Bormann*, Civ. No. 23-497, 2023 WL 62113167, at *1–3 (D.N.J. Sep. 25, 2023) and *Brink v. Bormann*, Civ. No. 23-497, 2024 WL 3159433, at *1–3 (D.N.J. June 25, 2024). Briefly, in September 2020, Plaintiff was hired as a School Nurse Permanent Substitute in the Rumson School District ("School District") by Defendant BOE. *Bormann*, 2024 WL 3159433, at *1. As a substitute school nurse, Plaintiff's job consisted of "assisting the two existing certified school nurses with their daily tasks and occasionally filling in if one of the nurses needed time off." (Second Amended Complaint ("SAC") ¶58.) Plaintiff's assigned, ordinary job duties included: (1) "monitoring the '[q]uarantine [r]oom' each morning," (2) "contacting parents/guardians of the children who were confined to the '[q]uarantime [r]oom' [and] of children to investigate absence, reported illness, travel and sick contacts," (3) "addressing emergent issues for example lost tooth, sprained ankle, symptomatic illness," (4) "arranging for the pickup of any child who reported COVID-like symptoms, as well as any of their siblings currently within the RSD," (5) "communicating with fellow nurses, Defendant Bormann, principals, and secretarial staff regarding children being quarantined from the school building," (6) "escorting school children out of school and into the custody of a parent/guardian and when necessary, explaining the RSD's policy on quarantine and testing," and (7) "documenting student-related interactions in the student's health record." (*Id.* ¶93.)

Over the next several months, Plaintiff, the Superintendent of the School District Defendant John Bormann, a certified school nurse Maria Montanez, and a school principal engaged in a series of communications about the COVID-19 vaccine and the School District's vaccination and quarantine policies. Among other things, Plaintiff informed Bormann that she

would not be getting vaccinated (*id.* ¶198), requested Bormann's "permission to email the [School District] staff and offer [her]self as a resource" for any questions about the COVID-19 vaccine (*id.* ¶217), and raised concerns about the alleged discrepancy in the quarantine period between federal and state guidelines and the School District's quarantine policy (*id.* ¶¶354, 366-369).

Following a February 1, 2021, phone call between Plaintiff and Bormann, Bormann informed Plaintiff that her placement in the School District was being terminated. (*Id.* ¶¶398, 404). Bormann then sent the following email to the BOE:

> [T]his sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS . . . . Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

*Id.* ¶412.

On January 26, 2023, Plaintiff filed a twelve-count Complaint against Defendants including federal claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and U.S. Const. amends. I and XIV, and a *Monell* claim, as well as state law claims. (ECF No. 1.) On May 15, 2023, upon a motion by Plaintiff (ECF No. 10), the Clerk entered default against Defendants for failure to plead or otherwise defend. That same day, Plaintiff also moved for default judgment against all Defendants. (ECF No. 11.) On May 18, 2023, Defendants filed cross-motions to vacate the default judgment (ECF No. 13) and to dismiss the Complaint (ECF No. 12.) On September 25, 2023, the Court dismissed the Complaint without prejudice, allowed Plaintiff leave to amend, and vacated default. *Bormann*, 2023 WL 62113167, at *14.

On October 24, 2023, Plaintiff filed an Amended Complaint asserting just two counts against Defendants Bormann and the BOE pursuant to 42 U.S.C. § 1983: (1) First Amendment

retaliation, and (2) First Amendment viewpoint discrimination. (ECF No. 19.) On November 13, 2023, Plaintiff again moved for an entry of default which was entered by the Clerk's Office. (ECF No. 21.) On November 15, 2023, eight days late, Defendants filed motions to vacate default and dismiss the Amended Complaint. (ECF Nos. 22-23.) On June 24, 2024, the Court granted Defendants' motion to vacate default following its finding of "good cause." The Court additionally granted Defendants' motion to dismiss the Amended Complaint without prejudice. As to the First Amendment retaliation claim, the Court found that Plaintiff did not show that any of her alleged speech was protected and that, given COVID-19's wide-ranging impact on school operations, Defendants "permissibly exercised the broader discretion afforded them as a state-employer when they introduced view-point neutral controls on Plaintiff's speech as well as associated disciplinary measures for failure to abide by such controls." *Bormann*, 2024 WL 3159433, at *8. As to the First Amendment viewpoint discrimination claim, the Court found that the School District "provided reasonable, view-point neutral reasons for restricting Plaintiff's speech" including Defendant Bormann's statement that "it would be inappropriate to provide advocacy one way or another" and "our role as a public entity [is] to provide only the factual information available." *Id.* at *9. The Court gave Plaintiff leave to file a Second Amended Complaint to address the deficiencies set forth in its opinion within thirty days. *Id.* at *10.

On July 30, 2024, Plaintiff filed a SAC and alleges, similar to her previous pleading, two counts: (1) First Amendment retaliation, in violation of 42 U.S.C. § 1983 (Count One); and (2) First Amendment viewpoint discrimination, in violation of 42 U.S.C. § 1983 (Count Two). (ECF No. 31.) In sum, the SAC alleges that Defendants violated the First Amendment by refusing to allow Plaintiff to disseminate vaccine information to staff and parents in the School District and by dismissing her for voicing opposition to the School District's COVID-19 policies. Plaintiff

additionally filed a Motion for Judicial Notice to evidence the contract between the School District and ESS for substitute staffing services which Plaintiff received from a Public Records Request. (ECF No. 35.) Defendants oppose the Motion for Judicial Notice. (ECF No. 37.)

## II. **SUBJECT MATTER JURISDICTION**

The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

## III. **LEGAL STANDARD**

A court may dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted with the moving party "bear[ing] the burden of showing that no claim has been presented," *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). When considering a motion under 12(b)(6), the court must accept as true all the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court may, however, ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed me. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, to survive a motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Twombly*, 550 U.S. at 570. A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

It is well established that a "[pro se] complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Montgomery v. Pinchak*,

294 F.3d 492, 500 (3d Cir. 2002); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (demonstrating the point that a pro se plaintiff's pleading must be liberally construed and is held to a lesser standard than that which is applied to pleadings drafted by attorneys). However, "[e]ven a pro se complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013).

## IV. DISCUSSION

Defendants argue that the SAC should be dismissed because it is based on the same factual scenario as her prior two complaints from which the Court concluded that Plaintiff did not engage in protected activity under the First Amendment. (Moving Br. at 3.) In opposition, Plaintiff argues first that she was not an employee of the School District and therefore her claims should be construed as those of a private citizen. (Opp'n Br. at 11.) Plaintiff proffers that, at the very least, a genuine issue of material fact exists as to whether she was a private or public employee. (*Id.* at 12.) Plaintiff further argues that she has sufficiently pled a claim for retaliation based on her allegations that her request to send certain vaccination guidance was a factor in her termination. (*Id.* at 16.) Plaintiff lastly contends that she has sufficiently pled that Bormann knew Plaintiff's viewpoint, perceived it to be "anti-vaccine," and restricted her speech on that basis. (*Id.* at 20.)

### A. MOTION FOR JUDICIAL NOTICE

As an initial matter, the Court has reviewed Plaintiff's Motion for Judicial Notice pursuant to Federal Rule of Evidence 201 in which Plaintiff asks the Court to take judicial notice of the contract between ESS and the School District for the 2019–2020 school year ("ESS Contract"). (ECF No. 35.) She contends the ESS Contract demonstrates that she was an employee of ESS, not an employee of the School District or an independent contractor of the School District. (Opp'n

Br. at 3–4.) Defendants oppose on the basis that "it is unclear what Plaintiff is arguing these documents represent" as Plaintiff did not begin working for the School District until September 25, 2020. (Opp'n to Mot. For Jud. Not. at 2.)

The Court finds that the ESS Contract is a public record and therefore falls within the purview of Federal Rule of Evidence 201. Based on a reading of the ESS Contract and the SAC, the Court finds it is relevant to Plaintiff's allegations that she was an ESS employee rather than an employee of the School District. (SAC ¶¶63–72.) That relevance is limited, however, because: 1) the issue in dispute is not whether Plaintiff is an *actual* employee of the School District, but whether she should nevertheless be treated as one in this context given her contractor status, and 2) as Defendants point out, the term of the ESS Contract predates Plaintiff's employment. Plaintiff's Motion for Judicial Notice will nevertheless be granted.

**B. WHETHER THE PUBLIC EMPLOYEE BALANCING TEST APPLIES**

The Court found in its prior opinion that Plaintiff was an independent contractor subject to the same treatment as a public employee and analyzed Plaintiff's claims under the *Pickering*[1] balancing test for a public employee rather than the more favorable review afforded a private citizen asserting First Amendment rights. *Bormann*, 2024 WL 3159433, at *7.

In an effort to avoid *Pickering*, Plaintiff's now asserts in both the SAC and in her briefing that she is neither a public employee nor an independent contractor. (SAC ¶¶63–72; Opp'n Br. at 10–12.) She instead designates herself as "a private employee of a private company." (Opp'n Br. at 10; *see also* SAC ¶ 64.) She also repeatedly insists throughout her newest pleading that she "spoke as a citizen." (SAC ¶¶154–56, 158–59, 182–83, 188–89, 198–201, 218–220, 245, 248,

[1] *Pickering v. Bd. of Educ. Of Twp. High School Dist. 205*, 391 U.S. 563 (1968).

258.) Defendants argue that the changes to the SAC do not change Plaintiff's status as an independent contractor. (Moving Br. at 4–6; Reply at 1–2.)

Plaintiff's proper status as a speaker in the context of this case is a legal conclusion. Therefore, the Court must ignore any bald assertions in the SAC as to her status on this motion to dismiss. Instead, the Court must consider whether the SAC plausibly alleges Plaintiff's status as a private citizen when she sought to engage in her allegedly protected speech.

The SAC consistently alleges that Plaintiff is employed by ESS, which in turn has a contract with the School District. (SAC ¶¶63–65.) This does not, as Plaintiff appears to believe, render her a private citizen. She was still employed by the District, if indirectly. She is a contractor, or perhaps more precisely, a *sub*contractor. *See* Black's Law Dictionary (12th ed. 2024) (defining subcontractor as "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor.") The question is therefore whether in this context a subcontractor is properly treated the same as a public employee/independent contractor, i.e., whether the balancing test under *Pickering* applies.

In *Board of County Commissioners v. Umbehr*, the Supreme Court held that independent contractors are to be treated as public employees for this purpose, but did not address subcontractors. 518 U.S. 668 (1996) ("*Umbehr*"). In that case, the parties presented factually intensive arguments regarding their employment relationship in support of whether independent contractors were entitled to bring retaliation claims at all. *Id.* at 676–77. The Supreme Court rejected the parties' arguments in favor of the *Pickering* balancing test:

> Each of these arguments for and against the imposition of liability has some force. But all of them can be accommodated by applying our existing framework for government employee cases to independent contractors. *Mt. Healthy* assures the government's ability to terminate contracts so long as it does not do so in retaliation for protected First Amendment activity. *Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests. The dangers of burdensome litigation and the *de facto* imposition of rigid contracting rules necessitate attentive application of the *Mt. Healthy* requirement of proof of causation and substantial deference, as mandated by *Pickering, Connick,* and *Waters,* to the government's reasonable view of its legitimate interests, but not a *per se* denial of liability. Nor can the Board's and the dissent's generalization that independent contractors may be less dependent on the government than government employees . . . justify denial of all First Amendment protection to contractors. The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.
>
> Umbehr's claim that speech threatens the government's interests as contractor less than its interests as employer will also inform the application of the *Pickering* test. Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling governmental interest. But in this case, as in government employment cases, the Board exercised contractual power, and its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. Deference is therefore due to the government's reasonable assessments of its interests *as contractor.*
>
> We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors. There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees.

*Umbehr*, 518 U.S. at 677–78 (emphasis in original).

