No: 25-1805

**UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

JESSICA M. BRINK,
Appellant

v.

JOHN BORMANN, individually and in his official capacity as
Appellee and Chief Administrative Officer of the Rumson School District;
BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH,
a body politic and corporate

New Jersey - Trenton

U.S. District Court, D.N.J.

3:23-cv-00497

On Appeal from an Order of Zahid N. Quraishi, U.S.D.J, dated March 24, 2025
Dismissing Appellant's Second Amended Complaint with Prejudice

**SUPPLEMENTAL APPENDIX OF DEFENDANTS-APPELLEES**
**VOLUME 1**
**PAGES 1-242**

Sharyn J. Gallatin, Esq.
136 Franklin Corner Road, B2
Lawrenceville, New Jersey 08648
Tel. No.: 609-896-2000 x143
Attorney for Defendants-Appellees,
John Bormann and the Board of Education of Rumson
in the County of Monmouth

# TABLE OF CONTENTS

Notice of Appeal……………………………………………………………………1

United States District Court Order, dated March 24, 2025, Dismissing
the Second Amended Complaint with Prejudice……………………………2

Docket Report……………………………………………………………………3

Original Complaint dated January 31, 2023 ……………………………………12

Opinion Granting Motion to Vacate Default and Dismiss Complaint
without Prejudice, dated September 25, 2023 ……………………………113

Opinion Dismissing Amended Complaint, dated June 25, 2024………………141

Verified Second Amended Complaint, dated July 26, 2024……………………162

Opinion Dismissing Second Amended Complaint with Prejudice,
dated March 24, 2025……………………………………………………………222

Letter Order Denying Motion for Reconsideration of Complaint
Dismissal, dated November 24, 2025……………………………………………240

Certification of Service…………………………………………………………242

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

**Notice of Appeal to a Court of Appeals From an Appealable Order of a District Court**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

Docket Number 3:23-cv-00497 (ZNQ)(JTQ)

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.**<br><br>Defendants. | Notice of Appeal |

Jessica M. Brink appeals to the United States Court of Appeals for the Third Circuit from the order of DISMISSAL WITH PREJUDICE entered on March 24, 2025.

Jessica Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, *et al.*,**<br><br>Defendants. | Civil Action No. 23-497 (ZNQ) (JTQ)<br><br>**ORDER** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Defendants John Bormann and the Board of Education of Rumson's (collectively, "Defendants") Motion to Dismiss *pro se* Plaintiff Jessica M. Brink's ("Plaintiff") Second Amended Complaint. (the "Motion", ECF No. 33.) Plaintiff additionally filed a Motion for Judicial Notice ("Mot. For Jud. Not.", ECF No. 35). For the reasons set forth in the accompanying Opinion,

**IT IS** on this **24th** day of **March 2025,**

**ORDERED** that Plaintiff's Motion for Judicial Notice (ECF No. 35) is hereby **GRANTED**; and it is further

**ORDERED** that Defendants' Motion (ECF No. 33) is hereby **GRANTED**; and it is further

**ORDERED** that the Second Amended Complaint is hereby **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk's Office is hereby instructed to mark this matter **CLOSED**.

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

APPEAL,CLOSED,PROSE

# U.S. District Court
# District of New Jersey [LIVE] (Trenton)
# CIVIL DOCKET FOR CASE #: 3:23-cv-00497-ZNQ-JTQ

BRINK v. BORMANN et al
Assigned to: Judge Zahid N. Quraishi
Referred to: Magistrate Judge Justin T. Quinn
Case in other court: Third Circuit, 25-01805
Cause: 42:1983 Civil Rights Act

Date Filed: 01/26/2023
Date Terminated: 11/24/2025
Jury Demand: Plaintiff
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**JESSICA M. BRINK**

represented by **JESSICA M. BRINK**
8 GORDON COURT
PORT MONMOUTH, NJ 07758
Email: jessb11@me.com
PRO SE

V.

**Defendant**

**JOHN BORMANN**
*individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District*

represented by **MICHAEL A. PATTANITE, JR.**
LENOX, SOCEY, FORMIDONI, GIORDANO, COOLEY, LANG & CASEY LLC
136 FRANKLIN CORNER ROAD
UNIT B2
LAWRENCEVILLE, NJ 08648
(609) 896-2000
Email: mpattanite@lenoxlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**PATRICK F. CARRIGG**
LENOX SOCEY LAW FIRM
136 Franklin Corner Rd
Bldg B2
Lawrenceville, NJ 08648
609-896-2000
Fax: 609-895-1693
Email: Pcarrigg@lenoxlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

| | | |
|---|---|---|
| **MARIA MONTANEZ**<br>*individually and in her official capacity as School Nurse in Rumson School District*<br>*TERMINATED: 10/25/2023* | represented by | **MICHAEL A. PATTANITE, JR.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Defendant**

| | | |
|---|---|---|
| **BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH**<br>*a body politic and corporate* | represented by | **MICHAEL A. PATTANITE, JR.**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br><br>**PATRICK F. CARRIGG**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

| Date Filed | # | Docket Text |
|---|---|---|
| 01/26/2023 | 1 | Complaint Received. (Attachments: # 1 Civil Cover Sheet, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 EXhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21)(kht) (Main Document 1 replaced on 1/27/2023) (kht, ). (Entered: 01/27/2023) |
| 01/26/2023 | 2 | Consent & Registration Form to Receive Documents Electronically by JESSICA M. BRINK (kht) (Entered: 01/27/2023) |
| 01/27/2023 | 3 | Notice of Guidelines for Appearing Pro Se (kht) (Entered: 01/27/2023) |
| 01/27/2023 | 4 | Clerk's Letter: Complaint not accompanied by the filing fee or application to proceed in forma pauperis. (kht) (Entered: 01/27/2023) |
| 01/31/2023 | | Filing fee: $ 402, receipt number TRE130759. (mlh) (Entered: 01/31/2023) |
| 01/31/2023 | | COMPLAINT filed. See docket entry 1 for the complaint. (mlh) Modified on 1/31/2023 (km). (Entered: 01/31/2023) |
| 01/31/2023 | 5 | SUMMONS ISSUED as to BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN and MARIA MONTANEZ. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (mlh) (Entered: 01/31/2023) |
| 03/20/2023 | 6 | CERTIFICATE OF SERVICE as to BOARD OF EDUCATION OF RUMSON by JESSICA M. BRINK. (Filed via Ecf Held Desk) (jdg) (Entered: 03/21/2023) |
| 03/20/2023 | 7 | CERTIFICATE OF SERVICE as to JOHN BORMANN by JESSICA M. BRINK. (Filed |

| | | |
|---|---|---|
| | | via ECF Help Desk) (jdg) (Entered: 03/21/2023) |
| 03/31/2023 | 8 | SUMMONS Returned Executed by JESSICA M. BRINK. MARIA MONTANEZ served on 3/23/2023, answer due 4/13/2023. (Received via Help Desk) (mlh) (Entered: 04/03/2023) |
| 05/12/2023 | 9 | NOTICE of Appearance by MICHAEL A. PATTANITE, JR. on behalf of All Defendants (PATTANITE, JR., MICHAEL) (Entered: 05/12/2023) |
| 05/15/2023 | 10 | VACATED Request for Default by JESSICA M. BRINK against JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH. (Received via ECF Help) (Attachments: # 1 Entry of Default, # 2 Affidavit in Support)(jdg) Modified on 9/25/2023 (kht). (Entered: 05/15/2023) |
| 05/15/2023 | | Clerk's ENTRY OF DEFAULT as to JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH for failure to plead or otherwise defend. (jdg) (Entered: 05/15/2023) |
| 05/15/2023 | 11 | MOTION for Default Judgment as to JOHN BORMANN, MARIA MONTANEZ, BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH by JESSICA M. BRINK. (Filed via ECF Help Desk) (jdg) (Entered: 05/15/2023) |
| 05/15/2023 | | Set Deadlines as to 11 MOTION for Default Judgment as to. Motion set for 6/20/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 05/15/2023) |
| 05/18/2023 | 12 | MOTION to Dismiss by All Defendants. (Attachments: # 1 Brief Brief, # 2 Certification Certification of Counsel, # 3 Exhibit Exhibit A, # 4 Certificate of Service Proof of Service, # 5 Text of Proposed Order Order)(PATTANITE, JR., MICHAEL) (Entered: 05/18/2023) |
| 05/18/2023 | 13 | MOTION to Vacate 10 Request for Default by All Defendants. (Attachments: # 1 Brief Brief, # 2 Certification Certification of Counsel, # 3 Text of Proposed Order Order, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A, # 6 Exhibit Exhibit B, # 7 Exhibit Exhibit C, # 8 Exhibit Exhibit D, # 9 Exhibit Exhibit E)(PATTANITE, JR., MICHAEL) (Entered: 05/18/2023) |
| 05/22/2023 | | Set Deadlines as to 13 MOTION to Vacate 10 Request for Default . Motion set for 6/20/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 05/22/2023) |
| 06/01/2023 | 14 | MOTION for Extension of Time to File by JESSICA M. BRINK. (Filed via ECF Help Desk) (jdg) (Entered: 06/01/2023) |
| 06/01/2023 | | Set Deadlines as to 14 MOTION for Extension of Time to File. Motion set for 7/3/2023 before Magistrate Judge Douglas E. Arpert. Unless otherwise directed by the Court, this |

| | | |
|---|---|---|
| | | motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jdg) (Entered: 06/01/2023) |
| 06/12/2023 | 15 | BRIEF in Opposition filed by JESSICA M. BRINK re 12 MOTION to Dismiss (Filed via ECF Help Desk) (jdg) (Entered: 06/13/2023) |
| 06/20/2023 | | Set Deadlines as to 12 MOTION to Dismiss . Motion set for 7/17/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 06/20/2023) |
| 06/20/2023 | 16 | ORDER granting 14 Plaintiff's Motion for Extension of Time to File nunc pro tunc. The Court notes that Plaintiff filed a Motion for Extension of Time to oppose Defendant's Motion to Dismiss and thereafter filed her Opposition on 6/12/2023 15 . Signed by Judge Zahid N. Quraishi on 6/20/2023. (kht) (Entered: 06/20/2023) |
| 09/25/2023 | 17 | OPINION filed. Signed by Judge Zahid N. Quraishi on 9/25/2023. (kht) (Entered: 09/25/2023) |
| 09/25/2023 | 18 | ORDER that Plaintiff's 11 Motion for Default judgment is DENIED. Defendants' 13 Motion to Vacate Default is GRANTED. Defendants' 12 Motion to Dismiss is GRANTED; the Complaint is DISMISSED WITHOUT PREJUDICE. The Plaintiff may file an amended complaint consistent with the Court's Memorandum Opinion within thirty (30) days of this Order's filing. The Clerk's Office is hereby instructed to ADMINISTRATIVELY TERMINATE this matter pending the submission of an Amended Complaint. Signed by Judge Zahid N. Quraishi on 9/25/2023. (kht) (Entered: 09/25/2023) |
| 10/24/2023 | 19 | AMENDED COMPLAINT against BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN, filed by JESSICA M. BRINK. (Filed via ECF Help Desk) (jal, ) Modified on 10/25/2023 (jal, ). Modified on 6/20/2024 (jal, ). (Entered: 10/25/2023) |
| 10/24/2023 | 20 | Exhibit to 19 Amended Complaint by JESSICA M. BRINK. (Filed via ECF Help Desk) (jal, ) (Entered: 10/25/2023) |
| 11/11/2023 | 21 | Request for Clerk's Entry of Default by JESSICA M. BRINK against John Bormann & Board of Education of Rumson. (Filed via ECF Help Desk) (Attachments: # 1 Affidavit)(jal, ) (Main Document 21 replaced on 11/16/2023) (jjc, ). (Attachment 1 replaced on 11/16/2023) (jjc, ). (Entered: 11/13/2023) |
| 11/13/2023 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised that the Request for Default submitted by Jessica M. Brink on11/11/2023 cannot be granted as requested because Defendants still have time to answer. This submission will remain on the docket unless otherwise ordered by the Court. This message is for informational purposes only. (jal, ) (Entered: 11/13/2023) |
| 11/14/2023 | | CLERK'S QUALITY CONTROL MESSAGE - Please note the quality control message filed by the Clerk's office on 11/13/2023 was docketed in error. Please disregard. (jal, ) |

| | | |
|---|---|---|
| | | (Entered: 11/14/2023) |
| 11/14/2023 | | Clerk's ENTRY OF DEFAULT as to John Bormann & Board of Education of Rumson for failure to plead or otherwise defend. (jal, ) (Entered: 11/14/2023) |
| 11/15/2023 | 22 | MOTION to Vacate *Default* by All Defendants. (Attachments: # 1 Text of Proposed Order Order, # 2 Certification Certification of Counsel, # 3 Brief Brief, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A)(PATTANITE, JR., MICHAEL) (Entered: 11/15/2023) |
| 11/15/2023 | 23 | MOTION to Dismiss by All Defendants. Responses due by 11/14/2023. (Attachments: # 1 Text of Proposed Order Order, # 2 Certification Certification of Counsel, # 3 Brief Brief, # 4 Certificate of Service Proof of Service, # 5 Exhibit Exhibit A, # 6 Exhibit Exhibit B, # 7 Exhibit Exhibit C, # 8 Exhibit Exhibit D)(PATTANITE, JR., MICHAEL) (Entered: 11/15/2023) |
| 11/16/2023 | | Set Deadlines as to 22 MOTION to Vacate *Default*, 23 MOTION to Dismiss . Motions set for 12/18/2023 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, these motions will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 11/16/2023) |
| 11/28/2023 | 24 | BRIEF in Opposition filed by JESSICA M. BRINK re 22 MOTION to Vacate *Default*. (Received via ECF Help Desk) (mlh) (Entered: 11/28/2023) |
| 11/28/2023 | 25 | Application and Proposed Order for Clerk's Order to extend time to answer as to JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 11/28/2023) |
| 11/28/2023 | | Clerk`s Text Order - The document 25 Application for Clerk's Order to Ext Answer/Proposed Order submitted by JESSICA M. BRINK has been DENIED as it is beyond the scope of what the Clerk can grant. This submission has been forwarded to Chambers. (mlh) (Entered: 11/28/2023) |
| 12/04/2023 | 26 | BRIEF in Opposition filed by JESSICA M. BRINK re 23 MOTION to Dismiss (Attachments: # 1 Exhibits)(Received via Help Desk)(kht) (Entered: 12/04/2023) |
| 06/04/2024 | | Magistrate Judge Justin T. Quinn added. Magistrate Judge Douglas E. Arpert no longer assigned to case. (gxh) (Entered: 06/04/2024) |
| 06/06/2024 | 27 | NOTICE of Appearance by PATRICK F. CARRIGG on behalf of All Defendants (CARRIGG, PATRICK) (Entered: 06/06/2024) |
| 06/25/2024 | 28 | OPINION filed. Signed by Judge Zahid N. Quraishi on 6/25/2024. (jal, ) (Entered: 06/25/2024) |
| 06/25/2024 | 29 | ORDER granting 22 Motion to Vacate 22 23 MOTION to Dismiss with prejudice; The Clerks Office is instructed to Administratively terminate this matter. Signed by Judge Zahid N. Quraishi on 6/25/2024. (jal, ) (Entered: 06/25/2024) |
| 07/26/2024 | 30 | SECOND AMENDED COMPLAINT filed by JESSICA M. BRINK. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibits)(Received via Help Desk)(kht) (Main Document 30 replaced on 7/30/2024) (jdg, ). (Entered: 07/29/2024) |
| 07/30/2024 | 31 | VERIFIED SECOND AMENDED COMPLAINT against BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, JOHN BORMANN, filed by JESSICA M. BRINK. (Filed via ECF Help Desk)(amv) (Additional attachment(s) added on 7/31/2024: # 1 Exhibits) (jdg, ). (Main Document 31 replaced on 3/17/2025) (amv). (Entered: 07/31/2024) |
| 07/31/2024 | | Please disregard 30 SECOND AMENDED COMPLAINT as it was filed inadvertently. Please see 31 VERIFIED SECOND AMENDED COMPLAINT. (jdg) (Entered: 07/31/2024) |
| 08/01/2024 | 32 | TEXT ORDER: In light of the Plaintiff filing an amended complaint 30 , this case is hereby REOPENED. So Ordered by Judge Zahid N. Quraishi on 8/1/2024. (kas, ) (Entered: 08/01/2024) |
| 08/16/2024 | 33 | Third MOTION to Dismiss *Second Amended Complaint* by All Defendants. Responses due by 9/3/2024. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C, # 4 Exhibit Exhibit D, # 5 Exhibit Exhibit E, # 6 Exhibit Exhibit F) (CARRIGG, PATRICK) (Entered: 08/16/2024) |
| 08/16/2024 | | Set Deadlines as to 33 Third MOTION to Dismiss *Second Amended Complaint*. Motion set for 9/16/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 08/16/2024) |
| 08/29/2024 | 34 | MOTION for Extension of Time to Oppose 33 Third MOTION to Dismiss *Second Amended Complaint* by JESSICA M. BRINK. (Filed via ECF Help Desk) (amv) (Entered: 08/29/2024) |
| 08/29/2024 | | Set Deadlines as to 34 MOTION for Extension of Time to File Response/Reply as to 33 Third MOTION to Dismiss *Second Amended Complaint*. Motion set for 10/7/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 08/29/2024) |
| 09/07/2024 | 35 | MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) by JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 09/09/2024) |
| 09/07/2024 | 36 | PLAINTIFF'S BRIEF in Opposition to Defendants' 33 Third MOTION to Dismiss Second Amended Complaint filed by JESSICA M. BRINK. (Received via ECF Help Desk) (mlh) (Entered: 09/09/2024) |
| 09/09/2024 | | Set Deadlines as to 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2). Motion set for 10/7/2024 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the |

| | | |
|---|---|---|
| | | Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 09/09/2024) |
| 09/23/2024 | 37 | BRIEF in Opposition filed by All Defendants re 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) (CARRIGG, PATRICK) (Entered: 09/23/2024) |
| 09/23/2024 | 38 | REPLY BRIEF to Opposition to Motion filed by All Defendants re 33 Third MOTION to Dismiss *Second Amended Complaint* (CARRIGG, PATRICK) (Entered: 09/23/2024) |
| 09/24/2024 | | CLERK'S QUALITY CONTROL MESSAGE - The 37 Brief and 38 Reply Brief submitted by Patrick Carrigg on 9/23/2024 did not contain a proper electronic signature (s/). PLEASE RESUBMIT THE DOCUMENT WITH THE PROPER ELECTRONIC SIGNATURE (s/ Attorney's Name.) This submission will remain on the docket unless otherwise ordered by the court. (kht) (Entered: 09/24/2024) |
| 09/30/2024 | 39 | REPLY BRIEF to Opposition to Motion filed by JESSICA M. BRINK re 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2) (Filed via ECF Help Desk) (jdg) (Entered: 09/30/2024) |
| 10/07/2024 | 40 | NOTICE of Objection by JESSICA M. BRINK re 38 Reply Brief to Opposition to Motion, 33 Third MOTION to Dismiss *Second Amended Complaint* (Filed via ECF Help Desk) (jdg) (Entered: 10/08/2024) |
| 03/24/2025 | 41 | OPINION filed. Signed by Judge Zahid N. Quraishi on 3/24/2025. (mlh) (Entered: 03/24/2025) |
| 03/24/2025 | 42 | ORDER granting 33 Third MOTION to Dismiss Second Amended Complaint and granting 35 MOTION for Judicial Notice Pursuant to Federal Rules of Evidence 201(B)(2). It is ORDERED that the Second Amended Complaint is hereby DISMISSED WITH PREJUDICE; and it is further ORDERED that the Clerk's Office is herby instructed to mark this matter CLOSED. ***CIVIL CASE TERMINATED. Signed by Judge Zahid N. Quraishi on 3/24/2025. (mlh) (Entered: 03/24/2025) |
| 04/08/2025 | 43 | MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss, by JESSICA M. BRINK. (Filed via ADS) (amv) (Entered: 04/08/2025) |
| 04/08/2025 | | Set Deadlines as to 43 MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss,, Order on Motion for Miscellaneous Relief,. Motion set for 5/5/2025 before Judge Zahid N. Quraishi. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 04/08/2025) |
| 04/21/2025 | 44 | BRIEF in Opposition filed by All Defendants re 43 MOTION for Reconsideration re 41 Opinion, 42 Order on Motion to Dismiss,, Order on Motion for Miscellaneous Relief, (CARRIGG, PATRICK) (Entered: 04/21/2025) |
| 04/22/2025 | | CLERK'S QUALITY CONTROL MESSAGE - The Brief in Opposition 44 submitted by Patrick Carrigg on 4/21/2025 contains an improper signature. Only the filing user is |

| | | |
|---|---|---|
| | | permitted to sign electronically filed documents with an s/. PLEASE RESUBMIT THE DOCUMENT WITH A PROPER ELECTRONIC SIGNATURE. This submission will remain on the docket unless otherwise ordered by the court. (jal, ) (Entered: 04/22/2025) |
| 04/23/2025 | 45 | REPLY BRIEF to 44 Opposition to Motion filed by JESSICA M. BRINK (Received via ADS) (Attachments: # 1 Cover Letter)(mlh) (Entered: 04/24/2025) |
| 04/23/2025 | 46 | NOTICE OF APPEAL as to 42 Order on Motion to Dismiss by JESSICA M. BRINK. (Received via ADS) No Filing Fee or IFP Application received. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (mlh) (Entered: 04/24/2025) |
| 04/24/2025 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised, the Notice of Appeal 46 filed on 4/23/2025 was filed without a filing fee. PLEASESUBMIT THE FEE OF $605 to our Office Immediately. Your check should be made payable toClerk, U.S. District Court. In the alternative, an application for In Forma Pauperis can be filed. Please refer to the Courts website at www.njd.uscourts.gov for information and forms. (mlh) (Entered: 04/24/2025) |
| 04/25/2025 | 47 | USCA Case Number 25-1805 for 46 Notice of Appeal (USCA), filed by JESSICA M. BRINK. USCA Case Manager Stephanie (Document Restricted - Court Only) (ca3sb, ) (Entered: 04/25/2025) |
| 04/30/2025 | 48 | USCA Appeal Fees received $ 605 receipt number TRE143762 re 46 Notice of Appeal (USCA), filed by JESSICA M. BRINK. (amv) (Entered: 04/30/2025) |
| 11/24/2025 | 49 | LETTER ORDER directing the Clerk's Office to RE-OPEN this matter; DENYING Plaintiff's 43 Motion for Reconsideration; directing the Clerk's Office to RE-CLOSE this matter. Signed by Judge Zahid N. Quraishi on 11/24/2025. (sms2) (Entered: 11/24/2025) |
| 11/24/2025 | | ***Civil Case Terminated. (sms2) (Entered: 11/24/2025) |

## PACER Service Center

### Transaction Receipt

| 04/10/2026 17:10:24 | | | |
|---|---|---|---|
| **PACER Login:** | sharyngallatin | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:23-cv-00497-ZNQ-JTQ Start date: 1/1/1980 End date: 4/10/2026 |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**JESSICA M. BRINK,**
*Plaintiff*

V.

## SUMMONS IN A CIVIL CASE

**JOHN BORMANN, ET AL.,**
*Defendant*

CASE
NUMBER: **3:23–CV–00497–ZNQ–DEA**

TO: *(Name and address of Defendant):*
Board of Education of Rumson
60 Forrest Avenue
Rumson NJ 07760

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) –– or 60 days if you are the United States or a United States Agency, or an office or employee of the United States described in Fed. R. civ. P. 12 (a)(2) or (3) –– you must serve on the plaintiff an answer to the attached complaint or a motion under rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

**s/ WILLIAM T. WALSH**
CLERK

**ISSUED ON 2023–01–31 16:13:29.** Clerk
USDC NJD

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS** Jessica M. Brink

**DEFENDANTS** John Bormann, Maria Montanez, Board of Education of Rumson

**(b)** County of Residence of First Listed Plaintiff Monmouth
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Monmouth
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
pro se 8 Gordon Court
Port Monmouth, NJ 07758
(732) 492 4690

Attorneys *(If Known)*

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)* Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☒ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence
- ☐ 530 General
- ☐ 535 Death Penalty

Other:
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent - Abbreviated New Drug Application
- ☐ 840 Trademark
- ☐ 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729(a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit (15 USC 1681 or 1692)
- ☐ 485 Telephone Consumer Protection Act
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*: Constitution of the United States of America
Brief description of cause: Violations of First and Fourteenth Amendment rights

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** *(See instructions):* JUDGE ____ DOCKET NUMBER ____

DATE 1/26/2023 SIGNATURE OF ATTORNEY OF RECORD Jessica M Brink pro se

**FOR OFFICE USE ONLY**

RECEIPT # ____ AMOUNT ____ APPLYING IFP ____ JUDGE ____ MAG. JUDGE ____

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

| | |
|---|---|
| JESSICA M. BRINK<br><br>Plaintiff,<br><br>vs .<br><br>JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Officer of the Rumson School District; MARIA MONTANEZ, individually and in her official capacity as School Nurse in the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.<br><br>Defendants. | IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CLAIM FOR DAMAGES** |

## COMPLAINT

Comes now, Plaintiff, Jessica Brink ("Brink") in pro se, files the within Complaint and in support thereof avers as follows:

## INTRODUCTION

1. This is an action brought pursuant to U.S.C. §§ 1983 and 1985, the First and Fourteenth Amendments to the United States Constitution, and under the law of the State of New Jersey.

2. Plaintiff Brink alleges that Defendants conspired to restrain Plaintiff's protected speech, did restrain her speech, denied Plaintiff equal privileges of the law, denied Plaintiff's petition for redress of grievances, terminated Plaintiff's employment in a retaliation for protected activity, and falsely stigmatized and defamed Plaintiff without due process.

3. Plaintiff's protected activity related to matters of significant public concern including informed consent and the welfare of children.

4. Plaintiff alleges these constitutional violations were committed as a result of negligence, failure to train, and the policies and customs of the Rumson Board of Education.

**JURISDICTION AND VENUE**

5. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff's cause of action arising under the Constitution of the United States and 42 U.S.C. §§ 1983 and 1985, and the Declaratory Judgment Act 28 U.S.C. §§ 2201 and 2203. This Court has supplemental jurisdiction over Plaintiff's causes of action arising under the New Jersey state law pursuant to 28 U.S.C. § 1367.

6. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b) in that the alleged unlawful practices were committed in Monmouth County, New Jersey while Plaintiff was employed by Defendants.

**PARTIES**

7. Plaintiff, Jessica Brink, ("Brink") is an individual who at all times relevant, resided in Monmouth County, State of New Jersey.

8. Defendant, John Bormann ("Bormann"), is an individual and in his official capacity acts as Superintendent and Chief Administrative Officer employed by the Rumson School District in Monmouth County, New Jersey.

9. Defendant, Maria Montanez ("Nurse Montanez"), is an individual and in her official capacity acted as Certified School Nurse in the Forrestdale School, employed by the Rumson School District in Monmouth County, New Jersey.

10. Defendant, Board of Education of Rumson in the County of Monmouth ("Rumson BOE"), is a Board of Education in the Rumson School District (RSD), created pursuant to New Jersey law.

**STATEMENT OF FACTS**

11. In September 2020 Plaintiff Brink was recruited by Defendant Bormann for a position as School Nurse Permanent Substitute for the RSD.

12. Defendant Bormann explained that RSD needs "extra hands" on a daily basis during the pandemic and once the pandemic is over, Plaintiff would retain her role as Permanent Substitute in the RSD.

13. Plaintiff Brink and Defendant Bormann entered into a verbal contract in which Plaintiff would provide Substitute School Nurse services on a permanent basis to the Rumson School District, starting September 25, 2020, for a daily rate of $200.00.

14. On October 1, 2020 Plaintiff Brink signed a contract for "School Nurse Permanent Substitute" detailing a start date of "September 25, 2020 to a date to be determined, hired and paid through ESS at a rate of $200/day." Exhibit 1.

15. By signing Plaintiff Brink accepted the appointment and acknowledged that the position did not acquire tenure.

16. Plaintiff Brink acknowledged that she would not acquire tenure as a substitute, however Plaintiff understood the position to be permanent in the sense that she could not be terminated without good cause.

17. Plaintiff Brink's contract was retroactively approved by the Rumson BOE at a school board meeting held on October 28, 2020. Exhibit 2.

18. Plaintiff Brink was, for all intents and purposes, an employee of the RSD.

19. Plaintiff Brink reported for work daily Tuesday through Friday to the RSD.

20. Plaintiff Brink received direction and assignment directly from RSD staff, specifically Defendant Bormann, Defendant Nurse Montanez, and Nurse Zajac.

21. Plaintiff Brink's schedule was determined by RSD staff and approved by Defendant Bormann.

22. Plaintiff Brink was issued a RSD Identification Badge, lap top computer with log in credentials, an @rumsonschool.org email address, RSD Parking Permit, and keys to exterior and interior doors of Deane Porter School and Forrestdale School.

23. Plaintiff Brink had her picture taken for the school yearbook.

24. Plaintiff Brink's limited interaction with ESS included the application process, a background check, and payroll functions.

25. Plaintiff Brink worked daily as a supplement to the two (2) existing certified school nurses - Defendant Nurse Montanez and Nurse Zajac.

26. Occasionally, when one certified school nurse was absent, Plaintiff Brink worked with remote supervision from the certified school nurse within the RSD complex.

27. Plaintiff Brink's duties were directed by Defendant Nurse Montanez, Nurse Zajac, and Defendant Bormann.

28. Plaintiff Brink's duties included:

a. Monitoring the "Quarantine Room" each morning.

b. Contacting parents/guardians of children who were confined in the "Quarantine Room" because their COVID Screening Form was incomplete, and asking the parent/guardian to complete the form.

c. Contacting parents/guardians of children to investigate absence, reported illness, travel, sick contacts.

d. Addressing emergent issues for example, lost tooth, sprained ankle, symptomatic illness.

e. Arranging for the pickup of any child who reported COVID-like symptoms, as well as any of their siblings currently in school within the Rumson School District.

f. Communicating with fellow nurses, Defendant Bormann, principals, and secretarial staff, regarding children being excluded from school.

g. Escorting children out of school and into the custody of a parent/guardian and when necessary, explaining the Rumson Schools District's policy on quarantine and testing.

h. Documenting student-related interactions in the student's health record.

29. In the course of daily activities Plaintiff Brink observed clinically questionable and potentially unlawful activity, for example:

a. Untrained or poorly trained non medical personnel incorrectly using non contact thermometers to take students' forehead temperatures immediately after entering the building from outside, in conditions near freezing, resulting in temperature readings of ninety-two (92) degrees Fahrenheit, a dangerously low body temperature and virtually useless for identifying symptoms of infectious illness.

b. Twenty (20) or more middle school students confined to the "Quarantine Room" because their COVID-19 Screening forms were NOT COMPLETE.

c. Students whose COVID-19 Screening forms were NOT COMPLETE confined with students whose forms were NOT PASS (meaning they reported having possible symptoms of COVID-19).

d. Students remaining confined to the "Quarantine Room" for an hour or more because their COVID-19 Screening form was incomplete.

e. Students whose COVID-19 Screening forms were frequently incomplete were singled out and placed on the "Naughty List."

f. Students frequently, publicly reprimanded for not wearing their masks correctly in the hallways, despite having to carry books, backpacks, water bottles, plexiglass dividers, etc.

g. Personally identifiable information of staff, students, and family members entered into a Google Doc "Quarantine Spreadsheet" and shared with multiple staff across two (2) schools.

h. Students and staff compelled to quarantine away from school for fourteen (14) days or more without due process or court order.

i. A requirement that students take a RT-PCR rather than a antigen test before readmission to in-school learning.

j. Students who traveled out of state being disproportionately affected by quarantine.

k. Parents/guardians frustrated, confused, and angry regarding the treatment of their children with no clear path to address their concerns.

l. RSD policies and procedures, in some instances, contrary to official guidance.

30. One day in December Plaintiff Brink, Defendant Nurse Montanez, and Defendant Bormann were gathered together in the Forrestdale Nurse's office.

31. Plaintiff Brink voiced her concerns about these clinically questionable and potentially unlawful actions of the RSD.

32. Defendant Bormann explained that schools can go above and beyond what the state recommends.

33. On December 28, 2020, Defendant Bormann sent Plaintiff Brink an email advising that Defendant Bormann provided Plaintiff Brink's name to the New Jersey Department of Health to get Plaintiff Brink "on the list" to get the COVID-19 vaccine. Exhibit 3.

34. Plaintiff Brink was shocked and dismayed that Defendant Bormann would respond to a medically-based question on behalf of the Plaintiff without her input or consent and without knowing if Plaintiff had a moral, religious, or medical objection to COVID-19 vaccination.

35. Plaintiff Brink responded, stating that she would not be getting the COVID-19 vaccine for personal reasons and offered, in her personal capacity as a Patient Advocate, to share her reasoning with Defendant Bormann so that he could be fully informed on all aspects of this new vaccine. Exhibit 3.

36. Defendant Bormann responded that he was in no position to have an opinion on the matter and that he can only provide the opportunities and follow the guidance. Exhibit 3.

37. Plaintiff Brink observed a concerted effort by the RSD to encourage COVID-19 vaccination.

38. Defendant Nurse Montanez shared multiple vaccine-related email messages with the Forrestdale School staff including:

a. Incorrect information stating that the Pfizer-BioNTech vaccine was "approved". Exhibit 4.

i. EMERGENCY USE AUTHORIZATION (EUA) OF THE PFIZER-BIONTECH COVID-19 VACCINE TO PREVENT CORONAVIRUS DISEASE 2019 (COVID-19) states five (5) times that the Pfizer-BioNTech vaccine is "unapproved".

b. A detailed description of Nurse Montanez' experience receiving her first COVID-19 vaccination, including pictures of her Vaccine Card and upper arm with band-aid. Exhibit 5.

39. Defendant Bormann shared weekly vaccine-related email messages with the RSD including:

a. Internet links to COVID-19 vaccine information.

b. Email messages from State government regarding COVID-19 vaccine roll-out.

c. Vaccine-related surveys. Exhibit 6.

d. Email messages to specific staff members expressing his opinion and encouragement for the COVID-19 vaccination. Exhibit 7.

40. On January 7, 2021 Plaintiff Brink sent an email message to Defendant Bormann titled "A resource" to offer herself, in a private capacity as an independent Registered Nurse Patient Advocate, as a resource to the staff regarding the COVID-19 vaccine roll-out. Exhibit 8.

41. Plaintiff Brink felt a strong moral obligation to ensure that her fellow citizens had true informed consent and understanding of the medical terminology in the Emergency Use Authorization documentation.

42. Plaintiff Brink stated in the email message that Plaintiff's "only purpose is to ensure they [the staff] have the information they need, and understand the jargon in the documentation."

43. Plaintiff Brink stated "I will review the CDC/FDA supplies (sic) documents and stick to the facts."

44. Plaintiff Brink's email message in no way referenced any personal grievances.

45. Plaintiff Brink's email message clearly pertained to matters of public concern.

46. Plaintiff Brink's email message and intended speech in no way caused disruption or disharmony within the school, nor did it affect Plaintiff Brink's job responsibilities.

47. On January 8, 2021, Defendant Bormann collaborated with Dr. Carmela Rocchetti, a parent of a Rumson School District student, a doctor at Hackensack Meridian Health

(HMH) and a representative for the "Reopening America" consultant service, to design the "right [vaccine] survey questions …framing… drive(s) health behavior" Exhibit 9.

48. Defendant Bormann also collaborated with Dr. Carmela Rocchetti to plan a vaccination event giving RSD staff preferential access to vaccines provided by Hackensack Meridian Health. Exhibit 9.

49. Plaintiff Brink has reason to believe and does believe that the RSD and Hackensack Meridian Health have a financial interest in vaccinating the RSD staff with the COVID-19 vaccination.

50. On January 8, 2021 Defendant Bormann forwarded Plaintiff Brink's email message titled "A resource" to Defendant Nurse Montanez asking, "In full confidentiality, what do you think about this?" Exhibit 10.

51. Defendant Nurse Montanez responded *inter alia*, "we need to provide staff and parents with the information and let them decide how to proceed with this NEW vaccine. Like it or not working in a school has a political component and you have to be mindful when and how you should share. I feel uncomfortable with having a permanent sub nurse do this as I am not sure what information will be relayed." Exhibit 10.

52. On January 9, 2021 Defendant Bormann responded to Plaintiff Brink's email message "A resource" stating *inter alia* "it would not be appropriate to provide advocacy one way or another. It is our role as a public entity to provide only the factual information available from government institutions we are required to follow…" Exhibit 10.

53. Defendant Bormann and Defendant Nurse Montanez conspired to restrain Plaintiff Brink's protected speech regarding COVID-19 vaccination.

54. Defendant Bormann restrained Plaintiff Brink's protected speech for no rational or legitimate reason.

55. Defendant Bormann and Defendant Nurse Montanez harbored personal animus toward Plaintiff Brink because of her personal choice to refuse the COVID-19 vaccination.

56. On January 12, 2021 Plaintiff Brink was working independently in Forrestdale School when Nurse Zajac at Deane Porter School notified Plaintiff Brink that a child in Deane Porter School was being sent home with a fever.

57. Plaintiff Brink was directed by Nurse Zajac to send the ill child's sibling, who was in attendance at Forrestdale School, home as well.

58. As directed, Plaintiff Brink contacted the Mother of the Forrestdale child and explained that based on RSD policy, this child would also need to be excluded from school.

59. The Mother stated that because of the young age of the symptomatic child, she did not plan to test for COVID-19.

60. Plaintiff Brink explained to the Mother that without testing, the Deane Porter child would be considered COVID positive, and based on Center for Disease Control (CDC) and New Jersey Department of Health (NJDOH) guidelines and a current statewide activity level of HIGH, a voluntary fourteen (14) day self-quarantine was recommended.

61. Midday on January 12, 2020, Plaintiff Brink noticed that Defendant Bormann had entered a ten (10) day quarantine into the "Quarantine Spreadsheet" for the Forrestdale child.

62. Plaintiff Brink sent an email message to Jennifer Gibbons, the Principal of Forrestdale School, expressing Plaintiff's confusion over the discrepancy in the number of days of recommended quarantine. Exhibit 11.

63. Principal Gibbons replied "I had the same question for Dr. B he indicated 10 day." Exhibit 11.

64. The next morning Plaintiff Brink, Defendant Bormann, Principal Gibbons, and Defendant Nurse Montanez were gathered together in the hallway outside the Forrestdale "Quarantine Room."

65. Plaintiff Brink initiated a discussion regarding the question both Plaintiff and Principal Gibbons had regarding the recommended quarantine period for close contacts.

66. After a lengthy discussion, Plaintiff Brink was still unclear regarding the inconsistency and lawfulness of Defendant Bormann's quarantine recommendations.

67. Plaintiff Brink could not identify a clear grievance policy for someone in Plaintiff's position - permanent, non-tenured Professional Staff, without a labor union negotiated agreement.

68. Plaintiff Brink resorted to using Rumson BOE Policy SUPPORT STAFF MEMBERS 4340 GRIEVANCE as a guide to voice her concerns.

69. Shortly after the meeting in the hallway, Plaintiff Brink composed an email message addressed to Defendant Bormann, Principal Gibbons, Defendant Nurse Montanez, Nurse Zajac, and Shari Feeney, Principal of Deane Porter School.

