RECEIVED
APR 22 2026
KL ZCS
U.S.C.A. 3rd CIRCUIT

**No. 25-1805**

**UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

Jessica Brink

Plaintiff-Appellant

v.

John Bormann and Board of Education of Rumson
in the County of Monmouth,

Defendants-Appellees

On Appeal from the United States District Court of New Jersey's dismissal of Appellant's Second Amended Complaint with Prejudice pursuant to
*Fed. R. Civ. P.* 12(b)(6)
(Trenton, No. 3:23-cv-00497)

---

# REPLY BRIEF OF APPELLANT

---

Jessica M. Brink *pro se*
8 Gordon Court
Port Monmouth, NJ 07758
Phone: (732) 492-4690

**TABLE OF CONTENTS**


| | |
|---|---|
| TABLE OF CONTENTS | 2 |
| TABLE OF AUTHORITIES | 3 |
| I. INTRODUCTION | 5 |
| II. ARGUMENT | 8 |
| A. Ms. Brink Has Plausibly Stated A Claim For First Amendment Retaliation Because Each Element Has Been Met And Supported With Evidence. | 9 |
| 1. Bent facts | 11 |
| 2. Unaddressed facts | 12 |
| 3. Stretched case law | 13 |
| 4. Unaddressed case law | 16 |
| B. Ms. Brink Has Plausibly Stated A Claim For Viewpoint Discrimination Because Each Element Has Been Met And Supported With Evidence | 17 |
| CONCLUSION | 18 |
| Statutes and Administrative Code Reproduced | 20 |
| Certificate of Service | 30 |

# TABLE OF AUTHORITIES

**Cases**


| | |
|---|---|
| Board of County Comm'rs, Wabaunsee Cty. v. Umbehr 518 U.S. 668, 116 S. Ct. 2342 (1996) | 13 |
| Clairmont v. Sound Mental Health 632 F.3d 1091 (9th Cir. 2011) | 13, 15 |
| Dennison v. Indiana University of Pennsylvania, No. 22-2649 (3d Cir. Dec. 12, 2023) | 17 |
| De Ritis v. McGarrigle, 861 F.3d 444 (3d Cir. 2017) | 17 |
| Fowler v. UPMC Shadyside, 578 F. 3d 203 (3d Cir. 2009) | 9 |
| Flora v. Cty. Of Luzerne, 776 F.3d 169 (3d Cir. 2015) | 6, 17 |
| Garcetti v. Ceballos, 547 U.S. 410 (2006) | 6, 16 |
| Javitz v. Cnty. of Luzerne, 940 F.3d 858 (3d Cir. 2019) | 17 |
| Lane v. Franks, 573 U.S. 228 (2014) | 17 |
| Perry Ed. Assn. v. Perry Local Educators' Assn 460 U.S. 37, 47 (1983) | 18 |
| Pickering v. Bd. of Educ. 391 U.S. 563, 568 (1968) | 6, 8, 9, 10, 12, 13 |
| Rosenberger v. Rector & Visitors of the Univ. of Va., 515 U.S. 819 (1995) | 17 |

Sepulveda-Villarini v. Department of Educ., 628 F. 3d 25 (1st Cir. 2010) 10

West Run Student Housing Associates LLC v. Huntington Nat. Bank, 712 F. 3d 165 (3d Cir. 2013) 7

Wilkerson v. New Media Technology Charter School Inc., 522 F. 3d 315 (3d Cir. 2008) 9

Williams v. City of Allentown, 804 F. App'x 164 (3d Cir. 2020) 16

**Rules**

F.R.C.P. 12(b)(6) 6

**Statutes and Administrative Code**

N.J.S.A. 52:32-44 9, 14, 20

N.J.S.A. 18A:40-3.2 9, 23

N.J.A.C. 6A:16-2.3(b) 9, 24

N.J.A.C. 6A:16-2.3(c) 9, 24

**Books**

Basic School Law. Asher, K. (2019). Basic School Law 2019 14

## I. INTRODUCTION.

In this case Appellees sought and won dismissal for failure to state a claim. They did so by labeling Appellant Jessica Brink a public employee and claiming that all of her speech was unprotected. Yet, Appellees in their Brief and in their arguments, fail to establish a foundation to support this dismissal. Instead, they overlook important facts, misconstrue Appellant's arguments, and stretch the case law.

The S.S. Medical Jargon and the S.S. Legalese in the dark of night. The Appellees and the lower court misunderstand much of what Ms. Brink alleges and argues; sailing right past the fundamental issue before this Court, namely, whether Ms. Brink has pleaded a plausible claim for engaging in protected activity.

Indeed, the Second Amended Complaint factually states a plausible claim and supports it with evidence that is not in dispute. What is in dispute is how the law is applied to these facts.

Appellees' foundational argument that Ms. Brink did not state a claim hinges on their assertion that ALL of Ms. Brink's speech was in her capacity as a public employee. Yet, Appellees provide no facts to support this allegation. Rather, they contradict their own claim by saying that some speech was not appropriate, and at the same time, part of Ms. Brink's job duties. They claim that because all Ms. Brink's statements were made based on her experiences working within the District and were made to her supervisor, they are unprotected.