The Court distills two relevant points from *Umbehr*. First, the Supreme Court has expressed its confidence in the *Pickering* balancing test to properly accommodate nuances in an

employment relationship. Second, *Umbehr* also acknowledges that a government defendant is owed deference to its reasonable assessment of its interests *as a contractor*. On the latter point, whatever Plaintiff's status, it cannot be reasonably disputed that the School District nevertheless remains a contractor based on allegations in the SAC and is therefore entitled to the deference *Umbehr* endorsed. The Court finds that both points militate in favor of applying the *Pickering* test to Plaintiff's claims as a subcontractor.

As for guidance beyond *Umbehr* itself, neither the parties nor the Court were able to identify any relevant cases addressing this issue in this circuit.[2] Plaintiff aptly cites *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011). (Opp'n Br. at 10.) In that case, the Ninth Circuit observed that it was "not immediately obvious" how to treat a plaintiff who was an employee of a municipal contractor, i.e., a subcontractor. 632 F.3d at 1101. The court of appeals conducted a detailed factual analysis, and ultimately concluded that:

> Although Clairmont was not a Municipal Court employee, given the nature of the relationship between the court and [contractor] SMH, the nature of the services provided by SMH, and Clairmont's role in the provision of such services, we conclude that his relationship to the Municipal Court was analogous to that of an employer and employee. Further, given the Probation Unit's need to ensure that SMH's services were properly provided to court-ordered Treatment participants, the balance tips in favor of treating Clairmont as a public employee for purposes of determining whether he has alleged a viable First Amendment retaliation claim.

---

[2] In *Hayes v. Buffalo Municipal Housing Authority,* Civ. No. 12-578S, 2013 WL 5347544, at *4 (W.D.N.Y. Sept. 23, 2013), the district court assumed in passing that a subcontractor would be treated as a public employee ("In this case, applying what is a 'practical' test, see [*Garcetti*, 547 U.S. at 424], it cannot seriously be maintained that [the plaintiff] was speaking as part of his official duties as a subcontractor when he reported Fischer to the FBI.") *But see Lipkin v. George*, Civ. No. 23-127, 2024 WL 1119958, at *3 n.2 (D. Conn. Mar. 14, 2024) (distinguishing *Umbehr* on the basis that "Plaintiff is not an independent contractor with the City of New Haven. Their employer is an independent contractor and this is not a situation where the City of New Haven terminated its contract with CS-HHC.")

*Id.* at 1102. Defendants distinguish *Clairmont* based on other facts. (Reply at 2.) Plaintiff argues that *Clairmont* was decided on summary judgment and that there is not yet an adequate factual record in this case to permit a similar analysis. (Opp'n Br. at 10.) The Court disagrees.

Even reading the SAC in a light most favorable to Plaintiff, the following can be discerned from its allegations. Plaintiff worked on school grounds four days per week from 8 a.m. to 1 p.m. (*See* SAC ¶86.) During her tenure, Plaintiff was in regular contact and communication with the school staff and administration. (*See generally id.*) Her tasks were supervised by a Certified School Nurse who was an employee of the School District. (*See id.* ¶92.) Plaintiff's job duties included: addressing children's emergent health issues; communicating directly with parents/guardians of children with health issues; communicating on quarantine issues with school staff members, Defendant Bormann, and principals; and documenting student-related interactions in the student's health record. (*Id.* ¶93.) Based on the foregoing, the Court finds that the SAC pleads that Plaintiff's personal involvement with students, faculty, and administration was substantial and that a high degree of trust was placed in Plaintiff by both ESS and the District. The Court therefore concludes, consistent with the rationale of the Ninth Circuit, that the relationship between Plaintiff and the District "was analogous to that of an employer and employee" for the purpose of balancing Plaintiff's right to free speech against Defendants' rights as a contractor.[3]

[3] It should be noted that although the Court considered whether to direct the parties to conduct limited discovery as to their employment relationship, as a practical matter, it finds there is nothing to be gained factually for Plaintiff in such discovery. Notably, Plaintiff does not say what discovery she would even seek. Moreover, she has already obtained a copy of the ESS Contract (if an out-of-date one) although not especially persuasive because it only establishes that Plaintiff was not directly employed by the School District, a fact Defendants do not dispute. Additionally, as to any employment agreement Plaintiff might have had with ESS, Plaintiff is conspicuously silent. She has not referred to it in any of her three pleadings or her briefing in this matter, much less provided a copy. Presumably, she already has that agreement or at the very least could reasonably have obtained a copy of it without the aid of discovery. Finally, Plaintiff certainly has personal knowledge as to how she was treated while employed by the School District. Based on the foregoing, the Court separately finds there would be no value in directing the parties with even limited discovery on this issue.

*See Clairmont*, 632 F.3d at 1102. Accordingly, the Court will apply the balancing test under *Pickering* to this case.

### C. RETALIATION CLAIM

To assert a plausible First Amendment retaliation claim, a typical plaintiff must allege that: "(1) [she engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) [there was] a causal link between the constitutionally protected conduct and the retaliatory action." *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018).

Public employees, however, "accept certain limitations on [their] freedom" when they enter government service, including under the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006); *see also Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). Therefore, unlike a private citizen, a public employee's speech is only considered protected under the first prong if: "(1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019) (internal quotation marks omitted); *see also Eichenlaub v. Twp. Of Indiana*, 385 F.3d 274, 283 (3d Cir. 2004) ("[W]hile government employers . . . have the authority to mange their works–including the authority to restrict various kinds of expression–the First Amendment imposes limits on that authority when the employees are speaking about matters of public concern.")

When determining whether an individual speaks as a public employee versus a private citizen, the "'critical question' is 'whether the speech at issue is itself ordinarily within the scope of an employee's duties,'" and not merely whether the speech "concerns those duties." *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 864 (3d Cir. 2019) (quoting *Lane v. Franks*, 573 U.S. 228 (2014)). Courts in this Circuit have inquired "whether a public employee's speech was informed by or the result of his or her primary job duties." *Id.* "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

To the extent that Plaintiff's conduct and statements were speech, the Court finds that it was all part of her role as a substitute school nurse. Contrary to Plaintiff's position, she did not simply "sp[eak] as a citizen" in her efforts to "bring to light potential wrongdoing or breach of public trust on the part of government officials." (SAC ¶158.) Rather, Plaintiff's conduct concerning the importance of "consistency" of, among other things, the School District's guidance on its quarantine policy that Plaintiff "g[a]ve [the District's] students, families and staff" (ECF No. 31-1, Ex. 19), was "part of the role [she] was paid to perform on an ordinary basis." *Javitz*, 940 F.3d at 866. (*See* SAC ¶93, "contacting parents/guardians of the children who were confined to the 'quarantine room'," and "explaining the [School District's] policy on quarantine and testing."). For example, Plaintiff relayed to Bormann via email that, "because it relates to the confusion we had this morning," Plaintiff was "working on a flow chart of sorts, to make the decisions easier and consistent" regarding the differences between isolation and quarantine and which type of tests the state recommended children complete. (ECF No. 31-1, Ex. 19.)

Despite Plaintiff's attempts to conclusively plead that she initiated discussions "as a citizen," for example, "with Principal Gibbons, and the Certified School Nurses regarding the clinical soundness of the COVID-19 Screening Form and the confinement of healthy students to the '[quarantine [r]oom,'" stating such does not make it so. The SAC reflects that that Plaintiff's conduct and statements in these instances were clearly in the realm of, at the heart of, or in pursuit of her ordinary job duties as a substitute school nurse. (SAC ¶181.) *See De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017) ("[A]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee[.]"). Or, put another way, "a public employee speaks pursuant to employment responsibilities . . . [when] there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424. The Court finds that the SAC, even given its most liberal reading, fails to plausibly allege that Plaintiff acted as a private citizen and instead supports the conclusion that Plaintiff's speech was made pursuant to her official job duties. The Court reaches this conclusion "even though the COVID-19 pandemic was clearly a matter of public concern." *Dennison v. Indiana Univ. of Pennsylvania*, Civ. No. 22-2649, 2023 WL 8595426, at *5 (3d Cir. Dec. 12, 2023) (affirming the District Court's entry of summary judgment against a public employee's retaliation claim, reasoning that the Plaintiff's conduct "while related to a matter of public concern, were not just adjacent to her official duties; they were at the heart of her duties").

The Court will therefore GRANT Defendants' Motion to Dismiss Plaintiff's retaliation claim.

### D. VIEWPOINT DISCRIMINATION CLAIM

Plaintiff's First Amendment viewpoint discrimination claim also fails because the SAC does not sufficiently allege that Defendants discriminated against Plaintiff based on her viewpoint. The SAC alleges that Bormann restricted Plaintiff's speech because he perceived her viewpoint to be "anti-vaccine." (SAC ¶236). Defendants argue that Bormann's restrictions on use of the email server were view-point neutral. The Court agrees.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "[I]t is also well settled that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (citations omitted). "[T]he extent to which the Government can control access depends on the nature of the relevant forum." *Pomicter v. Luzerne Cnty. Convention Center Authority*, 939 F.3d 534, 540 (3d Cir. 2019) (quoting *U.S. v. Kokinda*, 497 U.S. 720, 726 (3d Cir. 2019)). In non-public fora, unlike traditional public fora, "[t]he government may issue content-based regulations on communicative activity . . . provided they are 'reasonable in light of the purpose served by the forum and are viewpoint neutral." *Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. School Dist.*, 233 F. Supp. 2d 647, 656 (D.N.J. 2002) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46 (1983)). "In a nonpublic forum, speech restrictions need only be reasonable, 'a much more limited review' than applied in public forums." *Pomicter*, 939 F.3d at 540 (quoting *Lee*, 505 U.S. at 679).

Several courts –including the Supreme Court –have held that government mail and email systems are nonpublic forums. *See Perry*, 460 U.S. at 46–47 (holding that a public school's "mail facilities" was a nonpublic forum because there was "no indication . . . that the school mailboxes

and interschool delivery system are open for use by the general public"); see also *Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 285 (4th Cir. 2008) (finding that "School District's e-mail facility" was a nonpublic forum because there was "no suggestion that" the public "had access to the School District's e-mail facility"). Assuming without deciding that a school email listerv is a nonpublic forum, Defendants could restrict a speaker's access to it "so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007); *see also Child Evangelism Fellowship of N.J.*, 386 F.3d at 526 (holding that "even if" school district's forum was "limited" or "closed," school district "still could not engage in viewpoint discrimination").

Bormann's denial of Plaintiff's request to send a listerv wide email to School District staff that she would "like to offer [her]self as a resource regarding any questions you may have about the Covid vaccine" was content and viewpoint neutral. Bormann's purpose in rejecting Plaintiff's requested speech, as plainly stated in his email response to Plaintiff, was because the School District's role was "to provide only the factual information available from government institutions we are required to follow [and] for families to seek guidance from their own physicians if they have questions." (ECF No. 31-1, Ex. 11.) Bormann further explained that he "would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact." (*Id.*) Contrary to Plaintiff's allegation that the School District allowed pro-vaccine speech, the exhibits show that the emails sent by school nurse Montanez simply provided links to the Center for Disease Control's website and did not purport to offer herself or anyone else in the District as a guide on the COVID-19 vaccine.[4] (ECF

[4] Therefore, the SAC's allegation stemming from Bormann's email after Plaintiff's dismissal that she "request[ed] to send anti-vaccination guidance" does not affect the Court's conclusion. The SAC reflects that Bormann prohibited both pro-vaccination and anti-vaccination messaging to be distributed on the email server.

No. 31-1, Ex. 7.) Given that Plaintiff's proposed email also stated that Plaintiff "has invested a significant amount of time researching vaccines and would welcome questions" and no other School District member had sent a similar email on the server, the Court finds that the SAC does not sufficiently plead a viewpoint discrimination claim.