70. In an email message dated January 13, 2021, titled "Requesting some clarity" Plaintiff Brink stated her grievance regarding discrepancies in interpretation and implementation of official guidance and RSD Polices and Protocols. Exhibit 12.

71. Plaintiff Brink's grievance concerned the wellbeing of students, staff, and their families.

72. On January 15, 2021 Plaintiff Brink shared with Defendant Bormann, Defendant Nurse Montanez and Nurse Zajac, a Google Doc titled "COVID Quarantine Decision Tool - Draft - Invitation to edit", which further outlined the unresolved problems concerning the interpretation of RSD Policies and Protocols. Exhibit 13.

73. On January 27, 2021, Plaintiff Brink was advised that Nurse Zajac needed time off and Plaintiff was asked to work independently at Deane Porter School for an undetermined amount of time.

74. Plaintiff Brink agreed to cover for Nurse Zajac, but first wanted to meet with Defendant Bormann because Plaintiff's concerns regarding medical policies and protocols had not been addressed.

75. When Plaintiff Brink mentioned to a colleague that Plaintiff was planning to meet with Defendant Bormann, the colleague warned Plaintiff to be careful as Defendant Bormann does not like to be challenged.

76. Plaintiff Brink and Defendant Bormann met by phone conference on February 1, 2021 at 11:15 am. Exhibit 14.

77. During this meeting, Plaintiff Brink petitioned Defendant Bormann, as Superintendent and Chief Administrative Officer of RSD, to redress the grievances Plaintiff posed in earlier email messages and conversations.

78. Plaintiff Brink's grievances related to matters of public concern that the parents and community were unaware of - the welfare, treatment, and privacy of staff and school children.

79. No parents, guardians, visitors, or members of the community were permitted to enter the Forrestdale or Deane Porter school because of the COVID-19 pandemic.

80. Official guidance from the CDC stated "Regardless of factors above, schools should ensure that their policies follow the recommendations of local public health officials and are consistent with Federal, state, and local laws, including FERPA." Exhibit 15.

81. Official guidance from the CDC warned of potential harms: "**Excluding students from school for longer than what is typically called for in existing school policies** - without considering the student's usual health and without assessing the likelihood the student was exposed to the virus that causes COVID-19 - **risks repeated, long term, and unnecessary student absence and possible unintended harm."** Exhibit 16.

82. Official guidance from the United States Department of Education, Student Privacy Office stated: "This "health and safety emergency" exception to FERPA's general consent requirement is limited in time to the period of the emergency and generally does not allow for a blanket release of PII from student education records." Exhibit 17.

83. Plaintiff Brink asked Defendant Bormann to share the written law, policy, or official guidance that authorizes the Rumson School District to do things like confining children to the "Quarantine Room", accepting only RT-PCR testing, compelling children to quarantine without a court order, inconsistently applying quarantine guidance, storing staff and students' private health information in a shared Google Doc "Quarantine Spreadsheet."

84. Plaintiff Brink asked under what authority does Defendant Bormann make medical decisions, when according to state statute, if a medically licensed person (physician or nurse) is present, the licensed person is responsible for excluding the student.

85. Defendant Bormann stated that everything was shared in email messages or on the RSD website.

86. Defendant Bormann stated that Plaintiff Brink was clearly not comfortable with the expectations of the job and that it would probably be best if she did not continue her role in the RSD.

87. Plaintiff Brink explained that she was completely confident in her skill as a nurse, yet one of the major things Plaintiff Brink needed to do her job effectively and in accordance with a nurse's scope of practice and license, is written, valid, policy and procedure.

88. Plaintiff Brink asked Defendant Bormann if he was terminating her contract with the Rumson BOE.

89. Defendant Bormann responded saying that Plaintiff Brink was free to work for ESS in other districts, but she was no longer welcome in the RSD District, and that he would email ESS about the termination.

90. Plaintiff Brink, in accordance with Rumson BOE POLICY 4140 SUPPORT STAFF MEMBERS TERMINATION, requested that Defendant Bormann send her, in writing, a copy of the email message to ESS so that she could have a written reason for the termination.

91. Defendant Bormann refused to copy Plaintiff Brink on the termination email message, stating that she wasn't an employee.

92. Plaintiff Brink was recruited by Defendant Bormann specifically and only for a permanent position in the RSD.

93. Plaintiff Brink never had any intention or desire to work in other school districts.

94. Plaintiff Brink was foreclosed from working in the RSD as a nurse or otherwise.

95. Plaintiff Brink's termination happened eighteen (18) days after Plaintiff voiced a grievance, and immediately during a discussion of that grievance.

96. Plaintiff Brink's grievance was based on actual examples of inconsistent implementation of Rumson BOE protocols, protocols in conflict with law and official guidance, unequal treatment of children, and personal privacy concerns - issues Plaintiff conscientiously believed to be potential government malfeasance.

97. Defendant Bormann, as Superintendent of the RSD and member of the Rumson BOE, had a duty and obligation to investigate Plaintiff Brink's legitimate concerns.

98. Despite being hired as permanent, with all the attributes of a RSD employee, Plaintiff Brink was provided no written reason or due process prior to termination.

99. Upon ending the meeting, Plaintiff Brink composed a letter to all members of the Rumson BOE, including Defendant Bormann, explaining what just transpired between Plaintiff Brink and Defendant Bormann. Exhibit 18.

100. Plaintiff Brink was extremely upset and emotional.

101. Plaintiff Brink's primary role was to protect the health and welfare of the children and staff of the RSD.

102. Defendant Bormann refused to address Plaintiff Brink's legitimate concerns regarding the clinical soundness and lawful authority of the Rumson BOE policies and procedures.

103. Plaintiff Brink provided her personal email address so members of the Rumson BOE could reach her privately.

104. Plaintiff Brink received no response from any Rumson BOE member.

105. Beginning in April 2021 Plaintiff Brink lodged multiple Open Public Records Act (OPRA) requests with the Business Administrator of the RSD.

106. One such request returned responsive records related to the termination of Plaintiff Brink.

107. In an email message from Defendant Bormann to the Rumson BOE Members dated February 1, 2021 at 9:27 pm, in response to Plaintiff Brink's earlier email message "Termination - Permanent School Nurse Substitute", Defendant Bormann stated *inter alia* "..this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. They have been notified and confirmed as has been done with other subs in the past. Please know that this is the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable. We are currently seeking a sub nurse through HMH." Exhibit 19.

108. Rumson BOE hired a replacement "Substitute School Nurse" four (4) days after Plaintiff Brink's termination. Exhibit 20.

109. In an email from Defendant Bormann, by way of his secretary, to ESS stated that the reason for Plaintiff Brink's termination was "Mrs. Brink was found not to be a good fit in the district." Exhibit 21.

110. Defendant Bormann was deceitful when responding to the Rumson BOE regarding Plaintiff Brink's email message titled "Termination..."

111. Defendant Bormann stated that Plaintiff Brink was 'indicating that she would not follow district protocols."

112. Plaintiff Brink never refused to follow district protocols.

113. Plaintiff Brink continued to follow orders while making every attempt to confirm that district protocols were clinically sound and verifiably lawful.

114. Defendant Bormann was in possession of Plaintiff Brink's grievance for eighteen (18) days and failed to act, respond, or forward the grievance.

115. Defendant Bormann stated that Plaintiff Brink "request[ed] to send anti-vaccination guidance to our staff."

116. Plaintiff Brink provided the exact text she intended to share with the RSD Staff; that text did NOT include any anti-vaccination guidance.

117. Plaintiff Brink's clearly stated intention was to provide CDC and FDA approved documentation, just as Defendant Nurse Montanez and Defendant Bormann had done.

118. Staff of the RSD had a right to read the factual information contained in Plaintiff Brink's protected speech.

119. Defendant Rumson BOE had a duty and obligation to review the legitimate concerns listed in Plaintiff Brink's grievance.

120. Defendant Bormann did not, and could not articulate any truthful, legitimate reason for Plaintiff Brink's termination.

121. Defendant Rumson BOE voted on and approved the contract for Plaintiff Brink as a "Permanent" employee "to a date to be determined."

122. Employees hired directly by the Rumson BOE, tenured and non-tenured, are afforded some form of written reason and basic due process before termination.

123. Plaintiff Brink was afforded no protections despite being a permanent employee hired through a private contractor and functioning exactly like an employee hired directly by the Rumson BOE.

124. Defendant Rumson BOE condoned Defendant Bormann's termination of Plaintiff Brink without input, approval or review of the full board.

125. After termination from the RSD Plaintiff Brink was very distraught over not being able to help the school children and because Plaintiff lost her main source of wages.

126. Plaintiff Brink felt a strong moral conviction to help the school children, so Plaintiff became a pro bono, full-time advocate for school children in New Jersey.

127. Plaintiff Brink experienced high anxiety, disturbed sleep, bouts of helplessness and anger, weight loss, and abdominal pain in the weeks and months after termination from the RSD.

128. Plaintiff Brink suffered mentally, physically and financially from the unconstitutional and negligent actions of Defendant Bormann, Defendant Nurse Montanez, and Defendant Rumson BOE.

129. The staff and students of the RSD also suffered harm because Defendant Bormann and the Defendant BOE deprived Plaintiff Brink of her First Amendment rights to protected speech.

130. During Plaintiff Brink's employment with the RSD from September 25, 2020 to February 1, 2021, Plaintiff never refused to complete an assigned task, nor was Plaintiff counseled or cited for any negative action, statement, or behavior.

131. Defendant Bormann's false claims, stigmatizing and defamatory comments made to the Rumson BOE are now part of the permanent record of the RSD.

132. After Plaintiff Brink's abrupt termination based on false claims, Plaintiff was stigmatized and defamed in the eyes of her colleagues of the RSD, the Rumson BOE, the staff at ESS, and her family and friends.

133. As a direct and proximate results of the acts of Defendants, Plaintiff Brink suffered the following injuries and damages:

a. Violation of Plaintiff's constitutional rights under the First Amendment to the Constitution of the United States:

(1) Abridgment of speech

(2) Denial of ability to petition the government for redress of grievances

(3) Retaliation for protected activities

(4) Adverse employment action

(5) Loss of wages

(6) Mental, physical, and emotional pain

(7) Financial hardship

b. Violation of Plaintiff's constitutional rights under the Fourteenth Amendment to the Constitution of the United States:

(1) Denial of equal protection of the laws

(2) Denial of due process

(3) Deprivation of a property right in continued employment

(4) Deprivation of a liberty right in protection of her good name, reputation, honor, and integrity.

(5) Mental, physical, and emotional pain

(6) Financial hardship

122. The actions of the Defendants violated the following clearly established and well settled federal constitutional rights of the Plaintiff:

a. Freedom of speech

b. Petition for redress of grievances

c. Due process

d. Equal protection and privileges of the laws

123. At all relevant times, Defendant Bormann was acting under color of state law and color of authority as Superintendent and Chief Administrative Officer of the Rumson School District, and as an agent of the State of New Jersey.

124. At all relevant times, Defendant Nurse Montanez was acting under color of state law and color of authority as Certified School Nurse of the Rumson School District, and as an agent of the State of New Jersey.

125. At all relevant times, Defendant Rumson BOE was acting under color of state law and color of authority in it's capacity as legislative body for the Rumson School District, and as an agent of the State of New Jersey.

**COUNT ONE**

**42 U.S.C § 1985 (3) Against Defendant Bormann and Defendant Nurse Montanez - Conspiracy to Interfere with Civil Rights**

126. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 125.

127. Plaintiff Brink alleges that (1) Defendant Bormann conspired with Defendant Nurse Montanez (2) for the purpose of depriving Plaintiff Brink - while acting in Plaintiff's personal capacity, of equal privileges under the First Amendment of the Constitution of the United States; and (3) Defendant Bormann acted in furtherance of the conspiracy by restraining Plaintiff Brink's speech and retaliating against Plaintiff Brink for intended speech by terminating her employment because of *inter alia* "anti-vaccination information"; (4) Plaintiff Brink was injured in her property interest of continued employment, and liberty interest of good reputation, and deprived of her right to free speech as a citizen of the United States.

128. Staff of the RSD were also harmed because they were unable to receive the factual information Plaintiff Brink was seeking to share.

129. Plaintiff Brink alleges that the conspiracy was motivated in bad faith by invidious animus directed at Plaintiff because, in her personal capacity, she opposed the COVID-19 vaccine.

130. The invidious animus initiated in the conspiracy that ultimately resulted in Plaintiff Brink's termination was falsely predicated on Plaintiff's purported political view and "request to send anti-vaccination guidance."

131. Plaintiff Brink's constitutionally protected First Amendment right to speak on matters of public concern was clearly established at the time the conspiracy was initiated.

**COUNT TWO**

**42 U.S.C § 1983 Against Defendant Bormann - First Amendment Restraint**

132. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 131.

133. Plaintiff Brink alleges to have suffered a (1) violation of Plaintiff's First Amendment right to free speech, secured by the Constitution and the laws of the United States (2) when Defendant Bormann, acting under the color of state law, restrained Plaintiff Brink's constitutionally protected speech.

134. RSD staff was deprived of their right to hear/read Plaintiff's speech on matters of public concern.

135. Plaintiff Brink's constitutionally protected First Amendment right to speak on matters of public concern was clearly established at the time her speech was restrained.

136. Defendant Bormann should have known that restraint of First Amendment protected speech is a violation of Plaintiff's constitutionally protected rights.

137. Defendant Bormann should have known that restraining Plaintiff Brink's First Amendment protected speech on issues of public concern was a violation of clearly established law.

**COUNT THREE**

**42 § 1983 Against Defendant Bormann - First Amendment Redress of Grievances**

138. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 137.

139. Plaintiff Brink alleges to have suffered a (1) violation of Plaintiff's First Amendment right to petition the government for redress of grievances, secured by the Constitution and the laws of the United States (2) when Defendant Bormann, acting under color of state law, deprived Plaintiff Brink of an opportunity to have her grievances heard, then retaliated by terminating Plaintiff's employment for impermissible reasons.

140. Plaintiff Brink, in good conscience, documented grievances relating to matters of public concern involving Defendant Bormann's actions and Defendant Rumson BOE's policies and procedures.

141. Defendant Bormann did not address Plaintiff Brink's grievances, nor did he forward them to the full board of the Rumson BOE for consideration.

142. Defendant Bormann should have known that Plaintiff Brink's written and verbal grievances regarding matters of public concern were First Amendment protected speech.

143. Defendant Bormann acted as a final policy maker when deciding not to address or forward Plaintiff Brink's grievances.

144. Plaintiff Brink's constitutionally protected First Amendment right to speak on matters of public concern was clearly established at the time her petition was denied.

145. The full board of the Rumson BOE was deprived of it's opportunity to hear Plaintiff Brink's legitimate grievances regarding the welfare, treatment, and privacy of RSD staff and students.

146. Plaintiff Brink was injured through the deprivation of her First Amendment right to petition the government for redress of grievances.

147. The staff and students of the RSD were injured through deprivation of any benefit or protection they may have received because of Plaintiff Brink's grievances.

**COUNT FOUR**

**42 U.S.C. § 1983 Against Defendant Bormann - First Amendment Retaliation**

148. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 147.

149. Plaintiff Brink (1) engaged in protected speech and petitioned her government on issues relating to matters of public concern - COVID-19 vaccination, the clinical soundness and lawful authority of actions and policies of Defendants, and the unequal treatment and harm of children (2) Defendant Bormann retaliated by terminating Plaintiff Brink's employment, an action that would chill a person of ordinary firmness from continuing to engage in protected speech and/or to petition for grievances (3) Plaintiff Brink's protected speech and petition of grievances on matters of public concern were a substantial and motivating factor in Defendant Bormann's adverse employment action as evidenced by Defendant Bormann's documented reasons for terminating Plaintiff Brink's employment.

150. Plaintiff Brink's First Amendment activity was undertaken out of personal concern as a citizen and nurse advocate, and was based on a matters of intense public significance.

151. Plaintiff Brink's protected activity did not and would not have affected the efficiency of school functions, nor was it disruptive.

152. Portions of Plaintiff Brink's protected activity clearly related to breaches of public trust and potential malfeasance of government.

153. Plaintiff Brink's constitutionally protected First Amendment right to speak on matters of public concern was clearly established at the time her employment was terminated.

154. As a final policy maker, Defendant Bormann terminated Plaintiff Brink's employment for impermissible reasons, in bad faith and without due process in contravention to the First and Fourteenth Amendments of the Constitution of the United States, Article I §§ 6,18 of the New Jersey State Constitution, N.J.S.A. 18A:27-4.1, N.J.S.A. 34:19-1, Rumson BOE Policy 4140 SUPPORT STAFF MEMBERS TERMINATION, Rumson BOE Policy 4381 SUPPORT STAFF MEMBERS PROTECTION AGAINST RETALIATION.

155. Defendant Bormann maliciously and invidiously defamed Plaintiff Brink and made false stigmatizing statements when attempting to explain the adverse employment action taken against Plaintiff Brink.

156. Defendant Bormann should have known that retaliating against Plaintiff Brink for exercising her First Amendment right to protected speech on matters of public concern was a violation of clearly established law and a violation of her constitutionally protected rights, state statues, and Rumson BOE's policy against retaliation.

157. Defendant Bormann is inadequately trained on constitutionally protected rights, state statutes and Rumson BOE Policy.

## COUNT FIVE

## 42 U.S.C. § 1983 Against Defendant Bormann - Fourteenth Amendment Equal Protection

158. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 157.

159. Defendant Bormann restrained Plaintiff Brink's protected speech, as a citizen and patient advocate, regarding COVID-19 vaccination and in doing so (1) treated Plaintiff Brink differently than Nurse Montanez, a similarly situated nurse (2) Defendant Bormann did so intentionally because he did not agree with Plaintiff Brink's personal viewpoint on COVID-19 vaccination (3) there was no rational basis for the difference in treatment, as both Plaintiff Brink and Nurse Montanez were licensed medical professionals sharing COVID-19 vaccine information from governmental sources.

160. Defendant Bormann demonstrated his disapproval and animus toward Plaintiff Brink's viewpoint by falsely claiming that Plaintiff "request(ed) to send anti-vaccination guidance to our staff."

161. Defendant Bormann's disapproval was further motivated by Defendant Nurse Montanez' statements regarding the "political component" of working in a school and questioning the "what information will be shared" by Plaintiff Brink.

162. Defendant Bormann and Defendant Nurse Montanez did not agree with Plaintiff Brink's personal viewpoint of the COVID-19 vaccine, and harbored personal animus because Plaintiff Brink was conscientiously challenging Defendant Bormann's actions and the protocols of the Rumson BOE.

163. Defendant Bormann permitted Nurse Montanez, a similarly situated staff member to exercise her First Amendment right regarding matters of public concern, specifically supporting the COVID-19 vaccination.

164. Defendant Bormann used Plaintiff Brink's protected speech as a pretext for terminating Plaintiff's employment.

165. Plaintiff Brink was injured in that she was discriminated against and not offered equal privileges of the laws resulting in deprivation of her First Amendment right to protected speech on matters of public concern.

**COUNT SIX**

**42 U.S.C. § 1983 Against Defendant Rumson BOE - Fourteenth Amendment Due Process, Liberty Interest**

166. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 165.

167. Plaintiff Brink (1) was deprived by the Rumson BOE of an individual liberty interest in her good name, reputation, honor, and integrity when Defendant Rumson BOE condoned Defendant Bormann's termination of Plaintiff Brink for impermissible reasons (2) the Defendant Rumson BOE offered no procedure to provide name clearing or due process to a permanent employee in Plaintiff Brink's position.

168. Defendant Rumson BOE should have known that the remarks falsely made by Defendant Bormann as a pretext to terminate Plaintiff Brink, were stigmatizing and defamatory.

169. Defendant Rumson BOE should have known that Plaintiff Brink has a legitimate liberty interest in her good name, reputation, honor, and integrity that is protected by the Fourteenth Amendment.

170. Defendant Rumson BOE did not afford Plaintiff Brink any opportunity to dispute the false claims made by Defendant Bormann or to clear her good name.

171. Plaintiff Brink suffered injury to her good name, reputation, honor, and integrity when Defendant Bormann publicly made false, stigmatizing, and defamatory statements as a pretext for termination.

## COUNT SEVEN

## 42 U.S.C. § 1983 Against Defendant Rumson BOE - Fourteenth Amendment Due Process, Property Interest

172. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 171.

173. Plaintiff Brink (1) was deprived by the Rumson BOE of an individual property interest in employment when Defendant Rumson BOE condoned Defendant Bormann's termination of Plaintiff Brink for impermissible reasons (2) the Defendant Rumson BOE offered no procedure to provide due process to a permanent employee in Plaintiff Brink's position.

174. Defendant Rumson BOE should have known that based on constitutional protections, State statutes, Rumson BOE policy and the contractual agreement entered into by both parties, Plaintiff Brink could not have been terminated for arbitrary and capricious reasons and was therefore denied due process.

175. Defendant Rumson BOE should have known that Plaintiff Brink had a legitimate property interest in continued employment.

176. Plaintiff Brink suffered injury to her property interest in that both verbal and written employment contracts indicated that she was a permanent employee of the Rumson School District and had a legitimate expectation of continued employment barring good cause for termination.

## COUNT EIGHT

### 42 U.S.C. § 1983 Against Defendant Rumson BOE - *Monell* Liability

177. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 176.

178. Defendant Bormann, acting as a final policy maker for Defendant Rumson BOE (1) executed policies or customs of Defendant Rumson BOE that resulted in a pattern of constitutional violations. First and Fourteenth Amendment rights of Plaintiff Brink, RSD staff and students were clearly established at the time of the incidents. (2) Defendant Bormann's pattern of conduct and refusal to address Plaintiff's concerns, show unconstitutional polices and customs, as well as a failure to train, to be substantial and moving forces behind Plaintiff's injuries.

179. Defendant Bormann, acting as a final policy maker for Defendant Rumson BOE (1) executed a policy or custom of Defendant Rumson BOE that resulted in the retaliatory termination of Plaintiff Brink's employment. (2) Defendant Bormann stated "we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. They have been notified and confirmed as has been done with other subs in the past." This policy or custom was a substantial and moving force behind Plaintiff's injuries.

180. Defendant Rumson BOE failed to act affirmatively at all, though they should have known that Defendant Bormann's final action in terminating Plaintiff Brink was likely to result in the violation of constitutional rights.

181. It is the custom or policy of Defendant Rumson BOE to approve contracts for 'permanent' substitute employment, then permit employees to work on a daily basis, not in the capacity of a substitute.

182. For all intents and purposes, Plaintiff Brink was an employee of the Rumson School District and Defendant Rumson BOE should have known that Plaintiff could not be terminated for unconstitutional reasons, nor be deprived of due process.

183. It is the custom or policy of Defendant Rumson BOE to hire permanent employees through ESS, use them in a daily capacity, allow them to function as employees, and deny them the benefits that are afforded to employees hired directly by the Rumson BOE.

184. It is the custom or policy of Defendant Rumson BOE to dismiss/terminate permanent employees without a written reason or due process.

185. Policies and customs of the Rumson BOE resulted in deprivation of Plaintiff Brink's constitutionally protected First and Fourteenth Amendment rights.

186. Defendant Rumson BOE permitted Defendant Bormann, a non-medical professional to make medical decisions, despite having professional, licensed medical staff on site, in contravention to N.J.S.A. 18A:40-7 and N.J.S.A. 18A:40-8.

187. Defendant Rumson BOE gave Defendant Bormann unbridled discretion with seemingly no oversight or safeguards when implementing and enforcing policies and protocols related to public health.

188. Defendant Rumson BOE devised and implemented policies and procedures that resulted in unequal treatment and harm to the children of the RSD.

189. Defendant Rumson BOE devised and implemented policies and procedures that authorized RSD staff to confine children against there will to the "Quarantine Room" for arbitrary and capricious reasons.

190. Defendant Rumson BOE devised and implemented polices and procedures that authorized RSD staff to gather and maintain personally identifiable health-related information in a shared Google Doc spreadsheet.

191. Defendant Rumson BOE devised and implemented policies and procedures that authorized RSD staff to require specific medical interventions (RT-PCR tests) as a condition of in-school learning.

192. Defendant Rumson BOE devised and implemented policies and procedures that authorized RSD staff to compel a significant number of students to quarantine from school for significant periods of time without consent or court order.

193. Defendant Rumson BOE devised and implemented policies, procedures, and customs that exhibit deliberate indifference to the constitutional rights of Plaintiff Brink, RSD staff and students which caused the violation of Plaintiff's rights and the rights of RSD students, specifically First and Fourteenth Amendment rights.

194. The training polices of Rumson BOE were not adequate to prevent violations by its members of constitutional rights, including Plaintiff Brink's First Amendment rights and the Fourteenth Amendment rights of Plaintiff Brink and RSD students.

**COUNT NINE**

**Breach of Contract - Against Defendant Rumson BOE**

195. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 194.

196. Plaintiff Brink alleges (1) Plaintiff entered into a contract for permanent employment with the Rumson School District starting September 25, 2020 to a date "to be determined", approved retroactively by Defendant Rumson BOE on October 28, 2020 (2) Defendant Rumson BOE breached that contract by terminating Plaintiff Brink's employment in bad faith, for unconstitutional reasons and without due process (3) Plaintiff Brink suffered mental, physical, emotional, and financial damages therefrom; (4) Plaintiff Brink performed all of her contractual obligations and was not once reprimanded for poor performance.

**COUNT TEN**

**Negligent Infliction of Emotional Distress - Defendant Bormann**

197. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 196.

198. Plaintiff Brink alleges that Defendant Bormann caused severe emotional distress to Plaintiff Brink when Defendant (1) acted deliberately to conspire with Nurse Montanez to deprive Plaintiff of protected speech because Defendant Bormann and Nurse Montanez did not agree with Plaintiff's personal viewpoint, Defendant Bormann acted outrageously when he ignored Plaintiff's good faith, legitimate concerns about the health and wellbeing of the children in the RSD, Defendant Bormann acted maliciously and intentionally when he retaliated against Plaintiff Brink for conscientiously and respectfully challenging his medical authority, Defendant Bormann acted maliciously and

deceitfully when he made false statements as pretext for the impermissible termination of Plaintiff Brink (2) Defendant Bormann's many outrageous actions were the proximate cause of Plaintiff Brink's (3) severe distress including high anxiety, disturbed sleep, bouts of helplessness and anger, weight loss, and abdominal pain caused by the deprivation of rights, loss of wages, and loss of time and financial resources spent to vindicate the rights of school children and the rights of Plaintiff Brink.

199. Plaintiff Brink suffered significant emotional distress knowing that Plaintiff's attempts to advocate for the students and staff of the RSD were silenced and ignored.

200. Defendant Bormann should have known that treating Plaintiff Brink differently for no legitimate reason, refusing to address Plaintiff's sincere grievances, making stigmatizing, defamatory statements in conjunction with a retaliatory termination of employment, and the resulting loss of wages, would cause the Plaintiff severe emotional distress.

## COUNT ELEVEN

### Gross Negligence - Against Defendant Bormann

201. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 200.

202. Plaintiff Brink alleges that Defendant Bormann was grossly negligent in his duties as Superintendent and Chief Administrative Officer of the Rumson School District.

203. Defendant Bormann failed to address Plaintiff Brink's factually supported concerns and relevant questions regarding the harmful and unequal treatment of school children.

204. Defendant Bormann's actions created unreasonable risk to the children of the RSD and deprived Plaintiff Brink of her constitutionally protected rights.

205. Defendant Bormann was aware of Plaintiff Brink's documented concerns for eighteen (18) days and willfully failed to act.

206. Instead of addressing Plaintiff Brink's legitimate concerns, Plaintiff Bormann terminated Plaintiff Brink's employment, fabricating reasons for his action.

207. Plaintiff Brink's concerns related to the health and welfare of RSD staff and school children, the very people Defendant Bormann is charged with protecting.

208. Defendant Bormann should have known that his actions resulted in harm to children in the RSD.

209. Defendant Bormann should have known that his actions resulted in harm to Plaintiff Brink.

210. Defendant Bormann should have known that policies, protocols and guidelines he implemented exceeded his authority and that of the Rumson BOE.

211. Defendant Bormann should have known that his actions were in contravention to the Constitution of the United States, New Jersey State law and RSD policy.

**COUNT TWELVE**

**Negligence - Against Defendant Rumson BOE**

212. Plaintiff Brink repeats and realleges as if fully set forth herein, the allegations contained in paragraphs numbered 1 through 211.

213. Defendant Rumson BOE failed to exercise the degree of care necessary to protect staff and students of the RSD from violations of clearly established law, including violations of the First and Fourteenth Amendments.

214. Defendant Rumson BOE devised and implemented policies, protocols, and guidelines in ways that exceed it's power and authority.

215. Rumson BOE failed to appropriately evaluate it's policies and their implementation which resulted in violations of clearly established law, harm and injury, including deprivation of rights and unequal treatment.

216. Rumson BOE should have known that policies, protocols and guidelines were being implemented in ways that exceeded the Board of Education's authority.

217. Rumson BOE should have known that policies, protocols and guidelines were being implemented in ways that injured Plaintiff Brink, staff, and students of the RSD.

**WHEREFORE**, the Plaintiff, Jessica M. Brink, moves this Honorable Court to enter an Order of Final Judgement against Defendants and respectfully moves this Honorable Court to:

a. Declare Defendants' conduct unconstitutional;

b. Declare that Defendants' acts as alleged above, violate First and Fourteenth Amendments to the Constitution of the United States;

c. Grant a permanent injunction enjoining Defendants and all persons in active concert or participation with them from engaging in any conduct deemed unlawful or retaliatory in nature as heretofore described;

d. Declare that Defendant Bormann is not lawfully authorized to exclude students from the school facility absent a properly obtained quarantine order;

e. Order Defendants to adopt and implement policies, training, accountability systems, practices, and safeguards to remedy the constitutional and statutory violations described herein;

f. Order Defendants to adopt and implement a policy that affords students/parents/guardians basic due process before excluding a student from school for an extended period of time;

g. Order Defendants to hire an independent contractor to evaluate the implementation, impact, appropriateness, and effectiveness of procedures enacted during the COVID-19 Pandemic;

h. Order Defendants to pay compensatory damages for all economic losses and expenses incurred by the Plaintiff as a result of the Defendants' misconduct;

i. Order Defendants to pay general damages for all physical pain, mental suffering, and emotional distress suffered by the Plaintiff;

j. Order Defendants to pay punitive damages to the fullest extent permitted by law;

k. Order Defendants to pay pre-judgement and post-judgement interest;

l. Order Defendants to pay costs incurred in this action and reasonable attorney fees under 42 U.S.C. § 1988, and any other provision of law;

m. Grant such other further specific and general relief as may become apparent from discovery as this matter matures for trial.

**JURY TRIAL DEMAND**

**Plaintiff demands a jury trial, pursuant to the Seventh Amendment of the Constitution of the United States, as to all claims for damages.**

Dated this 26th day of January, 2023

Respectfully submitted,

*Pro se*
8 Gordon Court
Port Monmouth, NJ 07758
(732) 492-4690
jessb11@me.com

## VERIFICATION

STATE OF ALABAMA

COUNTY OF DEKALB

BEFORE ME personally appeared Jessica M. Brink who, being by me first duly sworn and identified in accordance with Alabama law, deposes and says:

1. My name is Jessica M. Brink, Plaintiff herein.
2. I have read and understood the attached foregoing complaint, and each fact alleged therein is true and correct of my own personal knowledge.

FURTHER THE AFFIANT SAYETH NAUGHT.

[signature]

Jessica M. Brink, Affiant

SWORN TO and subscribed before me this 26th day of January, 2023.

[signature]

NOTARY PUBLIC

My Commission expires: My Commission Expires March 15, 2023

SHARON B. HALE NOTARY PUBLIC ALABAMA STATE AT LARGE

# EXHIBIT 1

RUMSON SCHOOL DISTRICT

BOARD OF EDUCATION OF THE BOROUGH OF RUMSON

60 Forrest Avenue, Rumson NJ 07760 732.842.0354/Fax 732.842.4877

*Office of the Superintendent*
John E. Bormann Ed. D.

September 25, 2020

Jessica Brink
8 Gordon Court
Port Monmuth, NJ 07758

Dear Jessica,

It is the intention of the Rumson Board of Education to retroactively approve your appointment as a School Nurse Permanent Substitute in the Rumson School District beginning on September 25, 2020 to a date to be determined, hired and paid through ESS at the rate of $200/day.

This letter serves as notification, as per N.J.S.A. 18A:16-1.1, that you have been contracted as a School Nurse Permanent Substitute and the time served in this position does not contribute toward acquiring tenure. Please sign and return one copy of this letter to the Superintendent's office.

Sincerely,

*John E. Bormann*

Dr. John E. Bormann, Ed.D
Superintendent of Schools

JEB/dgm

---

**ACCEPTANCE OF APPOINTMENT**

I have read this notice and understand time served in this temporary position will not contribute to acquiring tenure.

[signature] 10/1/2020

Signature Date

# EXHIBIT 2

12. Personnel Committee

- **Report of Meeting**
- **The Board approved the following consent agenda items (a-h), upon the recommendation of the Superintendent:**

**Moved: Dr. Connors Seconded: Mrs. Markiewicz**

**Roll Call Vote: AYES: 9**

a. **Resignations**

1. **Bus Aide**

Retroactively approved accepting the resignation of **Nancy McBurnie,** Bus Aide effective October 16, 2020.

2. **Girl's Basketball Coach**

Approved accepting the resignation of **Mary Beth Coleman**, Girls Basketball Coach at Forrestdale School, effective immediately.

3. **P/T Receptionist**

Approved accepting the resignation of **Jennifer Halcrow,** PT Receptionist at Deane-Porter School, effective October 30, 2020.

b. **Medical Leave Request**

Retroactively approved the medical leave request from **Corine Brennan** to begin on October 9, 2020 to a date to be determined.

c. **Unpaid Administrative Leave**

Retroactively approved **Maria Laspis**, Cafeteria Aide, to be placed on unpaid Administrative Leave, as related to the COVID-19 Pandemic, to begin on 10/21/2020 until further Board action is taken.

d. **Appointments**

1. **School Nurse Permanent Substitute**

Approved the retroactive appointment of **Jessica Brink**, School Nurse Permanent Substitute, hired and paid through ESS at the rate of $200/day beginning on September 25, 2020 to a date to be determined.

2. **P/T Kdg ICR Virtual Teacher**

Approved the retroactive appointment of **Gabrielle Williams**, P/T Kdg ICR Virtual Teacher, at Step M-5 (FTE .66) at a prorated salary of $38,339, per the Rumson Education Association Collective Bargaining Agreement, beginning on October 5, 2020 to a date to be determined, through the Emergent Hire process, pending Criminal History, Pre-employment medical, and Child Protective Measures approvals.

3. **Permanent Half-Day A.M. Substitute**

Retroactively approved hiring **Maria Laspis**, as a permanent half-day a.m. substitute for the district, hired and paid $75/day through ESS beginning on 10/21/2020 to a date to be determined.

4. **P/T A.M. Receptionist Leave Replacement**

Approved the appointment of **Geni DeRusso** as the P/T A.M. Receiptionist Leave Replacement for Debra Harwood, hired and paid $55/day through ESS beginning on 11/09/2020 to a date to be determined.

5. **Grade 2 ICR Vitrtual Substitute**

To approve the appointment of **Sandra Sandoli** as the Grade 2 ICR Virtual Substitute Teacher, hired and paid through ESS at the rate of $150/day for the first 20 days, and $200/day thereafter, beginning on November 9, 2020 to a date to be determined.

e. **Superintendent's Merit Goals**

Approved the 20-21 Merit Goals for the **Dr. John E. Bormann**, Superintendent by the following resolution: "BE IT RESOLVED, that the Rumson Board of Education approves the merit goals for Dr. John E. Bormann, Superintendent, as per receipt of the letter of approval from Dr. Lester W.Richens, Interim Executive County Superintendent."

# EXHIBIT 3

<alewert@unionbeachschools.org>, Union Beach - Loretta Sobin <lsobin@unionbeachschools.org>, Upper Freehold - Karen Farrell <farrelk@ufrsd.net>, Upper Freehold - Mark Guterl <guterlm@ufrsd.net>, "Wall - Dr. Tracy Handerhan" <thanderhan@wall.k12.nj.us>, Wall - Kim Keator <kkeator@wall.k12.nj.us>, "West Long Branch - Dr. Frank Alfano" <falfano@wlbschools.com>, West Long Branch - Susan Grimm <sgrimm@wlbschools.com>
Cc: "Bleisnick, Deborah" <Deborah.Bleisnick@doe.nj.gov>, "Richens, Lester W." <Lester.Richens@doe.nj.gov>, "Merkel, Christopher" <Christopher.Merkel@co.monmouth.nj.us>

Good Morning:

Please see the email below from Chris Merkel. School nurses are in the first group to receive the covid vaccine. Please send the requested information to Kate Andrews at the MC Health Department.

Les

**From:** Merkel, Christopher <Christopher.Merkel@co.monmouth.nj.us>
**Sent:** Saturday, December 26, 2020 3:37 PM
**To:** Richens, Lester W. <Lester.Richens@doe.nj.gov>
**Cc:** Andrews, Kate <Kate.Andrews@co.monmouth.nj.us>; Krautle, Jeryl <Jeryl.Krautle@co.monmouth.nj.us>; Margy Jahn <mjahn@twp.freehold.nj.us>; David A. Henry <dhenry@mcrhc.org>; Sidney Johnson <sjohnson@longbranch.org>; Keith Levine (klevine@mtnj.org) <klevine@mtnj.org>; tfrank@coltsneck.org; Debenedetto, Richard <rdebened@middletownnj.org>
**Subject:** [EXTERNAL] Covid Vaccine

| *** CAUTION *** |
| --- |
| This message came from an **EXTERNAL** address (Christopher.Merkel@co.monmouth.nj.us). **DO NOT** click on links or attachments unless you know the sender and the content is safe. **Suspicious?** Forward the message to spamreport@cyber.nj.gov. |

Les,

As we progress through the vaccine planning process, the health dept. is evaluating groups who are identified in the first group to receive covid19 vaccinations. School nurses are a group identified to receive the vaccine in the first group.

Therefore we are asking all superintendents to provide the following information -

Number of school nurses in your school district

Number of school nurses in your district who want to take the covid19 vaccine

Specific names and contact information for those school nurses who want the vaccine

Please send that information directly to Kate Andrews from the health dept.
- Kate.andrews@co.monmouth.nj.us

Please visit the Monmouth County Health Dept website for updated information on the covid vaccine - www.visitmonmouth.com/health

## Health Department Home

www.visitmonmouth.com

Monmouth County Government

Regards

Chris

NOTICE OF CONFIDENTIALITY This message, including any prior messages and attachments, may contain advisory, consultative and/or deliberative material, confidential information or privileged communications of the County of Monmouth. Access to this message by anyone other than the sender and the intended recipient(s) is unauthorized. If you are not the intended recipient of this message, any disclosure, copying, distribution or action taken or not taken in reliance on it, without the expressed written consent of the County, is prohibited. If you have received this message in error, you should not save, scan, transmit, print, use or disseminate this message or any information contained in this message in any way and you should promptly delete or destroy this message and all copies of it. Please notify the sender by return e-mail if you have received this message in error.