These claims fails for at least three reasons:

- First, if Ms. Brink were to be considered a public employee for the purposes of *Pickering* (which Appellant disputes), *Garcetti v. Ceballos,* 547 U.S. 410, 417 (2006) cautioned against "excessively broad job descriptions."
- Second, the assertion that all of Ms. Brink's speech was made to her supervisor is outside the record and demonstrably false. Ms. Brink does not identify a supervisor in her Second Amended Complaint. Further, Ms. Brink alleges that she engaged in protected speech with multiple people, including principals and support staff.
- Third, if Ms. Brink were to be considered a public employee, there exists a factual dispute regarding her job duties that can not be settled on a 12(b)(6) motion. *See Flora v. Cnty. of Luzerne*, 776 F.3d 169 at 175-76 (3d Cir. 2015)

Ms. Brink's speech is significant because it was more than just complaints, opinions, or rambling. Appellee Bormann, a non-medical professional, was directing the medical decision-making for the school district. He was overriding the recommendations of licensed nurses and changing the directives given by the Department of Health. This created a potentially dangerous situation for the students, staff, nurses, and community.

Allowing Appellees to silence Ms. Brink's speech will have lasting effects. If every work experience equates to an ordinary job duty then there can be no protected speech. If nurses can be fired for questioning the orders of a non-medical

professional, then potentially harmful situations will develop. If nurses are expected to perform outside their scope or risk being fired, then nurses themselves could become a danger.

As an initial matter, it is important to note that in Section II of their Brief titled "Pertinent Factual History", Appellees solely and repeatedly reference *Exhibit A* which is the Original Complaint. Based on this Court's ruling in *West Run Student Housing Associates LLC v. Huntington Nat. Bank,* 712 F. 3d 165 (3d Cir. 2013) the Appellees reliance on the Original Complaint throughout their brief appears to be inappropriate. *West Run Student Housing* quotes multiple cases and sums them up to say:

> "Indeed, effectively disallowing amendment by looking to the original pleading is contrary to the liberal amendment pleading policy embodied in Rule 15…[A]t the motion to dismiss stage, when the district court typically may not look outside the four corners of the amended complaint, the plaintiff cannot be bound by allegations in the superseded complaint."

If this is an accurate interpretation properly applied to this case, Ms. Brink respectfully requests this Court disregard any reference to *Exhibit A* or its allegations that are mentioned in Appellees' Brief, as well as the attachment in their Appendix.

Also, while this issue was not immediately apparent when Ms. Brink was drafting her Appellant Brief, she did touch on it. In an attempt to further preserve the issue for this appeal, she brings it to a fine point here. On at least three

occasions in the lower court's Opinion, Judge Quraishi indicates that he and the Defendants were considering earlier versions of the complaint. On page 7 the Opinion states "In an effort to avoid *Pickering,* Plaintiff's (sic) now asserts in both the SAC and her briefing that she is neither a public employee nor an independent contractor." Also on page 7, "She also repeatedly insists through her newest pleading that she 'spoke as a citizen.' Defendants argue that the changes to the SAC do not change Plaintiff's status as an independent contractor." In the footnote on page 11 the court writes "Additionally, as to any employment agreement Plaintiff might have had with ESS, Plaintiff is conspicuously silent. She has not referred to it in any of her three pleadings or her briefing in this matter, much less provided a copy."

## II. ARGUMENT.

### A. Ms. Brink Has Plausibly Stated A Claim For First Amendment Retaliation Because Each Element Has Been Met And Supported With Evidence.

Of all the elements necessary to prove a claim for First Amendment retaliation, it appears that one or two are before this Court. (1) Was Ms. Brink a public employee for the purposes of the *Pickering* balance test? (2) If so, was she speaking as a citizen in any of the alleged speech?

To survive a motion to dismiss a plaintiff must allege facts that support the elements and are plausible. At this stage of litigation all of plaintiff's allegations

are assumed to be true. In *Fowler v. UPMC Shadyside,* 578 F. 3d 203 (3d Cir. 2009) the plaintiff "nudged her claims against UPMC across the line from conceivable to plausible." This is despite the fact that the "complaint is not as rich with detail as some might prefer." In *Wilkerson v. New Media Technology Charter School Inc.*, 522 F .3d 315 (3d Cir. 2008) this Court said this about plausibility "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."

Surely, it can not be stated that Ms. Brink's complaint is lacking in the detail department. Even Appellees quip about her voluminous exhibits. And while they may be voluminous, it is not appropriate to conclude that they are complete. What the allegations and voluminous exhibits do show are the following facts:

- By statute and by the ESS contract, Ms. Brink was not a contractor or a subcontractor. N.J.S.A. 52:32-44
- By statute and function, Ms. Brink's role was ministerial. She could not work unsupervised. She was not a certified school nurse, she had no speciality training in COVID-19 or School Law. N.J.S.A. 18A:40-3.2; N.J.A.C. 6A: 16-2.3(b), N.J.A.C. 6A:16-2.3(c)
- Ms. Brink spoke out on matters of public concern including such topics as: advocating for safety, clinical soundness, and informed consent related to COVID-19 policies, procedures and vaccination.