### E. DISMISSAL WITH PREJUDICE

The Court afforded Plaintiff three opportunities to plead viable claims. The SAC again fails to do so. Under the circumstances, the Court finds that further amendment would not cure the deficiencies identified herein and would therefore be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110 (3d Cir. 2002). Accordingly, dismissal with prejudice is appropriate.

## V. CONCLUSION

For the reasons stated above, the Court will GRANT Plaintiff's Motion for Judicial Notice and GRANT Defendants' Motion to Dismiss. The Court will DISMISS WITH PREJUDICE the SAC and instruct the Clerk's Office to mark this matter CLOSED. An appropriate Order will follow.

Date: March 24, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

**Notice of Appeal to a Court of Appeals From an Appealable Order of a District Court**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Docket Number 3:23-cv-00497 (ZNQ)(JTQ)

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.**<br><br>Defendants. | Notice of Appeal |

Jessica M. Brink appeals to the United States Court of Appeals for the Third Circuit from the order of DISMISSAL WITH PREJUDICE entered on March 24, 2025.

Jessica Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CHAMBERS OF
ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE

U.S. COURTHOUSE
402 EAST STATE STREET, ROOM 4000
TRENTON, NJ 08608

November 24, 2025

**LETTER ORDER**

**Re: Jessica Brink v. John Borman, *et al.***
**Civil Action No. 23-497 (ZNQ)(JTQ)**

Dear Counsel and *Pro Se* Party:

Before the Court is Plaintiff's Motion for Reconsideration. ("Motion", ECF No. 43.) Therein, Plaintiff requests reconsideration of the Court's decision to dismiss with prejudice her Second Amended Complaint. (ECF No. 42.) Defendants oppose the Motion. ("Opp.", ECF No. 44.) Plaintiff filed a reply.[1] (ECF No. 45.)

Reconsideration under Local Civil Rule 7.1 is "an extraordinary remedy" that is rarely granted. *Interfaith Cmty. Org v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002) (citations omitted). It requires the moving party to set forth the factual matters or controlling legal authorities it believes the Court overlooked when rendering its decision. *See* L. Civ. R. 7.1(i). To succeed on a motion for reconsideration, a movant must show at least one of three factors: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion [at issue]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Significantly, a motion for reconsideration is not an opportunity to raise new matters or arguments that could have been raised before the court decided the original decision. *See Bowers v. NCAA*, 130 F. Supp. 2d 610, 612–13 (D.N.J. 2001). Nor is a motion for reconsideration an opportunity to "ask the court to rethink what it ha[s] already thought through." *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507 (alteration in original) (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990)). "Rather, the rule permits a reconsideration only when 'dispositive factual matters or controlling decisions of law' were presented to the court but were overlooked." *Id.* (quoting *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 337 (D.N.J. 1995)).

Insofar as Plaintiff does not raise an intervening change in law or a cite newly available evidence, the Court construes her Motion as seeking relief under the third category: clear error of law or fact or to prevent manifest injustice.

In the Motion, Plaintiff first reiterates her insistence that she was speaking as citizen not an employee, contractor, or subcontractor of the school board and that the balancing test under *Pickering*

---

[1] Plaintiff's submission of a reply without leave of Court runs afoul of Local Civil Rule 7.1(d)(3), which prohibits a reply on a motion for reconsideration without permission. Defendants did not object. Given that Plaintiff is *pro se*, the Court has considered her reply. The submission is devoted to recounting Plaintiff's view of the equities of her case. The Court does not find it persuasive.

therefore does not apply. (ECF No. 10 at 10–15.) None of Plaintiff's arguments persuade the Court erred in its *legal* conclusion as to her employment status or its application of the *Pickering* balancing test. Similarly, Plaintiff challenges the Court's determination that the school district's email server is a nonpublic forum and that the school district maintained a viewpoint neutral stance. (*Id.* at 16–21.) Here too, Plaintiff's arguments do not persuade the Court that its *legal* conclusions were erroneous. In any event, Plaintiff has not met her high burden to merit the extraordinary remedy of reconsideration.

**IT IS THEREFORE**, on this **24th** day of **November 2025**,

**ORDERED** that the Clerk's Office is instructed to **RE-OPEN** this matter; it is further

**ORDERED** that Plaintiff's Motion for Reconsideration (ECF No. 43) is hereby **DENIED**; and it is further

**ORDERED** that the Clerk's Office is instructed to **RE-CLOSE** this matter.

ZAHID N. QURAISHI
UNITED STATES DISTRICT JUDGE

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.**<br><br>Defendants. | Civil Action No. 3:23-cv-00497 (ZNQ)(JTQ) |

# MOTION FOR JUDICIAL NOTICE PURSUANT TO FEDERAL RULES OF EVIDENCE 201(B)(2)

Plaintiff, Jessica Brink, *pro se*, hereby submits the following Motion for Judicial Notice to evidence the contract Plaintiff received from a Public Records Request in support of the Verified Second Amended Complaint (dkt# 31, VSAC) allegations ¶¶ 64-66, as well as Plaintiff's Brief in Opposition to Defendants' Motion to Dismiss.

> "In evaluating a motion to dismiss, we may consider documents that are attached to or submitted with the complaint, *id.* at 560, and any "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case."

*Buck v. Hampton Tp. Sch. Dist*, 452 F.3d 256, 260 (3d Cir. 2006)

TIMELINE

1. Plaintiff sent an Open Public Records Act (OPRA) request on August 1, 2024 to Rumson School District Custodian of Records requesting, "The original contract between the Rumson School District and ESS (formerly Source4Teachers) for substitute staffing services. The contract referenced in the March 22, 2016 meeting minutes. Please include all pages, addenda, exhibits, and attachments."

2. Plaintiff received a partial response on August 7, 2024 that included the contract, but no addenda.

3. Plaintiff responded on August 7, 2024 stating, "Thank you for your quick response. Does this response include all the addenda to this contract? It appears that there have been at least two – 11/15/17 and 3/18/2020, both referenced in meeting minutes."

4. Custodian of Records responded that day stating, "We obtained this information directly from Source 4 Teachers and this was all they had. Thank you."

5. On August 7, 2024 Plaintiff sent a new Open Public Records Act (OPRA) request to the Rumson School District Records Custodian stating, "Please provide the contract between ESS and the Rumson School District that was in effect for the 2019 – 2020 school years. The contract referenced in the meeting minutes of 5/22/19. If the contract is a renewal, please include the original contract the renewal pertains to, include all pages."

6. Plaintiff received the attached documents by email message directly from the Rumson School District Records Custodian.

a. August 7, 2024: Original contract between ESS Northeast, LLC (formerly Source4Teachers) and the Rumson School District.

b. August 13, 2024: Two (2) addenda to the original contract dated 5/23/18 and 10/19/19.

Plaintiff respectfully moves this Court to take judicial notice of the attached contract and addenda, and consider them integral to the claim presented in the Verified Second Amended Complaint.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on September 6, 2024.

Respectfully submitted,
Jessica Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 6th day of September, 2024, I electronically filed the foregoing with the Clerk of Court by email to the NJD Help Desk at ecfhelp@njd.uscourts.gov, and a copy was provided to Patrick Carrigg Esq. by electronic mail at pcarrigg@lenoxlaw.com , and by regular U.S. mail at 136 Franklin Corner Road, St. 2B Lawrenceville, NJ 08648.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on September 6, 2024

Jessica Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

RUMSON BOARD OF EDUCATION

## OPEN PUBLIC RECORDS ACT REQUEST FORM

*60 Forrest Avenue, Rumson, N.J. 07760*

*dmccarthy@rumsonschool.org*
*Denise McCarthy*

**Important Notice**

The last page of this form contains important information related to your rights concerning government records. Please read it carefully.

**Requestor Information – Please Print**

First Name: Jessica MI: M Last Name: Brok

E-mail Address: jessb11@me.com

Mailing Address: 8 Gordon Court

City: Pt Monmouth State: NJ Zip: 07758

Telephone: 732-492-4690 FAX: 

Preferred Delivery: Pick Up ___ US Mail ___ On-Site Inspect ___ Fax ___ E-mail X

If you are requesting records containing personal information, please circle one: Under penalty of N.J.S.A. 2C:28-3, I certify that I HAVE / HAVE NOT been convicted of any indictable offense under the laws of New Jersey, any other state, or the United States.

Signature ____________ Date ____________

**Payment Information**

Maximum Authorization Cost $ 20.00

Select Payment Method

(Cash — circled) Check Money Order

Fees: Letter size pages - $0.05 per page; Legal size pages - $0.07 per page; Other materials (CD, DVD, etc) – actual cost of material

Delivery: Delivery / postage fees additional depending upon delivery type

Extras: Special service charge dependent upon request

**Record Request Information:** Please be as specific as possible in describing the records being requested. Also, please note that your preferred method of delivery will only be accommodated if the custodian has the technological means and the integrity of the records will not be jeopardized by such method of delivery.

Please provide the original contract between ESS (Formerly Source 4 Teachers) and the Rumson School District. The contract referenced in the March 22, 2016 meeting minutes. Please include all pages, addenda, exhibits, and attachments.

**AGENCY USE ONLY**

Est. Document Cost ____
Est. Delivery Cost ____
Est. Extras Cost ____
Total Est. Cost ____
Deposit Amount ____
Estimated Balance ____
Deposit Date ____

**AGENCY USE ONLY**

**Disposition Notes**

Custodian: If any part of request cannot be delivered in seven business days, detail reasons here.

In Progress - Open ____
Denied - Closed ____
Filled - Closed ____
Partial - Closed ____

**AGENCY USE ONLY**

**Tracking Information**

Tracking # ____
Rec'd Date ____
Ready Date ____
Total Pages ____

**Final Cost**

Total ____
Deposit ____
Balance Due ____
Balance Paid ____

**Records Provided**

Custodian Signature ____ Date ____

## S4TEACHERS LLC

### SUBSTITUTE STAFF PLACEMENT AGREEMENT

This is an Agreement, entered into as of May 3, 2016, by and between **S4Teachers LLC**, a Delaware limited liability company, d/b/a **Source4Teachers** (the "**Company**") located at 800 North Kings Highway, Suite 405, Cherry Hill, New Jersey 08034 and the **Rumson Borough Elementary School District** located at 60 Forrest Avenue, Rumson, NJ 07760 (hereinafter referred to as "**LEA**" for Local Education Agency).

### Background

The Company is in the business of providing substitute teachers for LEAs, as well as other related staffing services. The LEA desires to engage the services of the Company on the terms and conditions set forth in this Agreement.

NOW THEREFORE, intending to be legally bound and acknowledging the receipt of adequate consideration, the parties hereby agree as follows:

**1. Provision of Substitute Staff**. The Company shall be the exclusive provider of substitute teachers and other staff listed in Exhibit "A" **(hereinafter "Substitute Staff")** to fill positions at the request of the LEA on an as-needed basis, using such request mechanism(s), policies and procedures as may be established by the Company from time to time. The Company makes no guarantee that it will be able to fill all requests made by the LEA.

1.1 The LEA agrees that the Company shall be the exclusive contract provider of Substitute Staff to the LEA. All or any placement of Substitute Staff shall be made pursuant to this Agreement and the processes and procedures established by the Company, be paid by the Company, and be invoiced back to the LEA by Company.

1.2 The LEA may provide a list of Substitute Staff which the LEA has employed prior to the Agreement which the LEA desires to remain in the pool of Substitute Staff assigned by the Company to the LEA. The LEA shall provide a written list of such personnel and may update said list, by written addition or deletion of all changes, as appropriate. Subject to the interview, training, background checks and certification requirements included elsewhere in the Agreement, and normal employee responsibilities attendant to employment, the Company will accept such persons for assignment to the LEA. However, as part of the transition process, the LEA certifies that the aforementioned former Substitute Staff of the LEA meet the state requirements to serve as Substitute Staff (ex. Criminal history, TB Test) for the first 90 days after Company begins services, unless Company is otherwise notified by LEA. The LEA acknowledges that the Substitute Staff will be ineligible to accept substitute assignments after said 90 day period if they are determined to be non-compliant with the laws governing educational employees in the State, which shall be Company's responsibility to determine pursuant to the terms of the Agreement. LEA further agrees to forward to Company any report of criminal activity regarding these Substitute Staff from local, state or federal law enforcement or other governmental authorities.