CONFIDENTIALITY NOTICE: The information contained in this communication from the New Jersey Department of Education is privileged and confidential and is intended for the sole use of the persons or entities who are the addressees. If you are not an intended recipient of this email, the dissemination, distribution, copying or use of the information it contains is strictly prohibited. If you have received this communication in error, please immediately contact the New Jersey Department of Education at (609) 376-3500 to arrange for the return of this information.

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Dec 28, 2020 at 11:03 AM
To: [redacted], [redacted] Jessica Brink <jbrink@rumsonschool.org>

I sent you names and contact information in to get you on the list in the event that you will be getting the vaccine.
[Quoted text hidden]

--

**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

[redacted] Mon, Dec 28, 2020 at 11:10 AM
To: John Bormann <jbormann@rumsonschool.org>
Cc: Jessica Brink <jbrink@rumsonschool.org>, Maria Montanez <mmontanez@rumsonschool.org>

Great , thank you !
[Quoted text hidden]

---

**Jessica Brink** <jbrink@rumsonschool.org> Mon, Dec 28, 2020 at 1:47 PM
To: John Bormann <jbormann@rumsonschool.org>
Cc: [redacted], [redacted]

Thanks, Dr. Bormann. I appreciate the gesture, however I will not be getting the vaccine. The patient advocate in me is compelled to share my reasons with you - take what you want and leave the rest, but I wouldn't be true to my oath if I didn't share.

First, I am not a crazy anti-vaxxer. I've taken more vaccines than most because of my military service. I've also given a number of vaccines while working in pediatrics.

I've spent 30 plus hours investigating Covid-19 vaccines, in particular, and I can adamantly say that I cannot recommend them at this time. The information presented in the media is incomplete and one-sided. As the idiom says 'the devil is in the details' and I've been knee deep in the details for days.

I'd be happy to share a balanced presentation of the details with anyone wishing to know. You can email or call any time. And you have my word that any discussions will remain completely confidential.

Be well,

Jessica
Jessb11@me.com
732 492 4690

Sent from my iPhone

On Dec 28, 2020, at 11:03, John Bormann <jbormann@rumsonschool.org> wrote:

[Quoted text hidden]

**John Bormann** <jbormann@rumsonschool.org> Mon, Dec 28, 2020 at 3:33 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Not a problem Jessica. I just wanted to offer you the same opportunity as all our nurses. At this time I do not forsee any associated requirements related to the vaccine.

As a school leader I am in no position to have an opinion on the matter of whether one should or should not have a vaccine. I can only provide the opportunities and follow the guidance expected of schools.

Respectfully,
Dr. Bormann
[Quoted text hidden]

---

[redacted] Mon, Dec 28, 2020 at 4:17 PM
To: John Bormann <jbormann@rumsonschool.org>

Thanks, I started to research sites to receive the vaccine. This helps that process. I hope you are able to rest a little.

On Mon, Dec 28, 2020 at 11:03 AM John Bormann <jbormann@rumsonschool.org> wrote:
[Quoted text hidden]
--
*Igniting, Maintaining, and Promoting Health*
[redacted]

---

**Jessica Brink** <jbrink@rumsonschool.org> Mon, Dec 28, 2020 at 4:50 PM
To: John Bormann <jbormann@rumsonschool.org>

Thanks for your reply. I appreciate your objective approach and I respect your role as a school leader. I haven't said it to you directly, but I think it often - trying to balance the needs of everyone - staff, students, parents, district, DOH is a huge task, and you manage to do it with poise and professionalism. Not an easy feat!

I hope you're able to find some rest in these days off. I know we'd both rather be traveling!

Best,
Jessica

Sent from my iPhone

> On Dec 28, 2020, at 15:34, John Bormann <jbormann@rumsonschool.org> wrote:
>
> [Quoted text hidden]

# EXHIBIT 4

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Covid 19 vaccine information

3 messages

**Maria Montanez** <mmontanez@rumsonschool.org> Thu, Dec 17, 2020 at 2:00 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org> [redacted]

Learn the facts from reliable sources as we move toward the next phase of the pandemic.

One vaccine has been approved: the Pfizer BioNtech covid 19 vaccine . Additional vaccines are in the process. Moderna may be approved as early as today.

I am including some reliable sources on the approved vaccine. Educate yourself and stay informed.

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits/facts.html

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/pdfs/321466-A_FS_What_Expect_COVID-19_Vax_Final_12.13.20.pdf

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/different-vaccines.html

Vaccinations will be phased in over the next few months. The initial focus will be to administer the vaccine to health care personnel, followed by essential workers, individuals with high risk medical conditions and those 65 years of age and older.

Remember wearing a mask, social distancing, staying home if you are sick or if a family member is sick or getting tested is necessary to keep our school and your family safe until most are vaccinated.

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---

**Maria Montanez** <mmontanez@rumsonschool.org> Thu, Dec 17, 2020 at 3:18 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org>, [redacted]

Link access corrected.

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---------- Forwarded message ---------
From: **Maria Montanez** <mmontanez@rumsonschool.org>
Date: Thu, Dec 17, 2020 at 3:14 PM
Subject: Re: Covid 19 vaccine information
To: Maria Montanez <mmontanez@rumsonschool.org>

For access to the links see below

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/vaccine-benefits/facts.html

https://www.cdc.gov/coronavirus/2019-ncov/vaccines/pdfs/321466-A_FS_What_Expect_COVID-19_Vax_Final_12.13.20.pdf

# EXHIBIT 5

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Covid Vaccine roll out

4 messages

**Maria Montanez** <mmontanez@rumsonschool.org> Wed, Jan 6, 2021 at 1:43 PM
To: All Forrestdale Staff <AllForrestdaleStaff@rumsonschool.org>, [redacted], John Bormann <jbormann@rumsonschool.org>, [redacted]

I know we all received the plan for the covid vaccination.

Just an FYI

I received the 1st dose today. I had no immediate adverse reactions.

When going, I had an appointment. I had to wait outside to be signed in for my appointment.

Registration included showing ID, insurance card, answering Covid questions, getting a temp check and proving my status as a nurse.

The appt. for my next vaccine was also scheduled. I received a card with my next appt.

Once I was registered I went to the nursing station to have the vaccine administered. After administration I needed to wait 15 minutes to be observed and confirm no adverse reactions such as anaphylaxis.
The vaccination was administered inside but the post vaccination observation was done in a tent.

I know everyone's experience may differ but just some helpful hints. Please be prepared to wait on a line or wait outside. Make sure you are layered in clothing that is appropriate for the weather. Bring your ID, insurance card and some documentation that confirms your status such as a teacher. The registering staff member suggested a pay stub, or another form of ID that confirms your status.


Community Health Center


-19 Vaccinati
keep this record card, which includes
out the vaccines you have received.
Por favor, guarde esta tarjeta de registro, que inclu
médica sobre las vacunas que ha recibido.
Last Name
[redacted]
First Name
[redacted]
Date of birth
Patient number (medical re
Vaccine
Product Name/Manufacturer
Lot Number
Date
Healthca
or Clinic Sit
1st Dose COVID-19
Moderna
[redacted]
01/06/21
mm dd yy
VNA
2nd Dose COVID-19
2/3/21
mm dd yy
Other
mm dd yy
mm dd yy



Good luck to all and hoping for a HAPPIER NEW YEAR!!

PS Within 30 minutes I received a call from the department of health to ask if I wanted to get the vaccine. My sense is once it gets rolling more sites and locations will be available to all those that wish to receive the vaccine.

Until then keep using your mask, keep your distance and let us know if you are feeling ill or if you have come in contact with someone who is ill or has been exposed.

Stay safe, stay healthy my school family.

Maria

--

***Igniting, Maintaining, and Promoting Health***
***Maria Montanez, RN MSN***
***SCHOOL NURSE***

---

**John Bormann** <jbormann@rumsonschool.org>
To: Maria Montanez <mmontanez@rumsonschool.org>

Wed, Jan 6, 2021 at 1:45 PM

Sounds good but got notified that healthy educators will not be until late spring, if then! Uggh!

[Quoted text hidden]

--

**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**

# EXHIBIT 6

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

## Rumson Staff Member Vaccine Survey

8 messages

**jbormann@rumsonschool.org** <jbormann@rumsonschool.org> Sat, Jan 30, 2021 at 10:32 AM
Reply-To: jbormann@rumsonschool.org
To: AllDistrictStaff@rumsonschool.org

Google Forms

**Having trouble viewing or submitting this form?**

**FILL OUT IN GOOGLE FORMS**

I've invited you to fill out a form:

Rumson Staff Member Vaccine Survey

WE NEED THIS SURVEY DATA BY SUNDAY EVENING , 1/31/21 - Our School district is attempting to partner with a vaccination site to expedite your access to the COVID-19 vaccine. This process may be available to us quickly. As of this moment, the vaccination site can only administer the vaccine to those individuals currently eligible according to the State's current "Individuals at High Risk (Phase1B)". Our goal is to facilitate the vaccination of all staff who meet this criteria as quickly as possible. We will utilize this same process for all remaining staff as soon as the Governor announces that remaining school staff may proceed.

Please know all information is confidential and will be seen by the Superintendent only. Eligibility numbers only will be given to other individuals.

**Last Name ***

**First Name ***

**What is your position? ***

- ○ Certificated Teaching Staff & Related Service Providers
- ○ Paraprofessional or Instructional Aide
- ○ Custodian or Maintenance
- ○ Secretarial or administration

To: AllDistrictStaff@rumsonschool.org

**Google Forms**

**Having trouble viewing or submitting this form?**

**FILL OUT IN GOOGLE FORMS**

Thanks to those who have completed. Please talk this up with colleagues to ensure they fill out the form as well! If everyone texts a colleagues I can get the info needed to move this forward.

Thanks!
Dr. B

Rumson Staff Member Vaccine Survey

WE NEED THIS SURVEY DATA BY SUNDAY EVENING , 1/31/21 - Our School district is attempting to partner with a vaccination site to expedite your access to the COVID-19 vaccine. This process may be available to us quickly. As of this moment, the vaccination site can only administer the vaccine to those individuals currently eligible according to the State's current "Individuals at High Risk (Phase1B)". Our goal is to facilitate the vaccination of all staff who meet this criteria as quickly as possible. We will utilize this same process for all remaining staff as soon as the Governor announces that remaining school staff may proceed.

Please know all information is confidential and will be seen by the Superintendent only. Eligibility numbers only will be given to other individuals.

**Last Name ***

**First Name ***

**What is your position? ***

- ◯ Certificated Teaching Staff & Related Service Providers
- ◯ Paraprofessional or Instructional Aide
- ◯ Custodian or Maintenance
- ◯ Secretarial or administration
- ◯ Other:

**What is the grade level you primarily work with? ***

- ◯ Pre-k

# EXHIBIT 7

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

[redacted] Fri, Jan 15, 2021 at 2:32 PM
To: John Bormann <jbormann@rumsonschool.org> [redacted]

How did you know I was pregnant? I haven't told anyone yet! 😉
[Quoted text hidden]
--
[redacted]
Sent from Gmail Mobile

---

John Bormann <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 2:34 PM
[redacted]

LOL! Let's start smoking so we can get the vaccine!
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 2:35 PM
To: John Bormann <jbormann@rumsonschool.org>

That was going to be my next suggestion- kind of feeling like that's a little questionable- right?
[Quoted text hidden]
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 2:39 PM
To: John Bormann <jbormann@rumsonschool.org>

Thank you. I'm trying for an appointment asap. Decided to use my EMT status after all.
I love that you included their ***cautions*** about the talking points.
I presume there will be a mandate in the future haha.

[redacted]

[Quoted text hidden]

---

John Bormann <jbormann@rumsonschool.org> Fri, Jan 15, 2021 at 2:42 PM
[redacted]

Good! You are more important than a smoker!
[Quoted text hidden]

---

[redacted] Fri, Jan 15, 2021 at 3:38 PM
To: John Bormann <jbormann@rumsonschool.org>

thank you for the updates...looking forward to seeing 'teachers' on this list

[redacted]

Forrestdale School

# EXHIBIT 8

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# A resource

7 messages

**Jessica Brink** <jbrink@rumsonschool.org> Thu, Jan 7, 2021 at 4:38 PM
To: John Bormann <jbormann@rumsonschool.org>

Hi Dr. Bormann,

I know I'm new in the district and technically not an employee of Rumson, but I feel tied to the team for many reasons. You know my stance on the Covid vaccine and while it may not be the popular stance, it is based in facts of the research, in which I have invested days.

As such, I want to offer myself as a resource for the staff regarding the roll out. I'm a Nurse Patient Advocate first and foremost. My goal is to ensure that everyone has as complete an informed consent as possible. I have no reason to deter people from getting the vaccine. My only purpose is to ensure they have the information they need and understand the jargon in the documentation. I will review the CDC/FDA supplies documents and stick to the facts. I will email Maria and Krisanne ahead of time explaining what I've told you here.

Do I have your permission to email the staff and offer myself as a resource? Below is a draft of what I was planning to write.

Hi All,

I'd like to offer myself as a resource regarding any questions you may have about the Covid vaccine. As a Nurse Patient Advocate I believe informed consent is the most important step in making any medical decision. I have invested a significant amount of time researching vaccines and would welcome questions. I will review the fact sheet an emergency use authorization and make my best effort to answer any questions or connect you with resources.

Email me at jessb11@me.com and we can arrange a time to talk.

All my best,

Jessica Brink

Sent from my iPhone

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 8, 2021 at 2:46 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Jess,
Let me think about the optics of this and I will reach out! Thank you!

Dr. B
[Quoted text hidden]

--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

# EXHIBIT 9

| | | | | | | |
|---|---|---|---|---|---|---|
| 10 | 1.4 | 0.1-10.6 | 0.3 | 0.0-2.4 | 1.1 | 0.1-9.5 |
| 14 | 0.1 | 0.0-3.0 | 0.0 | 0.0-1.2 | 0.1 | 0.0-2.9 |

And this covers the statistics and epidemiology portion of your medical school lesson for this weekend (hopefully!)

On Jan 8, 2021, at 4:40 PM, John Bormann <jbormann@rumsonschool.org> wrote:

**CAUTION:** This email originated from outside the organization. **DO NOT CLICK ON LINKS** or **OPEN ATTACHMENTS** unless you know and trust the sender.

---

Thanks and will do. Once the go ahead is put forward by the state, let's connect and come up with a plan. Once you ha e a survey I will share. As a point of reference I know about 75% of staff has shared that they signed up to get in line for the vaccine using the state link! I would be happy to be first in line as a model to our staff!

..and my pen is ready for my class on vaccines! Lol!

John

On another note...what are your thoughts on this one...

Teacher received her PCR results and is negative, as is her entire family. The person that they were in contact with on 12/31 seems to have had a false positive . He is tested for work every shift- had a negative PCR test 12/28- received results on 12/31 the day they were in contact. Had another test 12/30 at work - that one came back positive 1/3. He retested the same day as the teacher's family on 1/5, and was negative . As was the rest of his family and teacher's.

As of now, she is scheduled to return in person on 1/15- if can she come back this Monday instead?

Thank you!

On Fri, Jan 8, 2021, 3:44 PM Rocchetti, Carmela <Carmela.Rocchetti@hmhn.org> wrote:

This message was sent securely using Zix®

We have to wait for the governor to give authority to vaccinate teachers, they are part of Phase 1 B which is the phase we are currently in, so it will be soon. I had a call with state leaders today and although there are many variables and no one is exactly sure when, I was told it could be by end of next week or the end of month, hopefully. Once he does put them on the eligible list, they will be able to sign up at any of our HMH sites for a vaccine with no out of pocket cost.

We are working with our marketing team to put together some educational material targeted to front line workers like teachers. We will also be setting up a few information sessions specifically for teachers, and can do one for our district joined with other districts in our program. In the meanwhile keep pushing out any good educational info you get as you have been doing!

I'm still working on getting you the right survey questions, please hold on sending out a survey for now. Survey research tells us that the framing, the actual questions, and the timing of surveys can all drive health behaviors later- the survey is an impactful tool we have to use carefully.

I hope your ready for your next medical school course- Intro to Vaccines 😉

Happy weekend!

Carmela Rocchetti M.D. | Human Dimension Course Director | Assistant Professor of Internal Medicine | Hackensack Meridian School of Medicine |Carmela.Rocchetti@hmhn.org| Direct 201-951-1788 |340 Kingsland Street Building 123 Nutley NJ 07110 |Human Dimension Course Coordinator: HDSOM@hmhn.org | Community Programs: CPSOM@hmhn.org

To learn more about the Human Dimension - watch our short video!

signature_863508101

*This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to which they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the individual responsible for delivering the email to the intended recipient, please advise that you have received this email in error and that any use, dissemination, forwarding, printing, copying of this email is strictly prohibited. If you have received this email in error, please contact me at the above address or number.*

This message was secured by **Zix**&#174.

# EXHIBIT 10

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

---

**John Bormann** <jbormann@rumsonschool.org> Fri, Jan 8, 2021 at 2:46 PM
To: [redacted]

In full confidentiality, what do you think about this?
[Quoted text hidden]
[Quoted text hidden]

---

[redacted] Fri, Jan 8, 2021 at 4:08 PM
To: John Bormann <jbormann@rumsonschool.org>

Confidential

I wrote my thesis on vaccines. I understand their role in improving our life expectancy and saving millions of children of premature deaths. I understand their historical value as long as all safety protocols were followed during their development. Having said that and putting that aside we need to provide staff and parents with the information and let them decide how to proceed with this NEW vaccine.

I was disappointed at Jess' response when you emailed the nursing staff on how to obtain the vaccine. That response was an overshare. Like it or not working in a school has a political component and you have to be mindful when and how you should share. I feel uncomfortable with having a permanent sub nurse do this as I am not sure what information will be relayed.

I know our permanent sub teachers are well trained but I feel we would not provide a permanent sub teacher to become the resource over our own full time staff.

I think providing the informational links like you have been doing allows staff to read, digest and make their own decisions. Staff can also forward any questions to their health care provider. I don't want to speak for Krisanne but I think we can offer ourselves as resources if there are any questions related to the vaccines. I hope this helps.

Have a great weekend,

*Igniting, Maintaining, and Promoting Health*
[redacted]

[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Sat, Jan 9, 2021 at 4:42 PM
To: [redacted]

Thank you for your thoughtful consideration. I will let her know that it is not our role to provide any advocacy one way or another, but to just share the factual information for them to consider with their own physician.

Thanks!
Dr. B
[Quoted text hidden]

---

**John Bormann** <jbormann@rumsonschool.org> Sat, Jan 9, 2021 at 4:49 PM
To: Jessica Brink <jbrink@rumsonschool.org>

Jessica,

Thank you for reaching out and sharing this. Your willingness to support the staff is appreciated and we value having you as part of our team. After much thought, it would not be appropriate to provide advocacy one way or another. It is our role as a public entity to provide only the factual information available from government institutions we are required to follow and the teachers and families to seek guidance from their own physicians if they have questions. I would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact.

Respectfully,
Dr. Bormann

[Quoted text hidden]

---

**Jessica Brink** <jbrink@rumsonschool.org> Sat, Jan 9, 2021 at 7:02 PM
To: John Bormann <jbormann@rumsonschool.org>

Hi Dr. B,

I appreciate your thoughtful response and understand your reasoning; It's a slippery slope down either side. I just couldn't help but notice that in [redacted] explanation of her vaccine experience, she didn't mention informed consent.

In the rush to get people vaccinated, I believe people aren't truly getting complete information and that, in itself, creates a liability.

As I mentioned previously, your role is a challenging one. I have high regard for the way you handle it.

Jessica

Sent from my iPhone

> On Jan 9, 2021, at 16:49, John Bormann <jbormann@rumsonschool.org> wrote:
>
> [Quoted text hidden]

# EXHIBIT 11

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

**Jennifer Gibbons <jgibbons@rumsonschool.org>**

[redacted]
3 messages

**Jessica Brink** <jbrink@rumsonschool.org> Tue, Jan 12, 2021 at 12:13 PM
To: Jennifer Gibbons <jgibbons@rumsonschool.org>

Hi Jen,

I noticed [redacted] was entered into the spreadsheet and I wanted to run something by you, because I may be confused ... Based on our discussion this morning, I was under the impression that anyone quarantining because of possible exposure needs to Q for 14 days: 4 days for symptom development + 10 days for resolution. Since we're considering her brother as a (+) because of fever (assuming he doesn't get tested), wouldn't [redacted] be considered Q for possible exposure and need 14 days after his symptoms resolve? While he would Q for 10 days after a 24 hr symptom free period?

Let me know if I'm misunderstanding.

Thanks!

Jessica

**Jennifer Gibbons** <jgibbons@rumsonschool.org> Tue, Jan 12, 2021 at 12:53 PM
To: Jessica Brink <jbrink@rumsonschool.org>

I had the same question for Dr B he indicated 10 day.
[Quoted text hidden]
--
Sincerely,
Jennifer Gibbons
Principal
Forrestdale School
Rumson, NJ

**Jessica Brink** <jbrink@rumsonschool.org> Tue, Jan 12, 2021 at 12:56 PM
To: Jennifer Gibbons <jgibbons@rumsonschool.org>

Ok, thanks. At least we're on the same page, but I'm still confused :)
[Quoted text hidden]

083

# EXHIBIT 12

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# Requesting some clarity

4 messages

**Jessica Brink** <jbrink@rumsonschool.org> Wed, Jan 13, 2021 at 11:36 AM
To: John Bormann <jbormann@rumsonschool.org>, [redacted]
Cc: [redacted]

Hi All,

You've probably noticed that I dig deep into rules / laws / guidelines and question what I don't understand. At the end of the day, I have a license to maintain and as one of the medical professionals here, I need to have a firm understanding from a medical safety standpoint and from a liability standpoint. I'm throwing my interpretation of the following paragraph into the ring, because it relates to the confusion we had this morning. I'm genuinely not trying to make this difficult. It's a very confusing thing for which consistency is paramount.

"In the context of an ongoing state-wide second wave, New Jersey continues to experience COVID-19 transmission among school-aged children. In children, signs/symptoms are often mild, and it may not be possible to clinically distinguish COVID-19 from other illnesses. For this reason, the New Jersey Department of Health (NJDOH) recommends that any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test (molecular or antigen) for SARS-CoV-2 or they have completed an isolation period of at least 10 days since symptom onset and at least 24 hours after resolution of fever without fever-reducing medications with symptom improvement. A purely clinical alternative diagnosis is no longer acceptable.

This letter states that PCR or Antigen test is acceptable.
It also states that it must be a period of isolation which is different from quarantine. See the CDC definition below, because this relates to siblings who are not isolated. If there is no isolation and anyone in the household develops symptoms, the quarantine period for the sibling would start fresh.
Finally, the 24 hour fever free period must be contiguous with the 10 day symptom free quarantine / isolation.

If school policy dictates otherwise, can you direct me to where I can find this documented, so that I can be consistent in the guidance I give our students, families and staff.

https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html

https://www.cdc.gov/quarantine/index.html#:~:text=%E2%80%A2%20Isolation%20separates%20sick%20people,if%20they%20become%20sick

- Isolation separates sick people with a contagious disease from people who are not sick.
- Quarantine separates and restricts the movement of people who were exposed to a contagious disease to see if they become sick.

I'm working on a flow chart of sorts, to make the decisions easier and consistent. Just to put the complexity in context - here are the possibilities that I've come with so far. Please let me know if you think of any that I haven't listed.

+ PCR

+Antigen

- PCR

- Antigen

Symptoms - 2 or more from A, No Test

Symptoms - 1 from B, No Test

Symptoms - 2 or more from A, Neg Test

Symptoms - 1 from B, Neg Test

Travel to High Risk area

Known Exposure to +

Exposure to Symptomatic, No Test

No Known Exposure, but Testing

Family Member Testing

Respectfully,

Jessica

---

**John Bormann** <jbormann@rumsonschool.org> Wed, Jan 13, 2021 at 11:54 AM
To: Jessica Brink <jbrink@rumsonschool.org>
Cc: [redacted]

Jessica,
Put your flow chart together and we will go from there. Much appreciated. Only area that might be included is if you are in home with COVID+ who is or is not ISOLATING
[Quoted text hidden]
--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

# EXHIBIT 13

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

# COVID Quarantine Decision Tool - Draft - Invitation to edit

1 message

**Jessica Brink (via Google Docs)** <drive-shares-noreply@google.com> Fri, Jan 15, 2021 at 10:02 AM
Reply-To: Jessica Brink <jbrink@rumsonschool.org>
To: jbormann@rumsonschool.org
Cc: [redacted]

jbrink@rumsonschool.org has invited you to **edit** the following document:

COVID Quarantine Decision Tool - Draft

For your review. Please feel free to make edits / start discussion. All the variable don't really fit into a flow chart, so I categorized instead.

Open in Docs

Google Docs: Create and edit documents online.
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this email because jbrink@rumsonschool.org shared a document with you from Google Docs.

Google™

COVID Isolation / Quarantine Decision Tool

14 Day Quarantine - no testing out, if symptoms develop - begin 10 day isolation / quarantine
- Exposure to COVID (+)
- Travel to High Risk Area
- Exposure to multi-symptomatic, untested (presumed (+))

10 Day Isolation / Quarantine - 10 days starts after first day of symptom onset or a (+) test and must be contiguous with a 24 hour fever free period.
- (+) PCR
- (+) Antigen
- Multi - symptomatic, untested
- (-) Antigen with multiple symptoms (consider PCR test)

Quarantine & Wait for Results
- Household / family member testing due to (+) exposure

No Quarantine - if multiple symptoms develop, move to 10 day isolation / quarantine and / or test
- (-) PCR
- (-) Antigen
- Household / family member quarantined for (+) exposure
- Household / family member quarantined for high risk travel
- Household / family member is testing as a precaution (i.e. work related)
- Household / family member is isolated and there was no exposure X days prior to (+) test.

The points highlighted in yellow are ones that I need guidance on as far as the school policy. I've placed them in a category based on my clinical judgement, but in some cases that seems to be different than the school policy.

A 14 day quarantine for a known (+) exposure is the CDC's recommendation. The CDC does offer guidance for a shortened quarantine period based on testing. However, the recommendation for a 14-day quarantine was based on estimates of the upper bounds of the COVID-19 incubation period.

CDC guidance on isolation / quarantine duration:
https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html

Guidance for alternative quarantine timeframes based on testing can be found here:
https://www.cdc.gov/coronavirus/2019-ncov/more/scientific-brief-options-to-reduce-quarantine.html

Guidance for testing: https://www.cdc.gov/coronavirus/2019-ncov/hcp/testing-overview.html

COVID Isolation / Quarantine Decision Tool

In all my searching I can not find clear and specific CDC guidance on the testing timeline. There are many scholarly articles written about incubation periods, but of the ones I reviewed, none commit to a testing time frame. I believe it is because of wide variation in the tests being used. Each test has its own criteria for positivity, as it relates to the viral load and cycle threshold. I think this article explains it well:
https://medical.mit.edu/covid-19-updates/2020/07/when-should-i-be-tested

The CDC's interim guidance on Antigen testing is pretty clear - it works best in certain situations. "The clinical performance of antigen diagnostic tests largely depends on the circumstances in which they are used. Both antigen tests and NAATs perform best when the person is tested when viral load is generally highest. They also may be informative in diagnostic testing situations in which the person has a known exposure to a person with COVID-19."
https://www.cdc.gov/coronavirus/2019-ncov/lab/resources/antigen-tests-guidelines.html

# EXHIBIT 14

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

**John Bormann <jbormann@rumsonschool.org>**

# Accepted: Dr. B. - Call with Jessica Brink @ Mon Feb 1, 2021 11:15am - 11:45am (EST) (John Bormann)

1 message

**Jessica Brink** <jbrink@rumsonschool.org> Sun, Jan 31, 2021 at 5:42 PM
Reply-To: Jessica Brink <jbrink@rumsonschool.org>
To: John Bormann <jbormann@rumsonschool.org>

**Jessica Brink has accepted this invitation.**

## Dr. B. - Call with Jessica Brink

When Mon Feb 1, 2021 11:15am – 11:45am Eastern Time - New York

Joining info Join with Google Meet
meet.google.com/kxh-nrgr-obz

Join by phone
(US) +1 929-399-7779 (PIN: 474220189)

More phone numbers

Calendar John Bormann

Who
- John Bormann - organizer
- [redacted]
- jbrink@rumsonschool.org

Invitation from Google Calendar

You are receiving this email at the account jbormann@rumsonschool.org because you are subscribed for invitation replies on calendar John Bormann.

To stop receiving these emails, please log in to https://calendar.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to send a response to the organizer and be added to the guest list, or invite others regardless of their own invitation status, or to modify your RSVP. Learn More.

**invite.ics**
2K

092

# EXHIBIT 15

**Although CDC does not currently recommend that schools conduct symptom screening,** for schools that choose to implement screening on-site, CDC offers the following:

- Consider the scientific evidence previously outlined and weigh the risks and benefits to students, staff, and the larger community.
- Consider how school policies regarding symptom screening can balance the resources required and feasibility of implementation and the risk of transmission in schools.
- Consider ways to reduce the likelihood of excluding students who do not have COVID-19 from essential instructional and critical developmental experiences.

Before conducting screenings or sharing personally identifiable information on students concerning COVID-19 with public health authorities or other officials, consider federal, state, and local requirements, including provisions in the Family Educational Rights and Privacy Act (FERPA). Some of the factors schools may weigh include:

## Feasibility

- If symptom screening is implemented by the school, are there enough staff who are sufficiently trained in screening procedures as well as in putting on and taking off personal protective equipment (PPE)?
- How will results of screening be verified?
- Is proper equipment (e.g., thermometers, PPE) available in sufficient quantities?
- How will proper cleaning and disinfection of the screening area and equipment be ensured?
- Will processes be in place to ensure screeners and students maintain safe distance during screening?
- What protections will be included for staff who are at increased risk of severe COVID-19?
- What testing strategies will be implemented by the school so that students with positive symptom screenings can be further evaluated? (See Considerations for Testing in K-12 Schools.)

## Harm mitigation

- What strategies are needed to reduce the harms to students and their families when students are excluded from school, such as students who rely on school meals or impact on parental ability to work, when screening falsely identifies their chronic symptoms as symptoms of COVID-19?
- How will students with chronic conditions or special health care needs be accommodated to minimize the risk of symptom screening falsely identifying chronic symptoms as symptoms of COVID-19?
- How will stigma be reduced for students who screen positive for having symptoms of COVID-19, regardless of whether they have COVID-19?
- What is the emotional impact of daily screening on young children and how can fear of new mitigation protocols, such as adults wearing PPE, be reduced?
- How will ill students be afforded the opportunity to make up any missed classwork without penalty to reduce mental or physical anxieties about missed academic opportunities when screening falsely identifies their chronic symptoms as symptoms of COVID-19?

## Level of community transmission in the area

- If there is minimal COVID-19 transmission in the community, symptom screening will be more likely to identify people with symptoms who have something other than COVID-19. Symptom screening in this scenario will be more likely to identify other illnesses or conditions, not COVID-19, including certain chronic symptoms, some of which may

not require staying home.

- When there is more community transmission, the likelihood that individuals with symptoms actually have COVID-19 is higher. Therefore, symptom screening may be more helpful when COVID-19 transmission in the community is high.

## Recommendations of local public health authorities

- Regardless of factors above, schools should ensure that their policies follow the recommendations of local public health officials and are consistent with Federal, state, and local laws, including FERPA.
- Schools that choose to conduct symptoms screening should contact their local health departments with questions regarding practices and implementation.
- Additionally, schools should continue to monitor compliance with the immunizations required for in-person school attendance.

Note: Symptom screening is intended to reduce transmission from a potentially infected person to others.

It is not designed to assess the severity of illness in the person with infection, the person's risk of developing serious illness, or the person's need to seek medical care. CDC has a COVID-19 self-checker to help caregivers of children with symptoms of COVID-19 assess whether they should contact their child's healthcare provider available at Coronavirus Self-Checker.

# EXHIBIT 16

# Unique challenges of school-based symptom screening

Schools face specific challenges not necessarily present in other settings when implementing symptom screening. This is because schools have a unique role not only in the lives of students and their families, but also in the broader community.

- **Symptom screening might require close contact or frequent interaction between screeners (school personnel or volunteers) and multiple students.** This could increase the risk of COVID-19 exposure to screeners or be logistically challenging for schools in which dedicated space is not available. In schools without a nurse on staff, a person who is not a healthcare professional might be asked to assess students' symptoms and make difficult determinations about which students should be excluded from school.
- **Symptom screening has the potential to exclude certain students repeatedly, such as those with chronic medical conditions, from school even though they do not have COVID-19 or any contagious illness.** This is particularly true when symptom screening is conducted by people who do not have the training or background to understand students' health status, potentially leading to false positive screenings by identifying chronic symptoms as symptoms of COVID-19. This in turn might worsen disparities for students who already miss school frequently because of chronic medical conditions.

**Excluding students from school for longer than what is typically called for in existing school policies—** without considering the student's usual health and without assessing the likelihood the student was exposed to the virus that causes COVID-19—**risks repeated, long-term, and unnecessary student absence and possible unintended harm.**

- **Symptom screening is not intended to diagnose someone with COVID-19.**When a student develops symptoms that suggest COVID-19, school officials must not only determine whether to exclude that student from school, but they must also identify polices regarding when it is safe to allow the student to return. Most illnesses do not require the same precautions or length of isolation that COVID-19 does.

**Because of these limitations and challenges, CDC does not currently recommend routine (such as daily) school-based COVID-19 symptom screening of all students.** However, students should not attend school when they are sick.

Schools can minimize some of the limitations and challenges of symptom screening and help reduce the spread of the virus that causes COVID-19 by

- Encouraging families to check their students' health and keep students home when they are sick
- Emphasizing home symptom screening or being aware of symptoms that suggest infectious illness generally rather than comprehensive screening for all known symptoms of COVID-19
- Basing decisions for safe return to school on the likelihood that the student's symptoms are from COVID-19

# EXHIBIT 17

**<u>Questions and Answers on the Applicability of FERPA to Disclosures Related to COVID-19 ("Coronavirus")</u>**

1. Do parents and eligible students have to provide consent before an educational agency or institution discloses PII from education records?

Generally, yes. A parent or eligible student must provide written consent before an educational agency or institution discloses PII from a student's education records, unless one of the exceptions to FERPA's general consent rule applies. 20 U.S.C. §§ 1232g(b)(1) and (b)(2); 34 C.F.R. §§ 99.30 and 99.31. FERPA requires that a consent form be signed and dated by a parent or eligible student and (1) specify the records that may be disclosed; (2) state the purpose of the disclosure; and (3) identify the party or class of parties to whom the disclosure may be made. 34 C.F.R. § 99.30(a) and (b). At the conclusion of this document, we have included a sample FERPA consent form.

2. How does the health or safety emergency exception to FERPA's consent requirement permit an educational agency or institution to disclose PII from the education records of affected students?

Although educational agencies and institutions can often address threats to the health or safety of students or other individuals in a manner that does not identify a particular student, FERPA permits educational agencies and institutions to disclose, without prior written consent, PII from student education records to appropriate parties in connection with an emergency, if knowledge of that information is necessary to protect the health or safety of a student or other individuals. 20 U.S.C. § 1232g(b)(1)(I); 34 C.F.R. §§ 99.31(a)(10) and 99.36. This "health or safety emergency" exception to FERPA's general consent requirement is limited in time to the period of the emergency and generally does not allow for a blanket release of PII from student education records. Typically, law enforcement officials, public health officials, trained medical personnel, and parents (including parents of an eligible student) are the types of appropriate parties to whom PII from education records may be disclosed under this FERPA exception.

For purposes of FERPA's health or safety emergency exception, the determination by an educational agency or institution that there is a specific emergency is not based on a generalized or distant threat of a possible or eventual emergency for which the likelihood of occurrence is unknown, such as would be addressed in general emergency preparedness activities. If local public health authorities determine that a public health emergency, such as COVID-19, is a significant threat to students or other individuals in the community, an educational agency or institution in that community may determine that an emergency exists as well.

Under the FERPA health or safety emergency exception, an educational agency or institution is responsible for making a determination, on a case-by-case basis, whether to disclose PII from education records, and it may take into account the totality of the circumstances pertaining to the threat. *See* 34 C.F.R. § 99.36(c). If the educational agency or institution determines that there is an articulable and significant threat to the health or safety of the student or another individual and that certain parties need the PII from education records, to protect the health or safety of the

# EXHIBIT 18

Dear Members of the Rumson School District Board of Education,

In the October 28, 2020 meeting this Board retroactively approved my employment as a School Nurse Permanent Substitute, hired and paid through ESS. As this is the body that approved my employment, I trust it's fitting to inform you that as of today, February 1st, 2021, my position with the Rumson School District has ended. I wish to share with you my perspective on the circumstances which led to the end of my employment. I do not want my job back. I am not requesting any investigation into whether the termination was founded. I'm simply asking for consistency, sound clinical judgement, and genuine concern for the wellbeing of our children, teachers and communities be brought to the forefront.

I have been a nurse for 15 years. I've worked inpatient pediatrics and pediatric home care. I worked in policy and procedure for a major health insurer. I am certified as a Nurse Patient Advocate. I served four years in the military. I had no intention of being a school nurse. However, my mother works on the custodial staff at Dean Porter School and at some point Dr. Bormann heard that I was a nurse. He contacted me directly in September 2020 asking if I would work as a substitute school nurse. I explained that I was not certified as school nurse and that I hadn't worked in pediatrics in 10 years. He assured me that was no problem. I went through the hiring process with ESS and started work on September 25, 2020. I completed all necessary requirements and as far as I was aware, I was fulfilling my expectations as a substitute school nurse.

Most days, I worked under the direction of the Certified School Nurse at either Dean Porter or Forrestdale. When I did not know something, or was confused about a decision, process or protocol I asked for advice or clarification. This was a regular occurrence because many things confused me surrounding the lack of consistency with guidelines, policies and protocols related to COVID-19.

On January 12, 2021 I was working independently at Forrestdale School because the Certified School Nurse requested the day off. I was instructed to send a child home because a sibling in another school was symptomatic. Based on CDC guidelines and my clinical judgment I explained the recommended 14-day quarantine period to the students' Mother. Later when I looked at the Quarantine Spreadsheet a 10-day quarantine was documented. I contacted the Principal and explained the conflict and my reasoning for the 14-day recommendation. She said that she too was confused and had confirmed with Dr. Bormann the 10-day recommendation.

They next day the four of us – Dr. Bormann, the Principal, the Forrestdale school nurse and myself were in the hallway. I addressed my confusion with the group and did not come away with a clear resolution. I composed an email expressing my confusion to the same group with the addition of the Dean Porter School Nurse and Principal. I laid out my concerns with inconsistencies in guidance regarding testing and quarantine. I provided sources for what I believed to be the appropriate clinical guidance from the CDC and DOH. I explained that I have a medical license to maintain and that I need clear, medically supported guidance on which to

make clinical recommendations. I offered to create a flow sheet based on my research and knowledge of the process.

On January 15, 2021 I emailed Dr. Bormann and both school nurses inviting them to review the document I created. I highlighted the areas of confusion and requested feedback.

On January 21, 2021 I was working in Dean Porter and was instructed to send several children home. In two instances parents voiced their irritation and frustration because they could not make sense of the protocols. I empathized with their emotions but couldn't provide any guidance because I too was confused. That afternoon school was closed to in person classes due to an increasing number of positive cases.