- Ms. Brink spoke during work and off-work hours to school staff including nurses, principals, support staff, and members of administration.
- Advocacy and vaccination-related topics were not part of Ms. Brink's ordinary job duties.
- Ms. Brink's assignment in the Rumson School District was terminated by Appellee Bormann because of her speech and conduct.
- Appellee Bormann's stated reasons for terminating Ms. Brink were: (1) questioning and indicating should would not follow district protocols. (2) her request to send anti-vaccination guidance to our staff. (3) conversations that have made both our school nurses uncomfortable.

Justice Souter, sitting by designation in the 1st Circuit, said in his Opinion in *Sepulveda-Villarini v. Department of Educ.*, 628 F. 3d 25 (1st Cir. 2010) "A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss." Inference is not necessary here. The above facts are unrefuted in any meaningful way. Ms. Brink was terminated for her speech. Her role, for the purposes of *Pickering,* and her job duties are both fact-intensive topics that are in dispute. Appellees do not claim that they had a compelling state interest. Instead they bend facts, stretch case law and leave much unaddressed.

**1. Bent facts**

The fact of the matter is that Bormann signed Ms. Brink up for the Department of Health COVID-19 vaccination list without consulting her. Bormann

emailed Ms. Brink and the two certified nurses after their names and contact information had already been sent to the DOH. Ms. Brink spoke out because she felt pressured to get the vaccine. Bormann fired her because she was viewed as an "anti-vaccine" proponent who requested to share "anti-vaccination guidance." Appellees claim that Bormann wanted to ensure that all school nurses would have the opportunity to receive the vaccine. But the intent of the initial DOH email is clear - to sign nurses up to get the COVID-19 vaccine. The DOH email explicitly requests "Specific names and contact information for those school nurses who want the vaccine." How is it the role of a Superintendent to ensure someone receives a voluntary medical intervention? What's next - mammogram, colonoscopy?

Appellees claim that Ms. Brink does not allege she was restricted from voicing her opinion on the vaccine in any personal forum, only that she was restricted from mass-emailing all District staff members. Bormann's restriction was not narrowly tailored as Appellees imply. Ms. Brink was told by Bormann that he "would not want anyone involved with the school to serve in that capacity." At ¶¶ 244, 245 of the Second Amended Complaint Ms. Brink alleges that her speech about informed consent and education regarding the COVID-19 vaccine was chilled for fear of losing her job if she did not abide by Bormann's warning that no one involved with the school should be involved with advocacy. Ms. Brink felt restricted in all manner of speaking about the COVID-19 vaccine. Appellees make

no attempt to explain how advocacy for informed consent can simultaneously be part of Ms. Brink's ordinary job duties for the purposes of the *Pickering* balance and an inappropriate topic for anyone involved with the school, such that it warrants termination. They fail to explain how Ms. Brink was, at the same time, imbued with a high degree trust, yet not trustworthy enough to share properly sourced, government approved information about the COVID-19 vaccine.

Appellees repeatedly misrepresent Ms. Brink's allegations. They frame the violation as "declin[ing] her request to utilize the District's email platform and forum to disseminate vaccine information to District staff and serve as a vaccine resource for the District" and reference ¶¶ 449-457 of the SAC. The SAC does not include any derivation of the word "decline." The allegation does include all of Ms. Brink's discrete episodes of speech, restraint of that speech, retaliation for speech that was made, and retaliation for requesting to speak.

**2. Unaddressed facts**

There are a considerable number of pertinent facts which Ms. Brink alleged that Appellees have left unaddressed. For example, (1) Ms. Brink has a long-standing, 20-year personal relationship with the Rumson School District. (2) Ms. Brink's role as a substitute was purely ministerial. (3) Ms. Brink began working in September 2020 but did not speak on COVID-related concerns until December 2020. (4) Ms. Brink drafted and sent emails, did research, and communicated on topics of public concern during her off work hours. (5) Ms. Brink spoke to many

people about topics of public concern who were outside any perceived "chain-of-command." (6) Ms. Brink was concerned for her license and spoke out specifically about potentially unlawful polices, procedures, and protocols, even mentioning quarantine laws and privacy laws like FERPA because she thought there was potential for harm. (7) Ms. Brink was given no formal training in School Law or COVID-19.

**3. Stretched case law**

Appellees reference well-established precedent and very salient legal theory established by case law to support the idea that a contract does not have to exist in order to find a relationship analogous to an employer-employee for the purposes of the *Pickering* balance test, but acknowledge that none can be found that fit the facts of this case. They cite only two cases to support this theory, but both are distinguished. *Board of County Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 678 (1996) and *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011).

*Umbehr* is emphatically limited in scope and applies to an independent contractor who has a direct, contractual relationship with county government. The government created the contractual relationship and the government has the power to terminate the contractual relationship because of the contract. Appellees attempt

to shoehorn Ms. Brink into the role of independent contractor or subcontractor by ignoring the statutory definitions, the ESS contract, and the basic facts.