2. **Treatment of Substitute Staff as Employees of the Company** All Substitute Staff provided

by the Company will be treated by the LEA as employees of the Company, and not as employees of the LEA, for all purposes, including but not limited to Federal and State income tax purposes. Without limiting the preceding sentence:

2.1 The Company shall maintain all necessary personnel and payroll records for the Substitute Staff;

2.2 The LEA shall not be responsible for the payment of the wages and fringe benefits (if any) of the Substitute Staff; The Company shall withhold applicable taxes from the wages of the Substitute Staff, and shall be responsible for any payroll tax liabilities of an "employer" with respect to the Substitute Staff;

2.3 The Company shall provide applicable workers' compensation insurance coverage for the Substitute Staff in such amounts as may be required by law; and

2.4 Substitute Staff shall not be eligible for tenure with the LEA or be entitled to participate in any of the LEA's employee benefit plans, including pension, 403(b), profit sharing, retirement, deferred compensation, welfare, insurance, disability, bonus, vacation pay, severance pay and other similar plans, programs and agreements, whether or not reduced to writing.

2.5. In order to provide certain Substitute Staff who are obtaining the required initial or renewal State certifications, depending upon state requirements, the LEA recognizes that it may be required to execute certificate/permit/license applications and other related documents, such as a criminal history request as a representative of or on behalf of the Company. If necessary, the LEA designates the Company as its designee to submit a Substitute Staff's credentials to the county or state department of education office to obtain the Substitute Staff certifications. The LEA recognizes that it may be required to execute certain documents to allow the Company to perform its function as its designee. In such instances, the LEA is not responsible for any of the obligations of the Company as the employer included in this Paragraph 2.

**3. The Company's Obligations**

3.1 The Company will act in good faith to provide Substitute Staff who, if needed or applicable, (a) hold a current license and certification for the positions requested by the LEA, (b) have had a completed criminal history and child abuse background check as required by law and/or the applicable Department of Education, (c) have appropriate health screenings, inoculations and tuberculosis testing as required by the state and (d) who shall render services in accordance with applicable laws and procedures of the state and this Agreement.

3.2 In selecting Substitute Staff, the Company shall apply such screening and evaluation criteria as it may determine in its sole discretion and as may be required by the applicable law of the jurisdiction in which the services of Substitute Staff will be performed. The Company will conduct any additional screening that may be mutually agreed by the Company and the LEA, with an appropriate increase in the Company's fees.

3.3 The Company seeks to provide Substitute Staff that are trained for the requested positions. The Company will provide Substitute Staff training as required by the State, including as applicable, classroom management, general rules and procedures applicable to the position, and

other pertinent matters prior to any assignment of said Substitute Staff. The Company shall provide training for existing LEA Substitute Staff as requested by the LEA at the Company's actual cost.

3.4 The Company expects that the Substitute Staff assigned to the LEA will perform their services satisfactorily. If the LEA notifies the Company in writing that a Substitute Staff has not performed satisfactorily within the reasonable discretion of the LEA, along with the clear reasons therefor, the Company will honor the LEA's request not to assign specific Substitute Staff. This section will in no way affect the right of Company, in its sole discretion as employer, to hire, assign, reassign, discipline and/or terminate its own employees. The LEA understands that declining the services of a specific Substitute Staff may result in the Company's inability to secure an acceptable alternate if timely notice of the request is not provided.

3.5 In the event of a complaint concerning Substitute Staff, Company and LEA agree to cooperate and reasonably permit each other's involvement in any investigatory activities or proceedings.

4. **The LEA's Obligations.** In connection with Substitute Staff provided by the Company pursuant to this Agreement, the LEA shall:

4.1 Provide information to the Substitute Staff as needed to allow the Substitute Staff to fully understand the duties and responsibilities of the placement and promptly report to Company any suspicious, unusual, inappropriate behavior or unsatisfactory performance;

4.2 Provide a safe and suitable workplace that complies with all applicable governmental safety and health standards, statutes, and regulations;

4.3 Provide Substitute Staff with (i) adequate information, training, and safety equipment with respect to hazardous substances and any inherent dangers of the workplace, (ii) emergency procedures, and (iii) school rules and protocols, policies and procedures regarding student disciplinary actions, and confidentiality of student records. Further, the LEA will provide all Substitute Staff with any training appropriate to the needs, duties, responsibilities or knowledge unique to the LEA or otherwise different than would generally be appropriate in other LEAs.

4.4 Not assign Substitute Staff to assignments which (i) have sole custody of a single student for an extended period without LEA oversight, (ii) have sole responsibility for more than one classroom of students at a time, (iii) administer or maintain custody of any student medications, (iv) have custody of cash, negotiable valuables, merchandise, credit cards, check writing materials, keys or similar property, except for student lunch money that may be collected in the normal course of business, (v) use any vehicle on behalf of the LEA; (vi) work more than eight (8) hours in a day or more than forty (40) hour per week without notice to Company;

4.5 Assign Substitute Staff only to tasks for which they have been requested, unless written consent has been given by the Company. Heavy labor, lifting, or physical activity is prohibited unless required and accepted in the job description.

4.6 Not assign Substitute Staff to travel or perform duties off the normal school premises of the LEA except for class trips which are supervised by a LEA teacher;

4.7 If Substitute Staff is assigned duties in connection with the LEA's computer systems, maintain appropriate pass word security and backup copies of all data;

4.8 Maintain appropriate written internal control policies and procedures to ensure the confidentiality of all student records and appropriately limit the access of Substitute Staff to such records;

4.9 Not promise any Substitute Staff an increased rate of compensation;

4.10 Comply with any reasonable restrictions imposed by the Company on the responsibilities to be assigned to any Substitute Staff;

4.11 Approve and sign paper or electronic forms supplied by the Company documenting the amount of time worked by Substitute Staff or, if representatives of the LEA are not available to approve and sign such forms, authorize such forms to be executed by representatives of the Company on behalf of the LEA;

4.12 Be responsible for keeping the Company promptly informed by email (if available) of all Substitute Staff on-site changes and any changes in the LEA or building supervisory contact information;

4.13 To the extent possible, notify the Company as soon as possible, but no later than the earlier of before 6 a.m. daily or 3 hours prior to the start of the class, through the protocols established by the Company for such notice, of the need for Substitute Staff for that day; provided, however, the Company and the LEA recognize that the need for a substitute may occur after the above times and that in such cases the Company will use best efforts to find a substitute for such LEA requests;

4.14 Comply with all Company policies and procedures to accurately invoice the LEA, process the daily record keeping and other tasks necessary for the Company to administer and track Substitute Staff, including but not limited to, sign in and out procedures and related records;

4.15 The LEA shall be solely responsible to control teacher absences and any budgetary impact resulting therefrom;

4.16 LEA represents that its actions under this Agreement do not violate its obligations under any agreement that LEA has with any labor union;

4.17 LEA shall cooperate with Company with respect to Company's recruiting efforts and activities, including but not limited to, (i) promptly sharing applications for LEA positions with Company and (ii) adding a link on the front page and employment page of the LEA's website to Company's website;

4.18 If allowable by state procurement law, other public bodies may utilize this Agreement if mutually agreeable to Company.

5. **Indemnification and Limitations of Liability.**

5.1 **Indemnification of the LEA by the Company**. The Company shall indemnify and hold the LEA's Board, and its agents, employees and Board members harmless from and against all claims or losses incurred, including reasonable attorney's fees, that are proximately caused by the acts or omissions of the Company, Substitute Staff, or other employees or authorized agents of the Company, or by the Company's breach of this Agreement, except that such indemnification shall not apply to any claims or losses for which the Company is entitled to indemnification by the LEA. In addition, the Company's indemnification for any and all claims here under this Agreement shall be expressly limited to the extent of insurance coverage that is paid to the Company for such claims, if any, under the Company's insurance policies required under this Agreement.

5.2 **Indemnification of the Company by the LEA**. The LEA shall indemnify and hold the Company harmless from and against all claims or losses incurred by the Company, including reasonable attorney's fees, (i) that are proximately caused by the acts or omissions of the LEA or its employees or authorized agents, or by the LEA's breach of this Agreement; or (ii) arise from any injury to Substitute Staff or other persons on the premises of the LEA or while performing services on behalf of the LEA and not caused by the acts or omissions of the Company, Substitute Staff, or other employees or authorized agents of the Company. Such indemnification shall not apply to any direct claim for workers' compensation benefits for job-related benefits for job-related bodily injury or death against the Company by any of the Company's employees or their representatives.

5.3 **Notification; Right to Defend**. A party incurring any claim or loss for which indemnification may be provided pursuant to this section 5 shall promptly notify the other party in writing. The recipient of such notice may, at its own cost and expense, thereupon assume the defense of any third party claim using counsel reasonably satisfactory to the notifying party.

5.4 **Limitation of Damages**. Under no circumstances shall the Company be liable for special, indirect, consequential, punitive, expectancy, lost profit or goodwill damages, or for damages caused by the unsatisfactory performance of Substitute Staff that does not result in a finally adjudicated claim of damages against the LEA brought by a third party.

5.5 **Complete Agreement**. The parties agree that this section 5 sets forth their complete agreement with respect to any possible indemnification claim, and waive their right to assert any common-law indemnification or contribution claim against the other.

6. **Fees and Payment.**

6.1. **The Company's Pricing Plan**, attached hereto as Exhibit A and made a part of this Agreement, is accepted by the LEA. The Company shall submit to the LEA a weekly invoice showing in reasonable detail the services provided.

6.2 **Changes to Pricing Plan**. In the event that the LEA determines to increase the established pay rate for Substitute Staff from that specifically listed on Exhibit A or if the LEA determines to establish a new Substitute Staff classification or new pay rate to be paid to some or all of the Substitute Staff (e.g., for improved recruitment, retention or for other reasons) not identified on Exhibit A then, the billing rate to the LEA shall be determined by using the markup

used on Exhibit A. The LEA shall provide the Company fourteen (14) days prior written notice of its decision to change an existing pay rate or establish a new Substitute Staff classification and pay rate.

6.3 The Company may change the Pricing Plan contained on Exhibit A in the event that government (local, state or federal) mandated labor costs, including but not limited to, employer healthcare or family leave benefits, minimum wage, payroll taxes, or workers compensation rates, which are required by law, regulation or mandate are enacted, implemented, become effective or are increased after the date of this Agreement. The Pricing Plan shall be adjusted as of the effective date of the law, regulation or mandate to reflect the actual cost increase to the Company reasonably calculated on a direct or pro rata basis. For multi-year Agreements or whenever this Agreement is extended, the Pricing Plan will be modified to reflect a cost of living adjustment equal to the greater of 3% or the applicable consumer price index rate for the LEA for the twelve months preceding the most recent quarterly rate.

6.4 **Affordable Care Act.** The Patient Protection and Affordable Care Act ("ACA") became effective January 1, 2014. The ACA has a look back period that determines Substitute Staff eligibility for healthcare insurance coverage that shall begin on the beginning of this Agreement.

The Company normally hires Substitute Staff as part time employees who will work on average less than 30 hours per week such that they are not eligible for healthcare benefits under the ACA. However, should the LEA in its discretion employ Substitute Staff to work directly for LEA in addition to the hours worked for Company (example: after school program director or coach), and the combined work hours of the Substitute Staff cause the Substitute Staff to be deemed eligible to receive healthcare benefits under the ACA, the LEA agrees to reimburse the Company's cost of providing the minimum plan healthcare insurance coverage under the ACA.