On January 27, 2021 the nurse from Dean Porter emailed me asking if I could cover the nurse role for a period of time once we returned to in person classes. I agreed, but added that I would talk to Dr. Bormann in the meantime to get clarification on medical policies.

This afternoon I met with Dr. Bormann via phone conference to discuss my concerns. I explained that I was uncomfortable doing things that were not found in official policy or guidance. I explained that as the only medical professional in the building I must do what is clinically supported by verifiable sources. I explained that I was still unclear about the examples I gave in the document I provided on January 15, 2020 i.e. only accepting PCR testing when DOH guidance identifies Antigen testing as acceptable, and the required quarantining / testing of all siblings when one has symptoms. I explained that while quarantining is recommended it is voluntary and I cannot compel anyone to do so. I explained I was also unclear about keeping private health information in a shared Google Spreadsheet. Based on my interpretation of NJ Administrative Code and the Family Education Privacy Act this could be a violation of privacy. As is, encouraging staff to report any discussions of questionable behavior like travel or indoor unmasked events or gatherings, that they might overhear.

I asked for Dr. Bormann to share with me the written law, policy or guidance that authorizes me, as a nurse, to do these things. His response was to say that I get the emails he sends and that everything is on the website. I asked that he send me the link so that I can review what he is referring to. He said that clearly, I am not comfortable with the expectations of the job and that it would probably be best if I did not continue my role with the school district. I said that I am completely confident with my skill as a nurse, yet one of the major things I need to do my job effectively and in accordance with my scope of practice and my license is written, valid policy and procedure. I asked him if he was terminating my contract with the school district. He again said that I wasn't comfortable doing what is expected, that I'm free to work for ESS in other school districts and that he'd email ESS about my termination. I asked him to copy me on the email and he refused.

In the same way I started my conversation with Dr. Bormann, I will end my letter to you. I am not trying to be difficult. I want what is best for the children, their families and the staff of every school. The circumstances we are all facing right now are unprecedented. We've all

been under extreme stress attempting to do 'the best we can,' for nearly a year. At some point, we must acknowledge the harm this stress, fear and uncertainty is causing for our children, and realize the 'best we can' needs to be reevaluated. No doubt everyone is exhausted. But one thing that makes exhaustion a little more tolerable is clear, consistent guidance from appropriate resources.

Let me reiterate, I am no longer interested in working for the Rumson School District. I am not asking for anyone to decide if what occurred during my employment was right, wrong or indifferent. I'm asking that you evaluate the appropriateness and consistency of the policies, procedures, guidelines, rules, ideas that are impacting the health and wellbeing of your children and community. Please feel free to email me with any questions.

Respectfully,

Jessica Brink BSN, RN, iRNPA
Jessb11@me.com

# EXHIBIT 19

RUMSON SCHOOL DISTRICT IGNITING POTENTIAL

John Bormann <jbormann@rumsonschool.org>

## Termination - Permanent School Nurse Substitute

5 messages

**Jessica Brink** <jessb11@me.com> Mon, Feb 1, 2021 at 8:21 PM
To: cjones@rumsonschool.org, kswain@rumsonschool.org, kmarkiewicz@rumsonschool.org, tduva@rumsonschool.org, sizzo@rumsonschool.org, jconnors@rumsonschool.org, scaldwell@rumsonschool.org, mginsberg@rumsonschool.org, cscoble@rumsonschool.org
Cc: jbormann@rumsonschool.org

Good evening,

Please find my letter attached.

Respectfully,

Jessica Brink BSN, RN, IRNPA

**J. Brink Rumson BOE 2.1.21.pdf**
33K

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 1, 2021 at 9:27 PM
To: Charles Jones <cjones@rumsonschool.org>, Kim Swain <kswain@rumsonschool.org>, Kara Markiewicz <kmarkiewicz@rumsonschool.org>, Scott Caldwell <scaldwell@rumsonschool.org>, Melissa Ginsberg <mginsberg@rumsonschool.org>, Tara D'Uva <tduva@rumsonschool.org>, Curran Scoble <cscoble@rumsonschool.org>, John Connors <jconnors@rumsonschool.org>, Stacy Izzo <sizzo@rumsonschool.org>, Denise McCarthy <dmccarthy@rumsonschool.org>

As you can extract from reading the letter, this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. They have been notified and confirmed as has been done with other subs in the past.

Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

We are currently seeking a sub nurse through HMH.

Please contact me if you have any questions.

John

[Quoted text hidden]

**J. Brink Rumson BOE 2.1.21.pdf**
33K

**Charles Jones** <cjones@rumsonschool.org> Mon, Feb 1, 2021 at 9:41 PM
To: John Bormann <jbormann@rumsonschool.org>

I'll give you a ring in the morning.

[Quoted text hidden]
[Quoted text hidden]
<J. Brink Rumson BOE 2.1.21.pdf>

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 8, 2021 at 2:15 PM
To: Edlawgroup <edlawgroup@sciarrillolaw.com>

---------- Forwarded message ---------
From: **Jessica Brink** <jessb11@me.com>
Date: Mon, Feb 1, 2021 at 8:21 PM
Subject: Termination - Permanent School Nurse Substitute
To: <cjones@rumsonschool.org>, <kswain@rumsonschool.org>, <kmarkiewicz@rumsonschool.org>, <tduva@rumsonschool.org>, <sizzo@rumsonschool.org>, <jconnors@rumsonschool.org>, <scaldwell@rumsonschool.org>, <mginsberg@rumsonschool.org>, <cscoble@rumsonschool.org>
Cc: <jbormann@rumsonschool.org>

[Quoted text hidden]

--
**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

**J. Brink Rumson BOE 2.1.21.pdf**
33K

---

**John Bormann** <jbormann@rumsonschool.org> Mon, Feb 8, 2021 at 2:16 PM
To: Edlawgroup <edlawgroup@sciarrillolaw.com>

Give me a call about this.

Thanks-
John
[Quoted text hidden]

# EXHIBIT 20

a. **Homebound Instruction**

1. Approved homebound instruction for student **SID #1152499448** by a NJ certified teacher through Silvergate Prep, Bridgewater location, at the rate of $35/hr for a total of up to 10 hrs per week for an estimated length of stay of up to 30 days (January 19 - February 17, 2021)

2. Retroactively approved homebound instruction for student **SID #4123411940** provided by MOESC at the rate of $75/hr for up to 3 hrs/week for Math beginning on 2/04/2021 thru 2/11/21.

b. **21-22 Non-Resident Tuition Students**

Approved Non-Resident tuition students for the 21-22 school year as follows:

| Grade in 2021-2022 | # of students / Tuition | Total Tuition / Grade |
|---|---|---|
| K | 1 / $10,000<br>1 / $ 5,000** | $15,000 |
| 1 | 1 / $10,000 | $10,000 |
| 2 | 2/ $10,000 ea. | $20,000 |
| 3 | NA | NA |
| 4 | 2 / $10,000 ea. | $20,000 |
| 5 | NA | NA |
| 6 | 1 / $11,000<br>1 / $ 5,500** | $16,000 |
| 7 | 1 / $ 5,500** | $5,500 |
| 8 | 1 / $11,000<br>1 / $11,000<br>1 / $ 5,500** | $27,500 |
| | **TOTAL: 13** | **$114,000** |

** Rumson/RFH Staff

12. Personnel Committee

- **Report of Meeting** - Mrs. Ginsberg reported on the meeting held on 2/10/2021.
- **Approved the following consent agenda items ( a - e) presented upon the recommendation of the Superintendent:**

**Moved: Mr. Caldwell Seconded: Mrs. Scoble**

**Roll Call: AYES: 9**

a. **Appointment**

1. **Spanish Leave Replacement**
Retroactively approved the appointment of **Victoria S. Takacs,** as the Spanish Leave Replacement for Susan Graye, hired and paid through ESS, to begin on/or about February 22, 2021 through June 8, 2021, to be paid at the rate of $334/day.

2. **Substitute School Nurse**
Retroactively approved **Katelyn Mahon** as the Substitute School Nurse, beginning on 2/05/2021 hired and paid for through ESS at the rate of $200/day.

b. **Salary Correction**

Approved the salary correction for **Rebecca Toohig,** from Masters Step 8 - $59,909 to the corrected salary of $59,090.

# EXHIBIT 21

RUMSON SCHOOL DISTRICT
IGNITING POTENTIAL

**John Bormann <jbormann@rumsonschool.org>**

# Fwd: Jessica Brink

2 messages

**Dara Burke** <dburke@rumsonschool.org> Wed, Mar 3, 2021 at 8:47 AM
To: John Bormann <jbormann@rumsonschool.org>

How would you like me to respond?

*Dara Burke*
Administrative Assistant
Rumson Board of Education
732-842-0354
732-842-4877 (fax)
dburke@rumsonschool.org

The information contained in this email/document is confidential and may be legally privileged. Access to this email/document by anyone other than the intended recipient(s) is unauthorized. If you are not an intended recipient, any disclosure, copying, distribution, or any action taken or omitted to be taken in reliance to it, is prohibited.

---------- Forwarded message ---------
From: **Brian Engle** <BEngle@ess.com>
Date: Tue, Mar 2, 2021 at 10:50 AM
Subject: Jessica Brink
To: Dara Burke <dburke@rumsonschool.org>

Hi Dara – I have a favor to ask. Could you give me some information on why Jessica Brink was let go from her nurse position? She's reaching out to our HR department asking why she was dismissed from the position.

Thanks for the help. Have a great day.

**Brian Engle**

Senior Regional Manager

856.482.0300 ext. 3215 | BEngle@ESS.com | ESS.com

ESS
*Every day counts.*

--------------------------------------CONFIDENTIALITY NOTICE------------------------------------------

This message is intended only for the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited, and you are requested to please notify us immediately by telephone, and return the original message to us at the above address. ESS.

---

**John Bormann** <jbormann@rumsonschool.org> Wed, Mar 3, 2021 at 9:06 AM
To: Dara Burke <dburke@rumsonschool.org>

Mrs. Brink was found to not be a good fit in the district.

[Quoted text hidden]

--

**John E. Bormann, Ed. D.**
**Superintendent**
**Rumson School District**
**"Igniting Potential"**
60 Forrest Avenue
Rumson, NJ 07760
Phone: 732-842-4747
Fax: 732-842-4877
Twitter: @Rumsonbulldawgs
Facebook: Rumson School District
Instagram: @bormannjohn

Please consider the environment before printing this email

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure. If you are not the intended recipient of this message or their agent, or if this message has been addressed to you in error, please immediately alert the sender by reply email and then delete this message and any attachments. If you are not the intended recipient, you are hereby notified that any use, dissemination, copying, or storage of this message or its attachments is strictly prohibited.

# EXHIBIT B

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN *et al.***,<br><br>Defendants. | Civil Action No. 3:23-cv-00497 (ZNQ) (DEA)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon a Motion for Default Judgment filed by *pro se* Plaintiff Jessica M. Brink ("Plaintiff") (ECF No. 11), and upon the Cross-Motions of Defendants John Bormann, Maria Montanez, and Board of Education of Rumson (together "Defendants") to vacate default (ECF No. 13), and to dismiss Plaintiff's Complaint (ECF No. 12). Plaintiff opposed the Motion to Dismiss (ECF No. 13). The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Plaintiff's Motion for Default will be DENIED, Defendants' Motion to Vacate Default will be GRANTED and Defendants' Motion to Dismiss will be GRANTED.

## I. **BACKGROUND**[1]

In September 2020, to assist with the novel coronavirus ("COVID-19") pandemic, Plaintiff was hired as a School Nurse Permanent Substitute in the Rumson School District ("School District") by Defendant Board of Education of the School District ("Board of Education"). ("Compl." ¶¶ 11–14, ECF No. 1; *id.* at Ex. 1, ECF No. 1-1.)[2] An employment contract dated October 1, 2020, provided that Plaintiff would work "beginning on September 25, 2020 to a date to be determined, hired and paid through ESS at the rate of $200/day." (*Id.* at Ex. 1.) Plaintiff worked within the School District as a supplement to two Certified School Nurses, including Defendant Montanez. (*Id.* ¶ 25.)

In December 2020, Defendant Bormann, the Superintendent of the School District, received an email from the Monmouth County Health Department ("Health Department") notifying him that school nurses were to be one of the first groups to receive COVID-19 vaccinations. (*Id.* at Ex. 3, ECF No. 1-4.) Bormann later emailed Plaintiff to inform her that he provided her name and contact information to the Health Department "to get you on the [vaccination] list in the event that you will be getting the [COVID-19] vaccine." (*Id.* ¶ 33; *id.* at Ex. 3.) In response, Plaintiff informed Bormann that she would not be getting the vaccine for personal reasons and offered, in her capacity as a Patient Advocate, to share her reasoning for her decision. (*Id.* ¶ 35; *id.* at Ex. 3.) Bormann replied to Plaintiff's email that this was "[n]ot a problem" and that he "just wanted to offer you the same

---

[1] For the purposes of this Motion to Dismiss, the Court accepts the factual allegations in the Counterclaim as true and draws all inferences in the light most favorable to the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *Merchs. Mut. Ins. Co. v. 215 14th Str., LLC*, No. 19-9206, 2020 WL 634149, at *1 (D.N.J. Feb. 10, 2020). Further, the Court also considers any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

[2] In October, Plaintiff's hiring was retroactively approved by the Board of Education. (Compl., Ex. 2, ECF No. 1-2.)

opportunity as all our nurses. At this time I do not for[e]see any associated requirements related to the vaccine." (*Id.* ¶ 36; *id.* at Ex. 3.)

In December 2020 and January 2021, Montanez emailed staff members at a school within the School District to provide COVID-19 vaccine-related information. (*Id.* ¶ 38.) Bormann also shared weekly vaccine-related emails with School District staff, including, *inter alia*, a survey to "expedite [staff members'] access to the COVID-19 vaccine." (*Id.* ¶ 39; *id.* at Ex. 6, ECF No. 1-7.)

On January 7, 2021, Plaintiff sent Bormann an email with the subject line: "A resource" in which Plaintiff requested Bormann's "permission to email the [School District] staff and offer [her]self as a resource" for any questions about the COVID-19 vaccination. (*Id.* at Ex. 8, ECF No. 1-9.) In the email, Plaintiff states that she is "technically not an employee of [the School District]" and that she wants to "ensure that everyone has a complete an informed consent as possible." (*Id.*) She also includes a draft copy of the email she intended to send to all School District staff. (*Id.*)

A day later, on January 8, 2021, Bormann forwarded Plaintiff's email to Montanez to ask her what she thought about Plaintiff's request. (*Id.* at Ex. 10, ECF No. 1-11.) Montanez replied that "[she felt] uncomfortable with having a permanent sub nurse do this as [she is] not sure what information will be relayed." (*Id.*) Further, Montanez said that "we would not provide a permanent sub[stitute] teacher to become the resource over our own full time staff." (*Id.*) Instead, Montanez states that "providing the informational links like [Bormann has] been doing allows staff to read, digest and make their own decisions. Staff can forward any questions to their health care provider." (*Id.*) On January 9, 2021, Bormann responded to Plaintiff's email to state the following:

> After much thought, it would not be appropriate to provide advocacy one way or another. It is our role as a public entity to provide only the factual information available from government institutions we are required to follow and the teachers and families to seek guidance from their own physicians if they have questions. I would not want anyone involved with the school to serve in that capacity as it would put the [D]istrict in jeopardy if one followed the advice and it had a negative impact.

(*Id.*)

Plaintiff replied that she appreciated Bormann's thoughtful response and understood his reasoning. (*Id.*) Further, she stated that "[i]n the rush to get people vaccinated, I believe people aren't truly getting complete information and that, in itself, creates a liability." (*Id.*)

On January 12, 2021, Plaintiff initiated a discussion with Bormann, Montanez, and a school principal to discuss questions she had regarding the discrepancy in the recommended quarantine period between federal and state guidelines (14 days) and the School District's quarantine recommendations (10 days). (*Id.* ¶¶ 60–65.) After the discussion failed to provide Plaintiff the clarity she sought (*id.* ¶ 66), Plaintiff sent an email with the subject line: "Requesting some clarity" to Bormann, Montanez, two school principals, and another School District nurse. (*Id.* at Ex. 12, ECF No. 1-13.)[3] Plaintiff sent the email in order to "state her grievance regarding discrepancies in interpretation and implementation of official guidance and [School District] Policies and Protocols." (*Id.* ¶ 70.) In her email, Plaintiff states that "I'm throwing my interpretation of the following [state quarantine guideline] into the ring, because it relates to the confusion we had this morning. I'm genuinely not trying to make this difficult. It's a very confusing thing for which consistency is paramount." (*Id.* at Ex. 12.) Further, Plaintiff explains that she is working on a flow chart to make decisions about the quarantine period easier and more consistent. In response to Plaintiff's email, Borman replied "[p]ut your flow chart together and we will go from there." (*Id.*)

On February 1, 2021, Plaintiff and Defendant had a phone call to discuss the concerns Plaintiff stated in her email regarding COVID-19 policies and procedures. (*Id.* ¶¶ 76–77; *id.* at Ex. 14, ECF No. 1-15.) During this phone call, Plaintiff asked Bormann to share with her the written law,

[3] Plaintiff characterizes this email as a petition of grievances based upon the Board of Education's policy titled SUPPORT STAFF MEMBERS 4340 GRIEVANCE. (Compl. ¶ 68.) Plaintiff contends that she could not identify a clear grievance policy for someone in her position, *i.e.*, permanent non-tenured staff, without a labor union-negotiated agreement. (*Id.* ¶¶ 67–68.)

policy, or guidance that authorized the School District to, *inter alia*, compel children to quarantine without court order and inconsistently apply quarantine guidance. (*Id.* ¶ 83.) Further, she explained that she "was uncomfortable doing things that were not found in official policy or guidance" and that "while quarantining is recommended, it is voluntary and [she] cannot compel anyone to do so." (*Id.* at Ex. 18, ECF No. 1-19.) In response, Bormann told Plaintiff that she "was clearly not comfortable with the expectations of the job and that it would probably be best if she did not continue her role in the [School District]." (*Id.* ¶¶ 85–86.) He stated that Plaintiff "was free to work for ESS in other districts, but she was no longer welcome in [this district], and that he would email ESS about the termination." (*Id.* ¶ 89.)[4]

After the meeting with Bormann, Plaintiff drafted a letter and transmitted it through email to the Board of Education and Bormann, discussing "[her] perspective on the circumstances which led to the end of [her] employment." (*Id.* ¶ 99; *id.* at Ex. 18.)[5] In response to Plaintiff's letter, Bormann sent a reply email that stated the following:

> As you can extract from reading this letter, this sub[stitute] nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub[stitute] not be assigned to our schools. She is not an employee of the [D]istrict and can retain her employment with ESS. They have been notified and confirmed as has been done with other sub[stitute]s in the past.
>
> Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

[4] In an email in response to an inquiry from ESS, Bormann stated that the reason for Plaintiff's termination from the School District was "[Plaintiff] was found not to be a good fit." (*Id.* ¶ 109; *id.* at Ex. 21, ECF No. 1-22.)

[5] Plaintiff did not receive any response to her letter from any member of the Board of Education. (*Id.* ¶ 104.)

(*Id.* at Ex. 19, ECF No. 1-20.)[6]

On January 26, 2023, Plaintiff filed the instant Complaint asserting twelve claims against Defendants. The Complaint asserts the following seven federal causes of action pursuant to 42 U.S.C. § 1983: (1) First Amendment free speech claim against Bormann (Count Two); (2) First Amendment right to petition claim against Bormann (Count Three); (3) First Amendment retaliation claim against Bormann (Count Four); (4) Fourteenth Amendment equal protection claim against Bormann (Count Five); (5) Fourteenth Amendment due process claim based on liberty interest against the Board of Education (Count Six); (6) Fourteenth Amendment due process claim based on property interest against the Board of Education (Count Seven); and (7) *Monell* claim against the Board of Education (Count Eight). (ECF No. 1.) The Complaint also brings a conspiracy claim under 42 U.S.C. § 1985(3) against Defendants Bormann and Montanez (together, "Individual Defendants") (Count One). Finally, the Complaint brings the following four state law claims: (1) breach of contract (Count Nine), (2) negligent infliction of emotional distress (Count Ten), (3) gross negligence (Count Eleven), and (4) negligence (Count Twelve).

Defendants Board of Education and Bormann were both served on March 14, 2023 (ECF Nos. 6, 7.) Defendant Montanez was served on March 23, 2023. (ECF No. 8.) On May 12, 2023, a notice of appearance by Defendants' counsel was filed on behalf of all Defendants. (ECF No. 9.) Upon motion by Plaintiff (ECF No. 10), on May 15, 2023, the Clerk entered default against Defendants for failure to plead or otherwise defend. That same day, Plaintiff also moved for default judgment against all Defendants. On May 18, 2023, Defendants moved to vacate the default judgment (ECF No. 13) and to dismiss the Complaint (ECF No. 12).

[6] Plaintiff obtained a copy of this post-termination email correspondence through a request for records under New Jersey's Open Public Records Act, N.J.S.A §§ 47:1A-1 *et seq*. (*Id.* ¶¶ 105–06.)

## II. JURISDICTION

This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

## III. LEGAL STANDARD

### A. Setting Aside Default

The Clerk must enter default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise . . . ." Fed. R. Civ. P. 55(a). "A judgment setting aside the entry of default is within a district court's discretion . . . ." *Doe v. Hesketh*, 828 F.3d 159, 174 (3d Cir. 2016) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194–95 (3d Cir. 1984)). "The court may set aside an entry of default for good cause. . . ." Fed. R. Civ. P. 55(c). "In exercising that discretion and determining whether 'good cause' exists, [the Third Circuit has] instructed district courts to consider the following factors: '(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; [and] (3) whether the default was the result of the defendant's culpable conduct.'" *Hesketh*, 828 F.3d. at 175 (quoting *$55,518.05 in U.S. Currency*, 728 F.2d at 195) (second alteration in original). Delay rarely is ever sufficiently prejudicial to prevent vacating default. *See Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656–57 (3d Cir. 1982). "To show a meritorious defense, a plaintiff must assert defenses that would constitute a complete defense to the action." *World Ent. Inc. v. Brown*, 487 F. App'x 758, 761 (3d Cir. 2012). And "the standard for 'culpable conduct' in this Circuit is the 'willfulness' or 'bad faith' of a non-responding defendant," including "acts intentionally designed to avoid compliance with court notices"—it must be more than "mere negligence." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1182–83 (3d Cir. 1984).

### B. Rule 12(b)(6)

Case: 25-1805 Document: 39-1 Page: 122 Date Filed: 04/13/2026

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must tak[e] note of the elements a plaintiff must plead to state a claim." *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must review "the complaint to strike conclusory allegations." *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the defendant unlawfully harmed me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678) (citation omitted).

It is well established that a "[*pro se*] complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (demonstrating the point that a pro se plaintiff's pleading must be liberally construed and is held to a lesser standard than that which is applied to pleadings drafted by attorneys). However, "[e]ven a pro se complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013). "In resolving a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case and exhibits attached to the complaint may also be taken into account." *Halstead v.*

*Motorcycle Safety Found., Inc.*, 71 F. Supp. 2d 455, 464, 467 (E.D. Pa. 1999) (citing *Chester Cnty. Intermediate Unit v. Pa. Blue Shield*, 896 F.2d 808, 812 (3rd Cir. 1990)).

## IV. <u>DISCUSSION</u>

### A. MOTION TO VACATE DEFAULT JUDGMENT

As stated above, in determining whether good cause exists to set aside an entry of default judgment, courts consider "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; [and] (3) whether the default was the result of the defendant's culpable conduct." *Hesketh*, 828 F.3d at 175. Here, the Court finds that all three factors weigh in favor of finding good cause to vacate the Clerk's entry of default entered against the Defendants.

First, the Court considers whether Plaintiff will suffer prejudice if the Motion to Vacate Default is granted. "Prejudice arises where the setting aside of the entry of default results in the loss of relevant evidence or some other occurrence that tends to impair the plaintiff's ability to pursue its claims." *N.J. Chinese Cmty. Ctr. v. McAleer*, No. 21-08320, 2022 U.S. Dist. LEXIS 145256, at *13 (D.N.J. Aug. 15, 2022) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987)). Defendants argue that Plaintiff will not suffer any prejudice because there has been no significant delay in the litigation resulting from the default, as Defendants have filed a motion to dismiss the Complaint along with the instant motion. Plaintiff, on the other hand, makes no argument as to how setting aside the default would prejudice her. In any case, "the inconvenience and expense to a plaintiff of having to litigate on the merits do not rise to the level of prejudice required." *Julaj v. Tau Assocs. LLC*, No. 12-1464, 2013 WL 4731751, at *4 (D.N.J. 2013). Accordingly, the Court finds that this factor weighs in favor of vacating default.

Next, the Court considers whether Defendants have raised a meritorious defense. Where "at least one meritorious defense" has been specifically alleged, default judgment may be inappropriate. *Feliciano*, 691 F.2d at 657. Here, Defendants set forth multiple meritorious defenses under Rule

12(b)(6) to each of Plaintiff's claims in their Motion to Dismiss Plaintiff's Complaint. (*See generally* "Defs.' Mot. to Dismiss", ECF No. 12-1.) Defendants are not required to prove their case at this moment, but only "set forth with some specificity the grounds for [their] defense." *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988); *see also Hritz*, 732 F.2d at 1181 (stating that "a meritorious defense is presumptively established when the allegations of defendant's answer, if established on trial would constitute a complete defense to the action.") (internal quotations and citations omitted)). As a result, the Court finds that this factor also weighs in favor of setting aside default.

Finally, the Court considers whether the default was a result of Defendants' culpable conduct. To find "culpable conduct" on the part of a non-responding defendant requires evidence of "willfulness" or "bad faith." *Hritz*, 732 F.2d at 1182. Here, Defendants responded, albeit delayed, with the instant cross-motion and motion to dismiss. Further, in their briefing, Defendants assert that the delay was because the Board of Education, as a public entity, needed to submit the case to its insurance provider to obtain legal representation. ("Defs.' Mot. to Vacate" 4–5, ECF No. 13-1.) The Court finds that failure to respond, on this basis, does not rise to "willfulness" or "bad faith." *Hritz*, 732 F.2d at 1182. In sum, the Court finds that all three factors weigh in favor of denying Plaintiff's motion for default judgment against Defendants and granting Defendants' cross-motion to vacate default judgment.

**B. MOTION TO DISMISS THE COMPLAINT**

Defendants also move to dismiss each of Plaintiff's twelve claims under Rule 12(b)(6). (*See generally* Defs.' Mot. to Dismiss.) The Court examines each claim in turn.

**1. Conspiracy Claim under § 1985 (Count One)**

The Complaint first asserts a § 1985(3) claim against the Individual Defendants for conspiracy to violate Plaintiff's constitutional rights. (Compl. ¶¶ 126–131 (Count One).) Namely, in

Count One, Plaintiff alleges that "Bormann conspired with [Montanez] . . . for the purpose of depriving Plaintiff Brink . . . of equal privileges under the First Amendment." (*Id.* ¶ 127.)

"Section 1985(3) provides a cause of action if: (1) two or more persons conspire to deprive any person of the equal protection of the law; (2) one or more of the conspirators performs or causes to be performed any overt act in furtherance of the conspiracy; and (3) that overt act injures the plaintiff in his person or his property or deprives the plaintiff of any right or privilege of a citizen of the United States." *Barnes Found. v. Twp. of Lower Merion*, 242 F.3d 151, 162 (3d Cir. 2001) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)). "[C]laims under Section 1985 must be pled with specificity in order to withstand a motion to dismiss. Broad, conclusory allegations, unsupported by specific facts implicating specific defendants are insufficient to state a claim upon which relief can be granted." *Handelman v. New Jersey*, No. 16-2325, 2016 WL 3691976, at *11 (D.N.J. July 12, 2016) (quoting *Martin v. Delaware Law Sch. of Widener Univ.*, 625 F. Supp. 1288, 1297 (D. Del. 1985)). Moreover, it is well-settled that "intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*, 403 U.S. at 102.

Here, the Complaint fails to state a claim for conspiracy under § 1985(3). First, Plaintiff does not allege any facts in support of the existence of a conspiracy. Specifically, nothing in the Complaint suggests an agreement or concerted action amongst the Individual Defendants. *See Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008) ("To constitute a conspiracy, there must be a 'meeting of the minds.'") (citations omitted); *Aulisio v. Chiampi*, 765 F. App'x 760, 764 (3d Cir. 2019) (dismissing conspiracy claim under § 1985 against state prison officials because inmate-prisoner "offered nothing more than conclusory statements that [d]efendants conspired to deprive him of his constitutional rights; no evidence suggests that they agreed, plotted, or even discussed doing so"). The Complaint merely states conclusively, that "Defendant Bormann conspired with

Defendant Nurse Montanez" to violate Plaintiff's First Amendment rights. (Compl. ¶ 127.) The only supporting allegation for the alleged conspiracy in the Complaint is the email between Bormann and Montanez discussing Plaintiff's email requesting to offer herself "as a resource to the staff regarding the COVID-19 vaccine roll-out." (*Id.* ¶ 40; *id.* at Ex. 8, .) This email, however, is insufficient on its own to support the inference of any agreement or understanding between Bormann and Montanez to "restrain Plaintiff['s] protected speech regarding COVID-19 vaccination." (*Id.* ¶ 53.) Therefore, Plaintiff has not pled a conspiracy with specificity because she "fails to allege any agreement or understanding among or between any of the defendants to plot, plan or conspire to violate h[er] constitutional rights." *Gay v. City of Philadelphia*, No. 03-5358, 2005 WL 1844407, at *7 (E.D. Pa. Aug. 2, 2005).

Further, the Complaint does not allege that the Individual Defendants were motivated by invidious discriminatory class-based animus. Instead, Plaintiff alleges that the "invidious animus . . . was falsely predicated on Plaintiff's purported political view and 'request to send anti-vaccination guidance.'" (Compl. ¶ 130.) Nowhere in the Complaint does Plaintiff allege any class- or race-based discriminatory animus, as is required for a viable § 1985(3) claim. *See Farber v. City of Paterson*, 440 F.3d 131, 135 (3d Cir. 2006) ("[A] plaintiff must allege both that the conspiracy was motivated by discriminatory animus against an identifiable class and that the discrimination against the identifiable class was invidious."); *see also Grant v. Slattery*, Civ. No. 22-941, 2022 U.S. Dist. LEXIS 177234, at *21 (D.N.J. Sept. 29, 2022) ("Plaintiff cannot demonstrate that the alleged conspiracy by Defendants was motivated by racial or discriminatory animus against an identifiable protected class, since Plaintiff fails to allege that he is part of an identifiable class that requires constitutional protection.").

Accordingly, Plaintiff's § 1985 conspiracy claims against the Individual Defendants will be dismissed without prejudice.

### 2. First Amendment Claims under § 1983 (Counts Two, Three, and Four)

Next, the Court considers Plaintiff's First Amendment claims under § 1983 against Bormann. (Compl. ¶¶ 132–37 (Count Two).)

Section 1983 allows an individual to sue a "person" who, acting "under color of any statute [or] ordinance … of any State," violates that individual's Constitutional rights. 42 U.S.C. § 1983; *Callan v. Ocean Cnty. Dep't of Corr.*, Civ. No. 21-08450, 2022 WL 901528, at *4 (D.N.J. Mar. 28, 2022). To state a cognizable claim under § 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips*, 515 F.3d at 235 (citing *Kneipp v. Teder*, 95 F.3d 1199, 1204 (3d Cir. 1996)). A plaintiff is required to plead two elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privilege secured by the Constitution or the laws of the United States"; and (2) that the plaintiff was deprived of her rights by a person acting under the color of state law. *Williams v. Borough of W. Chester*, 891 F.2d 458, 464 (3d Cir. 1989); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983, does not, by itself, confer any substantive rights. It only serves to enforce rights granted under the Constitution or federal law. *Mayer v. Gottheiner*, 382 F. Supp. 2d 635, 646–47 (D.N.J. 2005). Thus, the specific constitutional right alleged establishes what the controlling substantive law will be. *Ingliema v. Town of Hampton*, Civ. No. 05-3497, 2007 WL 980414, at *2 (D.N.J. Mar. 28, 2007).

Counts Two through Four of the Complaint are predicated on alleged First Amendment violations based upon Plaintiff's right to free speech and right to petition the government to redress grievances. The First Amendment states as follows:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. amend. I.

Defendant argues that each of Plaintiff's First Amendment claims should be dismissed because Plaintiff fails to assert that she was deprived of any right protected by the First Amendment. The Court agrees.

**a) Restraint of First Amendment Free Speech (Count Two)**

An employee suing her government employer under the First Amendment's Speech Clause must show that "she spoke as a citizen on a matter of public concern." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011) ("If an employee does not speak as a citizen, or does not address a matter of public concern, a federal court is not the appropriate forum….") "When employees 'make statements pursuant to their official duties,' they are not 'speaking as citizens for First Amendment purposes,' such that the speech is not of public concern and the First Amendment does not prohibit as retaliatory subsequent employer discipline." *D & D Assocs. v. Bd. of Educ.*, No. 03-1026, 2012 U.S. Dist. LEXIS 44887, at *61 (D.N.J. Mar. 30, 2012) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or other concern to the community." *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 146–148 (1983)).

Even if an employee does speak as a citizen on a matter of public concern, the employee's speech is not automatically privileged. *Guarnieri*, 564 U.S. at 386. "The First Amendment right of a public employee or an independent contractor … is to be weighed against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its

employees.'"[7] *D & D Assocs.*, 2012 U.S. Dist. LEXIS 44887, at *61 (quoting *Guarnieri*, 564 U.S. at 386); *see also Garvey v. Barnegat Bd. of Educ.*, No. 07-6134, 2008 U.S. Dist. LEXIS 57603, at *14 (D.N.J. July 21, 2008) ("A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations.") (quoting *Garcetti*, 547 U.S. at 418.)

In Count Two, Plaintiff alleges that Bormann restrained Plaintiff's right to free speech under the First Amendment for no rational or legitimate reason when Bormann declined to allow Plaintiff to send an email to School District staff members to offer herself as a resource for any COVID-19 vaccination questions. (Compl. ¶¶ 52–54.) Plaintiff's proposed speech would have been sent to all School District staff members through the School District's internal email listserv for staff called "AllDistrictStaff@rumsonchool.org". (*See, e.g.*, *id.* At Ex. 6.)

Here, the Court finds that Plaintiff fails to allege that her request to send an email communication to staff members was a matter of public concern. Instead, Bormann denied Plaintiff's purely personal request as to whether she could offer herself as a resource to answer any questions about the COVID-19 vaccination through the School District's email listserv. Such speech is not protected under the First Amendment. Furthermore, even if such speech was protected, because Plaintiff sought to use the School District's email listserv as a forum, Bormann "may impose restrictions on speech that are reasonable and viewpoint-neutral." *Miller v. Goggin*, 2023 U.S. Dist. LEXIS 78620, at *28 (E.D. Pa. May 5, 2023) (quoting *Christian Legal Soc. Chapter of the Univ. of California*, *Hastings College of the Law v. Martinez*, 561 U.S. 661, 679 n.11 (2010)). Bormann's reasoning for imposing his restriction was both reasonable and viewpoint-neutral (*See, e.g.*, Compl.

---

[7] "For First Amendment protection purposes, independent contractors are treated the same as public employees." *D & D Assocs.*, 2012 U.S. Dist. LEXIS 44887, at *61 (citing *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996)).

at Ex. 10 (stating that "it would not be appropriate to provide advocacy one way or another" and that "our role as a public entity [is] to provide only the factual information available".))

Accordingly, because Plaintiff has not plead that the alleged restraint applied to speech protected by the First Amendment, Defendants' Motion to Dismiss Plaintiff's restraint of speech claim will be granted and Count Two will be dismissed without prejudice.

**b) First Amendment Retaliation (Count Four)**

Similar to Plaintiff's First Amendment restraint of speech claim, Plaintiff's First Amendment retaliation claim in Count Four cannot be sustained because the Complaint has failed to sufficiently plead that Plaintiff engaged in a protected activity. (Compl. ¶¶ 148–57 (Count Four).)

To assert a retaliation claim under § 1983 predicated on the First Amendment, a plaintiff must show (1) that she engaged in a protected activity, (2) that the defendant's retaliatory action was sufficient to deter a person of ordinary firmness from exercising her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action. *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2012) (citations omitted). "[T]he 'critical question' for determining whether a public employee's speech is protected under the First Amendment 'is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" *Pasqua v. Cnty. of Hunterdon*, 721 F. App'x 215, 221 (3d Cir. 2018) (quoting *Lane v. Franks*, 573 U.S. 228, 239 (2014)).

In Count Four, Plaintiff alleges that the protected activity that she claims led Bormann to retaliate against her was engaging in "protected speech and petition[ing] her government on issues relating to matters of public concern." (Compl. ¶ 149.) In response to Plaintiff's protected activity, Plaintiff alleges that Bormann retaliated against her by terminating her employment. (*Id.*)

As alleged, and even when construing the Complaint in the light most favorable to Plaintiff, Plaintiff's speech here is within the scope of her duties as a nurse and thus, was not made as private

citizen on a matter of public concern. Instead, Plaintiff's speech was made in her capacity as a school nurse to discuss questions she had regarding the application of COVID-19 policies and procedures in the School District. She sought clarity regarding the COVID-19 protocols as it applied to her responsibilities as a nurse. (*See, e.g.*, Compl. ¶ 87 ("[O]ne of the major things Plaintiff Brink needed to do her job effectively and in accordance with a nurse's scope of practice and license, is written, valid, policy and procedure."; *id.* at Ex. 12 ("[A]s one of the medical professionals here, I need to have a firm understanding from a medical safety standpoint and from a liability standpoint."); *id.* at Ex. 18 ("I explained [to Bormann] that I was uncomfortable doing things that were not found in official policy or guidance.").) Such speech is thus not of public concern and is not entitled to First Amendment protection for subsequent retaliatory action. Therefore, Plaintiff has not sufficiently pled a plausible First Amendment retaliation claim and Count Four for failure to state a claim will be dismissed without prejudice.

**c) First Amendment Right to Petition (Count Three)**

Next, Count Three asserts a claim under § 1983 against Bormann for deprivation of her First Amendment right to petition. (Compl. ¶¶ 138–47 (Count Three).)

It is well-established that the First Amendment protects the right to file grievances. *Watson v. Rozum*, 834 F.3d 417, 422 (3d Cir. 2016). "The right to petition the government is 'one of the most precious of the liberties safeguarded by the Bill of Rights.'" *Mirabella v. Villard*, 853 F.3d 641, 653 (3d Cir. 2017) (quoting *BE & K Constr. Co v. NLRB*, 536 U.S. 516, 524 (2002)). A petition may take multiple forms and may be directed towards any department of a local, state, or the national government. Further, "[t]he right to petition allows citizens to express their ideas, hopes, and concerns to their government and their elected representatives." *Id.* at 654. But critically, there is no corresponding requirement that a governmental unit must respond to a petition. *See Smith v. Ark. State Highway Emp., Local 1315*, 441 U.S. 463, 465 (1979) ("But the First Amendment does not

impose any affirmative obligation on the government to listen, [or] to respond[.]"); *Newton v. Greenwich Twp.*, No. 12-238, 2012 WL 3715947, at *2 (D.N.J. Aug. 27, 2012) ("[W]hile there is a constitutional right to petition the government for redress of grievances, there is no constitutional right to have the government respond to that petition.") (emphasis omitted).