In terms of public contracting in New Jersey, a subcontractor is clearly defined. It is a business organization that knowingly enters into a contract for provision of goods, performance of services, or construction of a construction project. A subcontractor must have a business registration certificate. Appellees assertion that N.J.S.A. 52:32-44 only applies to construction projects is inaccurate. N.J.S.A. 52:32-44 is also known as the "business registration law" and dates back to at least 2004 under *P.L.* 2004, *c.* 57. Its purpose is to require certain government agency contractors and their affiliates to collect State use tax. The New Jersey School Board Association has this to say about N.J.S.A 52:32-44 on page 487 of their book Basic School Law. Asher, K. (2019). Basic School Law 2019

> "A contractor must also obtain proof of any subcontractor's business registration, and forward it to the board. The board must file all business registrations received with the other procurement documents related to the contract. The law applies to all contracts for goods and services, as well as professional services, regardless of the method of procurement."

Perhaps focusing on the statutory definition of subcontractor is an exercise in hair-splitting for the purposes of this case. If what is relevant is the relationship between employer and employee, that relationship is readily defined by the ESS contract and expanded upon in the Second Amended Complaint.

In regard to *Clairmont v. Sound Mental Health*, 632 F.3d 1091 (9th Cir. 2011) Appellees misunderstand Ms. Brink's argument regarding the contracts. Ms. Brink does not allege that no contract exists in this case that is similar to the one in *Clairmont*. On the contrary, Ms. Brink seeks to compare the contract between the Municipal Court and SMH in *Clairmont* to the existing contract between the Rumson Board of Education and ESS in this case, which she does in the Appellant Brief. These are the differences the 9th Circuit addressed in their Opinion. One pertinent difference that bears repeating is that SMH was the sole provider of Treatment program services in the Municipal Court, of which Mr. Clairmont was the Manager. If SMH through Clairmont did not provide services, services would not be available to the public. This is why the court reasoned that "the balance tips in favor of treating Clairmont as a public employee for the purposes of determining whether he has alleged a viable First Amendment retaliation claim." *Clairmont*, 632 F. 3d at 1102.

The contract and relationship between the Municipal Court and SMH and Municipal Court and Mr. Clairmont, are very different from the contract and relationship between the Rumson Board of Education and ESS and Rumson and Ms. Brink. Ms. Brink was a substitute nurse in a ministerial role acting under the

guidance of publicly employed, certified school nurses. She had no managerial or decision-making power. She was not imbued with the high degree of trust that the Appellees and lower court assert. Any perceived personal involvement with students, faculty, and administration is because of her existing relationship with the school, by and through her Mother's employment of 20 years.

**4. Unaddressed case law**

*Garcetti* warns against excessively broad job descriptions. *Lane*, building on *Garcetti*, rejects the idea that speech is unprotected because it concerns information acquired by virtue of public employment. Surely, Ms. Brink was speaking out about policies, procedures, and her experiences working in the school, but that does not make such speech unprotected. Such a rule would eviscerate the First Amendment rights of anyone working in the public setting. In *Williams v. City of Allentown,* 804 F. App'x 164 (3d Cir. 2020) this Court stated "If we construed William's official duties to include all speech related to the City's rules and policies, we would be permitting the type of excessively broad job descriptions that the Supreme Court cautioned against in *Garcetti.*" Appellees do not explain how or why School Law or COVID-19 policy speech was part of Ms. Brink's ordinary job duties when such knowledge was not a prerequisite for the job and she received no such training on the topics.

Ms. Brink offers a number of Third Circuit precedential cases in the Appellee Brief to demonstrate the fact-intensive nature of this Circuit's "ordinary job duty" framework. *See Flora, Javitz, De Ritis*. Appellees offer *Dennison v. Indiana University of Pennsylvania,* No. 22-2649 (3d Cir. Dec. 12, 2023) which is distinguished because Dennison was the Director of Residence Life responsible for design and implementation of a virtual checkout process. Ms. Brink had no design, implementation or decision-making power.

### B. Ms. Brink Has Plausibly Stated A Claim For Viewpoint Discrimination Because Each Element Has Been Met And Supported With Evidence.

Because many of the elements are the same across First Amendment claims, they will not be belabored again here. Suffice it to say that it is confounding how Appellee Bormann can explicitly state that he terminated Ms. Brink for "requesting to send anti-vaccination guidance to staff" yet the lower court finds that his reasoning for restricting Ms. Brink's use of the email sever was view-point neutral because the discriminatory reason came after she was terminated. The lower court provides no precedent to support this reasoning and Ms. Brink can find none.

What is clear, is that the subject matter of the COVID-19 vaccination was freely discussed on the email server without restriction. Ms. Brink's view, which was perceived to be "anti-vaccination", was restricted. *Rosenberger v. Rector and Visitors of Univ. of Va.,* 515 US 1995 states "When the government targets not subject matter, but particular views taken by the speakers on a subject, the violation

of the First Amendment is all the more blatant." Furthermore, the lower court conclusively states that "no other School District member had sent a similar email on the server" which is a fact outside the record and should not be the basis of dismissal.