6.5 **Use of Substitute Staff by the LEA Directly**. Company maintains the right to manage the schedule of its employees. Accordingly, if the LEA engages the services of any Substitute Staff other than through the Company on a per-diem, hourly or other basis, whether for services covered in this Agreement or otherwise, the LEA shall promptly notify the Company in writing and provide all information as the Company may reasonably request. Furthermore, if LEA hires Substitute Staff for services which are provided by Company in accordance with this Agreement, for the lesser of the period for which such Company employee is engaged or the term of this Agreement, the LEA shall calculate and pay to the Company any amounts due by using the markup used on Exhibit A. This payment requirement shall not apply to any Substitute Staff who is hired as a full-time, permanent employee of the LEA.

6.6 **Payment**. The LEA shall pay the Company monthly in United States currency by check (regularly payable in the normal course of banking transactions) or electronic transfer monthly within three (3) days following the Board of Education Monthly Action Meeting ("Due Date") for all invoices submitted at least one week prior to the Board of Education Action Meeting (or such other timeline as agreed to on Exhibit A.) Any adjustments will not delay payment and will be applied to the following month's invoice. In the event that the LEA fails to pay any fee to the Company when due (i) the LEA shall be liable for a late charge equal to 1½% per month on the outstanding amounts, commencing on the Due Date; and (ii) the LEA shall be liable for all of

the Company's reasonable costs of collection, including reasonable attorneys' fees, both (i) and (ii) to apply without any prior notice requirement.

6.7 **Sales and Use Tax.** The LEA represents that it is currently exempt from any sales and use taxes or similar governmental charges or value added tax imposed with respect to the services provided by the Company. If any such taxes or charges are otherwise due or are imposed or become due, they will be the responsibility of the LEA.

7. **Term.** The term of this Agreement shall begin on July 1, 2016 and shall remain in effect through June 30, 2017. Thereafter, the Agreement shall automatically renew on a yearly basis unless either party provides written notice of termination at least one hundred and twenty (120) days prior to the end of the fiscal school year. Notwithstanding the preceding sentence, either party may terminate this Agreement if (i) the other party breaches a material provision of this Agreement and such breach is not cured within 30 days following written notice or, in the case of a breach that by the terms of the breach cannot be cured within 30 days, the breaching party has not instituted measures to cure such breach within 10 days and fully cured such breach within 90 days. Further, the Company has the right to terminate this Agreement should any student physically or verbally assault or injure a Company's employee, and the LEA does not respond to the incident to the Company's satisfaction. In the event either party terminates this Agreement, the LEA shall pay all amounts due under the terms of this Agreement to the Company for services provided through the date of termination.

8. **Insurance Coverage.** Each party shall, at its own cost and expense, maintain insurance coverage reasonably appropriate for the activities it conducts and the risks it assumes. The insurance coverage maintained by the Company shall include:

8.1 Workers' compensation coverage of such types and in such amounts as may be required by the laws of the jurisdiction in which the services of Substitute Staff are performed;

8.2 Commercial general liability coverage, including personal injury, blanket contractual liability, and broad form property damage, with a $2,000,000 combined single limit per occurrence;

8.3 Umbrella coverage with a $1,000,000 combined single limit per occurrence.

9. **Confidentiality & Non-Disparagement.** During the course of the business relationship, each party may be given access to proprietary or confidential information of the other, including, but not limited to, pricing policies, the identity and social security numbers of employees, and business policies and systems ("Confidential Information"). Each party shall hold Confidential Information of the other party in confidence, treating such Confidential Information with no less care than it treats its own, and shall not disclose such Confidential Information to any third party or use such Confidential Information for any purpose other than as contemplated by this Agreement. Upon termination of this Agreement, or sooner if requested by either party, each party shall return all Confidential Information of the other party in its possession, without retaining copies of such Confidential Information. This section shall not apply to information (i) that is in the public domain, or (ii) required to be disclosed by law or legal process.

At no time during or after the term of this Agreement and for a period of two (2) years

thereafter shall either party directly or indirectly disparage the commercial business, professional or financial, as the case may be, reputation of the other party or any of their employees, management, owners or officers.

**10. Data and Intellectual Property.** The Company owns all employee and absence management information data. Additionally all intellectual property including Company process, procedures and knowhow, trademarks and copy rights is and shall remain the sole property of the Company.

**11. Miscellaneous**

11.1 **Amendments; Waivers.** No amendment, modification, or waiver of any provision of this Agreement shall be binding unless in writing and signed by the party against whom the operation of such amendment, modification, or waiver is sought to be enforced. No delay in the exercise of any right shall be deemed a waiver thereof, nor shall the waiver of a right or remedy in a particular instance constitute a waiver of such right or remedy generally.

11.2 **Notices.** Any notice or document required or permitted to be given under this Agreement shall be deemed to be given on the date such notice is (i) deposited in the United States mail, postage prepaid, certified mail, return receipt requested, (ii) deposited with a commercial overnight delivery service with delivery fees paid, or (iii) transmitted by facsimile or electronic mail with transmission acknowledgment, to the principal business address of the recipient or such other address or addresses as the parties may designate from time to time by notice satisfactory under this section. A copy of any notice to the Company shall be sent to the attention of the Company's president at the regular business address of the Company.

11.3 **Governing Law.** This Agreement shall be governed by the internal laws of the LEA's state without giving effect to the principles of conflicts of laws. Each party hereby consents to the personal jurisdiction of the federal or state courts located in LEA's County, and agrees that all disputes arising from this Agreement shall be prosecuted in such courts. Each party hereby agrees that any such court shall have in personam jurisdiction over such party and consents to service of process by notice sent by regular mail to the address set forth above and/or by any means authorized by the law of the LEA's state.

11.4 **Language Construction.** The language of this Agreement shall be construed in accordance with its fair meaning and not for or against any party. The parties acknowledge that each party and its counsel have reviewed and had the opportunity to participate in the drafting of this Agreement and, accordingly, that the rule of construction that would resolve ambiguities in favor of non-drafting parties shall not apply to the interpretation of this Agreement.

11.5 **Payment of Fees.** In the event of a dispute arising under this Agreement finally resolved through litigation or alternate dispute resolution, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs.

11.6 **Force Majeure.** Neither party shall be responsible for delays or failure to perform caused by acts of God (including fire, flood, storm, or other natural disturbances), war, civil war, riot, epidemic, acts of foreign enemies, terrorist activities, government sanction, strikes or other labor disputes (it being specifically understood that the existence of any picket line by a collective bargaining unit shall be considered as within this definition of force majeure), interruption or

failure of electric, telephone or similar service or other causes beyond such party's control.

11.7 **Signature in Counterparts.** This Agreement may be signed in counterparts, each of which shall be deemed to be a fully-executed original.

11.8 **Signature by Facsimile.** An original signature transmitted by facsimile shall be deemed to be original for purposes of this Agreement.

11.9 **Assignment.** No party to this Agreement shall assign its rights or duties hereunder, without the prior written consent of the other parties, except that the Company may assign its rights and duties in connection with a sale or other disposition of all or substantially all of its business.

11.10 **No Third Party Beneficiaries.** Except as otherwise specifically provided in this Agreement, this Agreement is made for the sole benefit of the parties. No other persons shall have any rights or remedies by reason of this Agreement against any of the parties or shall be considered to be third party beneficiaries of this Agreement in any way.

11.11 **Binding Effect.** This Agreement shall inure to the benefit of the respective heirs, legal representatives and permitted assigns of each party, and shall be binding upon the heirs, legal representatives, successors and assigns of each party.

11.12 **Titles and Captions.** All article, section and paragraph titles and captions contained in this Agreement are for convenience only and are not deemed a part of the context hereof.

11.13 **Pronouns and Plurals.** All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

11.14 **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior discussions, agreements, understandings and negotiations. The LEA and Company agree that in the event that any provision of this Agreement shall be held invalid or unenforceable for any reason, such invalidity or unenforceability shall attach only to such provision and shall not affect or render invalid any other provision of this Agreement.

**[INTENTIONALLY LEFT BLANK; SIGNATURES ON FOLLOWING PAGE]**

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth above.

**S4TEACHERS, LLC**

By ____________________
W. Andrew Hall, C.O.O.

**RUMSON BOROUGH ELEMENTARY SCHOOL DISTRICT BOARD OF EDUCATION**

By ____________________
Signature

____________________
Name and Title

Date ____________________

## EXHIBIT A

### PRICING PAID BY THE LOCAL EDUCATION AGENCY TO COMPANY

| Substitute Position | Daily Pay Rate | Company Pricing |
|---|---|---|
| Teacher - Substitute Certificate (Full Day) | $75.00 per day | $103.50 per day |
| Teacher – Substitute Certificate (Half Day) | $37.50 per day | $51.75 per day |
| Teacher – CE/CEAS (Full Day) | $80.00 per day | $110.40 per day |
| Teacher – CE/CEAS (Half Day) | $40.00 per day | $55.20 per day |
| Teacher – Teaching Certificate (Full Day) | $85.00 per day | $117.30 per day |
| Teacher – Teaching Certificate (Half Day) | $42.50 per day | $58.65 per day |
| Paraprofessional – Substitute Certificate (Full Day) | $75.00 per day | $103.50 per day |
| Paraprofessional – Substitute Certificate (Half Day) | $37.50 per day | $51.75 per day |
| Paraprofessional – CE/CEAS (Full Day) | $80.00 per day | $110.40 per day |
| Paraprofessional – CE/CEAS (Half Day) | $40.00 per day | $55.20 per day |
| Paraprofessional – Teaching Certificate (Full Day) | $85.00 per day | $117.30 per day |
| Paraprofessional – Teaching Certificate (Half Day) | $42.50 per day | $58.65 per day |
| Playground Aide | $30.00 per day | $41.40 per day |
| Clerical (Full Day) | $75.00 per day | $103.50 per day |
| Clerical (Half Day) | $37.50 per day | $51.75 per day |
| Long Term Teacher – Rate 1 (Full Day)* | $125.00 per day | $172.50 per day |
| Long Term Teacher – Rate 1 (Half Day)* | $62.50 per day | $86.25 per day |
| Long Term Teacher – Rate 2 (Full Day)* | $150.00 per day | $207.00 per day |
| Long Term Teacher – Rate 2 (Half Day)* | $75.00 per day | $103.50 per day |
| Long Term Teacher – Rate 3 (Full Day)* | $175.00 per day | $241.50 per day |
| Long Term Teacher – Rate 3 (Half Day)* | $87.50 per day | $120.75 per day |
| Long Term Teacher – Rate 4 (Full Day)* | $200.00 per day | $276.00 per day |
| Long Term Teacher – Rate 4 (Half Day)* | $100.00 per day | $138.00 per day |

***Pay Rate to be used at the discretion of the district**

*RUMSON BOARD OF EDUCATION*

# OPEN PUBLIC RECORDS ACT REQUEST FORM

*60 Forrest Avenue, Rumson, N.J. 07760*

*dmccarthy@rumsonschool.org*
*Denise McCarthy*

**Important Notice**

The last page of this form contains important information related to your rights concerning government records. Please read it carefully.

## Requestor Information – Please Print

First Name: Jessica MI: M Last Name: Pinok

E-mail Address: jessb11@me.com

Mailing Address: 8 Gordon Court

City: Pt Monmouth State: NJ Zip: 07758

Telephone: 732-492-4690 FAX: ______

Preferred Delivery: Pick Up ____ US Mail ____ On Site Inspect ____ Fax ____ E-mail X

**If you are requesting records containing personal information, please circle one:** Under penalty of N.J.S.A. 2C:28-3, I certify that I *HAVE / HAVE NOT* been convicted of any indictable offense under the laws of New Jersey, any other state, or the United States.