Plaintiff's First Amendment claim in Count Three arises from Bormann's failure to respond to her alleged petition of grievances. According to the Complaint, Plaintiff submitted her grievances to Bormann regarding implementation of COVID-19-related policies and procedures in an email dated January 13, 2021. (Compl. ¶ 70, Ex. 12.) Subsequently, because Plaintiff's grievances had not been addressed (*id.* ¶ 74), Plaintiff also expressed these grievances to Bormann orally over the phone on February 1, 2021 (*id.* ¶ 77). Bormann did not address any of Plaintiff's grievances, nor did he forward them to the Board of Education for consideration. (*See id.* ¶¶ 102, 114, 119.) Critically, however, the Complaint does not allege that Bormann prohibited or limited Plaintiff's right to communicate with him or the Board of Education. Although Plaintiff was unsatisfied with Bormann's lack of response to her grievances, Bormann's failure to respond "does not amount to a violation of [Plaintiff's] right to petition." *B.L. v. Fetherman*, No. 22-3471, 2023 U.S. Dist. LEXIS 68306, at *18-19 (D.N.J. Apr. 18, 2023); *see also Williams v. Del. Cty. Bd. of Prison Inspectors*, No. 17-4348, 2018 U.S. Dist. LEXIS 161342, at *34 (D.N.J. Sept. 20, 2018) ("[Plaintiff] does not have a constitutional right to have his grievances addressed."). Accordingly, the Defendants' motion with respect to Plaintiff's First Amendment right to petition claim will be granted and Count Three will be dismissed without prejudice.

### 3. Fourteenth Amendment Equal Protection Claim under § 1983 (Count Five)

The Complaint alleges a § 1983 claim against Bormann for violation of Plaintiff's equal protection rights under the Fourteenth Amendment. (Compl. ¶¶ 158–65 (Count Five).) Plaintiff

alleges that Bormann violated Plaintiff's Fourteenth Amendment Equal Protection rights by treating Plaintiff differently than Montanez, a similarly-situated nurse. (*Id.* ¶ 159.) Specifically, Plaintiff alleges that Bormann allowed Montanez to share information on the COVID-19 vaccine to School District staff but did not allow Plaintiff to do the same. (*Id.* ¶¶ 159, 163.)

The Fourteenth Amendment states that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "In order to establish a § 1983 equal protection claim on this basis, [Plaintiff] must demonstrate that she received different treatment than other similarly situated persons and that the disparate treatment was based on her protected class status." *Kasper v. Cnty. of Bucks*, 514 F. App'x 210, 214 (3d Cir. 2013).

In this case, Plaintiff's equal protection claim fails to allege or plead sufficient facts for the Court to infer that Plaintiff's disparate treatment was based on any protected class status. Instead, Plaintiff alleges that Bormann treated Plaintiff differently than Montanez because "[Bormann] did not agree with Plaintiff[']s] personal viewpoint on COVID-19 vaccination." (Compl. ¶ 159.)

In some cases, however, an equal protection claim can be sustained where a plaintiff does not allege that she is a member of a protected class, but rather "claims that [she] has been irrationally singled out as a so-called 'class of one.'" *Engquist v. Or. Dept. of Agr.*, 553 U.S. 591, 601 (2008); *see also Phillips*, 515 F.3d at 243. To state an equal protection claim under a class of one theory, a plaintiff must show "(1) the defendant treated [her] differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006). "Persons are similarly situated under the Equal Protection Clause when they are alike 'in all relevant aspects.'" *Startzell*, 533 F.3d at 203 (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992)).

Here, Plaintiff identifies Montanez as a similarly-situated individual because she was employed as a nurse in the School District by the Board of Education. Plaintiff alleges that Defendant

Bormann treated Plaintiff differently than Defendant Montanez in violation of the Equal Protection clause of the Fourteenth Amendment by allowing Montanez "to exercise her First Amendment right … supporting the COVID-19 vaccination" while restraining Plaintiff's protected speech under the First Amendment regarding the same topic. (Compl. ¶¶ 159, 163.)

Even assuming *arguendo* that Montanez constitutes a similarly-situated individual, Plaintiff's equal protection claim nevertheless fails to allege a non-class-based equal protection claim. Beyond conclusory statements, Plaintiff does not allege a lack of rational basis for the alleged differential treatment she received. *See Aulisio*, 765 F. App'x at 765 ("Under the rational basis standard, any rational ground for the conduct in question will suffice to defeat the class-of-one claim."). To the contrary, the Complaint includes allegations that support an inference that Bormann had a rational basis for the alleged disparate treatment. For instance, the Complaint attaches, as an exhibit, Bormann's email in response to Plaintiff's request to offer herself as a resource for COVID-19 vaccination questions. (Compl. at Ex. 10.) In the email, Bormann clearly explains that "it would not be appropriate to provide advocacy one way or another" and that "it would put the [D]istrict in jeopardy if one followed the advice [of Plaintiff] and it had a negative impact." (*Id.*) In Plaintiff's response to Bormann's explanation, she acknowledges his "thoughtful response" and that she understood his reasoning. (*Id.*) Therefore, because Plaintiff does not allege any facts indicating that her treatment lacked rational basis, her equal protection claim against Bormann cannot succeed on a "class of one" theory. *See Carson v. Mulvihill*, 488 F. App'x 554, 563 (3d Cir. 2012) (rejecting class of one equal protection claim based on denial of certain medical equipment where inmate did "not allege facts showing … that there was no rational basis for his different treatment"). Accordingly, the Count Five will be dismissed.

#### 4. Due Process Claims under § 1983 (Counts Six and Seven)

Next, the Court turns to address Plaintiff's due process claims against the Board of Education in Count Six and Seven of the Complaint. (Compl. ¶¶ 166–71 (Count Six); *id.* ¶¶ 172–76 (Count Seven).)

To state a claim under § 1983 for a deprivation of procedural due process rights, a plaintiff must allege that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill*, 455 F.3d at 233–34 (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)).

In the Complaint, Plaintiff advances two procedural due process claims.[8] In Count Six, Plaintiff alleges a violation of due process based on stigma-plus theory, meaning a liberty interest in "her good name, reputation, honor, and integrity." (Compl. ¶¶ 166–71.) In Count Seven, Plaintiff alleges a violation of due process based on a property interest in continued employment. (*Id.* ¶¶ 172–76.) With respect to both Counts, Plaintiff contends that the Board of Education deprived her of a liberty interest and a property interest when the Board of Education condoned her termination and failed to provide procedural due process as for a permanent employee in Plaintiff's position. (*Id.* ¶¶ 167, 173.) For the reasons discussed below, the Court finds Plaintiff has failed to state a claim for procedural due process based on either a stigma-plus theory or on her continued employment.

##### a) Stigma-Plus Claim (Count Six)

To establish a claim that Plaintiff was deprived of her liberty interest in her reputation, Plaintiff must plead a "stigma-plus claim." *Kane v. Chester Cnty.*, 811 F. App'x 65, 69 (3d Cir. 2020).

---

[8] While Plaintiff does not specify whether she asserts her due process claims under either substantive due process or procedural due process, the Court construes both claims under procedural due process due to the Complaint's allegations regarding failure to provide "procedure to provide due process." (Compl. ¶¶ 167, 173.)

An individual has a protectable interest in her reputation. *Wisconsin v. Constantineau*, 400 U.S. 433, 91 (1971). Reputation alone, however, is not an interest protected by the Due Process Clause. *See Versarge v. Twp. of Clinton*, 984 F.2d 1359, 1371 (3d Cir. 1993) (citation omitted). Rather, to make out a due process claim for deprivation of a liberty interest in reputation, a plaintiff "must show a stigma to [her] reputation plus deprivation of some additional right or interest." *Hill*, 455 F.3d at 236. "To satisfy the 'stigma' prong of the test the plaintiff must allege 'that the purportedly stigmatizing statement(s)' were (1) false, and (2) made publicly." *Kane*, 811 F. App'x at 69 (quoting *Hill*, 455 F.3d at 236) (citations omitted); *see also Chabal v. Reagan*, 841 F.2d 1216 (3d Cir. 1988).

Here, Plaintiff alleges that Bormann made "false claims, stigmatizing and defamatory comments" that caused Plaintiff to be "stigmatized and defamed in the eyes of her colleagues of the [School District], the [Board of Education], the staff at ESS, and her family and friends." (Compl. ¶¶ 131–132.) Bormann's alleged false statements are contained within an email dated February 1, 2021, from Bormann to the Board of Education, regarding Plaintiff's termination. For instance, in the email, Bormann states that "[Plaintiff] was questioning and indicating she would not follow district protocols." (*Id.* at Ex. 19.) Plaintiff argues that this statement was false because she "never refused to complete an assigned task, nor was Plaintiff counseled or cited for any negative action, statement, or behavior." (*Id.* ¶ 130.)

Even assuming that Bormann's statements in his email communication were false or defamatory, Plaintiff fails to allege any public statement. The Complaint does not allege that this email was disseminated to any members of the public and instead, Borman's email post-termination was sent to members of the Board of Education only. (*See id.* at Ex. 19.) Such an internal email communication falls far short of the type of public dissemination for which the protections of due process may be invoked. *See Chabal*, 841 F.2d at 1223–24 (government entity must disseminate

information disparaging a plaintiff's "good name, reputation, honor, or integrity" to the public in order to sustain an actionable infringement of plaintiff's liberty interest). Therefore, the email does not provide a basis for Plaintiff's stigma-plus due process claim.

Accordingly, Plaintiff has failed to sufficiently plead a due process claim, and Defendants' motion as to Count Six will be granted.

**b) Property Interest in Employment (Count Seven)**

Plaintiff's remaining due process claim under 42 U.S.C. § 1983 also fails to state a claim because Plaintiff has not identified a protected property interest under the Fourteenth Amendment.

"In order to succeed on a claim of deprivation of due process under the Fourteenth Amendment with respect to termination of a specific employment position, a plaintiff must first establish a property interest in the employment." *Latessa v. New Jersey Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir. 1997). "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Hill*, 455 F.3d at 234 (quoting *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005)). "A public employee, absent a statutory or contractual entitlement to his job, has no legitimate property interest in continued employment." *Daniels v. Borough of Spring Lake Heights*, No. 07-4921, 2009 U.S. Dist. LEXIS 85520, at *12 (D.N.J. Sept. 18, 2009) (citing *Bd. Of Regents v. Roth*, 408 U.S. 564, 578 (1972)). Similarly, an at-will employee does not have a property interest in a job and thus has no rights to procedural due process because she serves at the pleasure of her employer. *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005); *see also Robertson v. Fiore*, 62 F.3d 596, 601 (3d Cir. 1995); *Morgan v. Union Cnty. Bd. Of Chosen Freeholders*, 268 N.J. Super. 337, 355 (App. Div. 1993). "In New Jersey, an employer may fire an employee for good reason, bad reason, or no reason at all under the employment-at-will doctrine. An employment relationship remains terminable at the will of either an employer or employee, unless an agreement exists that

provides otherwise." *Witkowski v. Thomas J. Lipton, Inc.*, 136 N.J. 385, 397 (1994) (internal citation omitted). If parties to an employment agreement intend for the relationship to be something other than at-will, such intention must be "specifically stated in explicit, contractual terms." *Anderson v. DSM N.V.*, 589 F. Supp. 2d 528, 534 (D.N.J. 2008) (internal quotation marks and citation omitted).

Here, Plaintiff alleges that she was a permanent non-tenured employee of the School District and that she "had a legitimate expectation of continued employment barring good cause for termination." (Compl. ¶¶ 16, 176.) While "New Jersey law provides that tenured teachers may be terminated for cause only," because Plaintiff was a non-tenured employee, any claim to entitlement to her job must come from the employment contract. *Goodmann v. Hasbrouck Heights Sch. Dist.*, 275 F. App'x 105, 108 (3d Cir. 2008). The Court finds that the parties' employment contract does not create a protected property interest in Plaintiff's nurse position. Indeed, the employment contract does not contain language that would suggest any legitimate expectation of continued employment. The terms of the employment contract governing Plaintiff's appointment state that Plaintiff's position as a School Nurse Permanent Substitute was to begin on September 25, 2020 "to a date to be determined" and that Plaintiff was hired and paid through ESS, a third-party agency. (Compl. at Ex. 1.) It also states that Plaintiff was contracted for the temporary position pursuant to N.J.S.A. 18A:16-1.1[9] and "the time served in this position does not contribute toward acquiring tenure." (*Id.*)

Based on these terms, the Court finds that the employment contracts fails to indicate any intention that Plaintiff's employment to be anything other than at will. Thus, as an at-will employee, Plaintiff does not have any property interest in continued employment as a permanent substitute nurse with the School District. *See, e.g., Chen v. Newark Pub. Schs.*, No. 07-1618, 2009 U.S. Dist. LEXIS

[9] N.J.S.A. 18A:16-1.1 provides for the hiring of temporary employees "to act in place of any officer or employee during the absence, disability or disqualification of any such officer or employee." *Lammers v. Bd. of Educ.*, 134 N.J. 264, 268 (1993) (emphasis omitted).

103746, at *14 (D.N.J. Nov. 5, 2009) (dismissing a substitute teacher's due process claim under § 1983 because the teacher was an at-will employee and thus, could not establish his right in his at-will, per diem employment).

Therefore, the Defendants' motion as to Count Seven will be granted and Plaintiff's due process claim will be dismissed without prejudice.

### *5.* *Monell* Claim under § 1983 (Count Eight)

The Court next turns to Plaintiff's *Monell* claim under § 1983 against the Board of Education. (Compl. ¶¶ 177–94 (Count Eight).)

It is well settled law that a municipality may not be held liable under § 1983 for the misconduct of its employees under a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691 (1978). For a government entity to be liable for unconstitutional conduct, the injury alleged must result from the execution of a government policy or custom. *Id*. at 694–95. Such a policy or custom may be made by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id.* Thus, a government entity can be liable for constitutional injuries only when they result from the implementation or execution of an official policy, regulation, or decision adopted by it or informally adopted by custom. *McTernan v. City of York*, 564 F.3d 636, 657–58 (3d Cir. 2009). "This creates a 'two-track path' to municipal liability whereby a plaintiff may establish that his or her injury resulted from either an officially adopted policy or an informally adopted custom." *Henderson v. Matthews*, 565 F. Supp. 3d. 531, 534–35 (E.D. Pa. 2020) (citing *McTernan*, 564 F.3d at 657–58.)

Most critically, however, is that municipal liability under § 1983 requires an underlying constitutional violation. *See Monell*, 436 U.S. at 690–91; *Startzell*, 533 F.3d at 204 (stating that for § 1983 liability to attach to a municipality, there "must be a violation of [the plaintiff's] constitutional rights) (citation omitted). Indeed, without a "violation in the first place, there can be no derivative

municipal claim." *See Mulholland v. Gov't Cnty. of Berks, Pa.*, 706 F.3d 227, 245 n.15 (3d Cir. 2013); *see also Bridges ex rel. D.B. v. Scranton Sch. Dist.*, 644 F. App'x 172, 178 (3d Cir. 2016) ("To hold the school district liable for a failure to train under Section 1983, [plaintiffs] must demonstrate that there was a constitutional violation and that the violation was caused by the School District's policy or custom.") (emphasis added) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1212 n.26 (3d Cir. 1996)). Here, the Court has already dismissed Plaintiff's First Amendment and Fourteenth Amendment claims. Thus, no constitutional violation exists as to provide a basis to make the Board of Education liable under § 1983. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (if a municipal employee "inflicted no constitutional injury…, it is inconceivable that [the municipality] could be liable"); *see also, e.g., Hohsfield, v. Staffieri*, Civ. No. 21-19295, 2021 U.S. Dist. LEXIS 209773, at *11 (D.N.J. Nov. 1, 2021); *Brooks v. Codispoti*, Civ. No. 12-05884, 2015 U.S. Dist. LEXIS 172202, at *33 (D.N.J. Dec. 28, 2015). Thus, the Court grants Defendants' motion with respect to Plaintiff's *Monell* claim against the Board of Education. Count Eight of the Complaint is dismissed.

In sum, the Court finds that Plaintiff has failed to plead any plausible federal claim and accordingly, Counts One through Eight of the Complaint will be dismissed.

**6. State Law Claims (Counts Nine, Ten, Eleven, and Twelve)**

Finally, the Court turns to Plaintiff's remaining claims brought under state law, which the Court has supplemental jurisdiction over pursuant to 28 U.S.C. § 1367.

Having dismissed Plaintiff's federal claims, the Court now declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims (Counts Nine through Twelve). *See* 28 U.S.C. § 1367(c)(3). As is the case here, where "the district court has dismissed all claims over which it has original jurisdiction," a district court may decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009). "The decision to retain or decline jurisdiction over state-law claims is discretionary." *Kach*, 589 F.3d at 650. The Third Circuit Court

of Appeals has held that when determining whether to exercise supplemental jurisdiction, "the district court should take into account generally accepted principles of 'judicial economy, convenience, and fairness to the litigants.'" *Growth Horizons, Inc. v. Delaware Cnty., Pa.*, 983 F.2d 1277, 1284 (3d Cir. 1993) (quoting *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)). Where courts dismiss federal claims at an early stage in the litigation, courts generally decline to exercise supplemental jurisdiction over state claims. *Gibbs*, 383 U.S. at 726.

Here, the Court has determined that it will dismiss all of Plaintiff's claims for which it has original jurisdiction, *i.e.*, Plaintiff's federal claims. Pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Plaintiff may refile her state law tort claims in the appropriate state court.[10]

## V. CONCLUSION

For the reasons stated above, Defendants' Cross-Motion to Vacate Default will be GRANTED and Plaintiff's Motion for Default Judgment will be DENIED. Defendants' Cross-Motion to Dismiss will be GRANTED. The Complaint will be DISMISSED WITHOUT PREJUDICE. Plaintiff will be given leave to amend her complaint to address the deficiencies set forth in this Opinion within 30 days. An appropriate Order will follow.

Date: **September 25, 2023**

/s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

[10] Consequently, because the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, the Court need not address Defendants' remaining arguments in support of their motion to dismiss with respect to the state law claims.

# EXHIBIT C

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK,**<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, *et al.*,**<br><br>Defendants. | Civil Action No. 23-00497 (ZNQ) (JTQ)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon the Motions of Defendants John Bormann ("Bormann") and the Board of Education of Rumson ("Board of Education") (together, "Defendants") to vacate default and extend time to answer ("Mot. to Vacate Default", ECF No. 22), and to dismiss Plaintiff Jessica M. Brink's ("Plaintiff") Verified Amended Complaint ("Motion to Dismiss", ECF No. 23). Plaintiff opposed the Motion to Vacate Default ("Opp'n to MVD," ECF No. 24) and opposed the Motion to Dismiss ("Opp'n to MTD", ECF No. 26). The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Vacate Default will be **GRANTED** and Defendants' Motion to Dismiss will be **GRANTED**.

## I. BACKGROUND AND PROCEDURAL HISTORY[1]

In September 2020, to assist with the novel coronavirus ("COVID-19") pandemic, Plaintiff was hired as a School Nurse Permanent Substitute in the Rumson School District ("School District") by Defendant Board of Education. (Verified Amended Complaint ("VAC"), ECF No. 19 ¶¶ 110, 114.) An employment contract dated October 1, 2020 retroactively approved her hiring and provided that Plaintiff would work "beginning on September 25, 2020 to a date to be determined, hired and paid through [third-party employment contractor] ESS at the rate of $200/day." ("VAC Supp.", ECF No. 20 at Ex. 1; VAC ¶¶ 108–09.) Plaintiff worked within the School District as a supplement to two certified school nurses, including Maria Montanez ("Montanez"). (VAC ¶¶ 106, 124, 126.) Plaintiff worked part-time for the School District and part-time as a Patient Advocate. (*Id.* ¶ 114.)

In December 2020, Defendant Bormann, the Superintendent of the School District, emailed Plaintiff to inform her that he provided her name and contact information to the Health Department "to get you on the [vaccination] list in the event that you will be getting the [COVID-19] vaccine." (VAC Supp. at Ex. 2; *see also* VAC ¶ 163.) In response, Plaintiff informed Bormann that she would not be getting the vaccine for personal reasons and offered, in her capacity as a Patient Advocate, to share her reasoning for her decision. (VAC Supp. at Ex. 2.) Bormann replied to Plaintiff's email that this was "[n]ot a problem" and that he "just wanted to offer [her] the same opportunity as all our nurses." (*Id.*) He also noted that, as a school leader, he was "in no position

[1] For the purposes of the Motion to Dismiss, the Court accepts the factual allegations in the VAC as true and draws all inferences in the light most favorable to the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *Merchs. Mut. Ins. Co. v. 215 14th Str., LLC*, Civ. No. 19-9206, 2020 WL 634149, at *1 (D.N.J. Feb. 10, 2020). Further, the Court also considers any "document integral to or explicitly relied upon in the complaint[,]" including the Exhibits filed as a separate document (ECF No. 20) to the Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The parties are familiar with the factual and procedural history of this matter and therefore the Court recites only those facts necessary to resolve the instant Motions.

to have an opinion on the matter of whether one should or should not have a vaccine. I can only provide the opportunities and follow the guidance expected of schools." (*Id.*)

At various times including in January 2021, Montanez emailed staff members at a school within the School District to provide COVID-19 vaccine-related information. (VAC ¶ 176; VAC Supp. at Ex. 3.) Bormann also shared regular vaccine-related emails with School District staff in December 2020 and January 2021, including, *inter alia*, a survey to "gauge the staff's interest in receiving the vaccine." (VAC ¶ 178.)

On January 7, 2021, Plaintiff sent Bormann an email with the subject line: "A resource" in which Plaintiff requested Bormann's "permission to email the [School District] staff and offer [her]self as a resource" for any questions about the COVID-19 vaccination. (VAC Supp. at Ex. 4.) In the email, Plaintiff stated that she was "technically not an employee of [the School District]" and that she wanted to "ensure that everyone has a complete an informed consent as possible." (*Id.*) She also included a draft copy of the email she intended to send to all School District staff, which invited staff to contact her via her personal email with any questions about the vaccine, which she would answer based on her "significant . . . research[.]" (*Id.*)

A day later, on January 8, 2021, Bormann forwarded Plaintiff's email to Montanez to ask her what she thought about Plaintiff's request. (*Id.* at Ex. 10.) Montanez replied that "[she felt] uncomfortable with having a permanent sub nurse do this as [she is] not sure what information will be relayed." (VAC ¶ 273; VAC Supp. at Ex. 10.) Further, Montanez said that "we would not provide [sic] a permanent sub . . . to become the resource over our own full time staff." (VAC Supp. at Ex. 10.) Instead, Montanez stated that "providing the informational links like [Bormann had] been doing allows staff to read, digest and make their own decisions. Staff can forward any questions to their health care provider." (*Id.*) Bormann responded that he would let Plaintiff know

that "it is not our role to provide any advocacy one way or another, but to just share the factual information for them to consider with their own physician." (*Id.*) On January 9, 2021, Bormann responded to Plaintiff's email to state the following:

> [I]t would not be appropriate to provide advocacy one way or another. It is our role as a public entity to provide only the factual information available from government institutions . . . .

(VAC ¶ 274.)

On January 13, 2021, Plaintiff initiated a discussion with Bormann, Montanez, and a school principal to discuss questions she had regarding the discrepancy in the recommended quarantine period between federal and state guidelines (14 days) and the School District's quarantine recommendations (10 days). (VAC Supp. at Ex. 7.) The same day, Plaintiff sent an email with the subject line: "Requesting some clarity" to Bormann, Montanez, two school principals, and another School District nurse. (*Id.* at Ex. 5.) In her email, Plaintiff stated that "I'm throwing my interpretation of the following [state quarantine guideline] into the ring, because it relates to the confusion we had this morning. I'm genuinely not trying to make this difficult. It's a very confusing thing for which consistency is paramount." (*Id.*) Further, Plaintiff explained that she was working on a flow chart to make decisions about the quarantine period easier and more consistent. (*Id.*) In response to Plaintiff's email, Borman replied "[p]ut your flow chart together and we will go from there." (*Id.*)

On February 1, 2021, Plaintiff and Defendant had a phone call to discuss the concerns Plaintiff stated in her email regarding COVID-19 policies and procedures. (VAC ¶¶ 224–25; VAC Supp. at Ex. 7.) During this phone call, Plaintiff asked Bormann to share with her the written law, policy, or guidance that authorized the School District to, *inter alia*, compel children to quarantine without court order and inconsistently apply quarantine guidance. (*Id.* ¶¶ 226–230; VAC Supp. at

Ex. 7.) Further, she explained that she "was uncomfortable doing things that were not found in official policy or guidance" and that "while quarantining is recommended, it is voluntary and [she] cannot compel anyone to do so." (VAC Supp. at Ex. 7.) In response, Bormann told Plaintiff that she was clearly "not comfortable with the expectations of the job and that it would probably be best if [she] did not continue [her] role with the [School District]." (*Id.*) He stated she was "free to work for ESS in other districts and that [he would] email ESS about [her] termination." (*Id.*)[2]

After the meeting with Bormann, Plaintiff drafted a letter and transmitted it through email to the Board of Education and Bormann, discussing "[her] perspective on the circumstances which led to the end of [her] employment." (*Id.*) In response to Plaintiff's letter, Bormann sent a reply email that stated the following:

> As you can extract from reading this letter, this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. . . . Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

(*Id.* at Ex. 8.)[3]

On January 26, 2023, Plaintiff filed a Verified Complaint asserting twelve (12) claims against Defendants including federal claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and U.S. Const. amends. I and XIV, and a *Monell* claim, as well as state law claims. ("Verified Compl.", ECF No. 1.) On May 12, 2023, a notice of appearance by Defendants' counsel was filed on behalf of all Defendants. (ECF No. 9.) Upon motion by Plaintiff (ECF No. 10), on May 15,

[2] In an email in response to an inquiry from ESS, Bormann stated that the reason for Plaintiff's termination from the School District was "[Plaintiff] was found not to be a good fit in the [School District]." (*Id.* ¶ 252.)

[3] Plaintiff obtained a copy of this post-termination email correspondence through a request for records under New Jersey's Open Public Records Act, N.J.S.A §§ 47:1A-1 *et seq.* (VAC ¶ 249.)

2023, the Clerk entered default against Defendants for failure to plead or otherwise defend. That same day, Plaintiff also moved for default judgement against all Defendants. (ECF No. 11.) On May 18, 2023, Defendants filed cross-motions to vacate the default judgment (ECF No. 13) and to dismiss the Verified Complaint (ECF No 12.) On September 25, 2023, in its Prior Opinion the Court dismissed the Verified Complaint without prejudice, allowed Plaintiff leave to amend, and vacated the default. ("Prior Op.", ECF No. 17.)

On October 24, 2023, Plaintiff filed her VAC asserting two counts against Defendants Bormann and the Board of Education: (1) First Amendment Retaliation pursuant to 42 U.S.C. § 1983 ("§ 1983") and (2) First Amendment Viewpoint Discrimination also pursuant to § 1983. (*See generally* VAC.) On November 15, 2023, eight (8) days after their time to answer had expired, Defendants filed the instant Motion to Vacate Default (ECF No. 22) and Motion to Dismiss the VAC (ECF No. 23).

## II. JURISDICTION

The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

## III. LEGAL STANDARD

### A. Setting Aside Default

The Clerk must enter default "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise . . . ." Fed. R. Civ. P. 55(a). "A judgment setting aside the entry of default is within a district court's discretion . . . ." *Doe v. Hesketh*, 828 F.3d 159, 174 (3d Cir. 2016) (quoting *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194–95 (3d Cir. 1984)). "The court may set aside an entry of default for good cause. . . ." Fed. R. Civ. P. 55(c). "In exercising that discretion

and determining whether 'good cause' exists, [the Third Circuit has] instructed district courts to consider the following factors: '(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; [and] (3) whether the default was the result of the defendant's culpable conduct.'" *Hesketh*, 828 F.3d. at 174 (quoting *$55,518.05 in U.S. Currency*, 728 F.2d at 195) (second alteration in original). Delay is rarely sufficiently prejudicial to prevent vacating default. *See Feliciano v. Reliant Tooling Co.*, 691 F.2d 653, 656–57 (3d Cir. 1982). A defendant "must assert defenses that would constitute a complete defense" in order to show a "meritorious defense." *World Ent. Inc. v. Brown*, 487 F. App'x 758, 761 (3d Cir. 2012). "[T]he standard for 'culpable conduct' in this Circuit is the 'willfulness' or 'bad faith' of a non-responding defendant," including "acts intentionally designed to avoid compliance with court notices"—it must be more than "mere negligence." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1182–83 (3d Cir. 1984). On the whole, the Third Circuit has advised that default is disfavored, and instructs district courts to vacate default in "doubtful cases" "so that cases may be decided on their merits." *$55,518.05 in U.S. Currency*, 728 F.3d at 194–195.)

**B. Rule 12(b)(6)**

Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") provides that a court may dismiss a claim "for failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). On a motion to dismiss for failure to state a claim, the moving party "bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). District courts conduct a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court "must 'tak[e] note of the elements a plaintiff must plead to state a claim.'"

*Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks omitted). In doing so, the court is free to ignore legal conclusions or factually unsupported accusations that merely state, "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). "The defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages*, 926 F.2d at 1409).

Federal Rule of Civil Procedure 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). "A plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

It is well established that a "[pro se] complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Montgomery v. Pinchak*, 294 F.3d 492, 500 (3d Cir. 2002); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (demonstrating the point that a pro se plaintiff's pleading must be liberally construed and is held to a lesser standard than that which is applied to pleadings drafted by attorneys). However, "[e]ven

Case: 25-1825 Document: 39-1 Page: 151 Date Filed: 04/13/2026

a pro se complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013).

## IV. DISCUSSION

### A. MOTION TO VACATE DEFAULT

As stated above, in determining whether good cause exists to set aside an entry of default judgment, courts consider "(1) whether the plaintiff will be prejudiced; (2) whether the defendant has a meritorious defense; [and] (3) whether the default was the result of the defendant's culpable conduct." *Hesketh*, 828 F.3d at 175. Here, all three factors weigh in favor of finding good cause to vacate the Clerk's entry of default entered against Defendants.

First, the Court considers whether Plaintiff will suffer prejudice if the Motion to Vacate Default is granted. Defendants argue that Plaintiff will not suffer any prejudice "with regard to any evidentiary issues" because there has been only a "modest delay" and not a significant delay in the litigation resulting from the default. ("MVD Moving Br.", ECF No. 22-3 at 2.) Defendants further argue that they had 21 days to respond to the VAC and filed their Motions only one (1) day late. (*See id*. at 3.) Plaintiff argues that setting aside the default could result in the loss of evidence, as many Board of Education members have left office and the State of New Jersey's mandated three-year records retention schedule has nearly run its course. (*See* Opp'n to MVD at 7.) Plaintiff further argues that she has suffered prejudice due to errors by Court staff, and by the Court's dismissal of her original Verified Complaint, which she claims have led to litigation delays. (*See id.* at 8.)

As an initial matter, the Court notes that Defendants miscalculated their deadline. In fact, they filed their Motions eight (8) days late, not one day late. (*see id.* at 9.) This is because "any

required response to an amended pleading must be made within the time remaining to respond to the original pleading or within 14 days after service of the amended pleading, whichever is later." Fed. R. Civ. P. 15(a)(3). As such, Defendants' Answer and/or Motions were due by November 7, 2023, fourteen (14) days after Plaintiff filed the VAC. Defendants filed their Motions eight days later on November 15, 2023.

Defendants' eight-day delay is not insignificant, but the Court would be hard-pressed to find that it imposes a real prejudice on Plaintiff. This case was filed in 2023, yet it is still at its early stages. Notably, discovery has not even begun. This kind of delay is rarely sufficiently prejudicial to prevent setting aside a default, especially at this early stage in the litigation. *See Feliciano*, 691 F.2d at 656–57. As to Plaintiff's allegations that errors by Court staff and the Court's dismissal of the original Verified Complaint have resulted in prejudice to her, it is—and will continue to be—Plaintiff's burden to plead plausible claims for relief. Moreover, as the Court noted in its Prior Opinion, "the inconvenience and expense to a plaintiff of having to litigate on the merits do not rise to the level of prejudice required." *Julaj v. Tau Assocs. LLC*, Civ. No. 12-1464, 2013 WL 4731751, at *4 (D.N.J. 2013). Accordingly, this first factor weighs in favor of vacating default.

Next, the Court considers whether Defendants have raised a meritorious defense. Here, the Motion to Dismiss asserts multiple defenses under Rule 12(b)(6) that appear to be complete defenses to Plaintiff's claims. (*See generally* "MTD Moving Br.", ECF No. 23-3.) Defendants are not required to prove their case at this time, but only to "set forth with some specificity the grounds for [their] defense." *Harad v. Aetna Cas. & Sur. Co.*, 839 F.2d 979, 982 (3d Cir. 1988); *see also Hritz*, 732 F.2d at 1181 ("[A] meritorious defense is presumptively established when the allegations of defendant's answer, if established on trial would constitute a complete defense to

the action.") (cleaned up)). Thus, the Court finds that this second factor also weighs in favor of setting aside default.

Finally, the Court considers whether the default was a result of Defendants' culpable conduct. To find "culpable conduct" on the part of a non-responding defendant requires evidence of "willfulness" or "bad faith." *Hritz*, 732 F.2d at 1182. Here, Defendants responded, albeit belatedly, with the instant Motion to Vacate Default and Motion to Dismiss. Further, Defendants assert that the delay was because during the period Defendants had to respond to the VAC, schools were closed both for a holiday and for the New Jersey Education Association Convention, "thereby limiting access the amount of time Defendants had to discuss the Amended Complaint and subsequent motion with counsel." (MVD Moving Br. at 3.) The Court finds that failure to respond, on this basis, does not rise to "willfulness" or "bad faith."[4] *Hritz*, 732 F.2d at 1182. In sum, all factors weigh in favor of **GRANTING** Defendants' Motion to Vacate Default.

**B. MOTION TO DISMISS THE VERIFIED AMENDED COMPLAINT**

Defendants separately move to dismiss both counts in the VAC—First Amendment claims under § 1983—pursuant to Rule 12(b)(6). They argue Plaintiff fails to assert that she was deprived of any right protected by the First Amendment. (*See generally* MTD Moving Br.) The Court agrees.

Section 1983 allows an individual to sue a "person" who, acting "under color of any statute [or] ordinance . . . of any State," violates that individual's Constitutional rights. 42 U.S.C. § 1983;

[4] The Court notes, however, that Defendants have now twice filed late responses to the Complaints, resulting in entries of default. (ECF Nos. 10, 21.) Plaintiff contends that she made multiple attempts to contact Defendants in late 2023 regarding their response to the VAC, but that it was only after Plaintiff requested an entry of default that Defendants responded. (*See* Opp'n to MVD at 9–10.) Defendant made no attempts to request an extension of time to respond to the Complaints. (*See id.*) *See also* Fed. R. Civ. P. 6(b). Plaintiff further contends that Defendants' counsel "has made no attempts to confer with Plaintiff." (Opp'n to MVD at 10.) The Court cautions Defendants and their counsel that further delays on their part without appropriate attempts to notify the Court and/or confer with Plaintiff could result in a finding of culpable conduct and potential sanctions.

Case: 25-1805 Document: 39-1 Page: 154 Date Filed: 04/13/2026

*Callan v. Ocean Cnty. Dep't of Corr.*, Civ. No. 21-08450, 2022 WL 901528, at *4 (D.N.J. Mar. 28, 2022). To state a cognizable claim under § 1983, a plaintiff must allege a "deprivation of a constitutional right and that the constitutional deprivation was caused by a person acting under the color of state law." *Phillips*, 515 F.3d at 235 (citing *Kneipp v. Teder*, 95 F.3d 1199, 1204 (3d Cir. 1996)). A plaintiff is required to plead two elements to maintain a claim under § 1983: (1) that the plaintiff was deprived of a "right or privilege secured by the Constitution or the laws of the United States"; and (2) that the plaintiff was deprived of her rights by a person acting under the color of state law. *Williams v. Borough of W. Chester*, 891 F.2d 458, 464 (3d Cir. 1989); *see also West v. Atkins*, 487 U.S. 42, 48 (1988). Section 1983, does not, by itself, confer any substantive rights. It only serves to enforce rights granted under the Constitution or federal law. *Mayer v. Gottheiner*, 382 F. Supp. 2d 635, 646–47 (D.N.J. 2005). Thus, the specific constitutional right alleged establishes what the controlling substantive law will be. *Ingliema v. Town of Hampton*, Civ. No. 05-3497, 2007 WL 980414, at *2 (D.N.J. Mar. 28, 2007).

Both counts in the VAC are predicated on alleged First Amendment violations based upon Plaintiff's right to free speech. The First Amendment states, in relevant part: "Congress shall make no law . . . abridging the freedom of speech. . ." U.S. Const. amend. I. Although Plaintiff includes ostensibly new allegations, they are repackaged versions of the Verified Complaint, and the VAC cannot survive a motion to dismiss for similar reasons. The Court examines each claim in turn.

1. First Amendment Retaliation Claim Under § 1983 (Count I)

Plaintiff's First Amendment retaliation claim against Bormann and the Board of Education (Count I) cannot succeed because the VAC has failed to sufficiently plead that Plaintiff engaged in an activity protected by the First Amendment. (VAC ¶¶ 309–338.)[5]

[5] Plaintiff previously asserted, in the Verified Complaint, a claim for First Amendment retaliation. (Verified Compl. ¶¶ 148–57 (Count Four).) Her allegations here are substantially similar.

Plaintiff alleges that Bormann (in his individual and official capacities) violated Plaintiff's First Amendment right to free speech when he declined Plaintiff's request to disseminate information on a matter of "public concern"—the COVID-19 vaccine—to School District staff members and serve as a vaccine resource. (*Id.* ¶¶171–186, 316.) Plaintiff additionally alleges she engaged in the protected speech of questioning both Montanez's use of a non-contact thermometer and the authority of Bormann and the Board of Education "to require confinement, quarantines, testing, and collection of health-related data" for students and staff of the School District. (*Id.* ¶¶ 310, 318.) Plaintiff contends that her speech and the speech of other School District staff was chilled out of fear of retaliation. (*See id.* ¶¶ 303, 327.) Lastly, Plaintiff alleges that her anti-COVID vaccination viewpoint was the "motivating factor" in and "proximate cause" of her termination. (*Id.* ¶ 322–23, 332–33.) Defendants respond that Plaintiff's claim cannot succeed because her speech is not protected by the First Amendment because she was not speaking as a private citizen on a matter of public concern. (*See* MTD Moving Br. at 3–6.)

An employee suing her government employer under the First Amendment's Speech Clause must show that "she spoke as a citizen on a matter of public concern." *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386 (2011) ("If an employee does not speak as a citizen, or does not address a matter of public concern, a federal court is not the appropriate forum…."). "When employees 'make statements pursuant to their official duties,' they are not 'speaking as citizens for First Amendment purposes,' such that the speech is not of public concern and the First Amendment does not prohibit as retaliatory subsequent employer discipline." *D & D Assocs. v. Bd. of Educ.*, Civ. No. 03-1026, 2012 WL 1079583, at *19 (D.N.J. Mar. 30, 2012) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). "Speech implicates a matter of public concern if the content, form, and context establish that the speech involves a matter of political, social, or

other concern to the community." *Miller v. Clinton Cnty.*, 544 F.3d 542, 548 (3d Cir. 2008) (citing *Connick v. Myers*, 461 U.S. 138, 146–148 (1983)). Although "speech that relates solely to mundane employment grievances does not implicate a matter of public concern," *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 467 (3d Cir. 2015), "governmental inefficiency and misconduct is a matter of considerable significance." *Garcetti*, 547 U.S. at 425, 126 S. Ct. 1951.