Finally, Appellees cite to *Perry Ed. Assn. v. Perry Local Educators' Assn* 460 U.S. 37, 47 (1983) for its application to email as a public forum. This is incorrect. *Perry* concerned the internal physical mail system of a school to which the general public did not have access. Rumson School District's email system is open to the public. Anyone, at any time, can email nearly all employees. Staff members were discussing non-work-related issues freely, including COVID-19 vaccination, on the server. The server was, in essence, a public forum. Bormann himself opened the forum when he began routinely emailing the staff about the COVID-19 vaccination, sending names to the DOH, joking about getting pregnant or becoming a smoker to gain an advantage, and allowing others to share their personal vaccination views and experiences. Appellees would like to describe this as "general operations of the District," but it appears more like members of the public engaging in dialogue than employees engaged in work-related discourse.

## III. CONCLUSION.

This case is about more than just a substitute nurse getting fired for sharing her concerns and opinions. This is about a third-party nurse being used outside her employer's contractual scope and outside the scope of the law. Ms. Brink spoke up because she felt pressured and because she saw the potential for harm to children. Rather than addressing her concerns, she was silenced and removed.

Third-Party, temporary employees are some of the most vulnerable in the workforce. They receive lesser pay, fewer benefits, and often have little recourse. Appellees took advantage of this, and Ms. Brink suffered the consequences. This action was her only recourse.

For all the reasons described above, this Court should reverse the order of the district court dismissing this case and remand for further proceedings.

Respectfully submitted,

Jessica Brink (*Pro Se*)
8 Gordon Court
Port Monmouth, NJ 07758
Tel.: (732) 492-4690

## Statutes and Administrative Code Reproduced

**52:32-44 Definitions relative to registration of certain businesses; registration requirements.**

1. a. For the purposes of this section:

"Bid" or "request for proposal" means a publicly advertised, formal process used by a contracting agency to receive offers to provide goods or services or construct a construction project. It is not the same as an informal, non-advertised process of requesting quotations from contractors.

"Bid threshold" means the statutory amount over which a contracting agency must seek bids.

"Business organization" means an individual, partnership, association, joint stock company, trust, corporation, or other legal business entity or successor thereof, but does not include a government agency or organization organized as a nonprofit entity under 26 U.S.C. sec. 501 (c);

"Business registration" means a business registration certificate issued by the Division of Revenue in the Department of the Treasury or such other form of verification or proof of registration as may be approved by the Division that a contractor or subcontractor is registered with the Department of the Treasury;

"Contract" means any agreement, including but not limited to a purchase order or a formal agreement for the provision of goods, performance of services, or construction of a construction project, which is a legally binding relationship enforceable by law, between a contractor and a contracting agency that agrees to compensate the contractor, as defined by and subject to the terms and conditions of the agreement; and where the goods that are received, services that are delivered, and construction is constructed is within the geographic borders of the State of New Jersey; and where:

(1) the value of a single contract with the contractor is in excess of 15 percent of the amount of the contracting agency's bid threshold; or

(2) when the aggregate amount of contracts with the contractor, during the fiscal year of the contracting agency, exceeds 15 percent of the amount of the contracting agency's bid threshold.

"Contractor" means a business organization that seeks to enter, or has entered into, a contract with a contracting agency;

"Contracting agency" means the principal departments in the Executive Branch of the State Government, and any division, board, bureau, office, commission or other instrumentality within

or created by such department, or any independent State authority, commission, instrumentality or agency, or any State college or university, any county college, or any local unit;

"Local unit" means any contracting unit as defined pursuant to section 2 of P.L.1971, c.198 (C. 40A:11-2), any board of education as defined pursuant to N.J.S.18A:18A-2, a private firm that has entered into a contract with a public entity for the provision of water supply services pursuant to P.L.1995, c.101 (C.58:26-19 et al.), a private firm or public authority that has entered into a contract with a public entity for the provision of wastewater treatment service pursuant to P.L.1995, c.216 (C.58:27-19 et al.), and a duly incorporated nonprofit association that entered into a contract with the governing body of a city of the first class for the provision of wastewater treatment services pursuant to P.L.1995, c.216 (C.58:27-19 et al.);

"Subcontractor" means any business organization that is not a contractor that knowingly enters into a contract, or constructs a construction project, with a contractor or another subcontractor in the fulfillment of a contract issued by a contracting agency. In the case of a construction contract, "subcontractor" shall mean only those subcontractors who are required by law to be named in the submission of a bid.

b. A contractor shall provide the contracting agency with the business registration of the contractor and that of any named subcontractor prior to the time a contract, purchase order, or other contracting document is awarded or authorized. At the sole option of the contracting agency, the requirement that a contractor provide proof of business registration may be fulfilled by the contractor providing the contracting agency sufficient information for the contracting agency to verify proof of registration of the contractor, or named subcontractors, through a computerized system maintained by the State.