Signature ______________________ Date ______________

## Payment Information

Maximum Authorization Cost $ 20.00

Select Payment Method

(Cash) Check Money Order

Fees: Letter size pages - $0.05 per page
Legal size pages - $0.07 per page
Other materials (CD, DVD, etc) – actual cost of material

Delivery: Delivery / postage fees, additional depending upon delivery type

Extras: Special service charge dependent upon request

**Record Request Information:** Please be as specific as possible in describing the records being requested. Also, please note that your preferred method of delivery will only be accommodated if the custodian has the technological means and the integrity of the records will not be jeopardized by such method of delivery.

Please provide the contract between ESS and the Rumson School District that was in effect for the 2019-2020 school year. The contract referenced in the meeting minutes of 5/22/19. If the contract is a renewal, please include the original contract the renewal pertains to, include all pages.

### AGENCY USE ONLY

Est. Document Cost ______

Est. Delivery Cost ______

Est. Extras Cost ______

Total Est. Cost ______

Deposit Amount ______

Estimated Balance ______

Deposit Date ______

### AGENCY USE ONLY

**Disposition Notes**

Custodian: If any part of request cannot be delivered in seven business days, detail reasons here.

In Progress: Open ______

Denied: Closed ______

Filled: Closed ______

Partial: Closed ______

### AGENCY USE ONLY

**Tracking Information**

Tracking # ______

Rec'd Date ______

Ready Date ______

Total Pages ______

**Final Cost**

Total ______

Deposit ______

Balance Due ______

Balance Paid ______

**Records Provided**

______________________ Custodian Signature ______________ Date

## ADDENDUM

This is an Addendum to the Agreement between the Rumson School District (hereinafter referred to as "LEA" for Local Education Agency) and ESS Northeast, LLC (the "Company") for the services of Substitute Teachers and Staff:

The parties hereby agree to modify the Agreement as follows:

1. Effective October 10, 2019 the following positions and rates are added in Exhibit A:

| Position | Pay Rate | Bill Rate | Rule |
|---|---|---|---|
| Full Day Substitute Teacher - Discretionary Rate | $131.82 | $181.91 | Must have district approval |
| Half Day Substitute Teacher - Discretionary Rate | $65.91 | $90.65 | Must have district approval |

2. All other provisions of the Agreement shall remain in full force and effect during the term of the Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date set forth below.

Rumson School District

By________________
Signature

DEBRA ALLEN
Name and Title

Date 10/11/19

ESS Northeast, LLC

By________________
W. Andrew Hall, Executive V.P.

Date 10/14/19

# ADDENDUM TO EXTEND AGREEMENT

This is an Addendum to an Agreement between S4Teachers, LLC d/b/a ESS|Source4Teachers, a Delaware limited liability company (the "Company") located at 800 North Kings Highway, Suite 405, Cherry Hill, New Jersey 08034 and the Rumson School District (hereinafter referred to as "LEA" for Local Education Agency).

Whereas, the LEA and the Company entered into an Agreement whereby Company is to provide substitute staffing to fill positions at the request of the District for a period ending June 30, 2018;

Whereas, LEA and Company are desirous of extending the term of the Agreement through June 30, 2019 with the provisions set forth below;

Now, Therefore, be it agreed between the parties, as follows:

1. The Term of the Agreement, as reflected in Paragraph 7, is hereby extended from July 1, 2018 through June 30, 2019;
2. Effective July 1, 2018, Addendum "A" to the Agreement, Pricing, is amended as per the attached revised Addendum "A";
3. This Agreement will automatically renew for additional one (1) year periods unless either party provides written notice of termination at least ninety days prior to the end of the fiscal school year.
4. Except as specifically and explicitly set forth herein, all other terms of the Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first set forth below.

Rumson School District

By ____________________
Signature

Debra L Allen, School Business Admin.
Name and Title

Date May 23 2018

ESS|Source4Teachers

By ____________________
W. Andrew Hall, Executive V.P.

EXHIBIT A
Pricing Plan

| Position | Pay Rate | Bill Rate | Rule |
|---|---|---|---|
| Full Day Substitute Teacher - Sub Certification | $85.00 | $117.30 | |
| Half Day Substitute Teacher - Sub Certification | $42.50 | $58.65 | |
| Full Day Substitute Teacher - CE / CEAS / Standard | $90.00 | $124.20 | |
| Half Day Substitute Teacher - CE / CEAS / Standard | $45.00 | $62.10 | |
| Full Day Substitute Para - Sub Certification | $75.00 | $103.50 | |
| Half Day Substitute Para - Sub Certification | $37.50 | $51.75 | |
| Full Day Substitute Para - CE / CEAS | $80.00 | $110.40 | |
| Half Day Substitute Para - CE / CEAS | $40.00 | $55.20 | |
| Full Day Substitute Para - Standard | $85.00 | $117.30 | |
| Half Day Substitute Para - Standard | $42.50 | $58.65 | |
| Full Day Substitute Clerical - Sub Certification | $75.00 | $103.50 | |
| Half Day Substitute Teacher - Sub Certification | $37.50 | $51.75 | |
| Full Day Substitute Clerical - CE / CEAS | $80.00 | $110.40 | |
| Half Day Substitute Clerical - CE / CEAS | $40.00 | $55.20 | |
| Full Day Substitute Clerical - Standard | $85.00 | $117.30 | |
| Half Day Substitute Clerical - Standard | $42.50 | $58.65 | |
| Full Day Long Term Substitute Teacher | $200.00 | $276.00 | Long Term Rate administered on Day 1, Not retroactively paid, If absent the count does not reset, and the Long Term Rate is retained if absence. |
| Half Day Long Term Substitute Teacher | $100.00 | $138.00 | Long Term Rate administered on Day 1, Not retroactively paid, If absent the count does not reset, and the Long Term Rate is retained if absence. |
| Full Day Substitute Nurse | $125.00 | $172.50 | |
| Half Day Substitute Nurse | $62.50 | $86.25 | |

| | | | |
|---|---|---|---|
| Substitute Playground Aide | $30.00 | $41.40 | No lunch deductions |
| Full Day Long Term Substitute Teacher #2 | $240.00 | $331.20 | Discretionary Rate. Long Term Rate administered on Day 1, Not retroactively paid, If absent the count does not reset, and the Long Term Rate is retained if absence. |
| Half Day Long Term Substitute Teacher #2 | $120.00 | $165.60 | Discretionary Rate. Long Term Rate administered on Day 1, Not retroactively paid, If absent the count does not reset, and the Long Term Rate is retained if absence. |

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Covid 19 vaccine information

3 messages

**Maria Montanez** <mmontanez@rumsonschool.org> Thu, Dec 17, 2020 at 2:00 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org>[redacted]

Learn the facts from reliable sources as we move toward the next phase of the pandemic.

One vaccine has been approved: the Pfizer BioNtech covid 19 vaccine . Additional vaccines are in the process. Moderna may be approved as early as today.

I am including some reliable sources on the approved vaccine. Educate yourself and stay informed.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits/facts.html

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/pdfs/321466-A_FS_What_Expect_COVID-19_Vax_Final_12.13.20.pdf

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html

Vaccinations will be phased in over the next few months. The initial focus will be to administer the vaccine to health care personnel, followed by essential workers, individuals with high risk medical conditions and those 65 years of age and older.

Remember wearing a mask, social distancing, staying home if you are sick or if a family member is sick or getting tested is necessary to keep our school and your family safe until most are vaccinated.

😷

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---

**Maria Montanez** <mmontanez@rumsonschool.org> Thu, Dec 17, 2020 at 3:18 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org>, [redacted]

Link access corrected.

😷

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---------- Forwarded message ---------
From: **Maria Montanez** <mmontanez@rumsonschool.org>
Date: Thu, Dec 17, 2020 at 3:14 PM
Subject: Re: Covid 19 vaccine information
To: Maria Montanez <mmontanez@rumsonschool.org>

For access to the links see below

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits/facts.html

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/pdfs/321466-A_FS_What_Expect_COVID-19_Vax_Final_12.13.20.pdf

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html

Stay Safe and stay healthy

😷

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE*** [redacted]

[Quoted text hidden]

---

**Maria Montanez** <mmontanez@rumsonschool.org> Thu, Dec 17, 2020 at 4:25 PM
To: [redacted], All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org> [redacted]
[redacted] John Bormann <jbormann@rumsonschool.org> [redacted]

[redacted] had a great question on where teachers fall in the priority list.

The roll out for the vaccination plan is designed by each state. NJ's priority list is identified in the NJ Covid hub. Teachers are considered essential workers and are the latter part of phase 1.

I have attached the link pdf on the priority list for your review

covid priority list in NJ

https://www.nj.gov/health/cd/documents/topics/NCOV/Priority_Groups_English.pdf

Maria

😷

[redacted]

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

On Thu, Dec 17, 2020 at 3:23 PM Keith Laviola <klaviola@rumsonschool.org> wrote:

> Do you think school employees will be in phase 2 ?
> [Quoted text hidden]
> --
>
> Sincerely,
> [redacted]
> Rumson School District
> [redacted]
>
> *The information contained in this email/document is confidential and may be legally privileged. Access to this email/document by anyone other than the intended recipient(s) is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution, or any action taken or omitted to be taken in reliance to it, is prohibited.*

I sent you names and contact information in to get you on the list in the event that you will be getting the vaccine.
[Quoted text hidden]
--

**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

[redacted] Mon, Dec 28, 2020 at 11:10 AM
To: John Bormann <jbormann@rumsonschool.org>
Cc: Jessica Brink <jbrink@rumsonschool.org>, Maria Montanez <mmontanez@rumsonschool.org>

Great , thank you !
[Quoted text hidden]

---

**Jessica Brink** <jbrink@rumsonschool.org> Mon, Dec 28, 2020 at 1:47 PM
To: John Bormann <jbormann@rumsonschool.org>
Cc: [redacted], [redacted]

Thanks, Dr. Bormann. I appreciate the gesture, however I will not be getting the vaccine. The patient advocate in me is compelled to share my reasons with you - take what you want and leave the rest, but I wouldn't be true to my oath if I didn't share.

First, I am not a crazy anti-vaxxer. I've taken more vaccines than most because of my military service. I've also given a number of vaccines while working in pediatrics.

I've spent 30 plus hours investigating Covid-19 vaccines, in particular, and I can adamantly say that I cannot recommend them at this time. The information presented in the media is incomplete and one-sided. As the idiom says 'the devil is in the details' and I've been knee deep in the details for days.

I'd be happy to share a balanced presentation of the details with anyone wishing to know. You can email or call any time. And you have my word that any discussions will remain completely confidential.

Be well,

Jessica
Jessb11@me.com
732 492 4690

Sent from my iPhone

> On Dec 28, 2020, at 11:03, John Bormann <jbormann@rumsonschool.org> wrote:
>
> [Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Dec 28, 2020 at 3:33 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Not a problem Jessica. I just wanted to offer you the same opportunity as all our nurses. At this time I do not forsee any associated requirements related to the vaccine.

As a school leader I am in no position to have an opinion on the matter of whether one should or should not have a vaccine. I can only provide the opportunities and follow the guidance expected of schools.

Respectfully,
Dr. Bormann
[Quoted text hidden]

---

[redacted] Mon, Dec 28, 2020 at 4:17 PM
To: John Bormann <jbormann@rumsonschool.org>

Thanks, I started to research sites to receive the vaccine. This helps that process. I hope you are able to rest a little.

On Mon, Dec 28, 2020 at 11:03 AM John Bormann <jbormann@rumsonschool.org> wrote:
[Quoted text hidden]
--
***Igniting, Maintaining, and Promoting Health***
[redacted]

---

**Jessica Brink** <jbrink@rumsonschool.org> Mon, Dec 28, 2020 at 4:50 PM
To: John Bormann <jbormann@rumsonschool.org>

Thanks for your reply. I appreciate your objective approach and I respect your role as a school leader. I haven't said it to you directly, but I think it often - trying to balance the needs of everyone - staff, students, parents, district, DOH is a huge task, and you manage to do it with poise and professionalism. Not an easy feat!