To assert a retaliation claim under § 1983 predicated on the First Amendment, a plaintiff must show "(1) that [she] engaged in a protected activity,[6] (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2012) (citations omitted). "[T]he 'critical question' for determining whether a public employee's speech is protected under the First Amendment 'is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties.'" *Pasqua v. Cnty. of Hunterdon*, 721 F. App'x 215, 221 (3d Cir. 2018) (quoting *Lane v. Franks*, 573 U.S. 228, 239 (2014)).

Plaintiff has not shown that any of her speech was protected by the First Amendment. Bormann's stated reasons for terminating Plaintiff's employment were: "questioning and indicating that she would not follow district protocols," "request[ing] to send anti-vaccination guidance to the staff and conversations that have made both our school nurses uncomfortable." (VAC Supp. at Ex. 8; *see also* VAC ¶ 322.) For the reasons below, this is not protected speech.

---

[6] "A public employee's statement is protected by the First Amendment when: (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made." *Flora v. Cty. of Luzerne*, 776 F.3d 169, 174 (3d Cir. 2015) (citations and internal quotation marks omitted).

First, the VAC does not adequately plead that she made the remainder of her speech that allegedly led to retaliation in a capacity as a private citizen. (*See* Prior Op. at 16–17.) Rather, the VAC suggests she spoke as a non-certified substitute school nurse, posing questions she had regarding the application of COVID-19 policies and procedures in the School District—including the School District's quarantine and testing protocols. (*See* VAC ¶¶ 5, 318). The VAC indicates Plaintiff sought clarity regarding COVID-19 protocols as applied to her responsibilities as a non-certified substitute school nurse. (*See, e.g.*, VAC Supp. at Ex. 5 ("[A]s one of the medical professionals here, I need to have a firm understanding from a medical safety standpoint and from a liability standpoint."); *id.* at Ex. 7 ("[O]ne of the major things I need to do my job effectively and in accordance with my scope of practice and license is written, valid, policy and procedure."); *id.* ("I explained [to Bormann] that I was uncomfortable doing things that were not found in official policy or guidance.").) In response, Plaintiff emphasizes that she was "not an employee" of the School District. (Opp'n to MTD at 12.) However, "[f]or First Amendment protection purposes, independent contractors are treated the same as public employees." *D & D Assocs.*, 2012 WL 1079583, at *61 (citing *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 673 (1996)). Plaintiff's conclusory allegations that she "engaged in advocacy as a private citizen" and that she "was not acting pursuant to her job duties" cannot override contrary factual allegations. (VAC ¶¶ 311, 315.)

Similarly, the VAC suggests Plaintiff's observations of other nurses including Montanez using a non-contact thermometer, and her conversation with Montanez objecting to the same, occurred during Plaintiff's work hours as a non-certified substitute school nurse on school property. (*See id.* ¶¶ 129, 156, 159–60, 310.) Plaintiff responds that her role as a non-certified substitute school nurse was distinct from that of a certified school nurse and she was not authorized to perform the duties delegated by law to a certified school nurse. (*See* Opp'n to MTD at 10, 15–

16.) She contends that her official duties "did not include advocacy" (VAC ¶ 312; Opp'n to MTD at 20), and that she spoke purely "out of concern for the health and safety of children." (VAC ¶ 310.) Regardless of any distinction Plaintiff perceives between a certified school nurse and a non-certified substitute school nurse, Plaintiff fails to explain how the health and safety of children was *not* a part of her role. For all of these reasons, the Court finds that she did not speak as a private citizen on a matter of public concern and is not entitled to First Amendment protection from any subsequent retaliation.

Second, even if Plaintiff *had* spoken as a citizen on a matter of public concern, her speech is not automatically privileged. *Guarnieri*, 564 U.S. at 386. "The First Amendment right of a public employee or an independent contractor . . . is to be weighed against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *D & D Assocs.*, 2012 WL 1079583, at *19 (quoting *Guarnieri*, 564 U.S. at 386). A "government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Garvey v. Barnegat Bd. of Educ.*, Civ. No. 07-6134, 2008 WL 2902617, at *4 (D.N.J. July 24, 2008) (quoting *Garcetti*, 547 U.S. at 418).

Here, COVID-19 vaccine use, quarantine requirements, and testing protocols are issues that definitively affected the School District's operations. At the time the events giving rise to this lawsuit took place, New Jersey "continue[d] to experience COVID-19 transmission among school-aged children" and the New Jersey Department of Health recommended that any child with COVID-19 symptoms should not return to school until they had either received a negative COVID-19 test or completed the recommended quarantine period. (VAC Supp. at Ex. 5; *see also id.* at Ex. 9 (a 2020–2021 Rumson School District Operational Plan for the COVID-19 pandemic outlining

three education modes—Full In-Person, Hybrid, and Full Virtual—and advising that "Parents/guardians, students, and faculty/staff members must be prepared to move from one mode to another with short notice. This includes readiness with child support, transportation, instructional plans, support services, and technology needs.").) It is clear that the COVID-19 pandemic and associated vaccine, quarantine, and testing requirements changed the manner in which teachers and staff administered daily education to their students, and the way in which students received such an education, affecting their families as well. Because of this wide-ranging impact on school operations, the Court finds that, even reading the VAC in the light most favorable to Plaintiff, the Defendants' interests in maintaining their continued, safe operation outweighed Plaintiff's interests. Defendants therefore permissibly exercised the broader discretion afforded them as a state-employer when they introduced viewpoint-neutral controls on Plaintiff's speech as well as associated disciplinary measures for failure to abide by such controls.

Accordingly, Defendants' Motion to Dismiss Plaintiff's First Amendment retaliation claim will be **GRANTED**. Count I will be **DISMISSED WITHOUT PREJUDICE**.

2. <u>First Amendment Viewpoint Discrimination Claim Under § 1983 (Count II)</u>

Plaintiff's First Amendment viewpoint discrimination claim against Bormann and the Board of Education (Count II) also fails as the VAC does not sufficiently allege that a government actor discriminated against Plaintiff based on her viewpoint. (VAC ¶¶ 339–60.)

Plaintiff alleges that she "held a strong, personal viewpoint in opposition to the experimental, emergency use authorized COVID-19 vaccine." (*Id.* ¶ 341.) Plaintiff alleges Bormann (in his individual and official capacities) discriminated against her when he declined her request to disseminate information about the vaccine to School District employees because he, the Board of Education, and the School District did not agree with her views. (*Id.* ¶¶ 342–343, 351,

354–55.) She alleges her viewpoint was the "motivating factor" for her ultimate termination. (*Id.* ¶ 350.) Defendants respond that Plaintiff did not engage in any speech protected by the First Amendment, and that Bormann and the other Defendants imposed only viewpoint-neutral restrictions on Plaintiff. (*See* MTD Moving Br. at 7–8.)

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). Viewpoint discrimination occurs "when the government targets not subject matter, but particular views taken by speakers on a subject[.]" *Id.*

Here, Plaintiff alleges her free speech was prohibited because of her viewpoint opposing the COVID-19 vaccine. However, as stated above and in the Prior Opinion, Plaintiff's request to Bormann to serve as a vaccine resource "is not protected under the First Amendment." (Prior Op. at 15.) Moreover, "even if such speech was protected, because Plaintiff sought to use the School District's email listserv as a forum,[7] Bormann 'may impose restrictions on speech that are reasonable and viewpoint-neutral.'" (*Id.* (quoting *Miller v. Goggin*, 672 F. Supp. 3d 14, 36 (E.D. Pa. May 5, 2023) (holding that because school board meetings were "limited public fora," to be used by school district residents and taxpayers "to discuss matters of concern related to the school district[,]" content-neutral restrictions on speech in such meetings were permitted).)

The VAC makes clear that Bormann, on behalf of the School District, provided reasonable, viewpoint-neutral reasons for restricting Plaintiff's speech. The allegations do not suggest Bormann discriminated against Plaintiff based on her opposition to the COVID-19 vaccine. (*See*,

---

[7] Plaintiff argues she never intended to use the School District's listserv. She proffers instead that she intended to send the draft email to staff from her personal email address, which she states can be inferred from the inclusion of her personal email in the body of the draft message. (*See* Opp'n to MTD at 25–26.) However, even assuming Plaintiff did not intend to use the listserv, her act of copying all School District staff on an email to begin a discussion sanctioned by and including School District leaders is analogous to the board meetings that constituted "limited public fora" in *Miller v. Goggin*, allowing Bormann and the School District to impose viewpoint-neutral restrictions on such speech.

*e.g.*, VAC ¶ 274 (stating that "it would not be appropriate to provide advocacy one way or another" and "our role as a public entity [is] to provide only the factual information available").) When Plaintiff informed Bormann she would not be receiving the COVID-19 vaccine, he respected her position and responded that this was "[n]ot a problem" and that he "just wanted to offer you the same opportunity as all our nurses. (VAC Supp. at Ex. 2.) He also stated: "As a school leader I am in no position to have an opinion on . . . whether one should or should not have a vaccine." (*Id.*) In addition, Montanez assured Bormann in confidence that "providing the informational links like [Bormann had] been doing allows staff to read, digest and make their own decisions" together with their physicians. (*Id.* at Ex. 10.) These communications suggest a neutral opposition to any form of vaccine advocacy, not to Plaintiff's specific viewpoint. (*See* MTD Moving Br. at 8.)

Plaintiff contends that Defendants prioritized their own views over her own and "advocate[d] for the [COVID-19] vaccine" using the School District's listserv.[8] (Opp'n to MTD at 21.) However, a close examination of the allegations regarding Bormann and Montanez's communications to staff support that these were only informational, and not viewpoint-specific, notices. For example, Montanez's email simply notified staff of the process she experienced when receiving the vaccine, including the registration process and wait time, and a photograph of her vaccination card, but did not urge staff to receive the vaccine. (*See* VAC Supp. at Ex. 3.)

Furthermore, Bormann did not prevent Plaintiff from expressing her views outside the School District. He merely advised her that "would not want anyone involved with the [S]chool

[8] Plaintiff states that Montanez's communication "recogniz[ing] that the topic of the COVID-19 vaccine had a political component making it a matter of public concern" implies that "certain viewpoints are disfavored in the school." (Opp'n to MTD at 22–23.) However, this argument misses the mark. Montanez's exact words were: "Like it or not working in a school has a political component and you have to be mindful when and how you should share." (VAC Supp. at Ex. 10.) Montanez's complete statement indicates that she was referring to working in a school district in general as having a political component, and not the specific issue of the COVID-19 vaccine. In an email to Bormann, Montanez states she is "uncomfortable" having vaccination information disseminated by a substitute nurse as she is "not sure what information will be relayed." (*Id.*) Importantly, the statement is consistent with a policy of avoiding the promotion of one viewpoint over another.

[D]istrict" to "provide advocacy one way or another," implying that she should not engage in viewpoint-specific speech while contracted with the School District. (*See* Verified Compl., ECF No. 1-11 at Ex. 10; VAC ¶ 274; MTD Moving Br. at 8.) Bormann did not single out Plaintiff; rather, he stated that "anyone involved" with the School District should not advocate for a particular viewpoint. In fact, Bormann later made clear that despite Plaintiff's termination from the School District, she could still "retain her employment with ESS" and be assigned to other school districts where she could have a chance to express her views. (VAC Supp. at Ex. 8.) Thus, the VAC fails to show that Bormann, on behalf of the School District, took part in viewpoint-specific discrimination against "anti-vaccination guidance[.]" (*Id.*; *see also* VAC ¶ 322.)

Because the VAC fails to plead that the alleged restraint applied to speech protected by the First Amendment, or that Defendants' reasons for terminating Plaintiff were viewpoint-specific, Defendants' Motion to Dismiss Plaintiff's First Amendment viewpoint discrimination claim will be **GRANTED**. Accordingly, Count II will be **DISMISSED WITHOUT PREJUDICE**.

## V. <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Vacate Default (ECF No. 22) will be **GRANTED**. Defendants' Motion to Dismiss (ECF No. 23) will also be **GRANTED.** The VAC will be **DISMISSED WITHOUT PREJUDICE**. Plaintiff will be given leave to file a Second Amended Complaint to address the deficiencies set forth in this Opinion within thirty (30) days. Given Plaintiffs' previous unsuccessful attempts to plead her claims, the Court advises Plaintiff that failure to remedy these deficiencies in the next Complaint could result in dismissal with prejudice. An appropriate Order will follow.

Date: **June 25, 2024**

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT D

Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, individually and in his official capacity as Superintendent and Chief Administrative Office of the Rumson School District; BOARD OF EDUCATION OF RUMSON IN THE COUNTY OF MONMOUTH, a body politic and corporate.**<br><br>Defendants. | Civil Action No. 3:23-cv-00497 (ZNQ)(JTQ)<br><br>**VERIFIED SECOND AMENDED COMPLAINT** |

COMES NOW, Plaintiff, Jessica Brink ("Brink") in *pro se*, and for this Second Amended Complaint alleges the following:

## INTRODUCTION

1. It has been four years since the worst pandemic in recent history.

2. That pandemic, and our reaction to it, caused death, illness, isolation, learning loss, business failure, financial loss, mental health crises, increases in hunger, abuse, and hate that has persisted long beyond COVID-19.

3. In the years since the pandemic we have learned important lessons about what we could have



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

done better, what we could have done differently, and what we should never do again.

4. School closures, student quarantines, and remote learning had disastrous effects on children and families.

5. Social distancing, mandated use of face masks, and isolation of children from their friends and grandparents, disrupted the normal growth and development of children.

6. Plaintiff Brink and many others – citizens, parents, nurses, physicians, psychologists, teachers - recognized the dangers of these interventions in the early days of the pandemic.

7. Plaintiff Brink and many others spoke out about their concerns in an attempt to bring attention to the children and elderly that were suffering, and warn those in positions of power, about the dangers they were creating.

8. Parents were told to talk to school administrators, school administrators said their hands were tied. Sick patients were told to talk to their doctors, but many doctors weren't willing to see sick patients.

9. Students were relegated to a lonely, sterile classroom or an even more lonely computer screen. Sick patients were relegated to a hospital bed where many of them died scared and alone.

10. Children and the elderly suffered tremendously, and in some cases, needlessly during the COVID-19 pandemic.

11. People across the world were screaming from the rooftops "Danger! Danger!" but they were ignored, many were silenced, some had their licenses revoked, and their livelihoods destroyed.

12. Plaintiff Jessica Brink was one of those people who was silenced for attempting to sound the alarm.

13. She was a substitute nurse employed by a third-party, working in an affluent school district,

with no obligations as a government employee and no political influence from a teachers' Union.

14. Plaintiff Brink was a trained medical professional, an advocate, an objective third-party permitted inside the walls of school buildings during a time when no outsiders could enter.

15. Plaintiff Brink, as a medical professional and member of the community, was most likely to have informed and definite opinions about the health and safety of children in the school setting during a pandemic.

16. Plaintiff Brink was terminated from her assignment because she, in good conscience, brought to light serious clinical and societal issues in the Rumson School District (RSD).

17. Plaintiff Brink was terminated from her assignment because her views and opinions were "found not to be a good fit for the district."

18. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein."

19. Plaintiff Brink brings this case as a *pro se* litigant because, despite many attempts to secure counsel after the event, and in the months following – no attorney was willing to engage.

20. As the pandemic raged on and practically all COVID-related cases were dismissed, it became less likely that anyone would champion Plaintiff Brink's cause.

21. In a desperate act of ultimate Patriotism (in the traditional sense) and self-governance, Plaintiff Brink is learning to fight for herself, and for the millions of children and seniors that suffered needlessly during the COVID-19 pandemic.

22. Plaintiff Brink moves this Court to recognize that needless suffering, the efforts of so many who attempted to sound the alarm, the harshness with which they were silenced, and the opportunity this Court has, to prevent it from ever happening again.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

## JURISDICTION

23. This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over Plaintiff Brink's causes of action arising under the Constitution of the United States and 42 U.S.C. 1983.

## VENUE

24. Venue is proper in the United States District Court for the District of New Jersey pursuant to 28 U.S.C. § 1391(b) in that the alleged unlawful practices were committed in Monmouth County, New Jersey while Plaintiff Brink was assigned to work in the Defendants' school district.

## PARTIES

25. Plaintiff, Jessica M. Brink ("Brink") is an individual who at all times relevant, resided in Monmouth County, State of New Jersey.

26. Defendant, John Bormann ("Bormann"), is an individual and in his official capacity acts as Superintendent and Chief Administrative Officer employed by the Rumson School District ("RSD") in Monmouth County, State of New Jersey.

27. Defendant, Board of Education of Rumson in the County of Monmouth ("Rumson BOE"), is a Board of Education in the Rumson School District, created pursuant to New Jersey law.

## GENERAL STATEMENT OF FACTS RELEVANT TO THE CASE

28. Boards of Education are created by statute to perform a state function at a local level, their powers are derived from the Legislature.

29. The Board of Education is responsible for the development of policy and for the employment of a Superintendent who shall carry out its policies through the development and implementation of regulations.

30. The Board of Education shall be responsible for the operation of the school but shall delegate

the administration to the Superintendent.

31. It is the responsibility of the Superintendent to implement policies in accordance with law.

32. Boards of Education can perform only those acts for which express or implied authority exists in law or in the rules and regulations of the State Board of Education.

33. Implied powers of the Board of Education are limited and must be consistent with law and the rule of the state board, and must be necessary for the lawful and proper conduct of the public schools of the district.

34. The Board of Education is the final policymaker for all existing policies.

35. The Superintendent shall be delegated the authority to take necessary action in circumstances not governed by Board policy and shall report any such action to the Board at the first Board meeting following the action.

36. The Superintendent is the final policymaker in circumstances not governed by Board policy.

37. Appointing, transferring, removing or renewing the employment contract of a certificated or non-certificated officer or employee requires a recorded roll call vote and must pass by an affirmative vote of the majority of the full board.

38. Removing an ESS employee assigned to work in the district does not require a recorded roll call vote and affirmative vote of the majority of the full board.

39. Professional services must be provided through contract, in writing, and a brief notice stating the nature, duration, service and amount of the contract must be printed in an official newspaper.

40. Contracts for professional services shall be limited to non-recurring or specialized work for which the district does not possess adequate in-house resources or in-house expertise to conduct.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

41. Boards of Education must follow Public School Contracts Laws.

42. Policies, procedures and practices that impact the rights, benefits and privileges of students, must serve a legitimate government interest.

43. Students must be afforded minimal due process when their rights are deprived.

44. Students have a right to be free of arbitrary and capricious invasions of privacy and deprivations of rights.

45. Students have a right to know what defines acceptable behavior.

46. It is well established that remote learning is not equivalent or as effective as in-person learning in the regular educational environment.

47. It is the responsibility of every citizen, employee, volunteer, and contractor who interacts with children in the school setting, to be concerned with their health safety and well-being.

48. Silencing a citizen or public employee seeking to speak on a matter of public concern deprives a self-governing society of information that may be vital to informed decision-making.

49. Non-certified Nurses have limited job duties.

50. Substitutes are defined by N.J.S.A. 18A:16-1.1 as one who acts in place of any officer or employee during absence, disability or disqualification.

51. The School Ethics Act recognizes that school board members and administrators must "hold the respect and confidence of the people," and is thus designed to prevent school officials from engaging in "conduct which is in violation of their public trust, or which creates a justifiable impression among the public that such trust is being violated."



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

## FACTS OF THE CASE

Work history

52. Plaintiff Brink began work as a third-party contracted, non-certified nurse assigned to the RSD on September 25, 2020.

53. Plaintiff Brink's assignment in the RSD was terminated by Defendant Bormann on February 1, 2021.

54. The three reasons given for Plaintiff Brink's termination were:

    a. "She was questioning and indicating she would not follow district protocols"

    b. "Her request to send anti-vaccination guidance to our staff"

    c. "Conversations that have made both our school nurses uncomfortable"

55. Plaintiff Brink's work-related relationship with the RSD began when Defendant Bormann recruited Plaintiff Brink for a nursing position.

56. Defendant Bormann was aware of Plaintiff Brink and her status as a nurse because Plaintiff's Mother has worked as a custodian in the RSD since 2001.

57. In September of 2020 Defendant Bormann contacted Plaintiff Brink by phone to offer her a nursing position in the RSD.

58. Defendant Bormann explained that the job would involve assisting the two existing certified school nurses with their daily tasks and occasionally filling in if one of the nurses needed time off.

59. Plaintiff Brink explained that she did not have a school nurse endorsement or a state-issued substitute certificate and has never worked as a school nurse.

60. Defendant Bormann assured her that this would not be an issue.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

61. Plaintiff Brink agreed to a schedule of Tuesday thru Friday, 8 am to 1 pm, at a pay rate of $200/day.

62. Defendant Bormann directed Plaintiff Brink to contact ESS, a third-party employment contractor, to complete the hiring process.

63. Plaintiff Brink was hired and paid through ESS Northeast, LLC (ESS), a private company that provides education management and staffing solutions.

64. Plaintiff Brink was an employee of ESS.

65. ESS has a professional services contract with the RSD to provide substitute services.

66. Upon information and belief, the contract between the RSD and ESS clearly states "**Treatment of Substitute Staff as Employees of the Company** All Substitute Staff provided by the Company will be treated by the LEA (Local Education Agency) as employees of the Company, and not as employees of the LEA, for all purposes…"

67. Upon information and belief, the contract between the RSD and ESS contains an exclusivity clause to the affect that ESS shall be the exclusive contract provider of Substitute Staff to RSD.

68. Substitute Staff employed by ESS and assigned to public schools shall not be eligible for tenure with the LEA or be entitled to participate in any of the LEA's employee benefit plans, including pension, 403(b), profit sharing, retirement, deferred compensation, welfare, insurance, disability, bonus, vacation pay, severance pay and other similar plans, programs and agreements.

69. Plaintiff Brink did not have a contract with the RSD

70. Plaintiff Brink was not entitled to any of the benefits of public employment.

71. Plaintiff was not a public employee.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

72. If Plaintiff Brink were an employee of the RSD she could not have been appointed, transferred, removed, or renewed without a recorded roll call majority vote of the full board.

73. Plaintiff Brink was not an Independent Contractor of the RSD.

74. If Plaintiff Brink were an Independent Contractor she would have had a contract with the RSD.

75. Plaintiff Brink was directed to ESS by Defendant Bormann for the sole purpose of providing nursing services to the RSD on a permanent basis.

76. Removing Plaintiff Brink from her permanent assignment to the RSD, was in all respects, the same as terminating her job with ESS.

77. Defendant Rumson BOE appointed Plaintiff Brink to the position of School Nurse Permanent <u>Substitute</u>. (Exhibit 1)

78. Substitutes are defined by N.J.S.A. 18A:16-1.1 as one who acts in place of any officer or employee during absence, disability or disqualification.

79. Plaintiff Brink was knowingly assigned as a daily, long-term worker and was not acting in place of any existing employee.

80. Defendant Rumson BOE leases employees from ESS, appoints them as substitutes and uses them as daily, long-term workers not acting in place of another.

81. Upon information and belief, Defendants Bormann and Rumson BOE knowingly use this leasing scheme to avoid hiring employees directly, thereby denying them the rights, benefits, and privileges afforded to public employees.

82. A School District should not knowingly use a third-party contractor to hire part-time employees and label them substitutes to avoid affording them rights, benefits, and privileges.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

83. Misuse of a public contract and deceptive hiring practices by government officials demonstrates potential wrongdoing or breach of public trust.

84. At all times during Plaintiff Brink's assignment with the RSD she was never a public employee and could therefore, speak only as a citizen.

85. Despite this allegation, and considering some of the events referenced herein occurred during work hours, Plaintiff offers facts to support the allegation that her speech was citizen speech even if Plaintiff had been a public employee.

86. Beginning on September 25, 2020, Plaintiff Brink worked Tuesday thru Friday from 8 am to 1 pm.

87. Plaintiff Brink was not a school nurse.

88. Plaintiff Brink was a non-certified nurse, as she did not possess a certification or credential from the Department of Education.

89. Plaintiff Brink was provided no formal job orientation or training by ESS or the RSD.

90. No formal job description for Plaintiff's position exists on the RSD Website, nor was Plaintiff provided a job description.

91. Plaintiff Brink was never verbally or in written form counseled, disciplined, admonished, warned or criticized for her work performance.

92. Plaintiff Brink's duties as an ESS employee, non-certified nurse working in a public school were limited to tasks supervised by a Certified School Nurse and those which she is lawfully permitted to do under her nursing license issued by the State Board of Nursing.

93. Plaintiff Brink's assigned, ordinary job duties included:

a. Monitoring the "Quarantine Room" each morning.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

b. Contacting parents/guardians of the children who were confined to the "Quarantine Room."

c. Contacting parents/guardians of children to investigate absence, reported illness, travel, sick contacts.

d. Addressing emergent issues for example lost tooth, sprained ankle, symptomatic illness.

e. Arranging for the pickup of any child who reported COVID-like symptoms, as well as any of their siblings currently within the RSD.

f. Communicating with fellow nurses, Defendant Bormann, principals, and secretarial staff regarding children being quarantined from the school building.

g. Escorting school children out of school and into the custody of a parent/guardian and when necessary, explaining the RSD's policy on quarantine and testing.

h. Documenting student-related interactions in the student's health record.

94. Plaintiff Brink's assigned, ordinary job duties as an ESS employee, non-certified nurse did **not** include, nor was she expected to:

a. Be knowledgeable or proficient in school law, public health, COVID-19 guidance, protocols or vaccines.

b. Observe RSD staff and analyze the clinical soundness or legitimacy of their actions.

c. Initiate discussions on the clinical soundness or legitimacy of the actions of the staff of the RSD.

d. Research COVID-19 guidance, protocols, or vaccines.

e. Analyze the accuracy of the COVID-19 information provided by the RSD to the families and staff of the RSD.

f. Advocate for the distribution of factual information regarding COVID-19 to RSD Staff.

g. Advocate for the rights, health and safety of students, families, and staff of the RSD.

95. Plaintiff Brink was not trained by ESS or by the RSD regarding COVID-19 guidance, protocols, or vaccines.

96. Plaintiff Brink, in her capacity as a private citizen and advocate, and of her own volition, educated herself on School Law, Public Health Law, COVID-19 guidance, protocols, and vaccines.

97. While working in the RSD, Plaintiff observed several things that concerned her as a citizen, because it impacted the health and well-being of students and the community.

Face Masks

98. The Rumson BOE adopted a face mask policy that did not prescribe with sufficient detail the type of face mask to be worn, the material of which it should be made or the proper way in which to wear a face mask. (Exhibit 2, pg.3)

99. Students' face masks were of varying sizes, shapes, and materials, and rarely fit properly.

100. Many students frequently wore their face masks below their nose or chin.

101. Despite no policy describing proper use of a face mask, students were frequently reprimanded by RSD staff for not wearing their face masks appropriately.

102. Students were singled-out by RSD staff and directed in a loud voice to "put your mask on."



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

103. Parents and guardians often called and emailed the RSD to question the use of face masks and to request face mask accommodations for their children.

104. It was the directive of Defendant Bormann to "Minimize mask breaks and maskless snack times for students and staff as much as possible."

105. One day in December 2020 Defendant Bormann, Nurse Montanez and Plaintiff Brink were together in the Nurse's Office at Forrestdale School discussing face masks.

106. Plaintiff Brink stated that wearing a face mask properly was guidance, not law and that without parental consent she could not compel a student to wear a non-medical device securely over their nose and mouth.

107. Defendant Bormann stated that the Executive Orders (EO) and The Road Back Plan permit the Governor and Department of Education to make stronger laws, and parental consent is not needed.

108. Plaintiff Brink explained that the EO stated that a school must maintain a policy regarding face masks, however the EO did not prescribe how the student must wear a face mask, and compelling a child to securely cover their nose and mouth with cloth that is not intended for medical use, is a gray area in her opinion.

109. Defendant Bormann stated that a state can make stronger rules and offered the example of New Jersey legalizing same-sex marriage.

110. Plaintiff Brink responded by explaining that Defendant Bormann's example was an expansion of rights, not a deprivation.

111. Only properly fitted, medical-grade, respiratory protection prevents the transmission of COVID-19.

112. A cloth face mask of unknown quality and cleanliness, that is not properly fitted or worn, does not prevent the transmission of COVID-19, nor does it treat the disease.

113. The mandated wearing of a cloth face mask of unknown quality and cleanliness, whose effectiveness is completely unregulated, does not serve a legitimate public health interest.

114. Any policy that mandates the use of face masks to protect public health, but does not require the face mask to be effective or used in a legitimate way, to protect health, is arbitrary and capricious.

115. The policy adopted by the Rumson BOE did not prescribe in sufficient detail, the way in which a face mask must be worn by students.

116. The policy adopted by the Rumson BOE did not serve a legitimate public health interest.

117. Students have a right to know what defines acceptable behavior.

118. Students were intimidated, reprimanded and disciplined by staff of the RSD for improper use of face masks.

119. Students in the public school must submit to the authority of the teachers and others in authority over them.

120. Continued or willful disobedience of a student, as well as open defiance of the authority of any teacher or person, having authority over him can be cause for suspension or expulsion.

121. Students have a right to be secure in their person.

122. Parents or guardians of students have a right to object to medical treatments and no student shall be compelled to receive such treatment.

123. The rights of parents, guardians, and students were deprived when school staff compelled students, under threat of discipline, to wear face masks that did not treat or prevent the spread of

a communicable disease, nor did unregulated, cloth face masks serve a legitimate public health interest.

124. A student cannot be compelled, without due process of law, to use a device that does not serve a legitimate public health interest.

125. There were known risks associated with wearing face masks.

126. Executive Order 175, issued before students were back to in-person learning, recognized risks associated with masking such as masking in extreme heat, masking when unable to remove a face mask, masking when eating or drinking, masking when an Individual Education Program precludes the use of a face mask.

127. Parents, guardians, and citizens regularly communicated with Defendant Bormann, staff, and the Board of Education regarding concerns and risks related to the use of face masks.

128. Plaintiff Brink spoke as a citizen when she shared, with Defendant Bormann and Nurse Montanez, her opinion and concerns about the compelled use of face masks by students.

129. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

130. Plaintiff Brink, as a citizen, was concerned for the health and well-being of the students of the RSD.

131. Plaintiff Brink, as a citizen, sought to protect the rights of school children whom which, in most respects, were in the custody of the state because no parent, guardian or member of the general public could access the school building.

132. Plaintiff Brink felt that the face mask policy of the RSD, as applied to students, was unconstitutional.

133. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to Defendant Bormann and Nurse Montanez about compelling the use of face masks on school children.

134. Compelling students to wear face masks that do not serve a legitimate public health interest, and deprive students and parents of their constitutional rights, is a matter of public concern.

135. The Rumson BOE failed to establish a legitimate, enforceable face mask policy.

136. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law, and public health law.

137. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students.

138. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

139. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

Health Screenings

140. The Rumson BOE established a policy or custom of using a thermal scanner or non-contact thermometer used by untrained or poorly trained, non-medical personnel to conduct health screenings for symptoms of communicable disease on all students who entered the school building. (Exhibit 2, pg. 3)

141. School law states that student health screenings are to be performed by medical personnel or those properly trained to perform specific screenings and assessments.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

142. In the RSD health screenings were being conducted by non-medical personnel to screen students for the presence of symptoms of a communicable disease.

143. Students' forehead temperatures were being assessed with thermal cameras or non-contact thermometers by non-medical personnel immediately upon entering the vestibule of the school building after waiting outside in near freezing conditions.

144. The vestibule of the school building was often cold and windy.

145. Students' skin temperatures were below normal because of prolonged exposure to the cold resulting in inaccurately low temperature readings.

146. This poses an obvious risk of potentially causing a feverish person to be incorrectly screened.

147. Instructions for using a thermal camera or non-contact thermometer state that the device and the subject being assessed must acclimate to the environment before an accurate reading can be taken.

148. Instructions for using a thermal camera or non-contact thermometer state that the environment around the subject should be stable and free from large air flows such as drafts, heating or cooling vents.

149. Subjecting a student to a health screening that will not result in an accurate assessment of health does not serve a legitimate public health interest and is arbitrary and capricious.

150. There were known risks associated with screening asymptomatic students for signs of illness.

151. Subjecting a student to a health screening that will not result in an accurate assessment of health puts students and staff at risk because it can result in unnecessary confinement, exclusion and quarantine, or potential exposure due to a communicable disease.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

152. Parents or guardians of students have a right to object to medical exams that do not serve a legitimate public health interest and no student shall be compelled to receive such an exam.

153. Students have a right to be free of arbitrary and capricious invasions of their privacy and health status.

154. Plaintiff Brink spoke as a citizen when she questioned four members of the RSD staff regarding their use of non-contact thermometers.

155. Plaintiff Brink spoke as a citizen when she explained to staff members the limitations of non-contact thermometers and the need to use them in a controlled environment.

156. Plaintiff Brink, as a citizen, sought to protect the rights of school children who were, in most respects, in the custody of the state because no parent, guardian or member of the general public could access to the school building.

157. Plaintiff Brink felt that the health screening policy and practice of the RSD, as applied to students, was unconstitutional.

158. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

159. Plaintiff Brink, as a citizen, was concerned for the health and well-being of the students of the RSD.

160. The principals and support staff of the RSD with whom Plaintiff spoke regarding the use of non-contact thermometers were outside Plaintiff's chain-of-command.

161. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals or support staff of the RSD about the use of non-contact thermometers.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

162. The improper use of thermal cameras and non-contact thermometers by non-medical personnel to screen students for symptoms of a communicable disease in a public school is a matter of public concern.

163. Using the results of an ineffective health screening to confine or exclude a student from the classroom or the school building is a matter of public concern.

164. Potential wrongdoing or breach of public trust on the part of government officials is a matter of public concern.

165. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law and public health law.

166. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students

167. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

168. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

<u>COVID-19 Screening Form / Quarantine Room</u>

169. It was the policy or procedure of the RSD to confine students to the “Quarantine Room” when their parent/guardian failed to complete the COVID-19 Screening Form. (Exhibit 2, pg. 5)

170. Each morning before school parents/guardians of students were required to complete a COVID-19 Screening Form.

171. Students whose forms were not complete were confined to the “Quarantine Room” until a parent/guardian could be reached and the form completed.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

172. The middle school "Quarantine Room" was routinely filled with twenty (20) or more students.

173. The "Quarantine Room" was designed to quarantine and isolate no more than (10) symptomatic or exposed people. (Exhibit 3, pg. 9)

174. Instead, the "Quarantine Room" was used to confine students whose parents/guardians did not complete the COVID-19 Screening Form.

175. Some students in the middle and elementary school were confined to the "Quarantine Room" for an hour or more, despite having no symptoms of illness.

176. Students whose parents/guardians frequently failed to complete the Screening Form were put on the "Naughty List."

177. In one example, a young child from the elementary school, whose Mother did not speak English and had difficulty completing the Screening Form, was frequently confined to the "Quarantine Room" for extended periods of time.

178. There were known risks associated with confining, quarantining, and isolating students unnecessarily.

179. Students have a right to be free of arbitrary and capricious deprivation of their liberty.

180. Confining a student to a "Quarantine Room" and depriving them of their liberty because their parent/guardian did not complete a screening form is arbitrary and capricious and serves no legitimate public health interest.

181. On several occasions Plaintiff Brink, as a citizen, initiated discussions with Principal Gibbons, and the Certified School Nurses regarding the clinical soundness of the COVID-19 Screening Form and the confinement of healthy students to the "Quarantine Room."



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

182. Plaintiff Brink, as a citizen, was concerned for the health, and well-being of the students of the RSD.

183. Plaintiff Brink spoke as a citizen when she questioned principals and support staff of the RSD staff regarding the use of COVID-19 Screening Form to confine healthy students to the "Quarantine Room."

184. The principals or support staff of the RSD with whom Plaintiff spoke regarding the use of the COVID-19 Screening Form, were outside Plaintiff's chain-of-command.

185. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals or support staff of the RSD about the use of the COVID-19 Screening Form to confine healthy students to the "Quarantine Room."

186. Confining healthy students in a "Quarantine Room" that is meant for those who are sick or have been exposed to a communicable disease is a matter of public concern.

187. Students being deprived of their liberty for arbitrary and capricious reasons, without due process of law is a matter of public concern.

188. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

189. Plaintiff Brink, as a citizen, sought to protect the rights of school children who were, in most respects, in the custody of the state because no parent, guardian or member of the general public could access to the school building.

190. Plaintiff Brink felt that the COVID-19 Screening policy as applied to the students of the RSD was unconstitutional because it caused the confinement of healthy students to a "Quarantine Room" for no legitimate public health reason.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

191. Potential wrongdoing or breach of public trust on the part of government officials is a matter of public concern.

192. The Rumson BOE failed to effectively train its staff in the constitutional rights of students, school law and public health law.

193. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to public health, communicable disease and the rights of students.

194. Failure to effectively train staff resulted in increased risk to children, potential violations of law, and deprivation of student rights.

195. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

Plaintiff's Stance on the COVID-19 Vaccine

196. On December 28, 2020 Defendant Bormann emailed Plaintiff Brink advising Plaintiff that he (Bormann) had provided her name the New Jersey Department of Health to get Plaintiff "on the list" to receive the COVID-19 vaccine. (Exhibit 4)

197. Plaintiff Brink did not consent to receiving the COVID-19 vaccine, nor did she want Defendant Bormann sharing her name with the Department of Health for such a purpose.

198. Plaintiff Brink spoke as a citizen when she responded by email from her personal cell phone, on her day off, to Defendant Bormann and both certified school nurses, stating that she would not be getting the COVID-19 vaccine. (Exhibit 5)

199. Plaintiff Brink spoke as a citizen in that email when she advocated for informed consent and offered to share her reasoning for choosing not to get the COVID-19 vaccine.

200. Plaintiff Brink spoke as a citizen when she wrote "The patient advocate in me is compelled to share my reasons with you…I've spent 30 plus hours investigating Covid-19

vaccines…the information presented in the media is incomplete and one-sided….I'd be happy to share a balanced presentation of the details with anyone wishing to know."

201. Plaintiff Brink was speaking as a citizen which is why she provided her personal phone number and personal email address as contact information.

202. Informed consent, the media's presentation, and factual details regarding the COVID-19 vaccine were issues of public concern.

203. Discussions of this new, experimental, fast-tracked vaccine clearly related to a matter of social or political concern of the community, as it was a topic many commercials, news reports, and social media posts.

204. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the Superintendent or certified school nurses of the RSD regarding information related to the COVID-19 vaccine.

205. In response to Plaintiff Brink's email, Defendant Bormann wrote "Not a problem Jessica… At this time I do not foresee any associated requirements related to the vaccine." (Exhibit 6)

206. Defendant Bormann and both certified school nurses were now aware of Plaintiff Brink's personally-held viewpoint in opposition to receiving the COVID-19 vaccine.

207. The COVID-19 vaccine was never mandated for public school employees in New Jersey.

208. Plaintiff Brink's email was 'not a problem' and did not distract or disrupt the function or efficiency of the workplace.