c. A subcontractor named in a bid or other proposal made by a contractor to a contracting agency shall provide a copy of its business registration to any contractor who shall provide it to the contracting agency pursuant to the provisions of subsection b. of this section. No contract with a subcontractor shall be entered into by any contractor under any contract with a contracting agency unless the subcontractor first provides the contractor with proof of a valid business registration. For bids and requests for proposals, the contracting agency must retain the proof of business registration in the file where documents relating to the contract are maintained. For all other contracts, proofs of business registration shall be maintained in an alphabetical file.

d. The contractor shall maintain and submit to the contracting agency a list of subcontractors and their addresses that may be updated from time to time during the course of the contract performance. A complete and accurate list shall be submitted before final payment is made for goods provided or services rendered or for construction of a construction project under the contract. A contracting agency shall not be responsible for a contractor's failure to comply with this subsection.

e. The Department of the Treasury shall provide each contracting agency with appropriate language reflecting the obligations of contractors and subcontractors under this section that the contracting agency shall include in any contract document, bid specification, requests for proposals, or other documents notifying potential contractors of contract opportunities with a contracting agency.

f. Nothing in this section shall in any way alter the provisions or change the responsibilities or obligations of casino industry licensees as set forth in section 92 of P.L.1977, c.110 (C.5:12-92).

g. (1) A contractor or a contractor with a subcontractor that has entered into a contract with a contracting agency, and each of their affiliates, shall collect and remit to the Director of the Division of Taxation in the Department of the Treasury the use tax due pursuant to the "Sales and Use Tax Act," P.L.1966, c.30 (C.54:32B-1 et seq.) on all their taxable sales of tangible personal property delivered into this State.

(2) A contracting agency entering into a contract with a contractor, or a contractor with a subcontractor, shall include in its contract with that contractor, or a contractor with a subcontractor, for the term of the contract, a requirement that the contractor or subcontractor and each of their affiliates shall collect and remit to the Director of the Division of Taxation in the Department of the Treasury the use tax due pursuant to the "Sales and Use Tax Act," P.L.1966, c. 30 (C.54:32B-1 et seq.) on all their sales of tangible personal property delivered into this State.

(3) For the purposes of this subsection, "affiliate" means any entity that (1) directly, indirectly, or constructively controls another entity, (2) is directly, indirectly, or constructively controlled by another entity, or (3) is subject to the control of a common entity. For purposes of this subsection an entity controls another entity if it owns, directly or individually, more than 50% of the ownership interest in that entity.

h. The State Treasurer may adopt regulations pursuant to the "Administrative Procedure Act", P.L.1968, c.410 (C.52:14B-1 et seq.) as are necessary to administer the provisions of this act.

i. If a contractor fails to provide proof of business registration upon request by the contracting agency for a contract that does not require bidding or a request for proposals, and the contracting agency determines that the purpose of that contract is of a proprietary nature with a contractor that does not have a business presence in New Jersey, the contracting agency shall provide the Division of Revenue, within 10 days of executing the contract, a copy of the contract, evidence of the contractor's taxpayer identification number, and a signed certification attesting to the proprietary nature of the contract and representing that the contracting agency made a diligent effort to obtain proof of a business registration from the contractor.

j. When a contracting agency enters into a contract with a contractor under a contract issued by State of New Jersey Cooperative Purchasing Program, or any other authorized cooperative purchasing system, the contracting agency awarding the initial contract shall receive and file the

proof of business registration. Contract documents issued under a cooperative purchasing agreement shall identify the contract and the contracting agency awarding the contract.

k. In situations of an emergent nature, a contracting agency may enter into a contract with a business organization, provided that the contractor agrees to provide a business registration within two weeks of the execution of the contract. The contracting agency shall not pay the business organization for goods or services provided until such time as the organization provides proof of business registration as set forth in this section. Failure to pay the business organization until proof of business registration is received shall not be grounds for the agency being liable for payment.

L.2001, c.134, s.1; (Title amended 2004, c.57, s.2); amended 2004, c.57, s.3; 2009, c.315, s.2.

Link to document:
https://lis.njleg.state.nj.us/nxt/gateway.dll/statutes/1/46628/50778?f=templates&fn=default.htm&vid=Publish:10.1048/Enu

**18A:40-3.2 Findings, declarations relative to school nursing, clinical nursing services.**

1. a. The Legislature finds and declares that school nursing is a separate and distinct specialty within the nursing and educational professions and that therefore competence in specified areas of health and education is needed in order for school nurses to act as health advocates for school-age children.

b. The Legislature further finds and declares that medically fragile students are often diagnosed with medical conditions and life-threatening diseases, including cerebral palsy, seizure disorder, and other neurological diseases, that require mechanical ventilation and emergent intervention by providers of clinical nursing services while attending school. Medically fragile students who require clinical nursing services while attending school should expect and receive the same level of care they receive at home. Maintaining a continuity of care for medically fragile students creates a safer environment at school, fosters learning, and gives parents confidence that their children's medical needs are being met by qualified health care providers. Currently, there are no standards of practice in place for providers of clinical nursing services. As a result, the quality of care medically fragile students receive in school is often inadequate to meet their health care needs. Therefore, it is in the public interest that, in order to guarantee the health and safety of medically fragile students while attending school, providers of clinical nursing services for such students meet the same qualifications as providers of clinical nursing services certified to participate in the State's Medicaid and NJ FamilyCare programs, and that parents should be given the option to choose the provider who will render clinical nursing services to their children while attending school, if the cost remains neutral to the school district.