I hope you're able to find some rest in these days off. I know we'd both rather be traveling!

Best,
Jessica

Sent from my iPhone

> On Dec 28, 2020, at 15:34, John Bormann <jbormann@rumsonschool.org> wrote:
>
> [Quoted text hidden]

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Covid Vaccine roll out

4 messages

**Maria Montanez** <mmontanez@rumsonschool.org> Wed, Jan 6, 2021 at 1:43 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org>, [redacted], John Bormann <jbormann@rumsonschool.org>, [redacted]

I know we all received the plan for the covid vaccination.

Just an FYI

I received the 1st dose today. I had no immediate adverse reactions.

When going, I had an appointment. I had to wait outside to be signed in for my appointment.

Registration included showing ID, insurance card, answering Covid questions, getting a temp check and proving my status as a nurse.

The appt. for my next vaccine was also scheduled. I received a card with my next appt.

Once I was registered I went to the nursing station to have the vaccine administered. After administration I needed to wait 15 minutes to be observed and confirm no adverse reactions such as anaphylaxis.
The vaccination was administered inside but the post vaccination observation was done in a tent.

I know everyone's experience may differ but just some helpful hints. Please be prepared to wait on a line or wait outside. Make sure you are layered in clothing that is appropriate for the weather. Bring your ID, insurance card and some documentation that confirms your status such as a teacher. The registering staff member suggested a pay stub, or another form of ID that confirms your status.


[redacted] Community Health Center


-19 Vaccinati
keep this record card, which includes
out the vaccines you have received.
Por favor, guarde esta tarjeta de registro, que inclu
médica sobre las vacunas que ha recibido.
Last Name
[redacted]
First Name
[redacted]
Date of birth
Patient number (medical re
Vaccine
Product Name/Manufacturer
Lot Number
Date
Healthca
or Clinic Sit
1st Dose COVID-19
Moderna
[redacted]
01/06/21
mm dd yy
VNA C
Asbury Par
2nd Dose COVID-19
2/3/21
mm dd yy
Other
mm / dd / yy
mm / dd / yy



Good luck to all and hoping for a HAPPIER NEW YEAR!!

PS Within 30 minutes I received a call from the department of health to ask if I wanted to get the vaccine. My sense is once it gets rolling more sites and locations will be available to all those that wish to receive the vaccine.

Until then keep using your mask, keep your distance and let us know if you are feeling ill or if you have come in contact with someone who is ill or has been exposed.

Stay safe, stay healthy my school family.

Maria

--
***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---

**John Bormann** <jbormann@rumsonschool.org> Wed, Jan 6, 2021 at 1:45 PM
To: Maria Montanez <mmontanez@rumsonschool.org>

Sounds good but got notified that healthy educators will not be until late spring, if then! Uggh!
[Quoted text hidden]

--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# A resource

7 messages

**Jessica Brink** <jbrink@rumsonschool.org> Thu, Jan 7, 2021 at 4:38 PM
To: John Bormann <jbormann@rumsonschool.org>

Hi Dr. Bormann,

I know I'm new in the district and technically not an employee of Rumson, but I feel tied to the team for many reasons. You know my stance on the Covid vaccine and while it may not be the popular stance, it is based in facts of the research, in which I have invested days.

As such, I want to offer myself as a resource for the staff regarding the roll out. I'm a Nurse Patient Advocate first and foremost. My goal is to ensure that everyone has as complete an informed consent as possible. I have no reason to deter people from getting the vaccine. My only purpose is to ensure they have the information they need and understand the jargon in the documentation. I will review the CDC/FDA supplies documents and stick to the facts. I will email Maria and Krisanne ahead of time explaining what I've told you here.

Do I have your permission to email the staff and offer myself as a resource? Below is a draft of what I was planning to write.

Hi All,

I'd like to offer myself as a resource regarding any questions you may have about the Covid vaccine. As a Nurse Patient Advocate I believe informed consent is the most important step in making any medical decision. I have invested a significant amount of time researching vaccines and would welcome questions. I will review the fact sheet an emergency use authorization and make my best effort to answer any questions or connect you with resources.

Email me at jessb11@me.com and we can arrange a time to talk.

All my best,

Jessica Brink

Sent from my iPhone

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 8, 2021 at 2:46 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Jess,
Let me think about the optics of this and I will reach out! Thank you!

Dr. B
[Quoted text hidden]
--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 8, 2021 at 2:46 PM
To: [redacted]

In full confidentiality, what do you think about this?
[Quoted text hidden]
[Quoted text hidden]

---

[redacted] Fri, Jan 8, 2021 at 4:08 PM
To: John Bormann <jbormann@rumsonschool.org>

Confidential

I wrote my thesis on vaccines. I understand their role in improving our life expectancy and saving millions of children of premature deaths. I understand their historical value as long as all safety protocols were followed during their development. Having said that and putting that aside we need to provide staff and parents with the information and let them decide how to proceed with this NEW vaccine.

I was disappointed at Jess' response when you emailed the nursing staff on how to obtain the vaccine. That response was an overshare. Like it or not working in a school has a political component and you have to be mindful when and how you should share. I feel uncomfortable with having a permanent sub nurse do this as I am not sure what information will be relayed.

I know our permanent sub teachers are well trained but I feel we would not provide a permanent sub teacher to become the resource over our own full time staff.

I think providing the informational links like you have been doing allows staff to read, digest and make their own decisions. Staff can also forward any questions to their health care provider. I don't want to speak for Krisanne but I think we can offer ourselves as resources if there are any questions related to the vaccines. I hope this helps.

Have a great weekend.

***Igniting, Maintaining, and Promoting Health***

[redacted]

[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Sat, Jan 9, 2021 at 4:42 PM
To: [redacted]

Thank you for your thoughtful consideration. I will let her know that it is not our role to provide any advocacy one way or another, but to just share the factual information for them to consider with their own physician.

Thanks!
Dr. B
[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Sat, Jan 9, 2021 at 4:49 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Jessica,

Thank you for reaching out and sharing this. Your willingness to support the staff is appreciated and we value having you as part of our team. After much thought, it would not be appropriate to provide advocacy one way or another. It is our role as a public entity to provide only the factual information available from government institutions we are required to follow and the teachers and families to seek guidance from their own physicians if they have questions. I would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact.

Respectfully,
Dr. Bormann

[Quoted text hidden]

---

**Jessica Brink** <jbrink@rumsonschool.org> Sat, Jan 9, 2021 at 7:02 PM
To: John Bormann <jbormann@rumsonschool.org>

Hi Dr. B,

I appreciate your thoughtful response and understand your reasoning; It's a slippery slope down either side. I just couldn't help but notice that in [redacted] explanation of her vaccine experience, she didn't mention informed consent.

In the rush to get people vaccinated, I believe people aren't truly getting complete information and that, in itself, creates a liability.

As I mentioned previously, your role is a challenging one. I have high regard for the way you handle it.

Jessica

Sent from my iPhone

> On Jan 9, 2021, at 16:49, John Bormann <jbormann@rumsonschool.org> wrote:
>
> [Quoted text hidden]

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

[redacted] Fri, Jan 15, 2021 at 2:32 PM
To: John Bormann <jbormann@rumsonschool.org> [redacted]

How did you know I was pregnant? I haven't told anyone yet!
[Quoted text hidden]
--
Sent from Gmail Mobile [redacted]

---

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 2:34 PM
[redacted]

LOL! Let's start smoking so we can get the vaccine!
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 2:35 PM
To: John Bormann <jbormann@rumsonschool.org>

That was going to be my next suggestion- kind of feeling like that's a little questionable- right?
[Quoted text hidden]
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 2:39 PM
To: John Bormann <jbormann@rumsonschool.org>

Thank you. I'm trying for an appointment asap. Decided to use my EMT status after all.
I love that you included their ***cautions*** about the talking points.
I presume there will be a mandate in the future haha.

[redacted]

[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 2:42 PM
[redacted]

Good! You are more important than a smoker!
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 3:38 PM
To: John Bormann <jbormann@rumsonschool.org>

thank you for the updates...looking forward to seeing 'teachers' on this list

[redacted]

Forrestdale School



[Quoted text hidden]

---

[redacted]
To: John Bormann <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 6:10 PM

[redacted]st asked how they will prove it- hmm. We can put a pack of Marlboro reds in our sleeve
[Quoted text hidden]
[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 6:46 PM
[redacted]

Apparently you do not need to show proof, but I like that look anyway!
[Quoted text hidden]

[redacted]

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Requesting some clarity

4 messages

**Jessica Brink** <jbrink@rumsonschool.org> Wed, Jan 13, 2021 at 11:36 AM
To: John Bormann <jbormann@rumsonschool.org>, [redacted]
Cc: [redacted]

Hi All,

You've probably noticed that I dig deep into rules / laws / guidelines and question what I don't understand. At the end of the day, I have a license to maintain and as one of the medical professionals here, I need to have a firm understanding from a medical safety standpoint and from a liability standpoint. I'm throwing my interpretation of the following paragraph into the ring, because it relates to the confusion we had this morning. I'm genuinely not trying to make this difficult. It's a very confusing thing for which consistency is paramount.

"In the context of an ongoing state-wide second wave, New Jersey continues to experience COVID-19 transmission among school-aged children. In children, signs/symptoms are often mild, and it may not be possible to clinically distinguish COVID-19 from other illnesses. For this reason, the New Jersey Department of Health (NJDOH) recommends that any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test (molecular or antigen) for SARS-CoV-2 or they have completed an isolation period of at least 10 days since symptom onset and at least 24 hours after resolution of fever without fever-reducing medications with symptom improvement. A purely clinical alternative diagnosis is no longer acceptable.

This letter states that PCR or Antigen test is acceptable.
It also states that it must be a period of isolation which is different from quarantine. See the CDC definition below, because this relates to siblings who are not isolated. If there is no isolation and anyone in the household develops symptoms, the quarantine period for the sibling would start fresh.
Finally, the 24 hour fever free period must be contiguous with the 10 day symptom free quarantine / isolation.

If school policy dictates otherwise, can you direct me to where I can find this documented, so that I can be consistent in the guidance I give our students, families and staff.

https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html

https://www.cdc.gov/quarantine/index.html#:~:text=%E2%80%A2%20Isolation%20separates%20sick%20people,if%20they%20become%20sick

- Isolation separates sick people with a contagious disease from people who are not sick.
- Quarantine separates and restricts the movement of people who were exposed to a contagious disease to see if they become sick.

I'm working on a flow chart of sorts, to make the decisions easier and consistent. Just to put the complexity in context - here are the possibilities that I've come with so far. Please let me know if you think of any that I haven't listed.

+ PCR

+Antigen

- PCR

- Antigen

Symptoms - 2 or more from A, No Test

Symptoms - 1 from B, No Test

Symptoms - 2 or more from A, Neg Test

Symptoms - 1 from B, Neg Test

Travel to High Risk area

Known Exposure to +

Exposure to Symptomatic, No Test

No Known Exposure, but Testing

Family Member Testing

Respectfully,

Jessica

---

**John Bormann** <jbormann@rumsonschool.org> Wed, Jan 13, 2021 at 11:54 AM
To: Jessica Brink <jbrink@rumsonschool.org>
Cc: [redacted]

Jessica,
Put your flow chart together and we will go from there. Much appreciated. Only area that might be included is if you are in home with COVID+ who is or is not ISOLATING
[Quoted text hidden]
--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

**John Bormann <jbormann@rumsonschool.org>**

# COVID Quarantine Decision Tool - Draft - Invitation to edit

1 message

**Jessica Brink (via Google Docs)** <drive-shares-noreply@google.com> Fri, Jan 15, 2021 at 10:02 AM
Reply-To: Jessica Brink <jbrink@rumsonschool.org>
To: jbormann@rumsonschool.org
Cc: [redacted]

jbrink@rumsonschool.org has invited you to **edit** the following document:

COVID Quarantine Decision Tool - Draft

For your review. Please feel free to make edits / start discussion. All the variable don't really fit into a flow chart, so I categorized instead.

Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because jbrink@rumsonschool.org shared a document with you from Google Docs.

Google

# COVID Isolation / Quarantine Decision Tool

14 Day Quarantine - no testing out, if symptoms develop - begin 10 day isolation / quarantine

- Exposure to COVID (+)
- Travel to High Risk Area
- Exposure to multi-symptomatic, untested (presumed (+))

10 Day Isolation / Quarantine - 10 days starts after first day of symptom onset or a (+) test and must be contiguous with a 24 hour fever free period.

- (+) PCR
- (+) Antigen
- Multi - symptomatic, untested
- (-) Antigen with multiple symptoms (consider PCR test)

Quarantine & Wait for Results

- Household / family member testing due to (+) exposure

No Quarantine - if multiple symptoms develop, move to 10 day isolation / quarantine and / or test

- (-) PCR
- (-) Antigen
- Household / family member quarantined for (+) exposure
- Household / family member quarantined for high risk travel
- Household / family member is testing as a precaution (i.e. work related)
- Household / family member is isolated and there was no exposure X days prior to (+) test.

The points highlighted in yellow are ones that I need guidance on as far as the school policy. I've placed them in a category based on my clinical judgement, but in some cases that seems to be different than the school policy.

A 14 day quarantine for a known (+) exposure is the CDC's recommendation. The CDC does offer guidance for a shortened quarantine period based on testing. However, the recommendation for a 14-day quarantine was based on estimates of the upper bounds of the COVID-19 incubation period.

CDC guidance on isolation / quarantine duration:
https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

Guidance for alternative quarantine timeframes based on testing can be found here:
https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html

Guidance for testing: https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html

COVID Isolation / Quarantine Decision Tool

In all my searching I can not find clear and specific CDC guidance on the testing timeline. There are many scholarly articles written about incubation periods, but of the ones I reviewed, none commit to a testing time frame. I believe it is because of wide variation in the tests being used. Each test has its own criteria for positivity, as it relates to the viral load and cycle threshold. I think this article explains it well:
https://medical.mit.edu/covid-19-updates/2020/07/when-should-i-be-tested

The CDC's interim guidance on Antigen testing is pretty clear - it works best in certain situations. "The clinical performance of antigen diagnostic tests largely depends on the circumstances in which they are used. Both antigen tests and NAATs perform best when the person is tested when viral load is generally highest. They also may be informative in diagnostic testing situations in which the person has a known exposure to a person with COVID-19."
https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

**John Bormann <jbormann@rumsonschool.org>**

# Termination - Permanent School Nurse Substitute

5 messages

**Jessica Brink** <jessb11@me.com> Mon, Feb 1, 2021 at 8:21 PM
To: cjones@rumsonschool.org, kswain@rumsonschool.org, kmarkiewicz@rumsonschool.org, tduva@rumsonschool.org, sizzo@rumsonschool.org, jconnors@rumsonschool.org, scaldwell@rumsonschool.org, mginsberg@rumsonschool.org, cscoble@rumsonschool.org
Cc: jbormann@rumsonschool.org

Good evening,

Please find my letter attached.

Respectfully,

Jessica Brink BSN, RN, iRNPA

**J. Brink Rumson BOE 2.1.21.pdf**
33K

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 1, 2021 at 9:27 PM
To: Charles Jones <cjones@rumsonschool.org>, Kim Swain <kswain@rumsonschool.org>, Kara Markiewicz <kmarkiewicz@rumsonschool.org>, Scott Caldwell <scaldwell@rumsonschool.org>, Melissa Ginsberg <mginsberg@rumsonschool.org>, Tara D'Uva <tduva@rumsonschool.org>, Curran Scoble <cscoble@rumsonschool.org>, John Connors <jconnors@rumsonschool.org>, Stacy Izzo <sizzo@rumsonschool.org>, Denise McCarthy <dmccarthy@rumsonschool.org>

As you can extract from reading the letter, this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. They have been notified and confirmed as has been done with other subs in the past.

Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

We are currently seeking a sub nurse through HMH.

Please contact me if you have any questions.

John

[Quoted text hidden]

**J. Brink Rumson BOE 2.1.21.pdf**
33K

---

**Charles Jones** <cjones@rumsonschool.org> Mon, Feb 1, 2021 at 9:41 PM
To: John Bormann <jbormann@rumsonschool.org>

I'll give you a ring in the morning.

[Quoted text hidden]
[Quoted text hidden]
<J. Brink Rumson BOE 2.1.21.pdf>

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 8, 2021 at 2:15 PM
To: Edlawgroup <edlawgroup@sciarrillolaw.com>

---------- Forwarded message ---------
From: **Jessica Brink** <jessb11@me.com>
Date: Mon, Feb 1, 2021 at 8:21 PM
Subject: Termination - Permanent School Nurse Substitute
To: <cjones@rumsonschool.org>, <kswain@rumsonschool.org>, <kmarkiewicz@rumsonschool.org>, <tduva@rumsonschool.org>, <sizzo@rumsonschool.org>, <jconnors@rumsonschool.org>, <scaldwell@rumsonschool.org>, <mginsberg@rumsonschool.org>, <cscoble@rumsonschool.org>
Cc: <jbormann@rumsonschool.org>

[Quoted text hidden]

--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

**J. Brink Rumson BOE 2.1.21.pdf**
33K

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 8, 2021 at 2:16 PM
To: Edlawgroup <edlawgroup@sciarrillolaw.com>

Give me a call about this.

Thanks-
John
[Quoted text hidden]

Dear Members of the Rumson School District Board of Education,

In the October 28, 2020 meeting this Board retroactively approved my employment as a School Nurse Permanent Substitute, hired and paid through ESS. As this is the body that approved my employment, I trust it's fitting to inform you that as of today, February 1st, 2021, my position with the Rumson School District has ended. I wish to share with you my perspective on the circumstances which led to the end of my employment. I do not want my job back. I am not requesting any investigation into whether the termination was founded. I'm simply asking for consistency, sound clinical judgement, and genuine concern for the wellbeing of our children, teachers and communities be brought to the forefront.

I have been a nurse for 15 years. I've worked inpatient pediatrics and pediatric home care. I worked in policy and procedure for a major health insurer. I am certified as a Nurse Patient Advocate. I served four years in the military. I had no intention of being a school nurse. However, my mother works on the custodial staff at Dean Porter School and at some point Dr. Bormann heard that I was a nurse. He contacted me directly in September 2020 asking if I would work as a substitute school nurse. I explained that I was not certified as school nurse and that I hadn't worked in pediatrics in 10 years. He assured me that was no problem. I went through the hiring process with ESS and started work on September 25, 2020. I completed all necessary requirements and as far as I was aware, I was fulfilling my expectations as a substitute school nurse.

Most days, I worked under the direction of the Certified School Nurse at either Dean Porter or Forrestdale. When I did not know something, or was confused about a decision, process or protocol I asked for advice or clarification. This was a regular occurrence because many things confused me surrounding the lack of consistency with guidelines, policies and protocols related to COVID-19.

On January 12, 2021 I was working independently at Forrestdale School because the Certified School Nurse requested the day off. I was instructed to send a child home because a sibling in another school was symptomatic. Based on CDC guidelines and my clinical judgment I explained the recommended 14-day quarantine period to the students' Mother. Later when I looked at the Quarantine Spreadsheet a 10-day quarantine was documented. I contacted the Principal and explained the conflict and my reasoning for the 14-day recommendation. She said that she too was confused and had confirmed with Dr. Bormann the 10-day recommendation.

They next day the four of us – Dr. Bormann, the Principal, the Forrestdale school nurse and myself were in the hallway. I addressed my confusion with the group and did not come away with a clear resolution. I composed an email expressing my confusion to the same group with the addition of the Dean Porter School Nurse and Principal. I laid out my concerns with inconsistencies in guidance regarding testing and quarantine. I provided sources for what I believed to be the appropriate clinical guidance from the CDC and DOH. I explained that I have a medical license to maintain and that I need clear, medically supported guidance on which to

make clinical recommendations. I offered to create a flow sheet based on my research and knowledge of the process.

On January 15, 2021 I emailed Dr. Bormann and both school nurses inviting them to review the document I created. I highlighted the areas of confusion and requested feedback.

On January 21, 2021 I was working in Dean Porter and was instructed to send several children home. In two instances parents voiced their irritation and frustration because they could not make sense of the protocols. I empathized with their emotions but couldn't provide any guidance because I too was confused. That afternoon school was closed to in person classes due to an increasing number of positive cases.

On January 27, 2021 the nurse from Dean Porter emailed me asking if I could cover the nurse role for a period of time once we returned to in person classes. I agreed, but added that I would talk to Dr. Bormann in the meantime to get clarification on medical policies.

This afternoon I met with Dr. Bormann via phone conference to discuss my concerns. I explained that I was uncomfortable doing things that were not found in official policy or guidance. I explained that as the only medical professional in the building I must do what is clinically supported by verifiable sources. I explained that I was still unclear about the examples I gave in the document I provided on January 15, 2020 i.e. only accepting PCR testing when DOH guidance identifies Antigen testing as acceptable, and the required quarantining / testing of all siblings when one has symptoms. I explained that while quarantining is recommended it is voluntary and I cannot compel anyone to do so. I explained I was also unclear about keeping private health information in a shared Google Spreadsheet. Based on my interpretation of NJ Administrative Code and the Family Education Privacy Act this could be a violation of privacy. As is, encouraging staff to report any discussions of questionable behavior like travel or indoor unmasked events or gatherings, that they might overhear.

I asked for Dr. Bormann to share with me the written law, policy or guidance that authorizes me, as a nurse, to do these things. His response was to say that I get the emails he sends and that everything is on the website. I asked that he send me the link so that I can review what he is referring to. He said that clearly, I am not comfortable with the expectations of the job and that it would probably be best if I did not continue my role with the school district. I said that I am completely confident with my skill as a nurse, yet one of the major things I need to do my job effectively and in accordance with my scope of practice and my license is written, valid policy and procedure. I asked him if he was terminating my contract with the school district. He again said that I wasn't comfortable doing what is expected, that I'm free to work for ESS in other school districts and that he'd email ESS about my termination. I asked him to copy me on the email and he refused.

In the same way I started my conversation with Dr. Bormann, I will end my letter to you. I am not trying to be difficult. I want what is best for the children, their families and the staff of every school. The circumstances we are all facing right now are unprecedented. We've all

been under extreme stress attempting to do 'the best we can,' for nearly a year. At some point, we must acknowledge the harm this stress, fear and uncertainty is causing for our children, and realize the 'best we can' needs to be reevaluated. No doubt everyone is exhausted. But one thing that makes exhaustion a little more tolerable is clear, consistent guidance from appropriate resources.

Let me reiterate, I am no longer interested in working for the Rumson School District. I am not asking for anyone to decide if what occurred during my employment was right, wrong or indifferent. I'm asking that you evaluate the appropriateness and consistency of the policies, procedures, guidelines, rules, ideas that are impacting the health and wellbeing of your children and community. Please feel free to email me with any questions.

Respectfully,

Jessica Brink BSN, RN, iRNPA
Jessb11@me.com

JESSICA BRINK
(732) 492-4690
8 GORDON CT
PORT MONMOUTH NJ 07758

19 LBS 1 OF 1
SHP WT: 19 LBS
DATE: 26 JAN 2026

SHIP ATTN CLERK OF THE COURT
TO: USCOURTOFAPPEALS,21400USCOURTHOUSE
601 MARKET ST

PHILADELPHIA PA 19106-1729

PA 191 9-10

UPS 2ND DAY AIR A.M.
TRACKING #: 1Z A58 E36 07 1941 2913

2A

BILLING: P/P