209. Defendant Bormann invaded Plaintiff Brink's privacy when he sent her name to the NJ Department of Health, without her consent, to sign her up for the COVID-19 vaccine.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

210. The Rumson BOE failed to train the Superintendent regarding the privacy of personal health decisions.

<u>Restraint and Viewpoint Discrimination</u>

211. There was a concerted effort on behalf of the RSD to get staff vaccinated with the COVID-19 vaccine.

212. Beginning in Mid-December of 2020, Defendant Bormann emailed the entire staff on a weekly basis regarding information and opportunities to receive the COVID-19 vaccine.

213. On December 17, 2020, Nurse Montanez sent an email sharing incorrect information with all middle school staff, stating that the COVID-19 vaccine was "approved", despite the fact that the vaccine was only authorized under emergency use as a medical countermeasure. (Exhibit 7)

214. On January 6, 2021, Nurse Montanez sent a detailed description of her vaccine experience along with pictures of her vaccine-site bandage and vaccination card. (Exhibit 8)

215. Defendant Bormann had taken the liberty of sending Plaintiff Brink's name to the NJDOH to sign her up to receive the COVID-19 vaccine, Bormann was sending regular vaccine-related emails to the staff, Nurse Montanez was sending inaccurate vaccine-related information to the staff, and Plaintiff's own Mother, a member of the staff, was feeling the pressure to get vaccinated.

216. On January 7, 2021 Plaintiff Brink emailed Defendant Bormann regarding her concern for the staff. (Exhibit 9)

217. Speaking as a citizen, Plaintiff Brink wrote:

> "I know I'm new in the district and technically not an employee of Rumson, but I feel tied to the team for many reasons…I am a Nurse Patient Advocate first and foremost. My goal is to ensure that everyone has as complete informed consent as possible. I have no reason to deter people from getting the vaccine. My only purpose is to ensure they have the information they need and understand the jargon in the



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

> documentation…Do I have your permission to email the staff and offer myself as a resource?"

218. Plaintiff Brink sent this email as a citizen, in her off hours, from her personal phone and provided her personal email address for any response.

219. Plaintiff Brink states clearly in the email "I know I'm…technically not an employee of Rumson…"

220. Plaintiff Brink spoke as a citizen in that email when she advocated for informed consent and education regarding the COVID-19 vaccine.

221. As a citizen and advocate, Plaintiff Brink was concerned that the staff of the RSD, including her own Mother, was not getting balanced and accurate information regarding the COVID-19 vaccine.

222. Plaintiff Brink, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to have concern over the lack of informed consent of the RSD staff.

223. Plaintiff Brink was not hired or paid to be an advocate, but she felt compelled to do so.

224. Informed consent, the media's presentation, and factual details regarding the COVID-19 vaccine were issues of public concern.

225. Discussions of this new, experimental, fast-tracked vaccine clearly related to a matter of social or political concern of the community, as it was a topic many commercials, news reports, and social media posts.

226. Upon receiving Plaintiff Brink's email referenced above, Defendant Bormann forwarded Plaintiff's email to Nurse Montanez asking, "In full confidentiality, what do you think about this?" (Exhibit 10)

227. Nurse Montanez responded in part that:

> "I [Montanez] was disappointed at Jess' [Plaintiff] response when you [Bormann] emailed the nursing staff on how to obtain the vaccine. That response was an overshare. Like it or not working in a school has a political component and you have to be mindful when and how you should share. I feel uncomfortable having a permanent sub nurse do this as I am not sure what information will be relayed." (Exhibit 10)

228. Nurse Montanez stated that Plaintiff Brink shared too much when she expressed her opinion in opposition to the COVID-19 vaccine, and for this, Nurse Montanez was disappointed in Plaintiff Brink.

229. Nurse Montanez implies that certain political viewpoints, like the viewpoint of Plaintiff Brink, may not be well received in the RSD and should only be shared in certain ways, at certain times.

230. However, Defendant Bormann and Nurse Montanez's advocacy for and support of the COVID-19 vaccine was acceptable to be shared during the work day, through the District email system.

231. Nurse Montanez perceived Plaintiff Brink's response as "anti-vaccine" and feared that Plaintiff would relay "anti-vaccine" information to others.

232. Nurse Montanez disagreed with Plaintiff Brink's viewpoint regarding the COVID-19 vaccine and for this reason she encouraged Defendant Bormann to chill Plaintiff Brink's speech.

233. After receiving Nurse Montanez's response, Defendant Bormann replied to Plaintiff Brink's email stating:

> "Thank you for reaching out and sharing this. Your willingness to support the staff is appreciated and we value having you as part of our team. After much thought, it would not be appropriate to provide advocacy one way or another…I would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact." (Exhibit 11)

234. Plaintiff Brink responded, further clarifying her position as a citizen concerned for the staff and community, "I just couldn't help but notice that in Maria's explanation of her vaccination experience, she didn't mention informed consent. In the rush to get people vaccinated, I believe people aren't truly getting complete information…" (Exhibit 11)

235. Defendant Bormann's proffered reason for restraining Plaintiff's speech was that advocacy one way or another would not be appropriate, yet his previous emails and those of Nurse Montanez demonstrate their own support of and advocacy for receiving the COVID-19 vaccine.

236. This purported neutral reasoning is pretext for viewpoint discrimination because Defendant Bormann and Nurse Montanez perceived Plaintiff's viewpoint to be "anti-vaccination."

237. One of the reasons given by Defendant Bormann when explaining Plaintiff's termination from the RSD was for "requesting to send anti-vaccination guidance to our staff."

238. Plaintiff Brink was singled-out and subjected to oppressive measures, when others similarly situated were free to share similar information and personal viewpoints.

239. Hatred, fear, and anger toward the unvaccinated was a widespread sentiment from many news outlets including MSNBC, CNN, FOX, and even President Biden, with comments like:

> "You're killing people", "The only people you can blame are the unvaccinated", "Idiots who do their own research", "Lunatics who won't take any of the COVID vaccines", "It is the unvaccinated who are the problem, period, end of story" "Those who are unvaccinated will end up paying the price."

240. Plaintiff Brink never requested to send anti-vaccination guidance to the staff of the RSD.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

241. Defendant Bormann states that advocacy is not appropriate, which indicates that it is not part of anyone's job duties, not Plaintiff Brink, not Defendant Bormann, and not Nurse Montanez.

242. Defendant Bormann did not offer Plaintiff Brink any alternatives to convey her message of informed consent and education.

243. Defendant Bormann's restriction did not include clear, narrow standards.

244. Plaintiff Brink understood this to mean that she was restrained from speaking about COVID-19 informed consent and education inside or outside the school.

245. Plaintiff Brink's speech, as a citizen, about informed consent and education regarding the COVID-19 vaccine was chilled for fear of losing her job if Plaintiff did not abide by Defendant Bormann's warning that no one involved with the school be involved with advocacy.

246. Plaintiff Brink's speech was also chilled out of fear for retaliation or discrimination against her Mother, who worked in the Rumson School District and interacted with Defendant Bormann regularly.

247. Plaintiff Brink made clear in her email that she was speaking as a citizen when she states, "I know I'm ….technically not an employee of Rumson…" (Exhibit 9)

248. Plaintiff Brink was speaking as a citizen who cares for her community when she states that she is speaking because "[she] feel[s] tied to the team for many reasons."

249. Plaintiff Brink's email was a response, as a daughter, to the coercion her own Mother experienced, as an employee of the RSD, who received the nearly daily emails from Defendant Bormann, encouraging her to complete surveys regarding vaccination status, and directives to sign up to receive the COVID-19 vaccine.

250. A staff member should not be coerced to divulge their personal medical information.

251. A staff member should not be coerced to accept a medical intervention that is still under clinical trial and is not proven to prevent any disease.

252. A school board should not act as the marketing arm for a private hospital system so that the hospital system can increase its revenue and number of potential patients.

253. There are known and unknown risks associated with receiving the COVID-19 vaccine.

254. Informed consent, clearly outlining those risks, was not required with the administration of the COVID-19 vaccine.

255. Those authorized under emergency circumstances to administer the COVID-19 vaccine were not equipped to answer questions about the effectiveness or risks associated with the COVID-19 vaccine.

256. Citizens have a First Amendment right to receive information and ideas.

257. The First Amendment exists to protect the free discussion of governmental affairs.

258. Plaintiff Brink was compelled, as a citizen, a daughter, and an advocate to ensure that people had as informed a consent as possible before receiving a new, experimental, fast-tracked vaccine.

259. Plaintiff Brink spoke as a citizen when she advocated for education and informed consent regarding the COVID-19 vaccine.

260. Plaintiff Brink, as a citizen, was concerned for the health and well-being of her Mother, her colleagues, and the community at large.

261. The COVID-19 vaccine was not mandatory for public school employees in New Jersey, it did not prevent transmission, and there were known and unknown risks for which the manufacturer nor the government had liability.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

262. It was not rational or justified to restrain and chill Plaintiff Brink's protected, citizen speech on the topics of informed consent and education for the COVID-19 vaccine.

263. Plaintiff, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak about advocacy for education regarding the COVID-19 vaccine.

264. Individual email addresses of staff and Board Members of the RSD are posted on the District's publicly available website.

265. The Rumson BOE intentionally opened the use of the RSD's email system to the public when it made staff and Board Member email addresses publically available and invited discourse through its website.

266. Any citizen with access to the internet and an email server can openly communicate their message by email with individual members or all members of the RSD and Board of Education.

267. Parents, guardians and members of the public had access to and used the RSD's email system without limitation.

268. Plaintiff Brink never requested to use the District's listserv.

269. Defendant Bormann freely shared information about the COVID-19 vaccine with the staff of the RSD that he received from the non-governmental, private hospital system representative.

270. Defendant Bormann should have known that it is unconstitutional to restrain the free speech rights of a citizen, especially on matters of public concern.

271. Defendant Bormann should have known that it is unconstitutional to discriminate against a citizen and deny their First Amendment right based on the viewpoint they seek to express.

272. The Rumson BOE failed to effectively train the Superintendent and Nurse Montanez in the constitutional rights of citizens and employees.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

273. The Rumson BOE failed to train the Superintendent regarding the lawful implementation of school law as it relates to free speech on matters of public concern.

274. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was deprived of her First Amendment right.

275. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

276. Failure to effectively train staff resulted in injury to the staff of the RSD when they were deprived of their First Amendment right to receive information.

277. The Rumson BOE does not have a policy to govern the use of the RSD email system by citizens or third-party employees.

278. The Rumson BOE does not have a policy to govern the First Amendment rights of citizens or third-party employees.

279. Defendant Bormann was the final policymaker when he acted to restrain Plaintiff's protected speech.

Concerted Effort to Vaccinate the Staff

280. Despite Defendant Bormann's directive to Plaintiff Brink that advocacy for education about the COVID-19 vaccine was not appropriate, Bormann himself educated the staff and encouraged vaccination.

281. Defendant Bormann advocated for, and he himself signed, a contract with a private hospital system to provide COVID-19 vaccines to staff. (Exhibit 12)

282. The RSD was used as a pilot by this private hospital system to roll out a program for vaccinating teachers and staff. (Exhibit 13)

283. The representative for the hospital system, who is also the parent of a RSD student, provided a survey to the RSD to gauge the interest of the staff in receiving the COVID-19 vaccine.

284. Upon information and belief, the private hospital system had a financial interest in testing and vaccinating as many people as possible.

285. Upon information and belief, Defendant Bormann leveraged his personal relationship with this parent to obtain benefits for the Rumson School District and provide benefits to the private hospital system.

286. Upon information and belief, the contract between the Rumson Board of Education and the private hospital system is unlawful and potentially fraudulent.

287. Defendant Bormann stated in an email to the representative at the private hospital system "I know about 75% of staff has shared that they signed up to get in line for the vaccine using the state link! I would be happy to be the first in line as a model to our staff!" (Exhibit 14)

288. The representative at the private hospital system responded "Its great to hear that 75% pre registered, hopefully you don't have much of a problem then. Lets see what the survey says."

289. It can be inferred that the view of the hospital representative was that those who chose not to get the vaccine were a "problem."

290. Defendant Bormann shared regular emails with staff directing staff to "VOLUNTEER TO COMPLETE THIS ONCE YOU ARE FULLY VACCINATED"

291. In an email message to All District Staff, Defendant Bormann stated, "read the information attached on COVID vaccines and consider your participation in getting the vaccine."

292. Defendant Bormann reported to All District Staff on the number of staff members who were already vaccinated, as well as those who were scheduled to be vaccinated.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

293. In an email to All District Staff, Defendant Bormann referred to those already scheduled to receive the COVID-19 vaccine as "the lucky few."

294. In an email dated January 11, 2021, from Defendant Bormann to All District Staff, Bormann stated "Over the next few weeks our focus will be on vaccinations. Please take some time to familiarize yourself with the vaccination process."

295. In an email dated January 12, 2021, Defendant Bormann encouraged All District Staff to participate in a "COVID-19 Vaccine Community Forum" hosted by the private hospital system.

296. In an email dated January 15, 2021, Defendant Bormann stated to a colleague "LOL, Let's start smoking so we can get the vaccine!" (Exhibit 15)

297. In an email dated January 30, 2021 from Defendant Bormann to All District Staff, Bormann states, "WE NEED THIS SURVEY DATA BY SUNDAY EVENING, 1/31/21…Our goal is to facilitate the vaccination of all staff who meet this criteria as quickly as possible."

298. Later that same day Defendant Bormann once again emailed All District Staff stating "Please talk this up with colleagues to ensure they fill out the form as well! If everyone texts a colleagues [sic] I can get the info needed to move this forward." (Exhibit 16)

299. Upon information and belief, Defendant Bormann held a personal pro-vaccine viewpoint.

300. Defendant Bormann shared his viewpoint with the staff of the RSD.

301. Nurse Montanez freely shared personal, vaccine-related email messages with all middle school staff including pictures of her vaccination experience and her vaccine card.

302. Nurse Montanez's email was viewed as advocacy for the vaccine by members of the staff as evidenced by their responses to it.

303. Defendant Bormann responded "Sounds good but got notified that healthy educators will not be until late spring, if then! Uggh!"



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

304. Another staff member responded "Talk about staff support! The first one to brave the vaccine…." (Exhibit 17)

305. Advocacy for and support of the COVID-19 vaccine was discussed freely in the RSD.

306. Discussion of, and advocacy for COVID-19 vaccination was not reserved to certified school nurses or medical professionals.

307. Defendant Bormann and members of the staff of the RSD freely presented a pro-vaccine viewpoint through discussion and use of the email system.

308. The COVID-19 vaccine was never proven to prevent transmission of the SARS CoV-2 virus.

309. There were known and unknown risks associated with the COVID-19 vaccine.

310. The topic of COVID-19 vaccination was a matter of public concern.

311. Proper informed consent for an Emergency Use Authorized medical countermeasure is a matter of public concern.

312. Plaintiff Brink's protected speech, geared toward educating the staff, was restrained and Plaintiff was ultimately removed from her position, just for making a request to share similar information.

11,000 Days of Exclusion from School

313. It was the policy, procedure, or custom of the Rumson BOE, during the pandemic, to exclude students from school for symptoms of known conditions like chronic allergies.

314. It was the policy, procedure, or custom of the Rumson BOE to exclude healthy students from school because they traveled to restricted areas outside the state of New Jersey.

315. Rumson BOE policies and their implementation by Defendant Bormann had significant impact on the students of the community.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

316. The RSD served on average approximately 915 students during the 2020-2021 school year.

317. In the four-month period between December 7, 2020 and April 25, 2021, three hundred seventy (370) student close-contact exclusions (quarantines) were ordered by the Rumson BOE.

318. The close-contact exclusion (quarantine) period was 14 days which results in 5,180 days of in-person learning missed by students.

319. During that same time, four hundred thirty-three (433) travel exclusions (quarantines) were ordered by the Rumson BOE.

320. On a 14-day exclusion, that amounts to 6,062 days of in-person learning missed by students.

321. Many of the same students were required to quarantine multiple times resulting in extended absence from the regular educational environment.

322. Exclusions from school for 10 days or more are equivalent to long-term suspensions.

323. Even short-term suspensions of one day require minimal due process of law.

324. Remote learning is not equivalent to learning in-person in the regular education environment.

325. Remote learning was authorized by EO in two scenarios – when schools were closed, and when parents/guardians chose a full-time remote option.

326. As early as August 13, 2020 Governor Murphy recognized the risks associated with remote learning when he stated in EO 175:

> "WHEREAS, the Department of Education has determined that in-person instruction provides students with academic, social, emotional, and mental health supports that cannot be provided with the same level of efficacy in a remote setting; and

> WHEREAS, the Department of Education has found that reopening schools for in-person instruction is critical in facilitating the social and emotional health of students and providing educators with the ability to actively participate in student learning, provide feedback, and promote active learning among students on a daily basis; and
>
> WHEREAS, the American Academy of Pediatrics has determined that in-person instruction is preferred over other forms of instructional delivery for reasons such as addressing and preventing learning loss, attending to students' social and emotional wellbeing, and minimizing educational inequities resulting from the remote learning model;"

327. Remote learning was not intended to be used as an ad hoc alternative to in-person education, making it more palatable to exclude students for extended periods of time.

328. No school law or Executive Order permits a Board of Education to exclude students from school without a departure from normal health, or without a known exposure to a communicable disease.

329. No school law or Executive Order permits a Board of Education to mandate quarantines for students or staff.

330. No Executive Order permits a Board of Education to prescribe remote learning except for school closure or as a full-time option when requested by a parent/guardian.

331. It is well established that the authority to quarantine citizens lies within the Department of Health, not the Department of Education.

332. Self-quarantine was recommended by the CDC and NJDOH; it was not mandatory.

333. Defendant Bormann and the Rumson BOE adopted policies and made it a custom to mandate quarantines for students, denying them access to in-person learning until their quarantine time expired.

334. Failure to abide by school exclusion policies could result in discipline for students and criminal disorderly conduct charges for parents and guardians.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

335. Students and parents / guardians were compelled under threat of punishment, to comply with the quarantine orders of the Rumson BOE.

336. It was the directive of the Rumson BOE to "report any student suspicions to the admin team. This includes travel, illnesses in the home, pending COVID test, group gatherings, etc…." (Exhibit 18)

337. It is irrational, discriminatory, and harmful to presume that students with known health conditions, like chronic allergies, are sick with a communicable disease.

338. It is irrational, discriminatory, and harmful to presume that every student who traveled to a "restricted area" outside the state of New Jersey during the pandemic was exposed to a communicable disease.

339. It is irrational to claim that COVID-19-like symptoms or travel to a "restricted area" are a significant threat to public health, yet under those conditions, quarantines were voluntary.

340. If COVID-19-like symptoms or travel to a restricted area were a significant threat to public health, quarantines would be mandatory, and such a deprivation of liberty requires due process of law.

341. The policies and procedures of the Rumson BOE, as applied to the students of the RSD, deprived them of their constitutional rights to liberty, privacy and a free, thorough and efficient public education.

342. A school board cannot act in an arbitrary fashion, especially when a child's right to an education is at stake.

343. There are known risks associated with excluding students from attending school in-person.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

344. Defendant Bormann and the Rumson BOE acknowledged these risks when, in November of 2021, they eliminated mandatory COVID close-contact quarantine of students stating, "Risk assessments that determine the need for students to be in school for social, emotional, school readiness and academic purposes outweigh the risks associated with close-contact spread as demonstrated by district data."

345. This risk associated with remote learning was well established in EOs 175, 214, and 253, all effective months before the RSD changed their policy.

346. The risk associated with close-contact spread in the school setting was established months before the RSD changed their policy.

347. The Rumson BOE demonstrated deliberate indifference for the health, well-being, and rights of students when it arbitrarily excluded students from in-person learning and required students to quarantine for 10 to 14 days while receiving only remote learning, depriving them of their right to a free, public, thorough and effective education.

348. Upon information and belief there has not been, nor is there currently any investigation into the number of in-person school days missed because of exclusions and quarantines imposed by Boards of Education throughout the state.

<u>Advocacy for Students and Families</u>

349. It was the policy, procedure, or custom of the Rumson BOE to permit the Superintendent, Defendant Bormann, to exclude students from the school building and determine the period of time the student should be excluded away from school due to COVID-19.

350. It was the policy of the RSD to accept only results of the Emergency Use Authorized COVID-19 RT-PCR test as means to reenter and attend in-person learning.

351. The Rumson BOE denied the use of the NJDOH recommended COVID-19 rapid antigen test.

352. Defendant Bormann is not a trained medical professional.

353. On January 13, 2021 while gathered in the hallway, Plaintiff Brink initiated a discussion between Defendant Bormann, Principal Gibbons, and Nurse Montanez regarding confusion that arose the previous day regarding the quarantine period required for two siblings - a preschool student who developed a fever after receiving a routine vaccination and his sister, an asymptomatic, close-contact.

354. Defendant Bormann required a ten (10) day quarantine for the close-contact, but Nurse Zajac, Plaintiff Brink, and Principal Gibbons determined a fourteen (14) day self-quarantine was the proper recommended timeframe.

355. Defendant Bormann overrode the medical judgment of two licensed medical professionals and the principal, and insisted on a (10) day quarantine.

356. Only when a medical professional is absent from the school, should the principal make the decision to exclude a student from the school building.

357. Reasonableness, in the context of excluding a student from school for possible illness, clearly involves appropriate deference to medical expertise.

358. During the discussion in the hallway Plaintiff expressed the confusion and concern of the Mother whose two children were required to quarantine the day before.

359. Because of the young age of the child with the fever, the Mother chose not to subject him to the invasive and painful PCR test.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

360. The Mother was frustrated and confused because her child's fever was clearly related to the vaccination just received and because of that, both her children were directed to quarantine for ten days.

361. The Mother was also frustrated because Defendant Bormann and the Board of Education would not accept an antigen test, but instead required a PCR test.

362. Plaintiff Brink spoke as a citizen and advocate for the Mother and her children because based on Plaintiff's medical training and experience, it was very likely that the child's fever was due to the immune response related to the recent vaccination.

363. Plaintiff Brink spoke as a citizen and advocate for the Mother and her children because she believed, based on guidance from the NJDOH, that an antigen test was acceptable and would be less invasive, less painful, less expensive, and provide faster results allowing the children to return to in-person learning.

364. Plaintiff Brink felt that this young child should have the opportunity to take an antigen test as recommended by the NJDOH.

365. Plaintiff Brink was also concerned because if the Mother refused to have the child PCR tested, he would be considered COVID-19 positive, meaning he would have to self-quarantine for at least 10 days, and his sibling for at least 14 days.

366. After that morning's discussion Plaintiff Brink was still unclear on Defendant Bormann's rationale and his implementation of the School District policies and procedures.

367. Plaintiff Brink, as a citizen and advocate, composed an email out of concern for the entire community. (Exhibit 19)

368. Plaintiff Brink addressed the email to Defendant Bormann, Principal Gibbons, Nurse Montanez, Nurse Zajac and Principal Feeney.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

369. In her email, Plaintiff Brink outlined several areas in which the policies and procedures of the RSD did not align with CDC and NJDOH guidance.

370. Plaintiff Brink expressed concern for her professional license because she felt that Defendant Bormann and the Board of Education were telling her to do things that were not permitted by her nursing license or the law.

371. Plaintiff Brink was also expressing concern for the staff and students when she wrote "It's a very confusing thing for which consistency is paramount…If school policy dictates otherwise, can you direct me to where I can find this documented, so that I can be consistent in the guidance I give our students, families and staff."

372. Plaintiff Brink quoted directly from the NJDOH recommendations as quoted by the American Academy of Pediatrics, NJ Chapter "any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test **(molecular or antigen)** for SARS-CoV-2 or they have completed an isolation period of at least 10 days since symptom onset…"

373. This update was shared with Defendant Bormann by Nurse Zajac on January 6, 2021.

374. In an email to All District Staff on January 8, 2021, Defendant Bormann inaccurately quoted the above referenced recommendation by stating "any child with COVID-19 compatible symptoms should not return to school until they have either received a negative viral test **[PCR]** or they have completed an isolation period of at least 10 days since symptom onset…"

375. Defendant Bormann knowingly changed the recommended guidance of the NJDOH which significantly affected the rights of students to receive an education in the regular learning environment.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

376. When comparing PCR tests to antigen tests, they are more expensive, more invasive, more painful, require more time for results, and must be administered by a trained professional.

377. No school law or Executive Order permits the Rumson BOE to prescribe specific diagnostic tests to staff and students as a condition of attending school.

378. No school law or Executive Order permits the Superintendent to override the exclusion recommendation of a medically licensed professional.

379. Only students who demonstrate a departure from normal health or who have had a known exposure to a communicable disease can be excluded from the school building, and only the principal is authorized to exclude them.

380. Plaintiff Brink, as a citizen, was concerned for the health, and well-being of the students of the RSD.

381. Plaintiff Brink spoke as a citizen when she sought to bring to light potential wrongdoing or breach of public trust on the part of government officials.

382. Plaintiff Brink spoke as a citizen when she addressed Defendant Bormann, Nurse Montanez, Principal Gibbons and Principal Feeney regarding the use of quarantine periods and testing requirements of Defendant Bormann and the Rumson BOE.

383. The principals with whom Plaintiff communicated regarding quarantine periods and testing requirements were outside Plaintiff's chain-of-command.

384. Plaintiff Brink, as an employee of ESS, had no obligation or expectation as part of her ordinary job duties, to speak to the principals regarding the use of quarantine periods and testing requirements.

385. Plaintiff Brink, as a non-certified nurse and third-party employee of ESS, had no obligation or duty to research or know the recommendations of the NJDOH as it relates to COVID-19 quarantine or testing.

386. Plaintiff Brink, as a non-certified nurse and third-party employee of ESS, had no obligation or duty to advocate for the Mother and her children affected by the policies and procedures of the Rumson BOE.

387. Plaintiff Brink's discussion and follow-up emails were well received by everyone and did not distract or disrupt the function or efficiency of the workplace.

388. Defendant Bormann responded, 'much appreciated" and Principal Feeney responded, "Thank you Jess for putting this together."

389. Plaintiff Brink, as a citizen and concerned member of the community, brought a complaint first verbally, then in writing, about several policies/procedures, to the Superintendent of the RSD.

390. Defendant Bormann had a duty to investigate Plaintiff's concerns and escalate them to the Board of Education if he could not resolve them.

391. Instead, Defendant Bormann terminated Plaintiff's assignment to prevent Plaintiff from exposing his potentially wrongful conduct.

392. The Superintendent is responsible for establishing procedures for the hearing of requests and complaints regarding the operation of the school district.

393. The Rumson BOE failed to effectively train the Superintendent in the school law regarding exclusion from the school building and the limits of authority regarding medical decisions that impact the rights of students.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

394. The Rumson BOE failed to effectively train the Superintendent in the proper handling of concerns and complaints.

395. Failure to effectively train staff resulted in injury to Plaintiff Brink when she was retaliated against for exercising her First Amendment right.

396. Failure to effectively train staff resulted in injury to the students of the RSD when they were deprived of their right to attend in-person learning in their regular learning environment.

Follow-up and Retaliation

397. When, after two weeks, Plaintiff Brink received no feedback regarding these concerns, Plaintiff requested a phone meeting with Defendant Bormann.

398. On Monday, February 1, 2021, Plaintiff's day off, she met by phone with Defendant Bormann.

399. Plaintiff Brink reviewed her concerns regarding quarantine timelines, PCR tests, the "Quarantine Room", and the sharing of staff, student, and family personal health information.

400. Plaintiff Brink was calm, courteous, and respectful while explaining her concerns for the health, safety, rights, and privacy of the staff, students, and parents/guardians.

401. Plaintiff Brink, as a citizen, echoed the frustration and confusion felt by the parents and guardians she interacted with regularly while working in the RSD.

402. Plaintiff Brink, as a citizen, advocated for lawful, consistent, clinically sound policies and procedures.

403. Defendant Bormann was not receptive to Plaintiff Brink's concerns and criticisms.

404. Defendant Bormann told Plaintiff Brink that she was no longer welcome in the RSD and he would email ESS about the termination.

405. Plaintiff Brink requested that Defendant Bormann copy her on the email to ESS.

406. Defendant Bormann refused to copy Plaintiff Brink on the termination email, stating that she wasn't an employee.

407. Immediately after their conversation Defendant Bormann emailed ESS stating "I wanted to inform you that Jessica Brink, substitute nurse for RSD will no longer be serving in the capacity for the district. Please ensure her placement with the district no longer occurs." (Exhibit 20)

408. Later that evening Plaintiff Brink, as a citizen with open access to the District email system, composed a letter to all members of the Rumson BOE, including Defendant Bormann, explaining what transpired earlier in the day. (Exhibit 21)

409. In her email, Plaintiff Brink stated:

> "I am simply asking for consistency, sound clinical judgment and genuine concern for the wellbeing of our children, teachers and communities be brought to the forefront…I want what is best for the children, their families and the staff of every school….At some point, we must acknowledge the harm this stress, fear, and uncertainty is causing for our children…I'm not asking for anyone to decide if what occurred during my employment was right, wrong, or indifferent. I am asking that you evaluate the appropriateness and consistency of the policies, procedures, guidelines, rules, ideas that are impacting the health and wellbeing of your children and community."

410. By way of an Open Public Records Act (OPRA) request, Plaintiff Brink obtained a copy of an email message from Defendant Bormann to the Rumson BOE. (Exhibit 22)

411. The email was Defendant Bormann's response to Plaintiff's February 1, 2021 email to the Board of Education regarding her termination.

412. Defendant Bormann stated:

> "…this sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS. They have been notified and confirmed as has been done with other subs in the past. Please

> know this is the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable."

413. Plaintiff Brink has been connected to the RSD community for nearly 20 years through her Mother's employment as a custodian. Over the years, she has come to know the staff and some students.

414. Plaintiff Brink, as a citizen and daughter of an employee, had a vested interest in the health and safety of the RSD.

415. Plaintiff Brink clearly stated that her concern was not for herself, but for the children when she states, "I'm not asking for anyone to decide if what occurred during my employment was right, wrong, or indifferent."

416. As clearly stated by Defendant Bormann, Plaintiff was "not an employee of the district", but she was nonetheless, very concerned.

417. Defendant Bormann should know that he cannot retaliate against a citizen or employee because of protected speech.

418. Plaintiff Brink's employment relationship with ESS would not have happened but for Defendant Bormann directing her there.

419. Plaintiff Brink was recruited by Defendant Bormann to have a permanent assignment in the RSD with a weekly schedule and on call duties.

420. Plaintiff Brink never intended to work other assignments for ESS nor did her Rumson schedule allow for other assignments.

421. Plaintiff Brink intended to work permanently in the RSD for as long as she possible could.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

422. Defendant Bormann, while acting in his role as Superintendent of the RSD, directed and caused ESS to remove Plaintiff Brink from her permanent assignment in the RSD, essentially ending her employment with ESS, in retaliation for her protected speech.

423. Weeks later, when pressed by staff at ESS, Defendant Bormann provided a reason for terminating Plaintiff's assignment stating, "Mrs. Brink was found not to be a good fit in the district." (Exhibit 23)

424. Upon information and belief, it is a requirement of the contract between the RSD and ESS, that Rumson notify ESS that a Substitute Staff has not performed satisfactorily, along with the clear reasons therefor.

425. Defendant Bormann stated clearly in his email message to the Rumson BOE on February 1, 2021, three reasons why Plaintiff was removed from her assignment, however he failed to provide those clear reasons to ESS over a month later.

426. Defendant Bormann possessed and was delegated final policymaking authority in regard to recruiting and removing third-party contracted ESS employees in the RSD.

427. Defendant Bormann had the final, unreviewable authority to request that an ESS employee be removed from their assignment with the RSD.

428. Defendant Bormann interfered directly with Plaintiff Brink's reasonable expectation of economic gain when he caused Plaintiff Brink's assignment through ESS to be terminated.

429. Defendant Bormann acted maliciously and intentionally when he retaliated against Plaintiff for her protected speech to hide his own wrongdoing, then fabricated lies to justify the termination of Plaintiff's assignment.

430. Plaintiff Brink suffered economically and emotionally when Defendant Rumson BOE failed to uphold its obligations under its contract with ESS Northeast, LLC.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

431. Plaintiff Brink suffered economically and emotionally when she no longer had an income from her previously consistent work with ESS assigned to the RSD.

432. Considering Plaintiff's abrupt termination from the RSD, she would have considered future employment with ESS, however ESS had no other nursing positions available.

433. Defendant Bormann should have known to take no retaliatory or adverse action against Plaintiff Brink because she conscientiously objected to a policy, or practice of District that she reasonably believed to be in violation of law or rule, or incompatible with a clear mandate of public policy concerning public health or safety.

434. An employee who has reason to believe that the Board has engaged in an activity contrary to public policy must report that belief in writing to the Superintendent before notice is given to a supervisor or a public body.

435. The Superintendent shall promptly report the same to the Board and institute an investigation of the reported activity. The findings of the investigation will be reported in writing to the Board and to the employee.

436. The Rumson BOE should have known that the rights of citizens were at risk by permitting Defendant Bormann to terminate the assignments of ESS employees with no oversight from the Board of Education.

437. The harm inflicted on Plaintiff Brink was foreseeable as Defendant Bormann previously stated, "we have the right to request a sub not be assigned to our schools…They have been notified and confirmed as has been done with other subs in the past."

438. The Rumson BOE failed to establish a policy to protect the First Amendment rights of private citizen, third-party ESS employees assigned to the RSD.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

439. There is no policy to protect private citizen, third-party ESS employees assigned to the RSD from retaliatory conduct.

440. The Rumson BOE was under an obligation to train its employees because for years, it has routinely used third-party ESS employees.

441. Plaintiff Brink was retaliated against by Defendant Bormann because she challenged his decision-making and threatened to expose his questionable actions.

442. Defendant Bormann fabricated lies to the Board of Education and to ESS in an attempt to justify his retaliation against Plaintiff Brink for her protected speech.

443. A Superintendent should not fabricate information in an attempt to justify the adverse action taken against an employee, citizen.

444. Defendant Bormann demonstrated deliberate indifference for the health, well-being and rights of citizens, students, and staff when he ignored Plaintiff Brink, a medical professional's, repeated, sincere concerns.

445. Defendant Bormann demonstrated deliberate indifference for the rights of citizens when he acknowledged Plaintiff was not an employee, then terminated her assignment because of her protected speech.

446. The Board of Education demonstrated deliberate indifference for Plaintiff Brink's rights when upon learning of Defendant Bormann's impermissible reasons for terminating her assignment, they acquiesced.

## COUNTS

**COUNT ONE: RETALIATION IN VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**

447. Plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through XX above.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

448. Plaintiff brings this claim pursuant to 42 U.S.C. §1983.

449. Plaintiff's speech, made as a citizen, expressing her opinion of and objection to the COVID-19 vaccine, advocating for informed consent and education regarding the COVID-19 vaccine, questioning the clinical soundness and legitimacy of health screenings, questioning the clinical soundness and legitimacy of the COVID-19 Screening Form, advocating for the rights, health, and safety of students and families, questioning the implementation of policies regarding quarantine periods and mandatory PCR testing as applied to the students and staff of the RSD, was protected by the First Amendment to the U.S. Constitution.

450. Defendant Bormann, as Superintendent of the RSD, was an official of New Jersey, Monmouth County, Rumson at all times relevant to this complaint.

451. Defendant Rumson BOE, as a body politic, was an official entity of New Jersey, Monmouth County, Rumson at all times relevant to this complaint.

452. Defendants' actions against the Plaintiff, including restraining Plaintiff's protected speech, communicating false information, retaliating against Plaintiff for her protected speech, and interfering with Plaintiff's employment, were taken under color of law.

453. Defendant Bormann's actions against the Plaintiff were such that they would chill a reasonable person from engaging or continuing to engage in the protected speech and were intended to cause harm to the Plaintiff.

454. Plaintiff's protected speech was a substantial or motivating factor in Defendant Bormann's actions.

455. Defendant Bormann was motivated by ill-will and malice when he retaliated against Plaintiff for her protected speech.

456. As a result of Defendants' unlawful actions, the Plaintiff suffered economic, non-economic and compensatory damages.

457. While acting under color of state law, Defendant Bormann deprived Plaintiff Brink of a Federal and Statutory right.

458. Defendant Bormann's decisions to restrain Plaintiff's speech and to terminate her assignment with the RSD were final, and unreviewable.

459. Defendant Board of Education is liable for Defendant Bormann's conduct because Defendant Bormann was a policymaking official in regard to restraining the speech and terminating the assignments of third-party ESS employees assigned to the RSD.

460. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to establish and maintain a policy which could have prevented this conduct.

461. Defendant Board of Education should have adopted policies to protect the First Amendment rights of third-party ESS employees assigned to the RSD.

462. Deprivation of the rights of private citizen, third-party ESS employees assigned to the RSD was a highly predictable consequence of the failure to adopt a needed policy.

463. Failure to adopt a policy that protects the free speech of private citizen, third-party ESS employees assigned to the RSD, created an unreasonable risk of deprivation of constitutional and statutory rights.

464. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to train staff on the contours of the First Amendment, who it applies to and how to apply it to citizens,



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

citizens assigned to the District by third-party employers, and employees of the RSD speaking as citizens.

465. Defendant Rumson BOE was aware that these unreasonable risks existed.

466. Defendant Rumson BOE was deliberately indifferent to these risks.

467. Defendant Bormann's restraint and retaliation against Plaintiff's speech resulted from Defendant Board of Education's failure to establish a policy that explains the First Amendment rights of private citizen, third-party ESS employees, assigned to the RSD.

468. Defendant Bormann was a policymaking official in regard to terminating the assignments of third-party ESS employees assigned to the RSD.

469. Defendant Bormann made a deliberate decision to terminate Plaintiff's assignment in the RSD, essentially terminating her employment, a choice that represents an official policy.

470. Through such a policy, Defendant Bormann caused the violation of Plaintiff's federal right by directing the violation to occur.

471. There was no policy of the Rumson BOE that protected the free speech of private citizen, third-party ESS employees assigned to the RSD.

472. It was the policy of the Rumson BOE to delegate to the Superintendent, policymaking power in instances where a policy does not exist.

**COUNT TWO: VIEWPOINT DISCRIMINATION IN VIOLATION OF PLAINTIFF'S RIGHTS UNDER THE FIRST AMENDMENT TO THE U.S. CONSTITUTION**

473. Plaintiff re-states, re-alleges, and incorporates by reference paragraphs 1 through XX above.

474. Plaintiff brings this claim pursuant to 42 U.S.C. §1983.

475. Rumson BOE, by history and practice established a designated public forum of the RSD electronic mail system.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

476. By the acts set forth above, the Rumson BOE has adopted, promoted, and endorsed certain messages regarding the COVID-19 vaccine, and permitted others to do the same.

477. While acting under color of state law, Defendant Bormann restrained Plaintiff Brink's speech on the topic of COVID-19 vaccination.

478. Defendant Bormann's restraint of Plaintiff's protected speech regarding education on the COVID-19 vaccine, which Bormann perceived as "anti-vaccination guidance" amounts to content-based discrimination.

479. Defendant Bormann was motivated by ill-will and malice when he restrained Plaintiff's protected speech because he disagreed with Plaintiff's viewpoint.

480. Content-based discrimination in a designated public forum triggers strict scrutiny, requiring the agency to prove that its decision is narrowly tailored to promote a compelling government interest.