L.1999, c.153, s.1; amended 2012, c.5, s.1.

Link to document:
https://lis.njleg.state.nj.us/nxt/gateway.dll/statutes/1/15891/18043?f=templates&fn=default.htm&vid=Publish:10.1048/Enu

# N.J.A.C. 6A:16-2.3

**Copy Citation**

This file includes all Regulations adopted and published through the New Jersey Register, Vol. 58 No. 8, April 20, 2026

- NJ - New Jersey Administrative Code PAW ET Table of ContentsTITLE 6A. EDUCATIONCHAPTER 16. PROGRAMS TO SUPPORT STUDENT DEVELOPMENTSUBCHAPTER 2. GENERAL PROVISIONS FOR SCHOOL HEALTH SERVICES

## § 6A:16-2.3 Health services personnel

**(a)** The district board of education shall appoint a school physician pursuant to N.J.S.A. 18A:40-1.

**1.** The school district shall conduct a criminal history background check on any physician before entering into an agreement for delivery of services.

**2.** The school physician shall be currently licensed by the New Jersey Board of Medical Examiners in medicine or osteopathy and shall have a training and scope of practice that includes child and adolescent health and development.

**3.** A contract between a school district and a school physician appointed pursuant to N.J.S.A. 18A:40-1 shall include a statement of assurance that the school physician has completed the Student-Athlete Cardiac Screening professional development module developed pursuant to N.J.S.A. 18A:40-41d and has read the sudden cardiac arrest pamphlet developed pursuant to N.J.S.A. 18A:40-41.

**4.** The school physician shall provide, at a minimum, the following services:

**i.** Consultation in the development and implementation of school district policies, procedures and mechanisms related to health, safety and medical emergencies pursuant to N.J.A.C. 6A:16-2.1(a);

**ii.** Consultation to school district medical staff regarding the delivery of school health services, which includes special health care needs of technology-supported and medically fragile children, including students covered by 20 U.S.C. §§ 1400. et seq., Individuals with Disabilities Education Act;

**iii.** Physical examinations conducted in the school physician's office or other comparably equipped facility for students who do not have a medical home;

**iv.** Provision of written notification to the parent stating approval or disapproval of the student's participation in athletics based upon the medical report;

**v.** Direction for professional duties of other medical staff;

**vi.** Written standing orders that shall be reviewed and reissued before the beginning of each school year;

**vii.** Establishment of standards of care for emergency situations and medically related care involving students and school staff;

**viii.** Assistance to the certified school nurse or noncertified nurse in conducting health screenings of students and staff and assistance with the delivery of school health services;

**ix.** Review, as needed, of reports and orders from a student's medical home regarding student health concerns;

**x.** Authorization of tuberculin testing for conditions outlined in N.J.A.C. 6A: 16-2.2(c);

**xi.** Review, approval, or denial with reasons of a medical home determination of a student's anticipated confinement and resulting need for home instruction; and

**xii.** Consultation with the school district certified school nurse(s) to obtain input for the development of the school nursing services plan, pursuant to N.J.A.C. 6A:16-2.1(b).

**(b)** The district board of education shall employ a certified school nurse to provide nursing services while school is in session pursuant to N.J.S.A. 18A: 40-1 and 3.3.

**1.** The certified school nurse shall work under the direction of the school physician and chief school administrator.

**2.** The certified school nurse shall receive training in airway management and in the use of nebulizers and inhalers consistent with nationally recognized standards including, but not limited to, those of the National Institutes of Health and the American Academy of Allergy, Asthma and Immunology.

**3.** The role of the certified school nurse shall include, but not be limited to:

**i.** Carrying out written orders of the medical home and standing orders of the school physician;

**ii.** Conducting health screenings, which include height, weight, blood pressure, hearing, vision, and scoliosis pursuant to N.J.A.C. 6A:16-2.2; and monitoring vital signs and general health status for emergent issues for students suspected of being under the influence of alcohol and controlled dangerous substances pursuant to N.J.S.A. 18A:40-4 and 18A:40A-12;

**iii.** Maintaining student health records, pursuant to N.J.S.A. 18A:40-4 and N.J.A.C. 6A:16-2.4;

**iv.** Recommending to the school principal students who shall not be admitted to or retained in the school building based on a parent's failure to provide evidence of the child's immunization according to the schedules specified in N.J.A.C. 8:57-4;

**v.** Annually reviewing student immunization records to confirm with the medical home that the medical condition for the exemption from immunization continues to be applicable, pursuant to N.J.A.C. 8:57-4.3;