481. Defendant's purported neutral reasoning is a pretext for viewpoint discrimination.

482. Since Defendant Bormann cannot meet this difficult burden, Defendant's decision to restrain Plaintiff's protected speech violates the First and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. §1983.

483. Alternatively, even if Rumson BOE history and practice has not established a designated public forum on the RSD electronic mail system, Defendant Bormann's restraint on Plaintiff's protected speech regarding the COVID-19 vaccine, while allowing other similar COVID-19 speech, amounts to viewpoint discrimination, which is *per se* a violation of the First and Fourteenth Amendments to the U.S. Constitution, and 42 U.S.C. §1983.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

484. Defendant Bormann's decisions to restrain Plaintiff's speech because of the viewpoint he perceived her to hold, and to terminate her assignment with the RSD, in part because of this perceived viewpoint, were final, and unreviewable.

485. Defendant Board of Education is liable for Defendant Bormann's conduct because Defendant Bormann was a policymaking official in regard to restraining the speech and terminating the assignments of third-party ESS employees assigned to the RSD.

486. Defendant Board of Education is liable for Defendant Bormann's conduct because, Defendant Board of Education, with deliberate indifference to the consequences, failed to establish and maintain a policy which could have prevented this conduct.

487. Defendant Board of Education should have adopted viewpoint neutral, narrowly-tailored policies to protect the First Amendment rights of citizens and third-party employees who use the electronic mail system to share ideas and information.

488. Deprivation of the rights of private citizen, third-party ESS employees assigned to the RSD was a highly predictable consequence of the failure to adopt a needed policy.

489. Failure to adopt a policy that protects the viewpoints and free speech of private citizen, third-party ESS employees assigned to the RSD, created an unreasonable risk of deprivation of constitutional and statutory rights.

490. Defendant Rumson BOE was aware that this unreasonable risk existed.

491. Defendant Rumson BOE was deliberately indifferent to that risk.

492. Restraint of Plaintiff's speech resulted from Defendant Board of Education's failure to train its staff on the importance of uninhibited, robust, and wide-open debate about matters of public importance that secures an informed citizenry.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

493. Restraint of Plaintiff's speech resulted from Defendant Board of Education's failure to train its staff on the different types of public forums and the type of restrictions permitted in each

494. Defendant Bormann was a policymaking official in regard to the content-based restriction he placed on Plaintiff's speech when Bormann restricted Plaintiff's speech because he perceived her viewpoint as "anti-vaccination."

495. Defendant Bormann made a deliberate decision to restrain Plaintiff's speech and provided a pre-textual reason for doing so, a choice that represents an official policy.

496. Through such a policy, Defendant Bormann caused the violation of Plaintiff's federal right by directing the violation to occur.

497. There was no policy of the Rumson BOE that protected the free speech of private citizen, third-party ESS employees assigned to the RSD.

498. It was the policy of the Rumson BOE to delegate to the Superintendent, policymaking power in instances where a policy does not exist.

499. As a result of Defendants' unlawful actions, the Plaintiff suffered economic, non-economic and compensatory damages.

WHEREFORE Plaintiff respectfully requests that this Court enter judgment against Defendants and grant the following relief:

a. Declaration that Defendants' retaliation against Plaintiff for her protected speech expressing her opinion of and objection to the COVID-19 vaccine, advocating for informed consent and education regarding the COVID-19 vaccine, questioning the clinical soundness and legitimacy of health screenings, questioning the clinical soundness and legitimacy of the COVID-19 Screening Form, advocating for the rights, health, and safety of students and families, questioning the



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

implementation of policies regarding quarantine periods and mandatory PCR testing as applied to the students and staff of the RSD, violates the First Amendment to the U.S. Constitution;

b. Declaration that Defendants' content-based restraint of Plaintiff's speech expressing her opinion of and objection to the COVID-19 vaccine and advocating for informed consent and education regarding the COVID-19 vaccine, violates the First Amendment to the U.S. Constitution;

c. Award damages for Defendants violation of her rights under the First Amendment to the U.S. Constitution, including for the Plaintiff's economic, non-economic, including emotional distress, and in an amount to be proven at trial;

d. Award punitive damages against Defendant Bormann in his individual capacity;

e. Award front pay in lieu of reinstatement;

f. Award pre- and post-judgment interest at the highest rate allowed by law;

g. Award Plaintiff's costs incurred to bring this action and attorney's fees pursuant to 42 U.S.C. §1988; and

h. Grant such other relief as this Court deems just and appropriate.



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

## JURY TRIAL DEMAND

**Plaintiff Brink demands a jury trial, pursuant to the Seventh Amendment to the Constitution of the United States, as to all claims for damages.**

Dated this 26th day of July 2024

Respectfully submitted,

Jessica M Brink

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

## VERIFICATION

BEFORE ME personally appeared Jessica M. Brink who, being by me first duly sworn and identified in accordance with law, deposes and says:

1. My name is Jessica M. Brink, Plaintiff herein.
2. I have read and understood the attached foregoing complaint, and each fact alleged therein is true and correct of my own personal knowledge.

FURTHER THE AFFIANT SAYETH NAUGHT.

Jessica M Brink

_______________________

Jessica M. Brink, Affiant
State of Texas, County of Harris
SWORN TO and subscribed by me this 26th day of July 2024.

Ana Laura Salazar Uribe

_______________________

NOTARY PUBLIC

NOTARY PUBLIC ★ STATE OF TEXAS ★
ANA LAURA SALAZAR URIBE
ELECTRONIC NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID: 131757026
COMISSION EXP: OCT 11, 2026

Document Notarized using a Live Audio-Video Connection



Document Id: 1AECDB60-4B80-11EF-957E-EBF7E1BC0E35
OnlineNotary.net

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of July 2024, I electronically filed the foregoing with the Clerk of Court by email to the NJD Help Desk at ecfhelp@njd.uscourts.gov, and a copy was provided to Michael A. Pattanite, Jr. Esq. by electronic mail at mpattanite@lennoxlaw.com, and to Patrick Carrigg, Esq. by electronic mail at pcarrigg@lenoxlaw.com and by regular U.S. mail at 136 Franklin Corner Road, St. 2B Lawrenceville, NJ 08648.

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690
Email: jessb11@me.com

State of Texas, County of Harris

BEFORE ME personally appeared Jessica M. Brink who, being by me first duly sworn and identified in accordance with law, did execute the foregoing under penalties of perjury in my presence this 26th day of July 2024.

NOTARY PUBLIC

NOTARY PUBLIC STATE OF TEXAS
ANA LAURA SALAZAR URIBE
ELECTRONIC NOTARY PUBLIC
STATE OF TEXAS
NOTARY ID: 131757026
COMISSION EXP: OCT 11, 2026

Document Notarized using a Live Audio-Video Connection

# EXHIBIT E

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JESSICA M. BRINK**,<br><br>Plaintiff,<br><br>v.<br><br>**JOHN BORMANN, *et al.***,<br><br>Defendants. | Civil Action No. 23-497 (ZNQ) (JTQ)<br><br>**OPINION** |

**QURAISHI, District Judge**

**THIS MATTER** comes before the Court upon Defendants John Bormann ("Bormann") and the Board of Education of Rumson's ("BOE") (collectively, "Defendants") Motion to Dismiss *pro se* Plaintiff Jessica M. Brink's ("Plaintiff") Second Amended Complaint. (the "Motion", ECF No. 33.) Defendants filed a brief in support. ("Moving Br.", ECF No. 33.) Plaintiff filed a brief in opposition to the Motion ("Opp'n Br.", ECF No. 36) as well as a Motion for Judicial Notice ("Mot. For Jud. Not.", ECF No. 35). Defendants replied to Plaintiff's opposition brief ("Reply", ECF No. 38) and filed a letter in opposition to the Motion for Judicial Notice ("Opp'n to Mot. For Jud. Not.", ECF No. 37).

The Court has carefully considered the parties' submissions and decides the Motions without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, the Court will GRANT Plaintiff's Motion for Judicial Notice and GRANT Defendants' Motion to Dismiss.

## I. <u>BACKGROUND AND PROCEDURAL HISTORY</u>

This is the third iteration of Plaintiff's Complaint before the Court. The Court thoroughly set forth the factual and procedural background in two prior opinions, *Brink v. Bormann*, Civ. No. 23-497, 2023 WL 62113167, at *1–3 (D.N.J. Sep. 25, 2023) and *Brink v. Bormann*, Civ. No. 23-497, 2024 WL 3159433, at *1–3 (D.N.J. June 25, 2024). Briefly, in September 2020, Plaintiff was hired as a School Nurse Permanent Substitute in the Rumson School District ("School District") by Defendant BOE. *Bormann*, 2024 WL 3159433, at *1. As a substitute school nurse, Plaintiff's job consisted of "assisting the two existing certified school nurses with their daily tasks and occasionally filling in if one of the nurses needed time off." (Second Amended Complaint ("SAC") ¶58.) Plaintiff's assigned, ordinary job duties included: (1) "monitoring the '[q]uarantine [r]oom' each morning," (2) "contacting parents/guardians of the children who were confined to the '[q]uarantime [r]oom' [and] of children to investigate absence, reported illness, travel and sick contacts," (3) "addressing emergent issues for example lost tooth, sprained ankle, symptomatic illness," (4) "arranging for the pickup of any child who reported COVID-like symptoms, as well as any of their siblings currently within the RSD," (5) "communicating with fellow nurses, Defendant Bormann, principals, and secretarial staff regarding children being quarantined from the school building," (6) "escorting school children out of school and into the custody of a parent/guardian and when necessary, explaining the RSD's policy on quarantine and testing," and (7) "documenting student-related interactions in the student's health record." (*Id.* ¶93.)

Over the next several months, Plaintiff, the Superintendent of the School District Defendant John Bormann, a certified school nurse Maria Montanez, and a school principal engaged in a series of communications about the COVID-19 vaccine and the School District's vaccination and quarantine policies. Among other things, Plaintiff informed Bormann that she

would not be getting vaccinated (*id.* ¶198), requested Bormann's "permission to email the [School District] staff and offer [her]self as a resource" for any questions about the COVID-19 vaccine (*id.* ¶217), and raised concerns about the alleged discrepancy in the quarantine period between federal and state guidelines and the School District's quarantine policy (*id.* ¶¶354, 366-369).

Following a February 1, 2021, phone call between Plaintiff and Bormann, Bormann informed Plaintiff that her placement in the School District was being terminated. (*Id*. ¶¶398, 404). Bormann then sent the following email to the BOE:

> [T]his sub nurse was questioning and indicating she would not follow district protocols. As per our contract with ESS we have the right to request a sub not be assigned to our schools. She is not an employee of the district and can retain her employment with ESS . . . . Please know that this was the culmination of other concerns growing with this substitute nurse, including her request to send anti-vaccination guidance to our staff and conversations that have made both our school nurses uncomfortable.

*Id*. ¶412.

On January 26, 2023, Plaintiff filed a twelve-count Complaint against Defendants including federal claims pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), and U.S. Const. amends. I and XIV, and a *Monell* claim, as well as state law claims. (ECF No. 1.) On May 15, 2023, upon a motion by Plaintiff (ECF No. 10), the Clerk entered default against Defendants for failure to plead or otherwise defend. That same day, Plaintiff also moved for default judgment against all Defendants. (ECF No. 11.) On May 18, 2023, Defendants filed cross-motions to vacate the default judgment (ECF No. 13) and to dismiss the Complaint (ECF No. 12.) On September 25, 2023, the Court dismissed the Complaint without prejudice, allowed Plaintiff leave to amend, and vacated default. *Bormann*, 2023 WL 62113167, at *14.

On October 24, 2023, Plaintiff filed an Amended Complaint asserting just two counts against Defendants Bormann and the BOE pursuant to 42 U.S.C. § 1983: (1) First Amendment

retaliation, and (2) First Amendment viewpoint discrimination. (ECF No. 19.) On November 13, 2023, Plaintiff again moved for an entry of default which was entered by the Clerk's Office. (ECF No. 21.) On November 15, 2023, eight days late, Defendants filed motions to vacate default and dismiss the Amended Complaint. (ECF Nos. 22-23.) On June 24, 2024, the Court granted Defendants' motion to vacate default following its finding of "good cause." The Court additionally granted Defendants' motion to dismiss the Amended Complaint without prejudice. As to the First Amendment retaliation claim, the Court found that Plaintiff did not show that any of her alleged speech was protected and that, given COVID-19's wide-ranging impact on school operations, Defendants "permissibly exercised the broader discretion afforded them as a state-employer when they introduced view-point neutral controls on Plaintiff's speech as well as associated disciplinary measures for failure to abide by such controls." *Bormann*, 2024 WL 3159433, at *8. As to the First Amendment viewpoint discrimination claim, the Court found that the School District "provided reasonable, view-point neutral reasons for restricting Plaintiff's speech" including Defendant Bormann's statement that "it would be inappropriate to provide advocacy one way or another" and "our role as a public entity [is] to provide only the factual information available." *Id*. at *9. The Court gave Plaintiff leave to file a Second Amended Complaint to address the deficiencies set forth in its opinion within thirty days. *Id*. at *10.

On July 30, 2024, Plaintiff filed a SAC and alleges, similar to her previous pleading, two counts: (1) First Amendment retaliation, in violation of 42 U.S.C. § 1983 (Count One); and (2) First Amendment viewpoint discrimination, in violation of 42 U.S.C. § 1983 (Count Two). (ECF No. 31.) In sum, the SAC alleges that Defendants violated the First Amendment by refusing to allow Plaintiff to disseminate vaccine information to staff and parents in the School District and by dismissing her for voicing opposition to the School District's COVID-19 policies. Plaintiff

additionally filed a Motion for Judicial Notice to evidence the contract between the School District and ESS for substitute staffing services which Plaintiff received from a Public Records Request. (ECF No. 35.) Defendants oppose the Motion for Judicial Notice. (ECF No. 37.)

## II. <u>SUBJECT MATTER JURISDICTION</u>

The Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331.

## III. <u>LEGAL STANDARD</u>

A court may dismiss a claim under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted with the moving party "bear[ing] the burden of showing that no claim has been presented," *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). When considering a motion under 12(b)(6), the court must accept as true all the plaintiff's well-pled factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court may, however, ignore legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed me. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Thus, to survive a motion to dismiss, the complaint must contain sufficient factual allegations to raise a plaintiff's right to relief above the speculative level, so that a claim "is plausible on its face." *Twombly,* 550 U.S. at 570. A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

It is well established that a "[pro se] complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Montgomery v. Pinchak*,

294 F.3d 492, 500 (3d Cir. 2002); *see also Haines v. Kerner*, 404 U.S. 519, 520 (1972) (demonstrating the point that a pro se plaintiff's pleading must be liberally construed and is held to a lesser standard than that which is applied to pleadings drafted by attorneys). However, "[e]ven a pro se complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Grohs v. Yatauro*, 984 F. Supp. 2d 273, 282 (D.N.J. 2013).

## IV. DISCUSSION

Defendants argue that the SAC should be dismissed because it is based on the same factual scenario as her prior two complaints from which the Court concluded that Plaintiff did not engage in protected activity under the First Amendment. (Moving Br. at 3.) In opposition, Plaintiff argues first that she was not an employee of the School District and therefore her claims should be construed as those of a private citizen. (Opp'n Br. at 11.) Plaintiff proffers that, at the very least, a genuine issue of material fact exists as to whether she was a private or public employee. (*Id*. at 12.) Plaintiff further argues that she has sufficiently pled a claim for retaliation based on her allegations that her request to send certain vaccination guidance was a factor in her termination. (*Id*. at 16.) Plaintiff lastly contends that she has sufficiently pled that Bormann knew Plaintiff's viewpoint, perceived it to be "anti-vaccine," and restricted her speech on that basis. (*Id*. at 20.)

### A. MOTION FOR JUDICIAL NOTICE

As an initial matter, the Court has reviewed Plaintiff's Motion for Judicial Notice pursuant to Federal Rule of Evidence 201 in which Plaintiff asks the Court to take judicial notice of the contract between ESS and the School District for the 2019–2020 school year ("ESS Contract"). (ECF No. 35.) She contends the ESS Contract demonstrates that she was an employee of ESS, not an employee of the School District or an independent contractor of the School District. (Opp'n

Br. at 3–4.) Defendants oppose on the basis that "it is unclear what Plaintiff is arguing these documents represent" as Plaintiff did not begin working for the School District until September 25, 2020. (Opp'n to Mot. For Jud. Not. at 2.)

The Court finds that the ESS Contract is a public record and therefore falls within the purview of Federal Rule of Evidence 201. Based on a reading of the ESS Contract and the SAC, the Court finds it is relevant to Plaintiff's allegations that she was an ESS employee rather than an employee of the School District. (SAC ¶¶63–72.) That relevance is limited, however, because: 1) the issue in dispute is not whether Plaintiff is an *actual* employee of the School District, but whether she should nevertheless be treated as one in this context given her contractor status, and 2) as Defendants point out, the term of the ESS Contract predates Plaintiff's employment. Plaintiff's Motion for Judicial Notice will nevertheless be granted.

### B. WHETHER THE PUBLIC EMPLOYEE BALANCING TEST APPLIES

The Court found in its prior opinion that Plaintiff was an independent contractor subject to the same treatment as a public employee and analyzed Plaintiff's claims under the *Pickering*[1] balancing test for a public employee rather than the more favorable review afforded a private citizen asserting First Amendment rights. *Bormann*, 2024 WL 3159433, at *7.

In an effort to avoid *Pickering*, Plaintiff's now asserts in both the SAC and in her briefing that she is neither a public employee nor an independent contractor. (SAC ¶¶63–72; Opp'n Br. at 10–12.) She instead designates herself as "a private employee of a private company." (Opp'n Br. at 10; *see also* SAC ¶ 64.) She also repeatedly insists throughout her newest pleading that she "spoke as a citizen." (SAC ¶¶154–56, 158–59, 182–83, 188–89, 198–201, 218–220, 245, 248,

[1] *Pickering v. Bd. of Educ. Of Twp. High School Dist. 205*, 391 U.S. 563 (1968).

258.) Defendants argue that the changes to the SAC do not change Plaintiff's status as an independent contractor. (Moving Br. at 4–6; Reply at 1–2.)

Plaintiff's proper status as a speaker in the context of this case is a legal conclusion. Therefore, the Court must ignore any bald assertions in the SAC as to her status on this motion to dismiss. Instead, the Court must consider whether the SAC plausibly alleges Plaintiff's status as a private citizen when she sought to engage in her allegedly protected speech.

The SAC consistently alleges that Plaintiff is employed by ESS, which in turn has a contract with the School District. (SAC ¶¶63–65.) This does not, as Plaintiff appears to believe, render her a private citizen. She was still employed by the District, if indirectly. She is a contractor, or perhaps more precisely, a *sub*contractor. *See* Black's Law Dictionary (12th ed. 2024) (defining subcontractor as "[s]omeone who is awarded a portion of an existing contract by a contractor, esp. a general contractor.") The question is therefore whether in this context a subcontractor is properly treated the same as a public employee/independent contractor, i.e., whether the balancing test under *Pickering* applies.

In *Board of County Commissioners v. Umbehr*, the Supreme Court held that independent contractors are to be treated as public employees for this purpose, but did not address subcontractors. 518 U.S. 668 (1996) ("*Umbehr*"). In that case, the parties presented factually intensive arguments regarding their employment relationship in support of whether independent contractors were entitled to bring retaliation claims at all. *Id*. at 676–77. The Supreme Court rejected the parties' arguments in favor of the *Pickering* balancing test:

> Each of these arguments for and against the imposition of liability has some force. But all of them can be accommodated by applying our existing framework for government employee cases to independent contractors. *Mt. Healthy* assures the government's ability to terminate contracts so long as it does not do so in retaliation for protected First Amendment activity. *Pickering* requires a fact-sensitive and deferential weighing of the government's legitimate interests. The dangers of burdensome litigation and the *de facto* imposition of rigid contracting rules necessitate attentive application of the *Mt. Healthy* requirement of proof of causation and substantial deference, as mandated by *Pickering, Connick,* and *Waters,* to the government's reasonable view of its legitimate interests, but not a *per se* denial of liability. Nor can the Board's and the dissent's generalization that independent contractors may be less dependent on the government than government employees . . . justify denial of all First Amendment protection to contractors. The tests that we have established in our government employment cases must be judicially administered with sensitivity to governmental needs, but First Amendment rights must not be neglected.
>
> Umbehr's claim that speech threatens the government's interests as contractor less than its interests as employer will also inform the application of the *Pickering* test. Umbehr is correct that if the Board had exercised sovereign power against him as a citizen in response to his political speech, it would be required to demonstrate that its action was narrowly tailored to serve a compelling governmental interest. But in this case, as in government employment cases, the Board exercised contractual power, and its interests as a public service provider, including its interest in being free from intensive judicial supervision of its daily management functions, are potentially implicated. Deference is therefore due to the government's reasonable assessments of its interests *as contractor.*
>
> We therefore see no reason to believe that proper application of the *Pickering* balancing test cannot accommodate the differences between employees and independent contractors. There is ample reason to believe that such a nuanced approach, which recognizes the variety of interests that may arise in independent contractor cases, is superior to a bright-line rule distinguishing independent contractors from employees.

*Umbehr*, 518 U.S. at 677–78 (emphasis in original).

The Court distills two relevant points from *Umbehr*. First, the Supreme Court has expressed its confidence in the *Pickering* balancing test to properly accommodate nuances in an

employment relationship. Second, *Umbehr* also acknowledges that a government defendant is owed deference to its reasonable assessment of its interests *as a contractor*. On the latter point, whatever Plaintiff's status, it cannot be reasonably disputed that the School District nevertheless remains a contractor based on allegations in the SAC and is therefore entitled to the deference *Umbehr* endorsed. The Court finds that both points militate in favor of applying the *Pickering* test to Plaintiff's claims as a subcontractor.

As for guidance beyond *Umbehr* itself, neither the parties nor the Court were able to identify any relevant cases addressing this issue in this circuit.[2] Plaintiff aptly cites *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011). (Opp'n Br. at 10.) In that case, the Ninth Circuit observed that it was "not immediately obvious" how to treat a plaintiff who was an employee of a municipal contractor, i.e., a subcontractor. 632 F.3d at 1101. The court of appeals conducted a detailed factual analysis, and ultimately concluded that:

> Although Clairmont was not a Municipal Court employee, given the nature of the relationship between the court and [contractor] SMH, the nature of the services provided by SMH, and Clairmont's role in the provision of such services, we conclude that his relationship to the Municipal Court was analogous to that of an employer and employee. Further, given the Probation Unit's need to ensure that SMH's services were properly provided to court-ordered Treatment participants, the balance tips in favor of treating Clairmont as a public employee for purposes of determining whether he has alleged a viable First Amendment retaliation claim.

[2] In *Hayes v. Buffalo Municipal Housing Authority,* Civ. No. 12-578S, 2013 WL 5347544, at *4 (W.D.N.Y. Sept. 23, 2013), the district court assumed in passing that a subcontractor would be treated as a public employee ("In this case, applying what is a 'practical' test, see [*Garcetti*, 547 U.S. at 424], it cannot seriously be maintained that [the plaintiff] was speaking as part of his official duties as a subcontractor when he reported Fischer to the FBI.") *But see Lipkin v. George*, Civ. No. 23-127, 2024 WL 1119958, at *3 n.2 (D. Conn. Mar. 14, 2024) (distinguishing *Umbehr* on the basis that "Plaintiff is not an independent contractor with the City of New Haven. Their employer is an independent contractor and this is not a situation where the City of New Haven terminated its contract with CS-HHC.")

Case: 25-1805 Document: 39-1 Page: 234 Date Filed: 04/13/2026

*Id*. at 1102. Defendants distinguish *Clairmont* based on other facts. (Reply at 2.) Plaintiff argues that *Clairmont* was decided on summary judgment and that there is not yet an adequate factual record in this case to permit a similar analysis. (Opp'n Br. at 10.) The Court disagrees.

Even reading the SAC in a light most favorable to Plaintiff, the following can be discerned from its allegations. Plaintiff worked on school grounds four days per week from 8 a.m. to 1 p.m. (*See* SAC ¶86.) During her tenure, Plaintiff was in regular contact and communication with the school staff and administration. (*See generally id*.) Her tasks were supervised by a Certified School Nurse who was an employee of the School District. (*See id*. ¶92.) Plaintiff's job duties included: addressing children's emergent health issues; communicating directly with parents/guardians of children with health issues; communicating on quarantine issues with school staff members, Defendant Bormann, and principals; and documenting student-related interactions in the student's health record. (*Id*. ¶93.) Based on the foregoing, the Court finds that the SAC pleads that Plaintiff's personal involvement with students, faculty, and administration was substantial and that a high degree of trust was placed in Plaintiff by both ESS and the District. The Court therefore concludes, consistent with the rationale of the Ninth Circuit, that the relationship between Plaintiff and the District "was analogous to that of an employer and employee" for the purpose of balancing Plaintiff's right to free speech against Defendants' rights as a contractor.[3]

[3] It should be noted that although the Court considered whether to direct the parties to conduct limited discovery as to their employment relationship, as a practical matter, it finds there is nothing to be gained factually for Plaintiff in such discovery. Notably, Plaintiff does not say what discovery she would even seek. Moreover, she has already obtained a copy of the ESS Contract (if an out-of-date one) although not especially persuasive because it only establishes that Plaintiff was not directly employed by the School District, a fact Defendants do not dispute. Additionally, as to any employment agreement Plaintiff might have had with ESS, Plaintiff is conspicuously silent. She has not referred to it in any of her three pleadings or her briefing in this matter, much less provided a copy. Presumably, she already has that agreement or at the very least could reasonably have obtained a copy of it without the aid of discovery. Finally, Plaintiff certainly has personal knowledge as to how she was treated while employed by the School District. Based on the foregoing, the Court separately finds there would be no value in directing the parties with even limited discovery on this issue.

*See Clairmont*, 632 F.3d at 1102. Accordingly, the Court will apply the balancing test under *Pickering* to this case.

### C. RETALIATION CLAIM

To assert a plausible First Amendment retaliation claim, a typical plaintiff must allege that: "(1) [she engaged in] constitutionally protected conduct, (2) [there was] retaliatory action sufficient to deter a person of ordinary firmness from exercising [her] constitutional rights, and (3) [there was] a causal link between the constitutionally protected conduct and the retaliatory action." *Conard v. Pennsylvania State Police*, 902 F.3d 178, 183 (3d Cir. 2018).

Public employees, however, "accept certain limitations on [their] freedom" when they enter government service, including under the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006); *see also Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968) ("[T]he State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general."). Therefore, unlike a private citizen, a public employee's speech is only considered protected under the first prong if: "(1) the employee spoke as a citizen; (2) the statement involved a matter of public concern; and (3) the government employer did not have "an adequate justification for treating the employee differently from any other member of the general public based on its needs as an employer." *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 753 (3d Cir. 2019) (internal quotation marks omitted); *see also Eichenlaub v. Twp. Of Indiana*, 385 F.3d 274, 283 (3d Cir. 2004) ("[W]hile government employers . . . have the authority to mange their works–including the authority to restrict various kinds of expression–the First Amendment imposes limits on that authority when the employees are speaking about matters of public concern.")

When determining whether an individual speaks as a public employee versus a private citizen, the "'critical question' is 'whether the speech at issue is itself ordinarily within the scope of an employee's duties,'" and not merely whether the speech "concerns those duties." *Javitz v. Cnty. of Luzerne*, 940 F.3d 858, 864 (3d Cir. 2019) (quoting *Lane v. Franks*, 573 U.S. 228 (2014)). Courts in this Circuit have inquired "whether a public employee's speech was informed by or the result of his or her primary job duties." *Id*. "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 547 U.S. at 421.

To the extent that Plaintiff's conduct and statements were speech, the Court finds that it was all part of her role as a substitute school nurse. Contrary to Plaintiff's position, she did not simply "sp[eak] as a citizen" in her efforts to "bring to light potential wrongdoing or breach of public trust on the part of government officials." (SAC ¶158.) Rather, Plaintiff's conduct concerning the importance of "consistency" of, among other things, the School District's guidance on its quarantine policy that Plaintiff "g[a]ve [the District's] students, families and staff" (ECF No. 31-1, Ex. 19), was "part of the role [she] was paid to perform on an ordinary basis." *Javitz*, 940 F.3d at 866. (*See* SAC ¶93, "contacting parents/guardians of the children who were confined to the 'quarantine room'," and "explaining the [School District's] policy on quarantine and testing."). For example, Plaintiff relayed to Bormann via email that, "because it relates to the confusion we had this morning," Plaintiff was "working on a flow chart of sorts, to make the decisions easier and consistent" regarding the differences between isolation and quarantine and which type of tests the state recommended children complete. (ECF No. 31-1, Ex. 19.)

Despite Plaintiff's attempts to conclusively plead that she initiated discussions "as a citizen," for example, "with Principal Gibbons, and the Certified School Nurses regarding the clinical soundness of the COVID-19 Screening Form and the confinement of healthy students to the '[quarantine [r]oom,'" stating such does not make it so. The SAC reflects that that Plaintiff's conduct and statements in these instances were clearly in the realm of, at the heart of, or in pursuit of her ordinary job duties as a substitute school nurse. (SAC ¶181.) *See De Ritis v. McGarrigle*, 861 F.3d 444, 454 (3d Cir. 2017) ("[A]n employee does not speak as a citizen if the mode and manner of his speech were possible only as an ordinary corollary to his position as a government employee[.]"). Or, put another way, "a public employee speaks pursuant to employment responsibilities . . . [when] there is no relevant analogue to speech by citizens who are not government employees." *Garcetti*, 547 U.S. at 424. The Court finds that the SAC, even given its most liberal reading, fails to plausibly allege that Plaintiff acted as a private citizen and instead supports the conclusion that Plaintiff's speech was made pursuant to her official job duties. The Court reaches this conclusion "even though the COVID-19 pandemic was clearly a matter of public concern." *Dennison v. Indiana Univ. of Pennsylvania*, Civ. No. 22-2649, 2023 WL 8595426, at *5 (3d Cir. Dec. 12, 2023) (affirming the District Court's entry of summary judgment against a public employee's retaliation claim, reasoning that the Plaintiff's conduct "while related to a matter of public concern, were not just adjacent to her official duties; they were at the heart of her duties").

The Court will therefore GRANT Defendants' Motion to Dismiss Plaintiff's retaliation claim.

### D. VIEWPOINT DISCRIMINATION CLAIM

Plaintiff's First Amendment viewpoint discrimination claim also fails because the SAC does not sufficiently allege that Defendants discriminated against Plaintiff based on her viewpoint. The SAC alleges that Bormann restricted Plaintiff's speech because he perceived her viewpoint to be "anti-vaccine." (SAC ¶236). Defendants argue that Bormann's restrictions on use of the email server were view-point neutral. The Court agrees.

"It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 828 (1995). "[I]t is also well settled that the government need not permit all forms of speech on property that it owns and controls." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992) (citations omitted). "[T]he extent to which the Government can control access depends on the nature of the relevant forum." *Pomicter v. Luzerne Cnty. Convention Center Authority*, 939 F.3d 534, 540 (3d Cir. 2019) (quoting *U.S. v. Kokinda*, 497 U.S. 720, 726 (3d Cir. 2019)). In non-public fora, unlike traditional public fora, "[t]he government may issue content-based regulations on communicative activity . . . provided they are 'reasonable in light of the purpose served by the forum and are viewpoint neutral." *Child Evangelism Fellowship of New Jersey, Inc. v. Stafford Twp. School Dist.*, 233 F. Supp. 2d 647, 656 (D.N.J. 2002) (citing *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44–46 (1983)). "In a nonpublic forum, speech restrictions need only be reasonable, 'a much more limited review' than applied in public forums." *Pomicter*, 939 F.3d at 540 (quoting *Lee*, 505 U.S. at 679).

Several courts –including the Supreme Court –have held that government mail and email systems are nonpublic forums. *See Perry*, 460 U.S. at 46–47 (holding that a public school's "mail facilities" was a nonpublic forum because there was "no indication . . . that the school mailboxes

and interschool delivery system are open for use by the general public"); see also *Page v. Lexington Cnty. Sch. Dist. One*, 531 F.3d 275, 285 (4th Cir. 2008) (finding that "School District's e-mail facility" was a nonpublic forum because there was "no suggestion that" the public "had access to the School District's e-mail facility"). Assuming without deciding that a school email listerv is a nonpublic forum, Defendants could restrict a speaker's access to it "so long as the distinctions drawn are viewpoint neutral and reasonable in light of the purpose served by the forum." *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 189 (2007); *see also Child Evangelism Fellowship of N.J.*, 386 F.3d at 526 (holding that "even if" school district's forum was "limited" or "closed," school district "still could not engage in viewpoint discrimination").

Bormann's denial of Plaintiff's request to send a listerv wide email to School District staff that she would "like to offer [her]self as a resource regarding any questions you may have about the Covid vaccine" was content and viewpoint neutral. Bormann's purpose in rejecting Plaintiff's requested speech, as plainly stated in his email response to Plaintiff, was because the School District's role was "to provide only the factual information available from government institutions we are required to follow [and] for families to seek guidance from their own physicians if they have questions." (ECF No. 31-1, Ex. 11.) Bormann further explained that he "would not want anyone involved with the school to serve in that capacity as it would put the district in jeopardy if one followed the advice and it had a negative impact." (*Id.*) Contrary to Plaintiff's allegation that the School District allowed pro-vaccine speech, the exhibits show that the emails sent by school nurse Montanez simply provided links to the Center for Disease Control's website and did not purport to offer herself or anyone else in the District as a guide on the COVID-19 vaccine.[4] (ECF

[4] Therefore, the SAC's allegation stemming from Bormann's email after Plaintiff's dismissal that she "request[ed] to send anti-vaccination guidance" does not affect the Court's conclusion. The SAC reflects that Bormann prohibited both pro-vaccination and anti-vaccination messaging to be distributed on the email server.

No. 31-1, Ex. 7.) Given that Plaintiff's proposed email also stated that Plaintiff "has invested a significant amount of time researching vaccines and would welcome questions" and no other School District member had sent a similar email on the server, the Court finds that the SAC does not sufficiently plead a viewpoint discrimination claim.

**E. DISMISSAL WITH PREJUDICE**

The Court afforded Plaintiff three opportunities to plead viable claims. The SAC again fails to do so. Under the circumstances, the Court finds that further amendment would not cure the deficiencies identified herein and would therefore be futile. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 110 (3d Cir. 2002). Accordingly, dismissal with prejudice is appropriate.

## V. CONCLUSION

For the reasons stated above, the Court will GRANT Plaintiff's Motion for Judicial Notice and GRANT Defendants' Motion to Dismiss. The Court will DISMISS WITH PREJUDICE the SAC and instruct the Clerk's Office to mark this matter CLOSED. An appropriate Order will follow.

Date: March 24, 2025

s/ Zahid N. Quraishi
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**CHAMBERS OF**
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**U.S. COURTHOUSE**
**402 EAST STATE STREET, ROOM 4000**
**TRENTON, NJ 08608**

November 24, 2025

**LETTER ORDER**

**Re: Jessica Brink v. John Borman, *et al.***
**Civil Action No. 23-497 (ZNQ)(JTQ)**

Dear Counsel and *Pro Se* Party:

Before the Court is Plaintiff's Motion for Reconsideration. ("Motion", ECF No. 43.) Therein, Plaintiff requests reconsideration of the Court's decision to dismiss with prejudice her Second Amended Complaint. (ECF No. 42.) Defendants oppose the Motion. ("Opp.", ECF No. 44.) Plaintiff filed a reply.[1] (ECF No. 45.)

Reconsideration under Local Civil Rule 7.1 is "an extraordinary remedy" that is rarely granted. *Interfaith Cmty. Org v. Honeywell Int'l, Inc.*, 215 F. Supp. 2d 482, 507 (D.N.J. 2002) (citations omitted). It requires the moving party to set forth the factual matters or controlling legal authorities it believes the Court overlooked when rendering its decision. *See* L. Civ. R. 7.1(i). To succeed on a motion for reconsideration, a movant must show at least one of three factors: "(1) an intervening change in the controlling law; (2) the availability of new evidence that was not available when the court granted the motion [at issue]; or (3) the need to correct a clear error of law or fact or to prevent manifest injustice." *Max's Seafood Café ex rel. Lou-Ann, Inc. v. Quinteros*, 176 F.3d 669, 677 (3d Cir. 1999) (citing *N. River Ins. Co. v. CIGNA Reins. Co.*, 52 F.3d 1194, 1218 (3d Cir. 1995)). Significantly, a motion for reconsideration is not an opportunity to raise new matters or arguments that could have been raised before the court decided the original decision. *See Bowers v. NCAA*, 130 F. Supp. 2d 610, 612–13 (D.N.J. 2001). Nor is a motion for reconsideration an opportunity to "ask the court to rethink what it ha[s] already thought through." *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507 (alteration in original) (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990)). "Rather, the rule permits a reconsideration only when 'dispositive factual matters or controlling decisions of law' were presented to the court but were overlooked." *Id.* (quoting *Khair v. Campbell Soup Co.*, 893 F. Supp. 316, 337 (D.N.J. 1995)).

Insofar as Plaintiff does not raise an intervening change in law or a cite newly available evidence, the Court construes her Motion as seeking relief under the third category: clear error of law or fact or to prevent manifest injustice.

In the Motion, Plaintiff first reiterates her insistence that she was speaking as citizen not an employee, contractor, or subcontractor of the school board and that the balancing test under *Pickering*

[1] Plaintiff's submission of a reply without leave of Court runs afoul of Local Civil Rule 7.1(d)(3), which prohibits a reply on a motion for reconsideration without permission. Defendants did not object. Given that Plaintiff is *pro se*, the Court has considered her reply. The submission is devoted to recounting Plaintiff's view of the equities of her case. The Court does not find it persuasive.

therefore does not apply. (ECF No. 10 at 10–15.) None of Plaintiff's arguments persuade the Court erred in its *legal* conclusion as to her employment status or its application of the *Pickering* balancing test. Similarly, Plaintiff challenges the Court's determination that the school district's email server is a nonpublic forum and that the school district maintained a viewpoint neutral stance. (*Id*. at 16–21.) Here too, Plaintiff's arguments do not persuade the Court that its *legal* conclusions were erroneous. In any event, Plaintiff has not met her high burden to merit the extraordinary remedy of reconsideration.

**IT IS THEREFORE**, on this **24th** day of **November 2025**,

**ORDERED** that the Clerk's Office is instructed to **RE-OPEN** this matter; it is further

**ORDERED** that Plaintiff's Motion for Reconsideration (ECF No. 43) is hereby **DENIED**; and it is further

**ORDERED** that the Clerk's Office is instructed to **RE-CLOSE** this matter.

**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**

**CERTIFICATION OF SERVICE**

I am employed by the law firm of LENOX, SOCEY, FORMIDONI, GIORDANO, LANG, CARRIGG & CASEY, LLC, and am the attorney for Defendant-Appellees, Board of Education of Rumson in the County of Monmouth and John Bormann, in the above-entitled matter.

2. On April 13, 2026, I personally mailed, certified and regular mail with postage paid thereon, a copy of Defendants-Appellees' Supplemental Appendix, Volume I to:

Jessica M. Brink, *pro se*
8 Gordon Court
Port Monmouth, New Jersey 07758

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

/s/ Victoria Cargill
Victoria Cargill

Dated: April 13, 2026