**vi.** Recommending to the school principal exclusion of students who show evidence of communicable disease, pursuant to N.J.S.A. 18A:40-7, 8, and 10;

**vii.** Directing and supervising the emergency administration of epinephrine and glucagon, and training school staff designated to serve as delegates, pursuant to N.J.S.A. 18A:40-12.6 and 12.14;
**viii.** Administering asthma medication through use of a nebulizer;
**ix.** Directing and supervising the health services activities of any school staff to whom the certified school nurse has delegated a nursing task;
**x.** Classroom instruction in areas related to health education pursuant to N.J.A.C. 6A:9B-14.3;
**xi.** Reviewing and summarizing available health and medical information regarding the student and transmitting a summary of relevant health and medical information to the child study team pursuant to N.J.A.C. 6A: 14-3.4(h);
**xii.** Writing and updating, at least annually, the individualized health care plans and the individualized emergency healthcare plans for students' medical needs, and instructing staff as appropriate;
**xiii.** Writing and updating, at least annually, any written healthcare provisions required under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.(a), for any student who requires them;
**xiv.** Assisting in the development of and implementing healthcare procedures for students in the event of an emergency;
**xv.** Instructing teachers on communicable disease and other health concerns, pursuant to N.J.S.A. 18A:40-3; and
**xvi.** Reviewing completed health history update questionnaires and sharing with the school athletic trainer for review, if applicable, pursuant to N.J.S.A. 18A:40-41.7; and
**xvii.** Providing other nursing services consistent with the nurse's educational services certification endorsement as a school nurse issued by the State Board of Examiners and current license approved by the State Board of Nursing.
**(c)** School districts may appoint a noncertified nurse under the supervision of a certified school nurse to supplement the services of a certified school nurse provided that:

**1.** The noncertified nurse shall be assigned to the same school building or complex as the certified school nurse pursuant to N.J.S.A. 18A:40-3.3.a.
**2.** A noncertified nurse is limited to providing services only as permitted under the noncertified nurse's license issued by the State Board of Nursing.

## History

**HISTORY:**

Amended by R.2002 d.134, effective May 6, 2002.
See: 34 N.J.R. 355(a), 34 N.J.R. 1667(a).
In (e), amended N.J.A.C. reference; added (g) and (h).
Repeal and New Rule, R.2006 d.366, effective October 16, 2006.
See: 38 N.J.R. 2294(a), 38 N.J.R. 4411(c).
Section was "Required school health services".
Amended by R.2007 d.184, effective June 4, 2007.
See: 39 N.J.R. 294(a), 39 N.J.R. 2243(a).
In (d)3viii, deleted "educational services certification endorsement as a school nurse issued by the State Board of Examiners and" following "nurse's".
Amended by R.2014 d.047, effective March 17, 2014.
See: 45 N.J.R. 987(a), 46 N.J.R. 505(a).
Rewrote the section.
Administrative change.
See: 46 N.J.R. 1743(a).
Amended by R.2015 d.158, effective October 5, 2015.
See: 47 N.J.R. 569(a), 47 N.J.R. 2492(b).
Added new (a)3; recodified former (a)3 as (a)4; in (a)4iii, deleted "or whose parent has identified the school as the medical home for the purpose of the sports physical examination" following "home"; in (b)3ii, substituted "18A:

40A-12" for "12"; added new (b)3xvi; and recodified former (b)3xvi as (b)3xvii.

Amended by R.2021 d.073, effective July 19, 2021.

See: 53 N.J.R. 197(a), 53 N.J.R. 1216(a).

In (b)3x, updated the N.J.A.C. reference; and in (b)3xi, deleted "for the meeting" following "team".

NEW JERSEY ADMINISTRATIVE CODE

Copyright © 2026 by the New Jersey Office of Administrative Law

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of April 2026, I sent for filing by UPS the foregoing to the Clerk of the Court of the United States of Appeals for the Third Circuit at 21400 United States Courthouse, 601 Market Street, Philadelphia, PA 19106-1790 and a copy was sent by electronic mail to Sharyn Gallatin, Esq. SGallatin@lenoxlaw.com and by UPS to 136 Franklin Corner Road, St. 2B Lawrenceville, NJ 08648.

*Pro se*
Jessica M. Brink
8 Gordon Court
Port Monmouth, NJ
07758
Phone: (732) 492-4690
Email: jessb11@me.com

JESSICA BRINK
(732) 492-4690
8 GORDON CT
PORT MONMOUTH NJ 07758

3 LBS 1 OF 1
SHP WT: 3 LBS
DATE: 20 APR 2026

SHIP TO:
ATTN CLERK OF THE COURT
US COURT OF APPEALS 21400
601 MARKET ST

PHILADELPHIA PA 19106-1729

PA 191 9-65

UPS GROUND
TRACKING #: 1Z A58 E36 03 2166 5162

BILLING: P/P

REF #2: PDR

MMGXHPA5GUT25 ISH 13.00C ZZP 450 16.5V 04/2026

The UPS Store Smart Label
Tracking #
1ZA58E36032166 5162